SPENCER FANE, LLP
DAVID L. PINKSTON (6630)
P. MATTHEW COX (9879)
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145
Telephone: (801) 521-9000
Email: dpinkston@spencerfane.com
        mcox@spencerfane.com
-and-
ERIC PETERSON (MO Bar No. 62429) (Admitted Pro Hac Vice)
1 North Brentwood Boulevard, Suite 1200
St. Louis, MO 63105
Telephone: (435) 673-8288
Facsimile: (435) 673-1444
Email: epeterson@spencerfane.com
-and-
RICHARD F. HOLLEY (NV Bar No. 3077) (Admitted Pro Hac Vice)
R. MCKAY HOLLEY (18957)
300 South Fourth Street, Suite 950
Las Vegas, Nevada 89101-6019
Telephone: (702) 408-3400
Facsimile: (702) 408-3401
Email: rholley@spencerfane.com
        mholley@spencerfane.com
*Attorneys for the Fox Family of Companies*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 24-25849 (PH) |
| | (Chapter 11) |
| APPLIED MINERALS, INC, | |
| | Hon. Peggy Hunt |
| Debtor. | Hearing Date: October 15, 2025 |
| | Hearing Time: 9:00 a.m. |

**OBJECTION TO CONFIRMATION OF JOINT PLAN OF REORGANIZATION
PROPOSED BY (A) THE DEBTOR, AND (B) HALLOYSITE INVESTMENT, LLC**

Brady McCasland, Inc. ("BMI"), Old Red H2S Scavenger, LLC ("Ole Red"), and BMI Minerals Company ("BMI Co." and collectively with BMI and Ole Red, the "Fox Family Companies") by and through its undersigned counsel, hereby files this Objection (the "Objection") to Confirmation of Joint Plan Of Reorganization Proposed By (A) The Debtor, And (B) Halloysite Investment, LLC, dated August 11, 2025 (as amended) [Docket No. 178] (the "Joint Plan"). This Objection is brought on the following grounds and for the following reasons:

## I.       Introduction

The Joint Plan does not satisfy the requirements under 11 U.S.C. § 1129. Specifically, the Joint Plan fails to comply with § 1129(a)(1), (a)(3), and (a)(11). The Joint Plan fails to comply with subsection (a)(1) because it proposes to reject contracts that are not susceptible to rejection and provides for impermissible waivers and releases to third parties and nonfiduciaries as noted in the objection by the United States Trustee. The Joint Plan fails to comply with subsection (a)(3) because there is no reasonable likelihood that the Joint Plan will achieve results consistent with the objectives and purposes of the Bankruptcy Code. Finally, the Joint Plan fails to comply with subsection (a)(11) because the Debtor's current and historical performance, irrespective of the unsupported and unsubstantiated future projections, will ultimately lead to the reorganized debtor seeking further financial reorganization or liquidation.

## II.       Statement of Relevant Facts

BMI started purchasing iron oxide from the Debtor in 2016. By the third quarter of 2021, the Debtor began marketing for sale its iron oxide mineral rights and related assets, including the Alpine Mill, ("Iron Oxide Assets") to fund the development of its halloysite clay business. *See* Unanimous Written Consent of the Board of Directors of Applied Minerals, Inc. ("Board

Resolution").[1] On or around February 11, 2022, the Debtor entered a Letter of Intent ("LOI") with BMI Co. to sell its Iron Oxide Assets for $2 million. *Id.* On February 16, 2022, the Debtor sent the terms of the LOI to Tintic Copper and Gold, Inc. ("Tintic") to allow Tintic the opportunity to exercise its contractual right of first offer to purchase the Iron Oxide Assets for the same price offered to BMI Co. *Id.* Tintic declined to exercise its contractual right of first offer. *Id.* After months of negotiations, on May 31, 2022, the Debtor, BMI, and BMI Co. finalized the sale of the Iron Oxide Assets through four agreements and related ancillary agreements and exhibits: the Iron Sale Agreement,[2] the Mill Sale Agreement,[3] the Mining Operations Agreement,[4] and the Milling Operations Agreement[5] (collectively referred to as the "Four Agreements"). *Id.* The Debtor's Board of Directors, including Christopher T. Carney and Geoffrey G. Scott, approved the sale of the Debtor's Iron Oxide Assets via the Four Agreements, determining it was "in the best interest of the Company, its shareholders, and other stakeholders." *Id.*

Consistent with the Iron Sale Agreement, and at the direction of its Board of Directors, the Debtor executed a general warranty deed ("General Warranty Deed") conveying certain iron oxide rights to BMI Co.[6] Pursuant to the General Warranty Deed, the Debtor granted BMI Co. "one hundred percent (100%) interest in and to the Iron Oxide Minerals and the Iron Oxide Rights." The General Warranty Deed defines Iron Oxide Minerals as "the iron oxide within the Mining Claims but shall exclude iron oxide intermingled with any economically recoverable deposit of

---

[1] A true and correct copy is attached as Exhibit A.
[2] A true and correct copy is attached as Exhibit B.
[3] A true and correct copy is attached as Exhibit C.
[4] A true and correct copy is attached as Exhibit D.
[5] A true and correct copy is attached as Exhibit E.
[6] A true and correct copy is attached as Exhibit F.

Halloysite." It defines Iron Oxide Rights as "rights reasonably necessary or useful for (i) access to (ingress and egress) to the Mining Claims, exploration for, drilling, mining, crushing, permitting, producing, removing, processing, bagging, testing, analyzing, storing in bags, piles, or otherwise (including the creation of waste piles), handling treating, disposing, containing, selling, vehicle parking for third party suppliers and others, communications equipment used for, and shipping of Iron Oxide Minerals . . . and (ii) the construction, repair, and/or use of buildings, sheds, fixtures, equipment, and personal property or similar in connection with any of the foregoing." The General Warranty Deed further provides that if "the Iron Oxide Rights may be deemed to be an easement, it is the intention of the Parties that such be deemed easements of necessity and to run with the land." The General Warranty Deed declares that the Iron Oxide Minerals and the Iron Oxide Rights are the dominant estates.

Consistent with the Mill Sale Agreement, and at the direction of its Board of Directors, the Debtor executed a ground lease with BMI ("Ground Lease").[7] Pursuant to the Ground Lease, the Debtor granted BMI a leasehold interest in the "rights of the Property together with any and all appurtenances, rights, privileges and easements benefiting same." The Property encompasses the Alpine Mill and all patented and unpatented mining claims which are within a 100-foot radius of the Alpine Mill. The Alpine Mill and all improvements within the 100-foot radius of the Alpine Mill are the personal property of BMI. The Ground Lease has an initial term of one hundred years, with BMI retaining the right to renew the Ground Lease for an additional one hundred years via ten consecutive ten-year renewal periods. BMI prepaid the rent for the entire initial term.

---

[7] A true and correct copy is attached as Exhibit G.

During this same time, the Debtor, BMI, and BMI Co. executed ancillary agreements with BMI and BMI Co. to induce BMI and BMI Co. to enter the Four Agreements, and which form part of the underlying transaction to sell the Iron Oxide Assets. In the first agreement, dated July 1, 2022 ("July 1 Agreement"), the Debtor, Carney and Scott in their individual capacities, and a majority of the Series A Notes and Series 2023 Notes ("Noteholders") entered the July 1 Agreement to induce BMI and BMI Co. to remove certain provisions in the Four Agreements that required the elimination of the outstanding balance of the Series A Notes and Series 2023 Notes. The Debtor, Carney and Scott, and the Noteholders agreed to "take reasonable actions necessary to protect the interests of BMI and BMCO as described in the Four Agreements," including not taking or supporting any adverse actions against BMI or BMI Co.'s interests in any bankruptcy case.[8] The July 1 Agreement ensured that a majority of the sale proceeds would go to the Debtor's creditors and not to former directors of the Debtor. Id. The July 1 Agreement was supplemented by a subsequent agreement dated Augst 5, 2022 ("Letter Agreement"), which affirmed the terms of the July 1 Agreement.[9]

Finally, BMI holds confidential trade secrets that it disclosed to the Debtor and Carney as necessary to facilitate the Milling Operations Agreement. Prior to the disclosure, Carney, on behalf of the Debtor, acknowledged that the Debtor would not disclose or discuss BMI's confidential trade secrets with anyone, and further acknowledged that the Debtor would destroy all confidential information and continue to not disclose BMI's trade secrets once the Debtor ceased to be a vendor for BMI ("Trade Secret Agreement").[10]

---

[8] A true and correct copy is attached as Exhibit H.
[9] A true and correct copy is attached as Exhibit I.
[10] A true and correct copy is attached as Exhibit J.

5

BMI and BMI Co. have never exercised their rights under the Milling Operations Agreement or the Mining Operations Agreement.

**Chapter 11 Plan**

On August 11, 2025, the Debtor and Halloysite Investment, LLC filed their Joint Plan [Docket No. 178]. The Joint Plan provides that the Debtor is rejecting "any and all executory contracts and unexpired leases that have not been either assumed or rejected prior to the Effective Date." *Id.* p. 45 of 78. The Joint Plan specifically identifies "any and all contracts between the Debtor and BMI Minerals Company, BMC Minerals Company, Brady McCasland, Inc., Richard Fox, Brady McCasland and/or any of their affiliates, including (without limitation) (i) the Mining Operations Agreement, (ii) the Milling Operations Agreement, (iii) any ground lease, and (iv) any and all letter agreement(s)." *Id.*

The funding of the Joint Plan consists of the following: (i) $600,000.00 principal—without factoring accrued interest—already provided through the DIP; (ii) $1,500,000.00 in cash to be disbursed to allowed Class 2 unsecured creditors within 60 days after the Effective Date; (iii) $600,000.00 set aside for Class 2 unsecured creditors who (1) do not wish to receive New Stock in the Reorganized Debtor or (2) who elect a Put Option to receive a pro rata distribution three years after the Effective Date; and (iv) $650,000.00 to fund the Debtor's operations, pay administrative expenses, and pay $70,000 to Class 10 Convenience Claims within 60 days of the Effective Date. *See* p. 7 of 124, Exhibit A to Order Approving Disclosure Statement With Respect to Debtor and Halloysite Investment, LLC's Joint Plan of Reorganization [Docket No. 233].

### III.    Legal Standard

A bankruptcy court can only confirm a chapter 11 plan if it complies with the applicable provisions of 11 U.S.C § 1129. *In re Paige*, 685 F.3d 1160, 1177 (10th Cir. 2012). The plan proponent carries the burden to demonstrate compliance with the provisions of § 1129 by a preponderance of the evidence. *Id.*

### A.    The Joint Plan Does Not Comply With 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) requires a proposed plan to comply "with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). "[C]ourts have held that § 1129(a)(1) requires that a plan comply with §§ 1122 and 1123, which provisions govern classification and contents of a plan." *In re Castle Arch Real Estate Inv. Co.*, LLC, 2013 WL 2467974, at *3 (Bankr. D. Utah June 7, 2013). Section 1123(b)(2) provides that a plan may, subject to § 365, "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section." 11 U.S.C. § 1123(b)(2). Courts should apply the business judgment rule when determining whether a debtor may reject an executory contract or unexpired lease. Rejection of an executory contract or unexpired lease under § 365 does not rescind the contract, it merely operates as a breach, "giving the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 378–79 (2019) (noting that the estate cannot possess anything more than the debtor itself did outside of bankruptcy).

i.    <u>Executory Contracts</u>

A debtor's ability to reject a contract turns on whether the contract is executory, meaning that both sides have unperformed material obligations such that failure to perform on either side

would result in a material breach of the contract, excusing performance by the other side. *Olah v. Baird (In re Baird)*, 567 F.3d 1207, 1211 (10th. Cir. 2009) (formally adopting the Countryman definition of executory contracts within the Tenth Circuit; *Tak Broadcasting Corp. v. Trinity Broadcasting of Florida, Inc. (Matter of Tax Broadcasting Corp.)*, 137 B.R. 728, 732 (W. D. Wis. 1992). Courts look to the purpose of the entire transaction when determining whether the remaining contractual obligations would constitute a material breach. *Lewis Brothers Bakeries Inc. v. Interstate Brand Corp. (In re Interstate Bakeries Corp.*, 751 F.3d 955, 963 (8th Cir. 2014) (noting that material breaches are those that go to the root or essence of the contract).

Here, the Joint Plan's proposal to reject certain contracts with BMI and BMI Co. runs afoul of §§ 1129(a)(1), 1123(b)(2), and 365(a)(1). For example, the July 1 Agreement, Letter Agreement, and Trade Secret Agreement are not executory contracts subject to rejection because, unlike the Debtor, BMI and BMI Co. have no remaining obligations. There is nothing BMI or BMI Co. could do that would constitute a breach of those agreements that would relieve the Debtor of its obligations under those agreements, including its obligations not to take or support adverse actions against BMI and BMI Co's interests or reveal or use BMI's confidential trade secrets.

BMI, BMI Co., and the Debtor executed many agreements and amendments during their business relationship, especially during the negotiation and sale of the Iron Oxide Assets. To the extent there are any further agreements the Debtor deems as executory contracts that are not otherwise included in its Schedule G, the Joint Disclosure Statement, or Joint Plan, the Debtor should be required to expressly identify such agreements and explain how they are executory and why they should be rejected. For the avoidance of doubt, however, BMI and BMI Co. do not object to the Debtor's rejection of the Milling Operations Agreement and Mining Operations Agreement.

ii.  Unexpired Leases

Section 365(h)(1) provides that a lessee to a rejected unexpired lease of real property can elect to "retain its rights under such lease . . . that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal" if the debtor is the lessor to the rejected unexpired lease. 11 U.S.C. § 365(h)(1)(A)(ii); *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 383 (2019) (noting how § 365(h) makes "clear that certain . . . lessees of real property . . . can continue to exercise rights after a debtor has rejected the lease").[11] The lessee's right to retain its rights under the lease after rejection exists whether the lessee is in constructive or actual possession of the property. *Stanley Station Assoc's, L.P. v. Fleming Companies, Inc. (In re Stanley Station Assoc's, L.P.*, 179 B.R. 682, 985 (Bankr. D. Kan. 1995).

BMI will retain its rights under the Ground Lease regardless of whether the Court authorizes the Debtor's rejection of the same by virtue of BMI's right under § 365(h)(1)(A)(ii). Given that BMI will exercise its rights and remain in possession of the premises for the remainder of the lease term and any subsequent renewal periods, it begs the question of whether the Debtor's election to reject the Ground Lease falls within the business judgment rule. Debtor's rights and obligations under the Ground Lease exist irrespective of whether it is rejected. For example, BMI retains the right to use, possess and quietly enjoy the premises while retaining the right to sublet or assign all or part of its interest in the Ground Lease without Debtor's consent. As such, the

---

[11] The Fox Family of Companies agree with Debtor and Halloysite that the Ground Lease is an unexpired lease as contemplated under § 365. To the extent the Court determines the Ground Lease is not an unexpired lease, it also does not qualify as an executory contract susceptible to rejection. *See San Francisco Market Corp. v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d 1179, 1184–85 (9th Cir. 1988) (noting that "[tenant's] failure to meet any of the remaining obligations under the Lease would not entitle [landlord] to reclaim the property").

Debtor remains obligated to not interfere with BMI's use of the premises "for any lawful purpose." As the owner of the Dragon Mine, the Debtor retains the obligation to pay taxes, utilities, and comply with all government laws and regulations. Rejection of the Ground Lease does not appear to provide any benefit to the Debtor and will not interfere with BMI's rights under the Ground Lease under § 365(h)(1)(A)(ii). Accordingly, the Ground Lease should not be rejected as the Debtor has not proven a good business judgment for doing so. BMI will retain its right to stay on the premises and use its own Mill regardless of assumption or rejection of the Ground Lease. If the Court allows the Debtor to reject the Ground Lease, any confirmation order must provide that BMI is electing its right under § 365(h)(1)(A)(ii) to stay in the premises for the remainder of the lease term. *See In re Wolf Creek Properties, LC*, No. 10-27816, 2012 WL 1985890, at *5 (Bankr. D. Utah, May 15, 2012).

   iii.   <u>Exculpation and Third-Party Releases</u>

     The exculpation provisions and related third-party releases in the Joint Plan are overly broad, precluding the feasibility of confirmation. The provisions cannot release claims against Scott and Halloysite, or Carney's prepetition conduct.

     The exculpation provisions in §§ 12.5 and 12.5.1 of the Joint Plan provide as follows:

**<u>Exculpation</u>**. The Exculpated Parties will neither have nor incur any liability to any person or entity for any Official Actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case, the investigations of potential claims or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Case, provided that, the foregoing shall not exonerate any of the Exculpated Parties from any liability that results from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct. In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their

respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any Official Actions made in good faith from and after the Petition Date through the Confirmation Date in connection with, relating to or arising out of the Chapter 11 Case or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Exculpated Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Exculpated Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, and (c) actions taken by Exculpated Parties who are holders of a Claim and are taking actions in pursuit of their allowance or payment of such Claim. The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the bankruptcy court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person or entity. For the avoidance of doubt and notwithstanding anything else herein, the foregoing exculpation shall be limited to parties that served as estate fiduciaries during the chapter 11 cases.

"Exculpated Parties" are defined in Section 1.46 of the Joint Plan as follows:

"Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtor, (b) Halloysite, and (c) their Related Parties, including, without limitation, their respective employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other representatives and professionals.

"Related Parties" are defined in Section 1.85 of the Plan as follows:

"Related Parties" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, investment committee members, special committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly),

affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, investment managers, and other professionals and advisors, each in their capacity as such, and any such person's or Entity's respective heirs, executors, estates, and nominees.

The exculpation provisions and related provisions, as proposed in the Joint Plan, are overbroad for several reasons. First, the exculpation provisions and the definitions of "Exculpated Parties" and "Related Parties" arguably cover parties who are not the debtor or "estate fiduciaries", such as: "employees, agents, financial advisers, accounts, investment bankers, consultants". These definitions are too broad. The exculpation clauses in the Joint Plan must be limited <u>only</u> to the debtor and estate fiduciaries, such as principals and officers of the debtor, as well as professionals of the Debtor, during the pendency of the bankruptcy case. Bankruptcy courts and Circuit Courts are generally in accord with that limitation. *See, e.g., In re Midway Gold US, Inc.,* 575 B.R. 475, 510–13 (Bankr. D. Colo. 2017) ("The U.S. Bankruptcy Court for the District of Delaware has held the fiduciary standard applicable only to estate fiduciaries includes the debtors' officers and directors who have served during the Chapter 11 case.") *Matter of Highland Cap. Mgmt., L.P.,* 48 F.4th 419, 437 (5th Cir. 2022) ("any exculpation in a Chapter 11 reorganization plan [must] be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties); *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 700-01 (E.D. Va. 2022) ("Exculpation is appropriate when it is solely limited to fiduciaries who have served a debtor through a chapter 11 proceeding."); *In re Washington Mutual, Inc.,* 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) ("[An] exculpation clause must be limited to the fiduciaries who have served during the chapter 11

12

proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers.")

The exculpation provisions may also render the plan unconfirmable in light of the Supreme Court's bar on non-consensual third-party releases in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 144 S. Ct. 2071 (2024). Further, these provisions potentially release future malpractice claims against the debtor's professionals, which is prohibited by Rule 1.8 of the Utah Rules of Professional Responsibility. In sum, because the exculpation provisions are overly broad, they render the Joint Plan unconfirmable.[12] In addition to the limitations of the exculpation and release provisions already in the plan, to the extent the Debtor and Halloysite modify the exculpation and release provisions, any confirmation order should explicitly state that Carney and Scott will not receive a release for any claims against them individually arising from their prepetition conduct and obligations. Additionally, Scott and Halloysite should not receive any release because they are third parties and are not fiduciaries of the estate.

**B.      The Joint Plan Does Not Comply With 11 U.S.C. § 1129(a)(3)**

Section 1129(a)(3) requires a plan to be "proposed in good faith and not by any means forbidden by law." *In re Paige*, 685 F.3d at 1178 (10th Cir. 2012). The "test of good faith under § 1129(a)(3) focuses on whether a plan is likely to achieve its goals and whether those goals are consistent with the Code's purposes." *Id.* at 1179. Courts have "considerable discretion in finding good faith, with the most important feature being an inquiry into the fundamental fairness of the

---

[12] This argument adopts the argument presented by the U.S. Trustee, in response to the Debtor's Disclosure Statement and the Disclosure Statement presented by the Fox Family of Companies. Because of the current uncertainty about provisional funding of the Department of Justice employees and the ability of the U.S. Trustee to timely object to the Joint Plan, the Fox Family of Companies asserts this argument.

plan." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001). One primary

purpose of the Code is "maximum recovery by and fair distribution to creditors." *In re Paige*, 685

F.3d at 1179. While a plan proponent's self-interested motive does not necessarily indicate a lack

of good faith, the proponent's actions and relationships can cause a plan to "be incapable of

achieving goals consistent with the Code." *Id.*

The Joint Plan was not proposed in good faith. The purpose behind the Joint Plan and this

Bankruptcy Case in general does not advance or seek maximum recovery by and fair distribution

to creditors, it is to provide Scott full control of the Reorganized Debtor as shown in the Amended

and Restated Bylaws [Docket No. 178, p. 68 of 78]. Pursuant to these bylaws, Halloysite (Scott)

is empowered to designate a Founder Director, who will remain in that capacity so long as

Halloysite retains at least 5% of the issued and outstanding shares. The Founder Director has the

"exclusive right to appoint or remove any other directors." The Founder Director, and any other

director appointed by the Founder Director, have the exclusive authority to determine their fees

and expenses. In short, Scott has unfettered power over the business and affairs of the Reorganized

Debtor.

Not only does Scott's unitary control of the Reorganized Debtor run afoul with maximizing

recovery and distribution to unsecured creditors, it shields prior directors and officers from

potential claims for their prepetition conduct. The Debtor and Halloysite repeatedly claim that BMI

and BMI Co. are the subject of potential avoidance actions worth as much as $10,000,000 for their

purchase of the Iron Oxide Assets, which was approved and unanimously ratified by the board of

directors. In fact, Carney negotiated the terms on behalf of the Debtor, which Scott approved as a

board member. The Debtor and Halloysite, however, make no reference to any potential claims the

14

Debtor may have against the directors and officers, including Scott and Carney, who negotiated

and approved the transaction. If the sale of the Iron Oxide Assets were so one-sided, then surely

the Debtor's directors and officers breached their fiduciary duties in negotiating and approving the

sale. If such a claim does exist, which the Debtor and Halloysite do not discuss in the Joint

Disclosure Statement, then it is highly unlikely that Scott will authorize the Reorganized Debtor

to pursue the claim against himself or Carney. *See In re Coram Healthcare Corp.*, 271 B.R. at 237

(determining that a plan was not proposed in good faith because the Debtor's CEO had an actual

conflict that precluded him from pursuing avoidance actions).

Further, based on the facts asserted by the Debtor since the beginning of the case, new and

existing customers are simply waiting for the Debtor to emerge from bankruptcy to place

significant orders. See, e.g., Docket No. 15, ¶¶ 40–49.  If true, then Scott, the chairman of the

Board of Directors until November 11, 2024, was apprised of these new and existing customer

plans to purchase significant amounts of halloysite clay. He would also have be apprised of that

information when he directed Halloysite and AMI to negotiate the terms of the DIP Loan

Agreement prior to his resignation as chairman.  If Scott and Carney used their insider knowledge

of the Debtor's new and existing customers—without prior disclosure to shareholders or

creditors—when concocting the plan to file bankruptcy to give Scott complete control of the

Reorganized Debtor, not only could it subject them to personal liability, but is bad faith preventing

confirmation of their proposed Joint Plan.

## C.  The Joint Plan Does Not Comply With 11 U.S.C. § 1129(a)(11)

Section 1129(a)(11) requires a plan to be feasible, meaning that the plan "must provide a

realistic and workable framework for reorganization" and confirmation will not be followed by a

liquidation or need for further financial reorganization. *F.H. Partners, L.P. v. Investment Co. of the Southwest, Inc. (In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298, 310–11 (B.A.P. 10th Cir. 2006). A court's determination that a plan offers a reasonable prospect of success and is workable "must be firmly rooted in predictions based on objective fact." *Id.* at 311.

In the last six (6) months, the Debtor has provided wildly different and unsupportable operating projections.  In the first Disclosure Statement filed on March 24, 2025, the Debtor attached as Exhibit 4, a Projected Statement of Operations for the years ending 2025 and 2029. *See* Docket No. 52, p. 34 of 36) ("Initial Statement of Operations").  In the Joint Disclosure Statement filed on August 11, 2025, the Debtor and Halloysite likewise attached as Exhibit 4, another Projected Statement of Operations for the years ending 2025 and 2029 (Docket No. 179, p. 54 of 63) ("Revised Statement of Operations). The Debtor's Initial Statement of Operations contained projections that have no factual or historical basis or support.  The Revised Statement of Operations reflects gross sales and profits that are five to six times greater than the Initial Statement of Operations.  "Glowing opinions or projections, having little or no basis in fact" are what lead to this bankruptcy case and will continue to lead to failure post confirmation.

In the Initial Statement of Operations filed by the Debtor, the Debtor projected gross sales by 2029 of $3,954,881 and EBITDAR of $3,068,179.  In the Revised Statement of Operations, the Debtor projects gross sales by 2029 of $18,279,350 and EBITDAR of $17,132,017.  Where this massive growth in revenue comes from is unsupported by any admissible evidence.  The Debtor's Revised Statement of Operations further reflects gross sales and profits that are five (5) to six (6) times greater than the Initial Statement of Operations that were offered in March 2025.  The Debtor has never achieved such productivity, even when it raised in excess of $32 million from investors,

and the Debtor does not explain the magical change in circumstances realized during these proceedings. Certainly, the Debtor's Monthly Operating Reports do not reveal the tsunami of new business. The Debtor's losses have continued to mount post petition. The Debtor's lengthy pre and post petition history is one of consistent, ongoing, and repeated loss after annual loss.

The Debtor and Halloysite likewise provide vastly different Enterprise Valuations between the first Disclosure Statement and the Joint Disclosure Statement, again with no explanation. Initially, the asserted Enterprise Value of the Debtor was estimated at between $7,479,431 and $10,495,573. *See* Docket No. 52, p. 36 of 36. There was no factual support for these projected valuations. Now, the Debtor and Halloysite assert that the Enterprise Value of the Debtor is between a whopping $19,217,237 and $25,458,251 [Docket No. 179, p. 63 of 63], with an unbelievable claim that the Enterprise Value could reach "approximately $40.4 million to $58.3 million." *Id.* p. 35 of 63. There is no factual or evidentiary support for these remarkable valuations, including without limitation, who prepared the valuations, their qualifications, or the methodology used to prepare the valuations.

Regarding the Revised Statement of Operations, the Debtor asserts, without any supporting evidence, that it will generate significant revenue from the sale of its halloysite clay, as much as $42,602,439.00 over the next five years. Docket No. 179, p. 54 of 63. This is approximately one hundred times more than its yearly revenue for 2024, which revenue was "a material increase from years 2023 and 2022." *Id.* p. 33 of 63. Nearly all this purported future revenue comes from a single new customer, Energy Storage. *Id.* p. 55 of 63. The Debtor provides no contract, letter of intent, or referenced "volume forecast estimates" to support its claim that Energy Storage will purchase this amount of halloysite clay by 2029. *Id.* p. 34 of 63. Of the Debtor's existing customers, the Debtor

17

only anticipates gross revenue of $3,609,434.00 over the next five years. *Id.* p. 55 of 63. Yet even these projections are fantastical and are inconsistent with the Debtor's historical sales.

The projections are also drastically inconsistent with the Debtor's operations while in bankruptcy. The Debtor and Halloysite do not provide any information in the Joint Disclosure Statement regarding the Debtor's post-petition operations.   The omission is easily explained, however.  Even operating with just one executive and a greatly reduced mining staff, the Debtor is unable to sell halloysite clay at a profit. *See* Monthly Operating Reports [Docket Nos. 33, 36, 55, 71, 111, 125, 153, 202, 248]. As noted above, During the bankruptcy case and through August 31, 2025, the Debtor operated at a cumulative loss of ($592,004.00). *Id.* The Debtor and Halloysite anticipate there will only be between $230,000 and $380,000 "to fund the Debtor's ongoing operations, including required equipment expenditures." [Docket 224, p. 9 of 53]. At its current rate, the Reorganized Debtor will run out of money within six months, leading to either a liquidation or further need for reorganization in contravention to § 1129(a)(11).

## **CONCLUSION**

For the foregoing reasons, the Court should deny confirmation of the Joint Plan.  In the alternative, any confirmation order should contain provisions protecting the interests of BMI and BMI Co. as indicated herein.  Also, the Fox Family of Companies reserve the right to join in and

argue in favor of any additional objection filed by other parties in interest.

DATED October 8, 2025.

SPENCER FANE, LLP

 /s/ P. Matthew Cox
David L. Pinkston
P. Matthew Cox
Eric Peterson (Admitted pro hac vice)
McKay Holley
Richard Holley (Admitted pro hac vice)
*Attorneys the Fox Family of Companies*

## CERTIFICATE OF SERVICE

The foregoing **OBJECTION TO CONFIRMATION OF JOINT PLAN OF REORGANIZATION PROPOSED BY (A) THE DEBTOR, AND (B) HALLOYSITE INVESTMENT, LLC** shall be served to the parties or record in this case, as identified below,  via the CM/ECF system:

Matthew M. Boley mboley@ck.law, krenak@ck.law
Elise M. Carter elise.carter@foley.com
Geoffrey S Goodman ggoodman@foley.com
Peter J. Kuhn Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov; Lindsey.Huston@usdoj.gov;
    Rinehart.Peshell@usdoj.gov; Rachelle.D.Hughes@usdoj.gov;
    Brittany.Dewitt@usdoj.gov
David W. Newman tr david.w.newman@usdoj.gov,
Ellen E. Ostrow eostrow@foley.com, ellen-ostrow4512@ecf.pacerpro.com;
docketflow@foley.com;geysa.peeler@foley.com
Jeffrey L. Trousdale jtrousdale@cohnekinghorn.com, mparks@ck.law;enilson@ck.law
United States Trustee USTPRegion19.SK.ECF@usdoj.gov
Aaron M. Waite aaronmwaite@agutah.gov
Gary T Wight gwight@agutah.gov
Melinda Willden tr melinda.willden@usdoj.gov,

/s/ P. Matthew Cox
P. Matthew Cox

# EXHIBIT A

**UNANIMOUS WRITTEN CONSENT OF
THE BOARD OF DIRECTORS OF
APPLIED MINERALS, INC.**

**July 21, 2022**

The undersigned, being all of the members of the board of directors (the "**Board**") of Applied Minerals, Inc., (the "**Company**"), a Delaware corporation, do hereby adopt the following resolutions by consent in lieu of a meeting:

WHEREAS, the Company has been struggling financially for years as it focuses on the development of its halloysite clay business. During 2021, the Board determined that if the Company were to continue developing its halloysite clay business, it would have to raise a significant amount of capital. The Board determined that the sale of the Company's iron oxide assets was the only realistic and feasible source of funding available to the Company. Management advised the Board that the sale of the Company's iron oxide resource could violate a negative covenant of both the Series A Notes and the Series 2023 Notes. Management determined and recommended that a waiver granted by the majority holders of the principal amounts of the Series A Notes and Series 2023 would be required to sell the Company's iron oxide resource;

WHEREAS, beginning in the third calendar quarter of 2021, the Company marketed the sale of its iron oxide resource and related assets;

WHEREAS, Provo Mining & Construction, Inc. ("PMC") expressed interest to management in making a significant equity investment in the Company and Brady McCasland, Inc. ("BMI") communicated to management of the Company an interest in potentially purchasing the iron oxide assets;

WHEREAS, in November 2022, PMC communicated to the management that it was interested in making an equity investment in the Company;

WHEREAS, on February 11, 2022, the Company entered into a Letter of Intent ("LOI") to sell its iron oxide assets to BMI Minerals Company ("BMCO") for $2 million, including a $100,000 down payment previously paid by BMI to AMI;

WHEREAS, on or around February 16, 2022, the Company sent a letter to Tintic Copper and Gold, Inc. ("Tintic") detailing the terms of the LOI as required by the terms of the Right of First Offer provision;

WHEREAS, on February 25, 2022, Tintic communicated to the Company that it would not exercise its Right of First Offer per the terms of the Second Amendment to and Replacement of Exploration Agreement with Option to Purchase entered into between the Company and Tintic on March 20, 2020;

1

WHEREAS, the Company and BMCO and its affiliate, Brady McCasland Inc., engaged in a months-long negotiation, which resulted in four agreements: the Iron Sale Agreement, Mill Sale Agreement, Mining Operations Agreement and Milling Operations Agreement and related exhibits and two amendments to those agreements (the "Mill Amendment Agreement" and the "Iron Amendment Agreement") (collectively referred to herein as the "Four Agreements");

WHEREAS, the Company and the holders of a majority of the principal amounts of the Series A Notes and the Series 2023 Notes engaged in a months-long negotiation. The negotiation resulted in, among other things, the majority holders of the principal amounts of both the Series A Notes and Series 2023 Notes waiving any event of default that may occur upon the closing of the Four Agreements. In exchange for the waivers, the Company, upon the closing of the Four Agreements, agreed to pay $375,000 to the majority holders of the principal amounts of the Series A Notes and $375,000 to the majority holders of the principal amounts of the Series 2023 Notes;

WHEREAS, management of the Company kept the Board apprised of its negotiations and the Board provided guidance to management throughout the negotiation process;

WHEREAS, the Board, having reviewed the Four Agreements (copies of which have been furnished to the directors), particularly the sale of the Company's iron oxide assets and the ground lease underlying the Mill and certain surrounding property, the provisions for continuing operating relationships between BMCO and its affiliates, and the waivers provided by the PIK Notes, believes that execution of the Four Agreements is in the best interest of the Company, its shareholders and other stakeholders;

WHEREAS, pursuant to the Iron Sale Agreement, the Board approves the issuance of 20 million shares of the Company's common stock to BMCO. The shares issued to BMCO will include a '33 Act Legend and will be issued at what the Company considers to be a fair market value;

WHEREAS, on March 31, 2022 the Company entered into a Letter Agreement with Provo Mining and Construction, Inc. ("PMC") agreeing to pay PMC $200,000 related to amounts owed to PMC under a Mining Services Agreement. Under the Letter Agreement, on April 1, 2022 the Company issued to PMC 4,444,444 restricted shares of common stock and agreed to pay PMC $10,000 per months for 10 consecutive months beginning April 2022. Furthermore, if on October 1, 2022 the 4,444,444 shares of common stock issued to PMC is worth less than $100,000, the Company agreed to true-up the shortfall through the issuance to PMC of additional shares of or the payment of cash to PMC;

WHEREAS, on June 14, 2022 Provo Mining & Construction, Inc. ("PMC") filed a Mining Services Lien on the Dragon Mine property for amounts owed by the Company to PMC as of June 14, 2022; and

WHEREAS, upon the Company entering into a Lien Settlement Agreement with PMC to have PMC release the lien and to satisfy all amounts owed to PMC by the Company, the Board approves the issuance of 17,777,777 shares of common stock to PMC. The shares issued to PMC will include a '33 Act Legend and will be issued at a price the Company considers to be a fair market value.

NOW THEREFORE,

RESOLVED, the Four Agreements approved and ratified on behalf of the Company and to the extent that that any such agreement has not been signed and delivered, the proper officers are directed to sign and delivers such agreement;

RESOLVED, that the Company is authorized to issue 20,000,000 million shares of Common Stock contemplated by the Iron Sale Agreement and the Board finds that the price per share ($0.005) is above market price and is fair to the Company;

FURTHER RESOLVED, the proper officers of the Company are, upon the closing of the Four Agreements, authorized to cause the issuance of duly executed share certificates for the 20,000,000 shares of common stock of the Company in such form as approved by the officers;

FURTHER RESOLVED, upon issuance and delivery of the shares of common stock of the Company in accordance with the Iron Sale Agreement, the shares of common stock will be duly and validly issued, fully paid and non-assessable shares of common stock of the Company; and

FURTHER RESOLVED, the proper officers of the Company are, upon execution and delivery of the Four Agreements, authorized and directed to perform or cause the performance of the Company's obligations under the Four Agreements.

RESOLVED, immediately prior to the closing of the Four Agreements, the Board will be expanded to six directors and Grant Fox will be appointed director until the next annual meeting of stockholders;

RESOLVED, in order to induce the Company to enter into and perform the Four Agreements and the Waivers, each of Mario Concha, John Levy, Robert Betz, Geoffrey Scott and Christopher Carney, upon the closing of the Four Agreements, relinquishes payment of all their accrued but unpaid Board Fees and Operations Committee Fees as those terms are used in AMI's 2021 Proxy Statement and Mr. Concha relinquishes payment of all compensation accrued but not paid during his tenure as CEO of AMI;

RESOLVED, each of Messrs. Concha, Levy and Betz, upon the closing of the Four Agreements, shall resign as directors of AMI; and

RESOLVED, the issuance of 17,777,777 shares of Common Stock to PMC in connection with a settlement agreement is hereby authorized and approved the shares of common stock will be duly and validly issued, fully paid and non-assessable shares of common stock of the Company and the Board finds that the price at which the stock is being issued ($0.004) is fair to the Company.


_____                    _____
Mario Concha                                        Robert Betz


_____                    _____
John F. Levy                                        Geoffrey G. Scott

_____
Christopher T. Carney


4

RESOLVED, the issuance of 17,777,777 shares of Common Stock to PMC in connection with a settlement agreement is hereby authorized and approved the shares of common stock will be duly and validly issued, fully paid and non-assessable shares of common stock of the Company and the Board finds that the price at which the stock is being issued ($0.004) is fair to the Company.


_____          _____
Mario Concha                              Robert Betz


_____          _____
John F. Levy                                Geoffrey G. Scott


_____
Christopher T. Carney

RESOLVED, the issuance of 17,777,777 shares of Common Stock to PMC in connection with a settlement agreement is hereby authorized and approved the shares of common stock will be duly and validly issued, fully paid and non-assessable shares of common stock of the Company and the Board finds that the price at which the stock is being issued ($0.004) is fair to the Company.


_____
Mario Concha

_____
John F. Levy

_____
Christopher T. Carney


_____
Robert Betz

_____
Geoffrey G. Scott

4

RESOLVED, the issuance of 17,777,777 shares of Common Stock to PMC in connection with a settlement agreement is hereby authorized and approved the shares of common stock will be duly and validly issued, fully paid and non-assessable shares of common stock of the Company and the Board finds that the price at which the stock is being issued ($0.004) is fair to the Company.


_____          _____
Mario Concha                                              Robert Betz


_____          _____
John F. Levy                                                Geoffrey G. Scott


_____
Christopher T. Carney

# EXHIBIT B

Iron sale 5-31 8 am

# IRON SALE AGREEMENT

### Applied Minerals, Inc.

### and

### BMC Minerals Company

### (Iron Oxide Minerals, Iron Oxide Rights and AMI Stock)

Iron sale 5-31 8 am

## Exhibits

| Exhibit | Title | Section |
|---|---|---|
| 1 | Mill Sale Agreement | Recitals |
| 2 | Lease | Recitals |
| 3 | Mining Operations Agreement | Recitals |
| 4 | Milling Operations Agreement | Recitals |
| 5 | Mining Claims | 1 |
| 6 | Second Amendment | 1 |
| 7 | Adverse Claim | 3.4(g) |
| 8 | Escrow Agreement | Article VI |
| 9 | Iron Warranty Deed | 6(c) |
| 10 | Bill of Sale | 6(c) |
| 11 | Noteholder Information | 6(d) |
| 12 | Foreign Corporation Certificate | 6(e) |

Iron sale 5-31 8 am

This AGREEMENT *("Iron Sale Agreement")* is made and entered into as of the 31st of May, 2022 by and between APPLIED MINERALS INC., a Delaware corporation, with a mailing address of 1200 Silver City Road, PO Box 432, Eureka, Utah 84628 *("AMI"),* and BMI MINERALS COMPANY, (*"BMC"*), a Missouri corporation having its principal place of business at 16640 Chesterfield Grove Road, Suite 170, Chesterfield, MO 63005.

AMI and BMC may be referred to herein collectively as the *"Parties"* or individually as a *"Party."*

## RECITALS

A. AMI owns the Mining Claims (as defined below) and it extracts and processes, or has processed by others, both Halloysite Clay ("Halloysite") and iron oxide for sale in a range of markets.

B. AMI desires to sell certain assets related to its iron oxide business while retaining certain assets related to its Halloysite business and BMC and its corporate parent Brady McCasland, Inc. ("BMI") desire to acquire certain assets related to AMI's iron oxide business.

C. To that end, four separate agreements as detailed below will be entered into among AMI, BMC and BMI.

D. This **Iron Sale Agreement** will transfer certain minerals, mineral rights, and AMI stock to BMC.

E. The **Mill Sale Agreement**, (Exhibit 1) will transfer to BMI the Mill and Related Equipment as those terms are defined in the Mill Sale Agreement and the parties will enter a ground lease relating to the Mill ("Lease," Exhibit 2).

F. The **Mining Operations Agreement** (Exhibit 3) will provide that AMI will provide mining services to BMC in accordance with that Mining Operations Agreement.

Iron sale 5-31 8 am

G. The **Milling Operations Agreement** (Exhibit 4) will provide that AMI will
provide iron-milling services to BMI in accordance with that Milling Operations
Agreement. These Milling services will be provided to BMI because after the
iron oxide is mined it will be transferred to BMI from BMC.

**ARTICLE I**
**DEFINITIONS**

"***AMI Stock***" means 20 million shares of authorized and unissued shares of common
stock of AMI, $0.001 par value.

"***Form 10-K***" means the Annual Report on Form 10-K filed by AMI with the Securities
and Exchange Commission for the year ended December 31, 2021.

**"*Iron Oxide Minerals*"** means the iron oxide within the Mining Claims, subject to the
Second Amendment, but shall exclude iron oxide intermingled with any economically
recoverable deposit of Halloysite. Iron Oxide Minerals do not include any iron oxide in
surface piles of minerals described in Note 10 to the financial statements in the 10-K.
The Iron Oxide Minerals and the Iron Oxide Rights are the dominant estate.

"***Iron Oxide Rights***" means rights reasonably necessary or useful for (i) access to
(ingress and egress) to the Mining Claims, exploration for, drilling, mining, crushing,
permitting, producing, removing, processing, bagging, testing, analyzing, storing in
bags, piles, or otherwise (including the creation of waste piles), handling treating,
disposing, containing, selling, vehicle parking for third party suppliers and others,
communications equipment used for, and shipping of Iron Oxide Minerals and non-Iron
Oxide Minerals intermingled with Iron Oxide Minerals or whose removal is deemed by
BMC as necessary or desirable in order to accomplish any of the foregoing and (ii) the
construction, repair, and/or use of buildings, sheds, fixtures, equipment, and personal
property or similar in connection with any of the foregoing.  To the extent that any of the

4

Iron Oxide Rights may be  deemed to be an easement, it is the intention of the Parties that such be deemed easements of necessity and to run with the land.

"**Mining Claims**" means the patented and unpatented mining claims located in Juab County, State of Utah, as more particularly described in Exhibit 5.

"**Second Amendment**" means Second Amendment to and Restatement of Exploration Agreement with Option to Purchase by and between AMI and Tintic Copper and Gold, Inc., a copy of which is included in Exhibit 6.

**ARTICLE II**
**SALE AND PURCHASE**

Section 2.1  Sale and Purchase.  Subject to the terms and conditions of this Iron Sale Agreement, AMI agrees to sell, and BMC agrees to purchase, the following: (i) Iron Oxide Minerals; (ii) the Iron Oxide Rights; and (iii) the AMI Stock.

Section 2.2.  Purchase Price.  The total purchase price under this Iron Sale Agreement for the three items listed in Section 2.1 is Three Hundred Thousand Dollars ($300,000)  ("**Iron Oxide Purchase Price**").  BMC has already paid One Hundred Thousand Dollars ($100,000) in cash as a deposit toward the total Purchase Price.  At the closing of the transaction, the $100,000 deposit will be credited to the Purchase Price under the Iron Sale Agreement.

Section 2.3  Tax Allocation  For federal income tax purposes, AMI and BMC agree to allocate the Iron Oxide Purchase Price as follows:  $100,000 for the Iron Oxide Minerals and Iron Oxide Rights, and $200,000 for the AMI Stock.

BMC and AMI covenant and agree that (a) BMC and AMI shall file all tax returns (including, but not limited to, IRS Form 8594) consistent with the allocation above and (b) neither BMC nor AMI will take any tax position before any governmental body or in any proceeding with respect to tax that is in any way inconsistent with such allocation;

provided, however, that nothing contained herein shall prevent BMC or AMI from settling any proposed tax deficiency or adjustment by any governmental body based upon or arising out of the allocation, and neither BMC nor AMI shall be required to litigate before any court any proposed tax deficiency or adjustment by any governmental body challenging such allocation. Each of BMC and AMI agrees to provide the other promptly with any other information reasonably required to complete Form 8594 and Form 8883 (and any similar forms required for state or local tax purposes). Each of BMC and AMI shall notify the other in the event of an examination, audit or other proceeding regarding the allocation determined under this section.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF AMI

AMI's Representations and Warranties. AMI represents and warrants to BMC, as of the date hereof and the Closing Date, as follows:

Section 3.1    Organization and Qualification. AMI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. AMI has full corporate power and authority to own, lease and operate its properties and to carry on its business. AMI is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in Utah.

Section 3.2    Authority. AMI has full corporate power and authority to execute, deliver and perform its obligations under this Iron Sale Agreement and the documents contemplated thereby (such documents, the "**Ancillary Documents**") and to consummate the transactions contemplated by this Iron Sale Agreement and the Ancillary Documents ("**Transactions**"), subject to any contingencies or preconditions included herein.  This Iron Sale Agreement has been, and when delivered, the Ancillary Documents will have been, duly executed and delivered by AMI and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding

6

obligation of AMI and be enforceable upon and against AMI in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.  No vote of any holders of any class or series of capital stock of AMI is necessary to approve the Iron Sale Agreement, the Ancillary Documents, or the Transactions.

Section 3.3    No Conflict; Required Filings and Consents. Except for specific preconditions and conditions to close contained herein, the execution, delivery and performance by AMI of this Iron Sale Agreement and the Ancillary Documents and the consummation by AMI of the Transactions do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of AMI;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to AMI;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of AMI pursuant to any contract, agreement, license, permit or other instrument to which AMI is a party or by which AMI or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

Section 3.4    Title

(a) Subject to the Second Amendment and the rights of Boral Resources, LLC, with respect to its ownership of the surface piles, AMI is the sole legal, beneficial and recorded owner of the Mining Claims (subject to the paramount title of the United States to the unpatented mining claims) and has good and marketable title to the Mining

7

Claims, Iron Oxide Minerals and Iron Oxide Rights free and clear free and clear lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest, restriction or condition of kind whatsoever. Subject to the Second Amendment and the rights of the owner of the surface piles, AMI has not previously granted, conveyed, sold, mortgaged, pledged, hypothecated, or otherwise transferred any interest in the Mining Claims, to any other person or entity, and is not aware of any transfer of an interest in the Mining Claims by its shareholders, nor any actual or threatened claim of title by its shareholders or any third party to the Mining Claims.  ,

(b) AMI has not received written notice of any claims, actions, suits, or other proceedings pending or threatened by any governmental department or agency, or any other entity or person, pertaining to the Mining Claims.

(c) The execution, delivery, and performance by AMI of this Iron Sale Agreement and the Ancillary Documents and the Transactions contemplated thereby does not and will not conflict with, or result in the breach or termination of any provision of, or constitute a default under, any indenture, mortgage, deed of trust, bond, lease, contract, or other instrument or agreement or any order, judgment, award, or decree to which AMI is subject or by which the assets of AMI may be bound, or result in the creation of a lien, charge, or encumbrance upon the Mining Claims.

(d) AMI has the full right, legal capacity and means to execute this transfer of the Iron Oxide Minerals, the Iron Oxide Rights, and the AMI Stock without obtaining the consent or approval of any governmental authority.

(e) There are no unpaid liabilities or obligations related to the Mining Claims which AMI is obligated to satisfy on or before the Closing or any such liabilities and obligations which AMI may be obligated to satisfy after the Closing and which arise by, through or under AMI.

(f) The unpatented Mining Claims included in Exhibit 5 have been duly and validly staked and recorded in accordance with applicable state and federal laws and regulations, all material filings and recordings of proof of performance and/or notice of intent to hold have been made properly and all federal annual unpatented mining claim maintenance

8

and rental fees have been paid properly and timely, and the Mining Claims are in all respects presently in good standing under applicable Utah and federal mining laws and regulations, and are free and clear of all liens, charges and encumbrances whatsoever. Prior the Closing anticipated under this Iron Sale Agreement, AMI shall be responsible for maintaining the unpatented Mining Claims in Exhibit 5, including completing any filings required under the federal mining law.

(g) Except as described in Exhibit 7, there is no adverse claim or challenge against or to the ownership of the Mining Claims nor is there any basis therefor. Subject to the Second Amendment, there are no outstanding agreements or rights or options to acquire or purchase the Mining Claims, or any portion thereof. Subject to the Second Amendment, no person, firm or corporation has any proprietary or possessory interest in the Mining Claims other than AMI and BMC pursuant to this Iron Sale Agreement. No person is entitled to any royalty or other payment in the nature of rent or royalty on any of the Iron Oxide Minerals from the Mining Claims.

(h) Neither AMI nor, to AMI's knowledge, has any third party:

(x)    Caused or permitted the Mining Claims to be used to generate, manufacture, refine, transport, treat, store, use, handle, dispose of, transfer, produce, process, contain or be constructed of a "Hazardous Material" (as defined below), except in compliance with all Applicable law; or

(y) Caused, permitted, authorized, or has knowledge of the presence or release or threat of release of any Hazardous Material in, on, under, or migrating to or from the Mining Claims; or

(z) Received any notice or other information, whether written or oral and whether actual or threatened, from any governmental agency or authority or any other entity or individual, whether governmental or private, concerning or alleging any liability of AMI or other persons or entities with

9

respect to the Environmental Condition of the Mining Claims, or any intentional or unintentional act or omission or any fact or condition which has resulted or which may result in any Environmental Condition in, on, under, or adjacent to the Mining Claims.

For purposes of this Iron Sale Agreement, "Environmental Condition" means (i) contamination or pollution of soil, air, surface or groundwater, (ii) the disposal, placement, existence, presence or release or threat of release of a Hazardous Material and the effects thereof, (iii) noncompliance with or violation of Applicable law including, without limitation, any lack of required governmental permits or approvals, "Hazardous Material' means (iv) any substance, the presence of which requires investigation, remediation, or other response or corrective action under Applicable law, or (v) any substance which is defined as a hazardous waste, hazardous substance, extremely hazardous substance, hazardous material, hazardous matter, hazardous chemical, toxic substance, toxic chemical, pollutant or contaminant, or other similar term, in or pursuant to Applicable law, or (vi) any asbestos or asbestos-containing material, PCBs or equipment or articles containing PCBs, petroleum, diesel fuel, gasoline or other petroleum hydrocarbons, and "Applicable law " means all existing federal, state or local laws, common law, statutes or regulations, including, without limitation, those relating to the protection of human health and safety, protection of the environment, or prevention of pollution.

(i) All documents provided to BMC by AMI pursuant to the Iron Sale Agreement are, and all statements in the Form 10-K as of the filing date of the Form 10-K were, accurate and not misleading and, to the extent in the possession or under the control of AMI, are complete and correct copies of originals and represent truly and completely the factual matters stated therein; provided that, notwithstanding the foregoing, AMI does not make, and shall not be deemed to have made, any representation or warranty with respect to any part or all of the information prepared or submitted by parties other than AMI or with respect to the amount or recoverability of Iron Oxide Minerals.

(j) To AMI's knowledge, there are not presently pending any special assessments or condemnation actions against the Mining Claims or any part thereof, and AMI has not received any notice of any assessment or condemnation actions being contemplated; provided that any assessment which is or becomes a lien against the Mining Claims prior to the Closing shall be satisfied by AMI prior to or at the Closing, except as set forth in this Iron Sale Agreement or otherwise agreed in writing by AMI and BMC.

## ARTICLE IV
## BMC'S REPRESENTATIONS AND WARRANTIES

BMC's Representations and Warranties. BMC represents and warrants to AMI, as of the date hereof and the Closing Date, as follows:

4.1    Organization and Qualification. BMC is a corporation duly organized, validly existing and in good standing under the laws of the State of Missouri. BMC has full corporate power and authority to own, lease and operate its properties and to carry on its business.

Section 4.2    Authority. BMC has full corporate power and authority to execute, deliver and perform its obligations under this Iron Sale Agreement and the Ancillary Documents and to consummate the Transactions. This Iron Sale Agreement has been, and when delivered, the Ancillary Documents will have been, duly executed and delivered by BMC and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of BMC and be enforceable upon and against BMC in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

Section 4.3    No Conflict; Required Filings and Consents. The execution, delivery and performance by BMC of this Iron Sale Agreement and the Ancillary Documents and the consummation by BMC of the Transactions do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of BMC;

11

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to BMC;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of BMC pursuant to any contract, agreement, license, permit or other instrument to which BMC is a party or by which BMC or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

## ARTICLE V
## ESCROW

5.1    The parties will enter into an Escrow Agreement in the form attached (Exhibit 8) The same Escrow account may be used in connection with the purchase price in the Mill Sale Agreement, if the parties so agree.

## ARTICLE VI
## CLOSING

The Closing. The Closing of this Iron Sale Agreement (the "*Closing*") shall be held on a date that is agreed upon by the Parties  ("*Last Date for Closing*"). The date upon which the Closing actually takes place, or, if more than one (1) day is required to complete the Closing, the dates upon which the Closing is actually accomplished, shall be deemed and considered the "*Closing Date*."

12

Iron sale 5-31 8 am

The Closing shall take place in accordance with the terms of the Escrow Agreement and this Iron Sale Agreement only when all of the conditions of the Closing of this Iron Sale Agreement have been satisfied or waived.

If the Closing does not take place on or before the Last Date for Closing, this Iron Sale Agreement shall terminate and in accordance with the Escrow Agreement, funds deposited in the Escrow will be returned to BMC.

At the Closing, the following shall occur or exist, each of which shall be considered a condition precedent to the other and all of which shall be considered as taking place simultaneously, unless noted:

(a)    The written consents to the amendments signed in counterparts by the majority holders of the Series A and Series 2023 Notes and AMI are delivered to Carney as an officer of the Company

(b)    AMI delivers a certified copy of a certificate filed with the Delaware Secretary of State setting forth the amendment adopting the Series C Preferred Stock and certifying that such amendment has been duly adopted in accordance with this section shall be executed, acknowledged and filed and shall become effective in accordance with §103 of the Delaware General Corporation Law;

(c)    BMC will fund the escrow in the amount of $200,000;

(d)    No breach, or any condition that could lead to such breach of any representation, warranty, or covenant or other obligation under this Iron Sale Agreement, the Mill Sale Agreement, the Mining Operations Agreement and the Mining Operations Agreement  (the "*Four Agreements*") shall have occurred and not been waived by the Party entitled to waive.

(e)    All of the conditions of closing in the Mill Sale Agreement, the Mining Operations Agreement and the Mining Operations Agreement shall have been satisfied.

13

Iron sale 5-31 8 am

(f)     AMI will deliver to BMC, evidence reasonably satisfactory to BMC that the requirements of Section 1.7 of the Second Amendment have been complied with in connection with the Iron Sale Agreement, the Mill Sale Agreement, the Mining Operations Agreement, and the Milling Operations Agreement.

(g)     AMI shall deliver to BMC a warranty deed ("*Iron Warranty Deed*") (Exhibit 9).

(h)     AMI shall deliver to BMC a certificate and affidavit (Exhibit 10) certifying that AMI is not a "foreign corporation," "foreign partnership," "foreign trust," "foreign estate," or foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986.

(i)     BMC shall record in the official real estate records of Juab County, Utah the Iron Warranty Deed.

(j)     AMI shall provide resolutions of its Board of Directors authorizing the Four Agreements, the Ancillary Documents, and the Transactions contemplated thereby and if stock is to be paid in consideration, the authorization for issuance of such stock. AMI, BMC and BMI shall execute such other documents and, further, take such other actions as are reasonably necessary and appropriate to effectuate the Closing in accordance with this Agreement. The parties specifically agree that the conditions precedent to this Agreement and to Closing are of substantial importance to the parties and the failure and non-waiver of any condition precedent shall be sufficient to terminate this Agreement and relieve each party of any obligation to Close.

(k)     Exhibits.  Notwithstanding statements elsewhere in the Iron Sale Agreement to the effect that exhibits are attached, certain exhibits are not attached.  But such exhibits are to be attached as a condition of closing.


### ARTICLE VII
### GENERAL PROVISIONS


14

Iron sale 5-31 8 am

7.1    Indemnity. Each Party shall hold harmless, indemnify and defend the other Party, its directors, officers, employees, representatives, attorneys, and agents (collectively, the "*Indemnified Parties*"), from any material claims, liability (including environmental liabilities) loss, damage, judgment or expense arising out of the indemnifying party's material breach of any representation, warranty or covenant contained in this Agreement or the Ancillary Documents, except to the extent any such claim, loss, damage, judgment, or expense is caused by the material negligence or intentional misconduct of the Indemnified Party or Parties.

Notwithstanding the foregoing, in the event that an arbitrator per Section 7.9 determines that any of the representations in Section 3.4(a) are incorrect and may be material and such incorrectness has not been cured, AMI will pay BMC $3.0 million in liquidated or stipulated damages. The Parties agree that $3.0 million is a reasonable estimate of the actual damages that BMC would suffer as a result of such breach because of the inherent uncertainty and difficulty of determining and quantifying damages and is not a penalty.  AMI agrees that it will not assert that such a remedy is unenforceable.

7.2  Survival; Remedies Cumulative. The representations warranties and covenants herein shall survive the Closing indefinitely.  All remedies are cumulative, and a Party may exercise all remedies afforded to it in any order.

7.3  Further Representations and Assurances.  Except as provided for in this Iron Sale Agreement, BMC is not, and is not deemed to be, a successor or agent of AMI, it being understood that BMC is acquiring only the Iron Oxide, the Iron Oxide Rights; and the AMI Stock and it is expressly understood and agreed that BMC has not and does not hereby assume or agree to assume any liability whatsoever of AMI, and BMC does not assume or agree to assume any obligation of AMI under any contract, agreement, indenture, or any other document to which AMI may be a party or by which AMI is or may be bound, or which in any manner affect the Mining Claims or any part thereof, except obligations as assignee under the Second Amendment.

15

Iron sale 5-31 8 am

    7.4    <u>Notices</u>. All communications, consents, and other notices provided for in this Iron Sale Agreement shall be in writing and shall be effective on the date hand-delivered, sent by facsimile, or mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

> If to AMI, to:
>
> APPLIED MINERALS, INC.
> 1200 Silver City Road
> PO Box 432
> Eureka, UT 84628
> Attn: Christopher Carney
>
> or to such other address as AMI may designate to BMC, in writing.
>
> If to BMC, to:
>
> BMI MINERALS COMPANY.
> 16640 Chesterfield Grove Road, Suite 170
> Chesterfield, MO 63005
> Attn: Richard Fox
>
> or to such other address as BMC may designate to AMI, in writing.

    7.5    <u>Amendment; Waiver.</u> No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed, in writing, by the Party making the waiver.

    7.6    <u>Binding Nature</u>. This Iron Sale Agreement shall be binding upon and shall inure to the benefit of the Parties to it and their respective successors and assigns.  ,

Iron sale 5-31 8 am

7.7     Invalidity. In the event that any provision of this Iron Sale Agreement shall be held invalid and unenforceable, such provision shall be severable from, and such invalidity and unenforceability shall not be construed to have any effect on the remaining provisions of this I Sale Agreement.

7.8     Counterparts.     This Agreement may be executed and delivered by facsimile or electric transmission, and in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

7.9     Governing law.  All disputes arising under this agreement shall be governed by and interpreted in accordance with the laws of Utah without regard to principles of conflict of laws. The parties to this agreement will submit all disputes arising under this agreement to arbitration in St. Louis, Missouri, before a single arbitrator of the American Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent  the party  from  obtaining  an  injunction. AMI waives the defense of inconvenient forum.

17

Iron sale 5-31 8 am

7.10

<u>7.10 Additional Documents</u>.   The Parties agree from time to time to execute such additional documents as are necessary to effect the intent of the Parties as manifested by this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

APPLIED MINERALS INC.

*Christopher T. Carney*

By: _____

Name: Christopher T. Carney

Title: President and CEO

BMI MINERALS COMPANY

By: _____

Name: _____

Title: _____

18

# EXHIBIT C

mill sale 5-31 8 am                                                MILL SALE AGREEMENT

# MILL
# SALE
# AGREEMENT
## (Mill and Related Equipment)


### Applied Minerals, Inc.

### and

### Brady McCasland, Inc.

mill sale 5-31 8 am                                          MILL SALE AGREEMENT

# Table of Contents

**Recitals**                                                                    **4**

**Article I    Definitions**                                                    **5**

**Article II   Sale and Purchase**                                             **6**

**Article III   Representations and**                                          **7**
**Warranties of BMI**

**Article IV  BMI's Representations**                                          **10**
**and Warranties**

**Article V  Escrow**                                                          **11**

**Article VI   Closing**                                                       **12**

**Article VII    General Provisions**                                          **14**

mill sale 5-31 8 am                                                    MILL SALE AGREEMENT

| Exhibit | Title | Section |
|---------|-------|---------|
| 1 | Iron Sale Agreement | Recitals |
| 2 | Mining Operations Agreement | Recitals |
| 3 | Milling Operations Agreement | Recitals |
| 4 | Lease | Recitals |
| 5 | Buildings and Fixtures | Article I |
| 6 | Laboratory Equipment | Article I |
| 7 | Related Equipment | Article i |
| 8 | Second Amendment | Article I |
| 9 | Mining Claims | Article 1 |
| 10 | Allocation Schedule | 2.2 |
| 11 | Escrow Agreement | Article V |
| 12 | | 7(a) |
| 13 | Bill of Sale | 7(c) |
| 14 | | 7(d) |
| 15 | | 7(e) |

MILL SALE AGREEMENT

This AGREEMENT *("Mill Sale Agreement")* is made and entered into as of the 31st of May, 2022 by and between APPLIED MINERALS INC., a Delaware corporation, with a mailing address of 1200 Silver City Road, PO Box 432, Eureka, Utah 84628 *("AMI"),* and BRADY MCCASLAND, INC., ("*BMI*"), a Missouri corporation having its principal place of business at 16640 Chesterfield Grove Road, Suite 170, Chesterfield, MO 63005.

AMI and BMI may be referred to herein collectively as the *"Parties"* or individually as a *"Party."*

## RECITALS

A. AMI desires to sell certain assets related to its mining operations business while retaining all assets related to its halloysite clay business and Brady McCasland, Inc. ("BMI") desires to acquire certain assets of AMI's iron oxide business.

B. This *Mill Sale Agreement*, transfers to BMI the Mill and Related Equipment ("Mill") as those terms are defined in this Mill Sale Agreement for cash, and the parties will enter into a separate ground lease relating to the Mill.

C. A *Mining Operations Agreement* (Exhibit 2) will be entered into to provide that AMI will provide certain mining services to BMC, a related BMI party for the extraction of minerals.

D. A *Milling Operations Agreement (*Exhibit 3) will be entered into to provide that AMI will provide certain milling services to BMI.

4

# ARTICLE I
## DEFINITIONS

Capitalized terms not defined herein have the same meanings as in the Iron Sale Agreement of even date herewith.

"**Form 10-K**" means the Annual Report on Form 10-K filed by AMI with the Securities and Exchange Commission for the year ended December 31, 2021.

"**Lease**" means the Lease in Exhibit 4.   The Lease is a ground lease for land that is within 100 feet of the Mill measured to include any Mining Claim that is within 100 feet of the Mill..  It is the intention of the Parties that in the future event of any bankruptcy involving AMI and the real property at the Mill that the Lessee be provided with adequate protection under Sections 363 of the Bankruptcy Code.

"**Mill**" means the building and fixtures described in the Form 10-K as follows. "We have a primary processing plant with capacity to mill up to 45,000 tons of mineralization per annum for certain clay applications. This facility can also be used to mill iron oxide." In particular, the Mill includes, but is not limited to, the buildings and the fixtures, including conveyors, tank farm, storage bins, bucket elevators, bagging machines, airlocks, and other machinery and equipment related to milling, bagging, storing, moving, loading and other fixtures used in connection with or related to the operation the Mill. A non-exclusive list of the buildings and fixtures is set forth in Exhibit 5. The Mill also includes an easement for access, maintenance, use, and support. For the purpose of clarity, the Mill includes the building but not the equipment used for quality control and research, described in the following as set forth in the 10-K: "The property also has a well-equipped laboratory used for quality control and research.  Such equipment is set forth in Exhibit 6.

"**Related Equipment**" means the equipment that is not a fixture that is or has been used in connection with the Mill and operation of the Mill, all as listed in Exhibit 7.  If it is subsequently determined that any equipment is or has been used in the Mill or the operation of the mill, it will be deemed Related Equipment.

"**Second Amendment**" means Second Amendment to and Restatement of Exploration
Agreement with Option by and between AMI and Tintic Copper and Gold, Inc., a copy of
which is included in Exhibit 8.

## ARTICLE II
## SALE AND PURCHASE

Section 2.1  Sale and Purchase.  Subject to the terms and conditions of this Mill
Sale Agreement, (i) AMI agrees to sell, and BMI agrees to purchase the following: (i) the
Mill; (ii) Related Equipment; and in conjunction with the sale the Parties agree to enter
into the Lease in the form attached as Exhibit 4.  In connection with the sale of the Mill,
the Mill is constructively severed from the land, the Mining Claims, on which it is
located.

Section 2.2.  Purchase Price.  The total purchase price including future lease
amounts for the items listed in Section 2.1 is one Million Seven Hundred thousand
Dollars ($1,700,000.00) ("**Purchase Price**").

Section 2.3  Allocation. AMI and BMI agree to allocate the Purchase Price and
other relevant items for tax purposes as set forth in the Allocation Statement set for in
Exhibit 9.  BMI and AMI covenant and agree that (a) BMI and AMI shall file all tax
returns (including, but not limited to, IRS Form 8594) consistent with the allocation in
exhibit 9 and (b) neither BMI nor AMI will take any tax position before any governmental
body or in any proceeding with respect to tax that is in any way inconsistent with such
allocation; provided, however, that nothing contained herein shall prevent BMI or AMI
from settling any proposed tax deficiency or adjustment by any governmental body
based upon or arising out of the allocation, and neither BMI nor AMI shall be required to
litigate before any court any proposed tax deficiency or adjustment by any governmental
body challenging such allocation. Each of BMI and AMI agrees to provide the other
promptly with any other information reasonably required to complete Form 8594 and

6

Form 8883 (and any similar forms required for state or local tax purposes). Each of BMI and AMI shall notify the other in the event of an examination, audit or other proceeding regarding the allocation determined under this section.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF AMI

AMI's Representations and Warranties. AMI represents and warrants to BMI as of the date hereof and the Closing Date, as follows:

Section 3.1    Organization and Qualification. AMI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. AMI has full corporate power and authority to own, lease and operate its properties and to carry on its business. AMI is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in Utah.

Section 3.2    Authority. AMI has full corporate power and authority to execute, deliver, and perform its obligations under this Mill Sale Agreement and the documents contemplated thereby (such documents, the "***Ancillary Documents***") and to consummate the transactions contemplated by this Mill Sale Agreement and the Ancillary Documents ("***Transactions***"). This Mill Sale Agreement has been, and when delivered, the Ancillary Documents will have been, duly executed and delivered by AMI and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of AMI and be enforceable upon and against AMI in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.  No vote of any holders of any class or series of capital stock of AMI is necessary to approve the Mill Sale Agreement, the Ancillary Documents, or the Transactions.

MILL SALE AGREEMENT

Section 3.3   No Conflict; Required Filings and Consents. Except for specific preconditions and conditions to Close contained herein, The execution, delivery and performance by AMI of this Mill Sale Agreement and the Ancillary Documents and the consummation by AMI of the Transactions do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of AMI;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to AMI;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of AMI pursuant to any contract, agreement, license, permit or other instrument to which AMI is a party or by which AMI or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

Section 3.4   Title

(a) AMI has good and marketable title to the Mill and all of the Related Equipment free and clear free and clear of any lien, charge. mortgage, limitation, encumbrance, adverse claim, security interest, restriction or condition of kind whatsoever.

(b) To the best of AMI's knowledge, the Mill and the fixtures in it and each item of tangible personal property of Related Equipment is in all material respects in good condition or good operating condition, ordinary wear and tear excepted, and is adequate for the uses to which it is being put.

(c)The execution, delivery, and performance by AMI of this Mill Sale Agreement and the Ancillary Documents and the Transactions contemplated thereby (including the Lease) does not and will not conflict with, or result in the breach or

8

mill sale 5-31 8 am                                              MILL SALE AGREEMENT

termination of any provision of, or constitute a default under, any indenture, mortgage, deed of trust, bond, lease, contract, or other instrument or agreement or any order, judgment, award, or decree to which AMI is subject or by which the assets of AMI may be bound, or result in the creation of a lien, charge, or encumbrance upon the Mill or the Related Equipment, the Laboratory Equipment or the Lease.

(d) AMI has the full right, legal capacity and means to execute this Mill Sale Agreement, the Lease, and the bill of sale of the Related Equipment, and the Ancillary Documents, and to transfer the Mill and the Related Equipment and the AMI Stock without obtaining the consent or approval of any governmental authority or any other person or entity to which AMI or any of AMI's property may be subject.

(e)There are no unpaid liabilities or obligations related to the Mill, the Related Equipment, or the Laboratory Equipment which AMI is obligated to satisfy on or before the Closing or any such liabilities and obligations which AMI may be obligated to satisfy after the Closing.

(f)All documents provided to BMI by AMI pursuant to the Mill Sale Agreement and statements in the 10-K are accurate and not misleading as of the date made and, to the extent in the possession or under the control of AMI, are complete and correct copies of originals and represent truly and completely the factual matters stated therein; provided that, notwithstanding the foregoing, AMI does not make, and shall not be deemed to have made, any representation or warranty with respect to any part or all of the information prepared or submitted by parties other than AMI or with respect to the amount or recoverability of Iron Oxide Minerals.

(g) There are not presently pending any special assessments or condemnation actions against the Mining Claims or any part thereof, and AMI has not received any notice of any assessment or condemnation actions being contemplated; provided that any assessment which is or becomes a lien against the Mining Claims prior to the Closing shall be satisfied by AMI prior to or at the Closing,

9

except as set forth in this Mill Sale Agreement or otherwise agreed in writing by AMI and BMI.

## ARTICLE IV
## BMI'S REPRESENTATIONS AND WARRANTIES

<u>BMI's Representations and Warranties</u>. BMI represents and warrants to AMI (with the understanding that AMI is relying on said representations and warranties in entering into this Mill Sale Agreement), as of the date hereof and the Closing Date, as follows:

4.1 <u>Organization and Qualification</u>. BMI is a corporation duly organized, validly existing and in good standing under the laws of the State of Missouri. BMI has full corporate power and authority to own, lease and operate its properties and to carry on its business.

4.2 <u>Authority</u>. BMI has full corporate power and authority to execute, deliver and perform its obligations under this Mill Sale Agreement, the Lease and the Ancillary Documents and to consummate the Transactions. This Mill Sale Agreement has been, and when delivered, the Ancillary Documents and the Lease will have been, duly executed and delivered by BMI and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of BMI and be enforceable upon and against BMI in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

10

mill sale 5-31 8 am                                                    MILL SALE AGREEMENT

4.3    No Conflict; Required Filings and Consents. The execution, delivery and performance by BMI of this Mill Sale Agreement and the Lease and the Ancillary Documents and the consummation by BMI of the Transactions do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of BMI;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to BMI;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of BMI pursuant to any contract, agreement, license, permit or other instrument to which BMI is a party or by which BMI or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

## ARTICLE V
## ESCROW

5.1    The parties will enter into an Escrow Agreement in the form attached (Exhibit 11) The same Escrow account may be used in connection with the purchase price in the Iron Sale Agreement, if the parties so agree.

.

## ARTICLE VI
## CLOSING

The Closing. The Closing of this Mill Sale Agreement (the "**Closing**") shall be held on a date agreed upon by the Parties ("**Last Date for Closing**"). The date upon

11

which the Closing actually takes place, or, if more than one (1) day is required to complete the Closing, the dates upon which the Closing is actually accomplished, shall be deemed and considered the "*Closing Date*."

The Closing shall take place in accordance with the terms of the Escrow Agreement and this Mill Sale Agreement only when all of the conditions of the Closing of this Mill Sale Agreement have been satisfied or waived.

If the Closing does not take place on or before the Last Date for Closing, this Mill Sale Agreement shall terminate and in accordance with the Escrow Agreement, funds deposited in the Escrow will be returned to BMI.

At the Closing, the following shall occur or exist, each of which shall be considered a condition precedent to the other and all of which shall be considered as taking place simultaneously, unless noted:

(a)      The written consents to the amendments signed in counterparts by the majority holders of the Series A and Series 2023 Notes and AMI are delivered to Christopher Carney or other duly appointed officer of AMI;

(b)      AMI delivers a certified copy of a certificate filed with the Delaware Secretary of State setting forth the amendment adopting the Series C Preferred Stock and certifying that such amendment has been duly adopted in accordance with this section shall be executed, acknowledged and filed and shall become effective in accordance with §103 of the  Delaware General Corporation Law;

(c)      BMI will fund the escrow in the amount of $1,700,000;

(d)      No breach, or any condition that could lead to such breach of any representation, warranty, or covenant or other obligation under this Mill Sale Agreement, the Iron Sale Agreement, the Mining Operations Agreement and the Milling Operations Agreement  (the "*Four Agreements*")  shall have occurred and not been waived by the Party entitled to waive;

mill sale 5-31 8 am                                                MILL SALE AGREEMENT

(e)      All of the conditions of closing in the Iron Sale Agreement, the Mining Operations Agreement and the Milling Operations Agreement shall have been satisfied;

(f)      AMI will deliver to BMI evidence reasonably satisfactory to BMI that the requirements of Section 1.7 of the Second Amendment have been complied with in connection with the Iron Sale Agreement, the Mill Sale Agreement, the Mining Operations Agreement, and the Milling Operations Agreement;

(g)      AMI shall deliver to BMI a bill of sale for the Mill Exhibit ___ and Related Equipment (Exhibit 10) and this Mill Sale Agreement and the Bill of Sale shall be filed with the Juab County Recorder of Deeds;

(h) AMI shall provide resolutions of its Board of Directors authorizing the Four Agreements, the Ancillary Documents, and the Transactions contemplated thereby and if stock is to be paid in consideration, the authorization for issuance of such stock. AMI, BMC and BMI shall execute such other documents and, further, take such other actions as are reasonably necessary and appropriate to effectuate the Closing in accordance with this Agreement; and

(i)Exhibits.  Notwithstanding statements elsewhere in the Mill Sale Agreement to the effect that exhibits are attached, certain exhibits are not attached.  But such exhibits are to be attached as a condition of closing.

The parties specifically agree that the conditions precedent to this Agreement and to Closing are of substantial importance to the parties and the failure and non-waiver of any condition precedent shall be sufficient to terminate this Agreement and relieve each party of any obligation to Close

## ARTICLE VII
## GENERAL PROVISIONS

13

mill sale 5-31 8 am                                                                    MILL SALE AGREEMENT

7.1    Indemnity.  Each Party shall hold harmless, indemnify and defend the other Party, its directors, officers, employees, representatives, attorneys, and agents (collectively, the "*Indemnified Parties*"), from any material claims, liability (including environmental liabilities) loss, damage, judgment or expense arising out of the indemnifying party's material breach of any representation, warranty or covenant contained in this Agreement or the Ancillary Documents, except to the extent any such claim, loss, damage, judgment, or expense is caused by the material negligence or intentional misconduct of the Indemnified Party or Parties.

7.2    Survival; Remedies Cumulative    The representations warranties and covenants herein shall survive the Closing indefinitely.  All remedies are cumulative, and a Party may exercise all remedies afforded to it in any order.

7.3    Further Representations and Assurances.  Except as provided for in this Sale/Lease Agreement, BMI is not, and is not deemed to be, a successor or agent of AMI, it being understood that BMI is acquiring only the Mill and the Related Equipment and it is expressly understood and agreed that BMI has not and does not hereby assume or agree to assume any liability whatsoever of AMI, and BMI does not assume or agree to assume any obligation of AMI under any contract, agreement, indenture, or any other document to which AMI may be a party or by which AMI is or may be bound, or which in any manner affect AMI's mine or any part thereof, except obligations as assignee under the Second Amendment.

7.4    Notices.  All communications, consents, and other notices provided for in this Mill Sale  Agreement shall be in writing and shall be effective on the date hand-delivered, sent by facsimile, or mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:


If to AMI, to:

APPLIED MINERALS, INC.

14

1200 Silver City Road
PO Box 432
Eureka, UT 84628
Attn: Christopher Carney

or to such other address as AMI may designate to BMI, in writing.

If to BMI, to:

BRADY MCCASLAND, INC
16640 Chesterfield Grove Road, Suite 170
Chesterfield, MO 63005
Attn: Richard Fox

or to such other address as BMI may designate to AMI, in writing.

7.5    Amendment; Waiver.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all Parties.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed, in writing, by the Party making the waiver.

7.6    Binding Nature.  This Mill Sale Agreement shall be binding upon and shall inure to the benefit of the Parties to it and their respective successors and assigns

7.7    Invalidity. In the event that any provision of this Sale/Lease Agreement shall be held invalid and unenforceable, such provision shall be severable from, and such invalidity and unenforceability shall not be construed to have any effect on the remaining provisions of this Sale/Lease Agreement.

15

**MILL SALE AGREEMENT**

7.8   Counterparts.   This Agreement may be executed and delivered by facsimile or electric transmission, and in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

7.9   Governing law.   All disputes arising under this agreement shall be governed by and interpreted in accordance with the laws of Utah without regard to principles of conflict of laws. The parties to this agreement will submit all disputes arising under this agreement to arbitration in St. Louis, Missouri, before a single arbitrator of the American Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction.

7.10   Additional Documents.   The Parties agree from time to time to execute such additional documents as are necessary to effect the intent of the Parties as manifested by this Agreement.

mill sale 5-31 8 am                                                    MILL SALE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

| APPLIED MINERALS, INC. | Brady McCasland, Inc. |
| --- | --- |
| *Christopher T. Carney*<br><br>By: | By: *[signature]*<br><br>Name: *Richard Fox*<br><br>Title: *President* |
| Name: Christopher T. Carney<br><br>Title: President and CEO | |

17

# EXHIBIT D

Mining op 5-31  8 am

# MINING OPERATIONS AGREEMENT

**Applied Minerals, Inc.**

**and**

**BMC Minerals Company**

Mining op 5-31  8 am

## Exhibits

| Exhibit | Title | Section |
|---------|-------|---------|
| Exhibit 1 | Iron Sale Agreement | Recitals |
| Exhibit 2 | Mill Sale Agreement | Recitals |
| Exhibit 3 | Lease | Recitals |
| Exhibit 4 | Milling Operations Agreement | Recitals |
| Exhibit 5 | AMI Equipment Available for Use | 3.5(a) |
| Exhibit 6 | Qualified Customers | 4.2 |

Mining op 5-31 8 am

This OPERATIONS AGREEMENT *("Mining Operations Agreement")* is made and entered into as of the_____ day of _____ 2022 by and between APPLIED MINERALS INC., a Delaware corporation, with a mailing address of 1200 Silver City Road, PO Box 432, Eureka, Utah 84628 *("AMI"),* and BMI MINERALS COMPANY, ("*BMC*"), a Missouri corporation having its principal place of business at 16640 Chesterfield Grove Road, Suite 170, Chesterfield, MO 63005.

AMI and BMC may be referred to herein collectively as the *"Parties"* or individually as a *"Party."*

### RECITALS

A. AMI owns the Mining Claims (as defined in the Iron Sale Agreement (Exhibit 1) and from that mine it extracts and processes, or has processed by others, halloysite clay and iron oxide for sale in a range of markets.

B. AMI desires to sell certain assets related to its iron oxide business while retaining assets related to its halloysite clay business and BMC and its parent corporation, Brady McCasland, Inc., ("*BMI*") desire to acquire certain assets related to the iron oxide business of AMI.

C. To that end, the parties and BMI will enter into four agreements, two sale agreements and two operations agreements.

D. One sale agreement, the *Iron Sale Agreement,* will transfer to BMC certain minerals, mineral rights, and AMI stock to BMC in exchange for cash.

E. The other sale agreement, the *Mill Sale Agreement* (Exhibit 2), will transfer to BMI the Mill and Related Equipment (as those terms are defined in the Mill Sale Agreement) and will enter into a ground lease relating to the Mill ("Lease," Exhibit 3).

F. One operations agreement, the *Milling Operations Agreement* (Exhibit 4), provides that AMI will provide milling services to BMI.

3

Mining op 5-31  8 am

G. This operations agreement, the ***Mining Operations Agreement***, provides
that AMI will provide mining services to BMC.

## ARTICLE I
## DEFINITIONS

Capitalized terms not defined in this Agreement shall have the meaning given to them in
the Iron Sale Agreement.

"***Mining Operations***" is intended to encompass all activities involving or incident to the
production of minerals up to and including the delivery of material to the Mill. Without
limiting the foregoing, the term Mining Operations includes (i) access to the Mining
Claims, (ii) exploration for minerals by any means including drilling, (iii) the development
of shafts, tunnels and similar infrastructure, (iv) the mining, extraction, and movement to
the surface of mined minerals, (v) the crushing and movement around the surface in
connection with such activities, (vi) the disposing or containing of minerals, (vi)
permitting, licensing, compliance with regulations, and similar activities. For the sake of
clarity, the term "Mining Operations" applies to activities of both Parties.

## ARTICLE II
## JOINT OPERATIONS

2.1 <u>Underground Issues.</u>

<u>(a)</u>    <u>Mining Operations.</u>  AMI and BMC will promptly and continuously keep the other
Party informed on proposed underground Mining Operations and changes to such
Mining Operations.  A Party may propose to take action that could reasonably be

4

Mining op 5-31  8 am

expected to materially adversely affect the other Party's ability to conduct Mining Operations.  In the event AMI's and BMC's respective Mining Operations on the Mining Claims could interfere with the maximization of the other's Mining Operations, the Parties shall meet and develop a joint operations plan to facilitate and promote the maximization of both Parties' Mining Operations.  In the event that the Parties cannot agree on a joint plan, they will choose a third party arbitrator who will develop a plan of joint operations to maximize both Parties' Mining Operations and the parties will be bound by such plan of joint operations.

(b)    In making determinations under this section, an arbitrator will take into account the number of tons to be mined and the time period for delivery of the mineral.  An arrangement whereby one Party would drill through a material deposit owned by the other Party or materially and adversely disturb a material deposit owned by the other Party would not be deemed to an arrangement that maximizes both Parties' operations.

## ARTICLE III
## WORK ORDERS

3.1 BMC's Role. While BMC will own the Iron Oxide and the Iron Oxide Rights, it is intended that unless otherwise stipulated by BMC, BMC will not actually carry out Mining Operations, and the following procedures will apply.

3.2 Work Orders.  From time to time with a reasonable notice, BMC will provide AMI with information as to the nature of the future Mining Operations to be performed in connection with the mining of iron oxide, the schedule for such performance, the workers to be used, and the reporting regime (the "**Work Order**").

3.3 AMI Employees. (a) Unless the Work Order stipulates otherwise, AMI will use its own employees ("*AMI Employees*") to perform the work.  The AMI Employees

5

may be full-time or part-time. If AMI has no adequately trained AMI Employees on its payroll to fulfill the Work Order, AMI will procure adequately trained contract workers to fulfill the Work Order until it has adequately trained AMI Employees on its payroll to fulfill the Work Order.

(b) AMI will have direct oversight duties over the AMI Employees to ensure that AMI Employees are qualified and operate in a safe, effective and efficient manner with respect to all mining-related activities.  AMI will supply all necessary training for AMI Employees with respect to the Work Order.   AMI may terminate or suspend any AMI Employee for the violation of MSHA or AMI-imposed workplace safety standards.

(c) BMC will reimburse AMI for the direct labor costs of the AMI Employees in a manner so that AMI can pay the AMI Employees on a timely basis.

(d) For AMI's services in connection with the AMI Employees, BMC will pay AMI 10% of the direct labor costs of the AMI Employees in connection with the Work Order and shall pay such amount to AMI at the same time as it pays the direct labor costs to AMI.

3.4   BMC Employees and Contract Workers.  (a) If BMC elects not to use AMI Employees or if and to the extent that AMI refuses to or is unable to supply AMI Employees to perform the Work Order, BMC may elect to use independent contract workers, a contract mining firm, and/or BMC employees to perform the Work Order. AMI will assist BMC in identifying a contract mining firm is one is pursued.

(b) AMI will have direct oversight duties over the contract workers, contract mining firm and/or BMC employees to ensure that such workers with respect to all mining-related activities. AMI will supply any necessary training of such employees in connection with the Work Order.

6

(c) AMI may suspend or terminate any worker in accordance with MSHA rules. Unless otherwise instructed by BMI, AMI will perform at cost standard maintenance and upkeep of the building, fixtures, and Related Equipment as well as to fulfill any MSHA requests.    AMI will obtain the approval of BMI before performing any repair and maintenance or action in response to MSHA requests.

(d) Contract workers will contract directly with AMI. A contract mining firm will contract directly with BMC.

(e) For AMI's supervisory services in connection with the contract workers, a contract-mining firm and BMC employees (other than non-mining and non-milling workers), BMC will pay AMI 10% of the direct labor costs of such workers and shall pay such amount within fifteen days after the month in which such services are rendered.

## 3.5  Use of Equipment

(a) Equipment BMC, in connection with its Mining Operations, may use, at any time subject to not materially interfering with AMI operations, any equipment owned, leased, rented, used, or usable by AMI in connection with iron oxide Mining Operations up to and including the point of delivery to the Mill, provided that BMC pays direct cost (such as fuel) promptly and its proportionate share of repairs, replacements and maintenance. Proportionate share is based on hours of usage after the Closing Date.  A preliminary list of such equipment owned, leased, rented, used, or usable by AMI is set forth in Exhibit 5, AMI Equipment Available for Use.  Exhibit 5 lists the equipment that needs repair and the Party responsible for paying for such repair, all as acceptable to BMC. For the sake of clarity, the equipment in Exhibit 5 does not include the Related Equipment.  However, BMC will be liable for any loss or damage resulting from its sole negligence or intentional conduct. AMI may not dispose of any such equipment without the prior written consent of BMC.

7

Mining op 5-31  8 am

(b) <u>Use of Laboratory and Administrative Buildings.</u>  Without cost, (i) AMI may use the equipment (which AMI owns) in the Laboratory attached to the Mill for testing and analyzing minerals;   (ii) BMC staff and employees may use AMI's administrative buildings and utilities such a telephone, water and facilities for administrative work in connection with its Mining Operations.  BMC may use the equipment in the laboratory for testing and analyzing minerals provided that it pays a reasonable fee for the consumables and any wear and tear related to BMC proportionate use of the equipment.

(c) Mining Operations will require the expenditure of funds in addition to labor costs; for example, mining-related consumables and associated costs being direct costs.  If AMI uses its own employees it will provide the items and services necessary for the completion of the work order.  If a contract-mining firm or BMC employees are used, AMI's responsibility for such items and services will depend on the terms of engagement.  BMC will reimburse AMI for such costs incurred by the fifteenth of the month after invoicing. AMI, when possible, will provide BMC an estimate of the direct costs prior to the start of any mining activities.

## ARTICLE IV
## ADDITIONAL COMPENSATION

(a)     <u>Net Profit Split</u>.  As additional compensation for its supervisory activities, BMC will pay AMI a Net Profit Split  determined as follows:

For any sales or transfers by BMC to BMI or any affiliate (as that term is defined in Rule 405 under the Securities Act of 1933) of BMI or any other person or entity BMC will pay AMI the amount that is equal to 15% (**"Net Profit Split"**) of the difference between $.065 per lb. and the subtrahend consisting of (i) the costs of the Mining Operations of

8

Mining op 5-31 8 am

such material estimated to be $.01 per lb., (ii) the costs of the Milling Operations of such material by BMI estimated to be $.04 per lb. and (iii) any supervisory fees ("**Subtrahend**").

It is understood that it may take time before the Subtrahend is calculable. It may also happen that the Mining or Milling Costs cannot be determined in which case the most recent Subtrahend determined be used.

BMC will provide AMI a monthly report of the volume and price of milled Iron Oxide Minerals it sells subject to this section. The report will also include a calculation of the BMI Profit Split for each sale. BMC will pay to AMI the BMI Net Profit Split no more than fifteen (15) days after BMC collects payment for the associated invoice from BMI.

This section will no longer be applicable 15 years after the Closing Date.

4.2 Further Additional Compensation. As additional compensation for its supervisory activities, for any mined, crushed, screened or milled Iron Oxide Mineral sold by BMC, BMI or any affiliate thereof to a Qualified Customer (Exhibit 6), BMC to AMI will pay AMI 20% of the Gross Profit (as defined herein) of such a sale made at a price of $0.08 - $0.149 per lb. and 25% of the Gross Profit of such a sale made at a price greater than $0.149 per lb. (each known as a "**Gross Profit Split**"). Sales to Qualified Customers will be made at the sole and exclusive discretion of BMI, BMC or any of their affiliates and on such terms and conditions as such entity determines.

A Qualified Customer is a person or entity identified in Exhibit 7 that has purchased iron oxide product from AMI in the two-year period before the date of this Mining Operations Agreement. AMI will provide to BMI any information it has or will receive with respect to other potential customers for iron.

**Gross Profit Split** is difference between the sale price to the Qualified Customer minus (i) the Subtrahend and any fee paid under 4.1.

9

AMI will incur all its SG&A costs associated with Qualified Customers. BMC will provide AMI a monthly report of the volume and price of crushed, screened and/or milled Iron Oxide Minerals it or its affiliates sell to Qualified Customers. The report will also include a calculation of the Gross Profit Split for each sale. BMC will pay to AMI the Gross Profit Split no more than fifteen (15) days after BMC collects payment for the associated invoice from the customer.

# ARTICLE V
## CONFIDENTIALITY

### 5.1 Confidential Information.

"**Confidential Information**" means any facts, opinions, conclusions, projections, data, information, trade secrets, patents, patent applications, inventions, software, hardware, products, technology or know-how relating to BMC's or BMI's iron oxide business (the "***Business Purpose***") whether communicated orally or in writing or obtained by AMI through observation or examination of BMC's or BMI's Mining or Milling Operations, facilities, documents, or procedures.

### 5.2 Exclusions.

AMI, however, shall have no liability to BMC with respect to the disclosure and/or use of any such Confidential Information that it can establish:

   (a) has become generally known or available to the public without breach of this Agreement by AMI;
   (b) was known by AMI as established by its written records, before receiving such information from BMC; or
   (c) has become known by or available to AMI from a source other than BMC, without, to AMI's knowledge, any breach of any obligation of confidentiality owed to BMC.

10

For purposes of the exclusions in this Section 5.2, none of BMI, BMC, or their affiliates or their officers, employees or agents shall be considered "the public".

### 5.3 Required Disclosures.

AMI may disclose Confidential Information if and to the extent that such disclosure required by applicable law, regulation, or court order, provided that AMI (i) uses reasonable efforts, at BMC's expense, to limit the disclosure by means of a protective order or a request for confidential treatment and (ii) provides BMC a reasonable opportunity (at least ten (10) business days) to review, if permitted, the disclosure before it is made and to interpose its own objection to the disclosure.

### 5.4 Confidentiality Obligations.

AMI acknowledges that irreparable injury and damage may result from disclosure of Confidential Information to any parties or individuals not expressly authorized under this Mining Operations Agreement or use by AMI for any purpose other than the Business Purpose.  AMI shall:

- (a) hold Confidential Information in strict confidence;
- (b) disclose such Confidential Information only to individuals who AMI warrants and represents have agreed in writing to be bound by this Article V;
- (c) use all reasonable precautions to prevent the unauthorized disclosure of Confidential Information, including, without limitation, protection of documents from theft, unauthorized duplication, and discovery of contents, and restrictions on access by other persons to such Confidential Information; and
- (d)  not use any Confidential Information for any purpose other than the Business Purpose.

Mining op 5-31  8 am

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF AMI

AMI 's Representations and Warranties. AMI represents and warrants to BMC (with the understanding that BMC is relying on said representations and warranties in entering into this Agreement), as of the date hereof and the Closing Date, as follows:

Section 6.1    Organization and Qualification. AMI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. AMI has full corporate power and authority to own, lease and operate its properties and to carry on its business. AMI is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in Utah.

Section 6.2    Authority. AMI has full corporate power and authority to execute, deliver and perform its obligations under this Mining Operations Agreement and to consummate the transactions contemplated thereby. This Mining Operations Agreement has been, duly executed and delivered by AMI and, the documents contemplated by this Mining Operations Agreement, when delivered in accordance with the terms hereof and thereof, and the transactions contemplated hereby and thereby will constitute the valid and binding obligations of the AMI and be enforceable upon and against AMI in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.  No vote of any holders of any class or series of capital stock of AMI is necessary to approve this Operations Agreement, the documents contemplated thereby, and the  Transactions contemplated thereby

Section 6.3    No Conflict; Required Filings and Consents. The execution, delivery and performance by AMI of this Mining Operations Agreement and the consummation by AMI of the transactions contemplated hereby do not and will not

12

(a) violate any provision of the Certificate of Incorporation or By-Laws of AMI;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to AMI;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of AMI pursuant to any contract, agreement, license, permit or other instrument to which AMI is a party or by which AMI or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.


# ARTICLE VII
## BMC'S REPRESENTATIONS AND WARRANTIES

BMC's Representations and Warranties. BMC represents and warrants to AMI (with the understanding that AMI is relying on said representations and warranties in entering into this Agreement), as of the date hereof and the Closing Date, as follows:

Section 7.1    Organization and Qualification. BMC is a corporation duly organized, validly existing and in good standing under the laws of the State of Missouri. AMI has full corporate power and authority to own, lease and operate its properties and to carry on its business.

Section 7.2    Authority. BMC has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the

13

transactions contemplated thereby. This Agreement has been, duly executed and delivered by BMC and, the documents contemplated hereby, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the BMC and be enforceable upon and against BMC in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

Section 7.3    No Conflict; Required Filings and Consents. The execution, delivery and performance by AMI of this Agreement and the consummation by AMI of the transactions contemplated hereby do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of BMC;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to BMC;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of BMC pursuant to any contract, agreement, license, permit or other instrument to which BMC is a party or by which BMC or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

14

Mining op 5-31 8 am

## ARTICLE VIII
## EFFECTIVENESS

This Mining Operations Agreement will become effective on the Closing of the Iron Sale Agreement and the Mill Saale Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1    Indemnity.  Each Party shall hold harmless, indemnify and defend the other Party, its directors, officers, employees, representatives, attorneys, and agents (collectively, the "**Indemnified Parties**"), from any material claims, liability (including environmental liabilities) loss, damage, judgment or expense for loss or damage arising out of the indemnifying party's material breach of any representation, warranty or covenant contained in this Agreement, except to the extent any such claim, loss, damage, judgment, or expense is caused by the material negligence or intentional misconduct of the Indemnified Party or Parties.

8.2  Survival; Remedies Cumulative    The representations warranties and covenants herein shall survive the Closing indefinitely.  All remedies are cumulative, and a Party may exercise all remedies afforded to it in any order

.

8.3  Further Representations and Assurances.  Except as provided for in the Agreement, BMC has not and does not hereby assume or agree to assume any liability whatsoever of AMI, and BMC does not assume or agree to assume any obligation of AMI under any contract, agreement, indenture, or any other document to which AMI may be a party or by which AMI is or may be bound, or which in any manner affect the

15

Mining Claims or any part thereof, except the Second Amendment or as expressly agreed to by BMC in this Agreement.

8.4    Notices. All communications, consents, and other notices provided for in this Agreement shall be in writing and shall be effective on the date hand delivered, sent by facsimile, or mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

> If to AMI, to:
> APPLIED MINERALS, INC.
> 1200 Silver City Road
> PO Box 432
> Eureka, UT 84628
> Attn: Christopher Carney

> or to such other address as AMI may designate to BMC, in writing.

> If to BMC, to:
> BMI MINERALS COMPANY.
> 16640 Chesterfield Grove Road, Suite 170
> Chesterfield, MO 63005
> Attn: Richard Fox

> or to such other address as BMC may designate to AMI, in writing.

8.5    Amendment.       No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a

Mining op 5-31  8 am

waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed, in writing, by the Party making the waiver.

8.6 <u>Binding Nature</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties to it and their respective successors and assigns; BMC or with the prior written consent of BMC, AMI shall be entitled to assign its rights and obligations hereunder to a third party.

8.7<u>Invalidity.</u> In the event that any provision of this Agreement shall be held invalid and unenforceable, such provision shall be severable from, and invalidity and unenforceability shall not be construed to have any effect on the remaining provisions of this Agreement.

8.8 <u>Counterparts.</u>  This Agreement may be executed and delivered by facsimile or electric transmission, and in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

8.9 <u>Governing law</u>. <u>Governing law</u>.  The laws of the State of Utah shall govern this Agreement. The parties agree to the exclusive jurisdiction of the Federal or state courts in Saint Louis, Missouri and any suit or proceeding based on or arising under this Iron Sale Agreement shall be determined in such courts.  AMI waives the defense of inconvenient forum.

8.10 <u>Additional Assurances</u>. The Parties agree from time to time to execute such additional documents as are necessary to effect the intent of the Parties as manifested by this Agreement.

17

Mining op 5-31  8 am

8.11 Exhibits.   Notwithstanding statements elsewhere in the Agreement to the effect that exhibits are not attached, certain exhibits are not attached.   But such exhibits are to be attached as a condition of closing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

| APPLIED MINERALS INC. | BMI Minerals Company |
|---|---|
| *Christopher T. Carney*<br><br>By: | By: _____<br><br>Name: *Richard Fox* |
| Name: Christopher T. Carney | Title: *President* |
| Title: President and CEO | |

# EXHIBIT E

Mill op 5-31  8 am

# MILLING OPERATIONS AGREEMENT

**Applied Minerals, Inc.**

**and**

**Brady McCasland, Inc.**

Mill op 5-31  8 am

## Table of Contents

| Article | Page |
|---------|------|
| Exhibit List | 3 |
| Recitals | 4 |
| Article I  Definitions | 5 |
| Article II   Work Orders | 7 |
| Article III    Confidentiality | 9 |
| Article IV    Representations and Warranties of AMI | 11 |
| Article V  BMI's Representations and Warranties | 13 |
| Article VI    Closing | 14 |
| Article  VII  General Provisions | 15 |

Mill op 5-31  8 am

## Exhibits

| Exhibit | Title | Section |
|---------|-------|---------|
| 1 | Iron Sale Agreement | Recitals |
| 2 | Mill Sale Agreement | Recitals |
| 3 | Lease | Recitals |
| 4 | Mining Operations Agreement | Recitals |

Mill op 5-31  8 am

This MILLING OPERATIONS AGREEMENT *("Milling Operations Agreement")* is made and entered into as of the 31st of May 2022 by and between APPLIED MINERALS INC., a Delaware corporation, with a mailing address of 1200 Silver City Road, PO Box 432, Eureka, Utah 84628 *("AMI"),* and Brady McCasland, Inc., ("*BMI*'), a Missouri corporation having its principal place of business at 16640 Chesterfield Grove Road, Suite 170, Chesterfield, MO 63005.

AMI and BMI may be referred to herein collectively as the *"Parties"* or individually as a *"Party."*

## RECITALS

This *Milling Operations Agreement* provides that AMI will provide milling services to BMI. The services will be provided because after mining, the iron oxide will be transferred to BMI from BMI Minerals Company ("BMC").

## ARTICLE I
## DEFINITIONS

Capitalized terms not defined in this Agreement shall have the meaning given to them in the Iron Sale Agreement and the Mill Sale Agreement.

"*Milling Operations*" is intended to encompass all activities involving or incident to the treatment or handling of minerals after delivery of the minerals to the Mill up to and including the shipping of the minerals for sale to customers or alternate end uses. Without limiting the foregoing, the term Milling Operations includes the (i) milling, treating, and movement around the surface in connection with such activities, (ii) bagging the minerals for sale or other means of enabling delivery and movement around the surface in connection therewith, (iii) storing in bags, piles (including waste piles), or otherwise the minerals on the Mining Claims, (iv) disposing or containing of minerals, (v) permitting, licensing, compliance with regulations, and similar activities.

4

Mill op 5-31  8 am

## ARTICLE II
## WORK ORDERS

3.1 <u>BMI's Role.</u> BMI owns the Mill and the Related Equipment, it is intended that unless otherwise stipulated by BMI, BMI will not actually carry out Milling Operations including the operations of running the Mill, and the following procedures will apply.

3.2 <u>Work Orders.</u> From time to time and with adequate notice, BMI will provide AMI with information as to the nature of the Milling Operations to be performed in connection with milling of iron oxide, the schedule for such performance, the workers to be used, and the reporting regime (the "**Work Order**").

3.3 <u>AMI Employees.</u> (a) Unless the Work Order stipulates otherwise, AMI will use its own employees ("***AMI Employees***") to perform the work. The AMI Employees may be full-time or part-time, but at all times subject to the control and direction of only AMI. Subject to having been given adequate notice in Section 3.2, the AMI Employees will be adequately trained to fulfill the Work Order. If AMI has no adequately trained AMI Employees on its payroll to fulfill the Work Order, AMI will procure adequately trained contract workers to fulfill the Work Order until it has adequately trained AMI Employees on its payroll to fulfill the Work Order.

(b) AMI will have direct oversight duties over the AMI Employees to ensure that AMI Employees are qualified and operate in a safe, effective, and efficient manner for the tasks and for operation of any necessary or useful equipment, including the Mill and the equipment associated therewith. AMI will supply any necessary training of AMI Employees in connection with the Work Order. AMI may terminate or suspend any AMI Employees for violations of MSHA safety standards.

(c) BMI will reimburse AMI for the direct labor costs of the AMI Employees in a manner so that AMI can pay the AMI Employees on a timely basis.

5

Mill op 5-31  8 am

(d)     For AMI's services in connection with the AMI Employees, BMI will pay AMI an additional ten percent (10%) of the direct labor costs of the AMI Employees in connection with the Work Order and shall pay such amount to AMI at the same time as it pays the direct labor costs to AMI.

3.4  <u>BMI Employees and Contract Workers</u>.  (a) If BMI elects not to use AMI Employees, BMI may elect to use contract workers and/or BMI employees to perform the Work Order. AMI will assist BMI with identifying appropriate contract workers.

(b) AMI will have direct oversight duties over the any workers contracted by BMI and/or BMI employees to ensure that such workers are qualified and operate in a safe, effective and efficient manner for the tasks and for operation of any necessary or useful equipment, including the Mill and the equipment associated therewith.  AMI will assure that it has sufficient persons on staff or under contract to supply any necessary training of such employees in connection with the Work Order.

(c)  AMI may suspend or terminate any worker for violating MSHA or other AMI-imposed workplace safety rules.

(d) For AMI's services in connection with the contract workers and BMI employees (other than non-mining and non-milling workers) BMI will pay AMI an additional ten percent (10%) of the direct labor costs of such workers and shall pay such amount within fifteen days after the month in which such services are rendered.

3.5 (a) <u>Use of Laboratory and Administrative Buildings.</u>  Without cost, (a) AMI may use its equipment located in the laboratory for testing and analyzing minerals and BMI grants AMI permanent and unfettered access to the laboratory space in the Mill, (b) BMI staff and employees may use AMI's administrative buildings and utilities such a telephone, water and facilities for administrative work in connection with its Milling Operations.  BMI may use the equipment in the laboratory for testing and analyzing minerals provided that it pays a reasonable fee for the consumables used in testing and

the wear and tear related to the equipment. BMI will allow AMI to use of two offices on the second floor of the Mill as well as shared us of the conference room located on the second floor of the Mill.

(b) Use of Mill. , AMI may use the Mill and have access to the land covered by the Lease upon providing adequate written or electronic notification to BMI provided that AMI's use is not reasonably likely to impede BMI's planned use of the Mill to mill minerals. AMI will cover the direct costs (e.g., fuel, electricity and labor) it incurs with respect to its use of the Mill. AMI will also cover its proportionate share of the cost of repair and maintenance of the Mill. Proportionate share is based on the hours of usage, which includes the time spent on the milling, treating, and bagging of minerals. after the Closing Date. AMI will keep BMI informed concerning maintenance and upkeep of the Mill and Related Equipment. Unless otherwise instructed by BMI, AMI will perform at cost standard maintenance and upkeep of the building, fixtures, and Related Equipment as well as to fulfill any MSHA requests or demands. AMI will obtain the approval of BMI before performing any repair and maintenance or action in response to MSHA requests. After the Closing Date, each party will provide the other party with a monthly report of the total number of hours used in, milling, treating and bagging during that month. AMI shall be liable for all damages caused by its negligence or intentional conduct. AMI shall be responsible for preparing the Mill to process Halloysite, and for paying all costs associated therewith. AMI shall pay the cost of cleaning the halloysite from the Mill after milling. BMI will not unreasonably impede AMI's ability to use the Mill when BMI is not using the Mill to mill iron oxide provided such is not reasonably likely to impede BMI's planned use of the Mill.

(c) Direct Expenses other than Labor. Milling Operations will require direct expenses (e.g., electricity, propane, etc.) other than labor. If AMI uses AMI employees, AMI will be responsible for providing, or arranging for the provision for, items and services whose costs would be considered direct expenses. If contract or BMI labor is used, AMI's responsibility for providing such items and services will depend on the arrangements with the contract labor supplier or

7

BMI, as the case may be.  To the extent that AMI pays such costs, it will be
reimbursed by BMI no later than 15 days after the end of the month of invoicing.

(d) <u>Use of Office Space in Mill</u>. AMI will be permitted use of two (2) offices located
on the second floor of the Mill where AMI will conduct standard administrative
functions both related to its business and the maintenance of the Mill. AMI will
be permitted shared use of the conference room located on the second floor of
the Mill. BMI's use of the conference room will take priority.

(e) For a period of five years from the Closing Date, BMI and/or its affiliates will not
use the Mill to mill or process any halloysite clay products without the approval
of AMI; provided that BMI and/or its affiliates may mill or process halloysite clay
products if during the two-year period preceding such milling or processing, AMI
has not used the Mill to mill or process halloysite clay products.

# ARTICLE III
## CONFIDENTIALITY

4.1 Confidential Information.

"**Confidential Information**" means any facts, opinions, conclusions, projections,
data, information, trade secrets, patents, patent applications, inventions, software,
hardware, products, technology or know-how relating to BMI's or BMC's iron oxide
business (the "***Business Purpose***") whether communicated orally or in writing
from BMI or BMC or any affiliate (as that term is defined in the Securities Act of
1933 )  or obtained by AMI through observation or examination of BMI's Mill,
Milling or Mining Operations, facilities, documents, or procedures.

4.2 Exclusions.

AMI, however, shall have no liability to BMI with respect to the disclosure and/or use of
any such Confidential Information that it can establish:

(a) has become generally known or available to the public without breach of this

8

Agreement by AMI;

(b) was known by AMI as established by its written records, before receiving such information from BMI, BMC or any of their affiliates; or

(c) has become known by or available to AMI from a source other than BMI or its affiliates without, to AMI's knowledge, any breach of any obligation of confidentiality owed to BMI.

For purposes of the exclusions in this Section 4.2, BMC, BMI, and their respective affiliates shall not be considered "the public".


4.3 <u>Required Disclosures</u>.

AMI may disclose Confidential Information if and to the extent that such disclosure required by applicable law, regulation, or court order, provided that AMI (i) uses reasonable efforts, at BMI's expense, to limit the disclosure by means of a protective order or a request for confidential treatment and (ii) provides BMI a reasonable opportunity (at least ten (10) business days) to review, if permitted, the disclosure before it is made and to interpose its own objection to the disclosure.

4.4 <u>Confidentiality Obligations</u>.

AMI acknowledges that irreparable injury and damage may result from disclosure of Confidential Information to any parties or individuals not expressly authorized under this Operations Agreement or use by AMI for any purpose other than the Business Purpose. AMI shall:

(a) hold Confidential Information in strict confidence;

(b) disclose such Confidential Information only to individuals who AMI warrants and represents have agreed in writing to be bound by this Article IV;

(c) use all reasonable precautions to prevent the unauthorized disclosure of Confidential Information, including, without limitation, protection of documents from theft, unauthorized duplication, and discovery of contents, and restrictions on access by other persons to such Confidential Information; and

(d) not use any Confidential Information for any purpose other than the Business

Mill op 5-31  8 am

Purpose.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF AMI

AMI's Representations and Warranties. AMI represents and warrants to BMI (with the understanding that BMI is relying on said representations and warranties in entering into this Agreement), as of the date hereof and the Closing Date, as follows:

Section 5.1    Organization and Qualification. AMI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. AMI has full corporate power and authority to own, lease and operate its properties and to carry on its business. AMI is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in Utah.

Section 5.2    Authority. AMI has full corporate power and authority to execute, deliver and perform its obligations under this Operations Agreement and to consummate the transactions contemplated thereby. This Operations Agreement has been, duly executed and delivered by AMI and, the documents contemplated by this Operations Agreement, when delivered in accordance with the terms hereof and thereof, and the transactions contemplated hereby and thereby will constitute the valid and binding obligations of the AMI and be enforceable upon and against AMI in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.  No vote of any holders of any class or series of capital stock of AMI is necessary to approve this Operations Agreement, the documents contemplated thereby, and the Transactions contemplated thereby.

10

Mill op 5-31  8 am

Section 5.3     <u>No Conflict; Required Filings and Consents</u>. The execution, delivery and performance by AMI of this Operations Agreement and the consummation by AMI of the transactions contemplated hereby do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of AMI;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to AMI;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of AMI pursuant to any contract, agreement, license, permit or other instrument to which AMI is a party or by which AMI or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

**ARTICLE V**
**BMI'S REPRESENTATIONS AND WARRANTIES**

<u>BMI's Representations and Warranties</u>. BMI represents and warrants to AMI (with the understanding that AMI is relying on said representations and warranties in entering into this Agreement), as of the date hereof and the Closing Date, as follows:

Section 6.1     <u>Organization and Qualification</u>. BMI is a corporation duly organized, validly existing and in good standing under the laws of the State of Missouri. AMI has full corporate power and authority to own, lease and operate its properties and to carry on its business.

11

Mill op 5-31  8 am

Section 6.2    Authority. BMI has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated thereby. This Operations Agreement has been, duly executed and delivered by BMI and, the documents contemplated hereby, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the BMI and be enforceable upon and against BMI in accordance with such terms except as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

Section 6.3    No Conflict; Required Filings and Consents. The execution, delivery and performance by AMI of this Agreement and the consummation by AMI of the transactions contemplated hereby do not and will not

(a) violate any provision of the Certificate of Incorporation or By-Laws of BMI;

(b) violate any federal, state or local law, order, decree, statute, regulation or injunction applicable to BMI;

(c) conflict with, result in a breach or default under, require any consent of or notice to or give to any third party any right of modification, acceleration or cancellation, or result in the creation of any lien, charge, mortgage, limitation, encumbrance, adverse claim, security interest or restriction or condition of any kind whatsoever upon any property or right of BMI pursuant to any contract, agreement, license, permit or other instrument to which BMI is a party or by which BMI or any of its rights, assets or properties may be bound, affected or benefited; or

(d) require any consent or approval of, registration or filing with or notice to any federal, state or local governmental authority or any agency or instrumentality thereof, except for any filings required to be made under applicable federal and state securities laws.

12

Mill op 5-31  8 am

# ARTICLE VI
## CLOSING

This Milling Operations Agreement will become effective on the closing of the Iron Sale Agreement and the Mill Sale Agreement.

# ARTICLE VII
## GENERAL PROVISIONS

8.1    Indemnity.  Each Party shall hold harmless, indemnify and defend the other Party, its directors, officers, employees, representatives, attorneys, and agents (collectively, the "***Indemnified Parties***"), from any material claims, liability (including environmental liabilities) loss, damage, judgment or expense for loss or damage arising out of the indemnifying party's material breach of any representation, warranty or covenant contained in this Agreement, except to the extent any such claim, loss, damage, judgment, or expense is caused by the material negligence or intentional misconduct of the Indemnified Party or Parties.

8.2  Survival; Remedies Cumulative  The representations, warranties and covenants herein shall survive the Closing indefinitely. All remedies are cumulative, and a Party may exercise all remedies afforded to it in any order

.

8.3    Further Representations and Assurances.  Except as provided for in the Agreement, BMI has not and does not hereby assume or agree to assume any liability whatsoever of AMI, and BMI does not assume or agree to assume any obligation of AMI under any contract, agreement, indenture, or any other document to which AMI may be a party or by which AMI is or may be bound, or which in any manner affect the Mining Claims or any part thereof, except the Second Amendment or as expressly agreed to by BMI in this Agreement.

13

Mill op 5-31  8 am

8.4     Notices. All communications, consents, and other notices provided for in this Agreement shall be in writing and shall be effective on the date hand delivered, sent by facsimile, or mailed by registered or certified mail, return receipt requested, postage prepaid, and addressed as follows:

> If to AMI, to:
> APPLIED MINERALS, INC.
> 1200 Silver City Road
> PO Box 432
> Eureka, UT 84628
> Attn: Christopher Carney
>
> or to such other address as AMI may designate to BMI, in writing.
>
> If to BMI, to:
> BMI MINERALS COMPANY.
> 16640 Chesterfield Grove Road, Suite 170
> Chesterfield, MO 63005
> Attn: Richard Fox
>
> or to such other address as BMI may designate to AMI, in writing.

8.5     Amendment.      No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed, in writing, by the Party making the waiver.

Mill op 5-31  8 am

8.6 <u>Binding Nature</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties to it and their respective successors and assigns; BMI or with the prior written consent of BMI, AMI shall be entitled to assign its rights and obligations hereunder to a third party.

8.7 <u>Invalidity.</u> In the event that any provision of this Agreement shall be held invalid and unenforceable, such provision shall be severable from, and invalidity and unenforceability shall not be construed to have any effect on the remaining provisions of this Agreement.

8.8 <u>Counterparts.</u> This Agreement may be executed simultaneously by  s of the State of Utah and the parties agree to the exclusive jurisdiction of the Federal courts in the eastern district of Missouri.

8.9 <u>Governing law</u>. All disputes arising under this agreement shall be governed by and interpreted in accordance with the laws of Utah without regard to principles of conflict of laws. The parties to this agreement will submit all disputes arising under this agreement to arbitration in St. Louis, Missouri, before a single arbitrator of the American Arbitration Association ("AAA"). The arbitrator shall be selected by application of the rules of the AAA, or by mutual agreement of the parties. No party to this agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction.

8.10 <u>Additional Assurances</u>. The Parties agree from time to time to execute such additional documents as are necessary to effect the intent of the Parties as manifested by this Agreement.

Mill op 5-31 8 am

(i)Exhibits. Notwithstanding statements elsewhere in the Mill Sale Agreement to the effect that exhibits are attached, certain exhibits are not attached. But such exhibits are to be attached as a condition of closing.

8.11 Exhibits. Notwithstanding statements elsewhere in the Mill Sale Agreement to the effect that exhibits are attached, certain exhibits are not attached. But such exhibits are to be attached as a condition of closing.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

| APPLIED MINERALS, INC. | Brady McCasland, Inc. |
|---|---|
| *Christopher T. Carney* | By: |
| By: | Name: Richard Fox |
| Name: Christopher T. Carney | Title: President |
| Title: President and cEO | |

# EXHIBIT F



RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

Mr. Richard Fox
BMI Minerals Company
16640 Chesterfield Grove Road
Chesterfield, MO 63005

(Space Above For Recorder's Use)

### GENERAL WARRANTY DEED

For good and valuable consideration, APPLIED MINERALS, INC., a Delaware corporation, with a mailing address of 1200 Silver City Road, PO Box 432, Eureka, Utah 84628 ("Grantor") hereby grants and warrants to BMI MINERALS COMPANY, a Missouri corporation having its principal place of business at 16640 Chesterfield Grove Road, Suite 170, Chesterfield, MO 63005 ("Grantee") the one hundred percent (100%) interest in and to the Iron Oxide Minerals and the Iron Oxide Rights together with any and all interests, rights and appurtenances thereto located on or within those certain patented and unpatented mining claims, located in Juab County, State of Utah, as more particularly described on attached <u>Schedule A</u> (the "Mining Claims"), TO HAVE AND TO HOLD the Iron Oxide Minerals and the Iron Oxide Rights, together with all tenements, hereditaments, and appurtenances thereunto belonging, unto the Grantee, and its successors and assigns, forever. Iron Oxide Minerals means the iron oxide within the Mining Claims but shall exclude iron oxide intermingled with any economically recoverable deposit of Halloysite. Iron Oxide Minerals do not include any iron oxide in surface piles of minerals described in Note 10 to the financial statements in the Annual Report on Form 10-K for the year ended December 31, 2021. The Iron Oxide Minerals and the Iron Oxide Rights are the dominant estate. Iron Oxide Rights means rights reasonably necessary or useful for (i) access to (ingress and egress) to the Mining Claims, exploration for, drilling, mining, crushing, permitting, producing, removing, processing, bagging, testing, analyzing, storing in bags, piles, or otherwise (including the creation of waste piles), handling treating, disposing, containing, selling, vehicle parking for third party suppliers and others, communications equipment used for, and shipping of Iron Oxide Minerals and non-Iron Oxide Minerals intermingled with Iron Oxide Minerals or whose removal is deemed by Grantee as necessary or desirable in order to accomplish any of the foregoing and (ii) the construction, repair, and/or use of buildings, sheds, fixtures, equipment, and personal property or similar in connection with any of the foregoing. To the extent that any of the Iron Oxide Rights may be deemed to be an easement, it is the intention of the Parties that such be deemed easements of necessity and to run with the land.

The undersigned represents and warrants that he/she has the right, power, legal capacity and authority to enter into and perform this General Warranty Deed. The undersigned further hereby acknowledges and affirms to the below named Notary Public that the undersigned appeared before such Notary Public and either executed this General Warranty Deed before such Notary Public or acknowledged to such Notary Public that the undersigned executed this General Warranty Deed, and that the undersigned executed this General Warranty Deed for the purposes stated in it.

DATED this _19TH_ day of April 2023

1

APPLIED MINERALS INC., a
Delaware corporation

By: _____

Name: _____

Title: _____

State of Utah            )

County of Utah _____ )

On the _____ day of April in the year 2023 before me, personally came Christopher Carney to me known, who, being by me duly sworn, did depose and say that he resides 425 East 51st Street, New York, N.Y. 10022 **(if the place of residence is in a city, include the street and street number, if any, thereof)**; that he is the president of the Applied Minerals, Inc., the corporation described in and which executed the above instrument; that he signed his name(s) thereto by like authority of the board of directors of said corporation

_____

## Schedule A

### Mining Claims

**Unpatented Mining Claims:**

Certain unpatented mining claims located in Juab County, State of Utah, as more particularly described as follows:

| Claim Names | IMC Numbers |
|---|---|
| Am Fraction #1 | UMC420562 |
| Am Fraction #2 | UMC420563 |
| Am Fraction #3 | UMC420564 |
| Am Fraction #4 | UMC420565 |
| Am Fraction #5 | UMC420566 |
| Am Fraction #6 | UMC420567 |

**Patented Mining Claims:**

Certain patented mining claims situated in Juab County, State of County, as more particularly described as follows:

Township 10 South, Range 2 West, SLBM

| | Card No. | Survey No. | Section | Property No | Unit No | Acreage |
|---|---|---|---|---|---|---|
| Black Dragon 1st | 294 | 79 | 31 | 33525 | 59887 | 1.495 |
| Black Dragon 3 | 294 | 79 | 31 | | 59887 | |
| Black Dragon 4 | 294 | 79 | 31 | | 59887 | |
| Black Dragon Con. | 297 | 49 | 30 | 51905 | 59887 | 3.640 |
| Black Dragon Con. | 297 | 49 | 31 | | 59887 | |
| Cross Dragon | 311 | 80 | 31 | 24755 | 59887 | 1.515 |
| Reverse | 458 ~~084~~ | 81 | 31 | 51930 | 59887 | 2.468 |
| Iron Clad | 362 | 82 | 19 | 51926 | 59887 | 4.669 |
| Contest | 309 | 83 | 31 | 51923 | 59887 | 1.284 |
| Elise | 540 | 84 | 31 | 24761 | 59887 | 3.000 |
| Governor | 155 | 85 | 29 | 51911 | 59887 | 6.880 |

3

CARD No

| | | | | | | |
|---|---|---|---|---|---|---|
| Brooklin | 237 | 86 | 31 | 51904 | 59887 | 5.023 |
| King James | 379 | 87 | 31 | 24657 | 59887 | 5.157 |
| Nom de Plume | 425 | 117 | 30 | 51929 | 59887 | 5.327 |
| June Rose | 125 | 136 | 31 | 51927 | 59887 | 2.230 |
| Martha Washington #2 | 124 | 137 | 31 | 51915 | 59887 | 5.420 |
| Silver Coin | 0012 | 144 | 31 | 51919 | 59887 | 6.340 |
| Roadside | 452 | 150 | 31 | 51931 | 59887 | 6.800 |
| Rattler | 229 | 151 | 31 | 51917 | 59887 | 9.950 |
| Elise No. 2 | 539 | 222 | 31 | 51909 | 59887 | 5.140 |
| Great Whel Vor | 151 | 298 | 31 | 51925 | 59887 | 19.834 |
| Reverse #2 | 457 | 333 | 31 | 51916 | 59887 | 1.792 |
| Cygnet | 310 | 334 | 31 | 24756 | 59887 | 19.400 |
| Snap Dragon | 483 | 3195 | 31 | 51932 | 59887 | 3.770 |
| Willie Gundry | 007 | 3240 | 31 | 51922 | 59887 | 8.051 |
| Tina | 020 | 3254 | 31 | 51934 | 59887 | 0.583 |
| Sunny Side | 045 | 3782 | 31 | 24760 | 59887 | 6.460 |
| Brooklyn No. 2 | 224 | 3783 | 31 | 51905 | 59887 | 2.428 |
| Guardian | 148-A | 3852 | 31 | 51912 | 59887 | 15.140 |
| Mary | 091 | 3873 | 31 | 51916 | 59887 | 8.570 |
| Frankie #1 | 337 ~~109~~ | 4109 | 31 | 24303 | 59887 | 13.260 |
| Frankie #2 | 337 ~~110~~ | 4110 | 31 | 51910 | 59887 | 16.520 |
| Frankie #3 | 337 ~~111~~ | 4111 | 31 | 51921 | 59887 | 11.843 |
| White Dragon | 002 | 4163 | 30 | 51933 | 59887 | 0.534 |
| June | 504 | 4519 | 30 | 51913 | 59887 | 4.647 |
| Daisy | 504 | 4519 | 30 | 51997 | 59887 | 4.626 |
| Dew Drop | 504 | 4519 | 31 | 51924 | 59887 | 13.734 |
| Turk | 504 | 4519 | 29 | 24759 | 59887 | 6.674 |
| Eastern | 504 | 4519 | 30 | 51908 | 59887 | 6.846 |
| March | 504 | 4519 | 29 | 51928 | 59887 | 16.542 |

4

# EXHIBIT G

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

Richard Fox
BMI Minerals Company
16640 Chesterfield Grove Road
Chesterfield, MO 63005

(Space Above For Recorder's Use)

## GROUND LEASE

This GROUND LEASE *("Lease")* is made and entered into as of the **22** of
July  2022 by and between APPLIED MINERALS INC., a Delaware corporation, with a mailing address of
1200 Silver City Road, PO Box 432, Eureka, Utah 84628 *("Landlord"),* and Brady McCasland. Inc.
("*Tenant*"), a Missouri corporation having its principal place of business at 16640 Chesterfield Grove
Road, Suite 170, Chesterfield, MO 63005.

AMI and BMC may be referred to herein collectively as the *"Parties"* or individually as a *"Party."*

## RECITALS:

**WHEREAS,** Landlord owns the real property more particularly described on <u>**Exhibit A**</u> attached
hereto and made a part hereof (the "<u>Property</u>"); and

**WHEREAS,** Landlord and Tenant have reached agreement with respect to Landlord's leasing and
demising to Tenant, and Tenant's taking and hiring from Landlord, the Property on and subject to the
terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants and conditions herein contained and
other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the
parties intending to be legally bound hereby agree as follows:

1. <u>**Lease of Premises; Title Matters; Modification of Property.**</u>

(a) **Lease Grant.** Landlord hereby leases and lets to Tenant, and Tenant hereby takes and hires from
Landlord, upon and subject to the terms, conditions, covenants and provisions hereof, rights of the
Property together with any and all appurtenances, rights, privileges and easements benefiting same (all
the foregoing, collectively, the "<u>Premises</u>").  Such surface rights shall be deemed to be the dominant
estate.  It is the intention of the Parties that the lease includes only those patented and/or unpatented
mining claims any part of which is within 100 feet of any part of the Mill, which is on the Property as of the
date of this agreement.  If it is later determined that there are mining claims not included in the Property
that are within 100 feet of the Mill, the Parties will amend this Lease to include such mining claims within
the Property.  If it is later determined that mining claims included in the Property are not within 100 feet of
the Mill, the Parties will amend this Lease to delete such mining claims from the Property.

(b) **Title Matters and Improvements.** Tenant shall hold legal title to, and possession of all improvements
constructed on the Property by or for the benefit of Tenant currently or subsequently installed, including

1

the Mill. The improvements  The improvements  are severed from the land and will be deemed to be personal property.

Except as provided herein, Title to the improvements including the Mill, furniture, fixtures, equipment and all personalty ("MFF&E"), shall, upon the termination or expiration of this Lease, not vest in Landlord. Any MFF&E which is not removed from the Property within two years following the termination of this Lease shall be considered abandoned and Landlord may dispose of and/or store same as it deems expedient with the cost thereof borne by Tenant. Notwithstanding anything herein to the contrary, Tenant shall have the right from time to time to demolish, remove, alter and/or replace any improvements on the Premises in its sole and absolute discretion.

2. **Term.**

(a) **Initial Term.** The initial term (the "Initial Term") of this Lease shall be one hundred (100) years commencing on the date hereof (the "Commencement Date") and ending at 11:59 p.m. on the day immediately preceding the one-hundredth (100th) anniversary of the Commencement Date (the "Expiration Date") unless sooner terminated in accordance with the terms hereof.  .

(b) **Renewal Term.** Tenant shall have the right to extend the term of this Lease for ten (10) consecutive ten (10) year renewal periods (each, a "Renewal Term"), upon all of the terms and conditions set forth in this Lease. Tenant may do so only if no uncured Event of Default, then exists hereunder, and by giving Landlord notice thereof (an "Renewal Notice") not less than one hundred eighty (180) days' prior to the expiration of the Initial Term or the immediately previous Renewal Term, as the case may be. The Initial Term and each exercised Renewal Term are collectively referred to herein as the "Term". Notwithstanding anything herein to the contrary, Tenant's right to extend the Term of this Lease shall not terminate or be extinguished due to Tenant's failure to give Landlord an Renewal Notice as herein provided unless and until (i) Landlord shall have notified each Leasehold Mortgagee (as hereinafter defined), if any, of such failure; and (ii) no Leasehold Mortgagee shall exercise the renewal option on behalf of Tenant within thirty (30) days of such Leasehold Mortgagee's receipt of the notice referred to in clause (i) above. Tenant hereby agrees to be legally bound by the exercise of any renewal option by any Leasehold Mortgagee.

(c) Tenant shall have the right to terminate this lease without further liability at any time after January 1, 2023, by delivering ninety (90) notice to L:andlord transfer and in the event of such termination shall have the right to transfer any of the Mill and/or any improvements to Landlord and Landlord agrees to accept such.

.

3. **Permitted Use; Undertakings by Tenant; Landlord Covenants.**

(a) **Permitted Use.** Landlord and Tenant acknowledge and agree that Tenant shall have the right to use the Premises or allow the Premises to be used for any lawful purpose.

(b) **Undertakings by Tenant.**  Tenant shall have the right (but shall not be obligated), at its sole cost and expense, from time to time, to demolish, remove, alter, replace and/or repair any improvements presently on the Property and construct and/or install and thereafter demolish, remove, alter, replace and/or repair any buildings, structures or other improvements thereon.

Landlord covenants and agrees to allow Tenant, at no out-of-pocket costs to Landlord, to (i) pursue the foregoing in Landlord's name and/or to execute and deliver such instruments and/or documents (including, but not limited to, applications for land development and/or permits) which may be required to be executed by the record owner of the Property in order to facilitate the foregoing, provided that all documents executed in Landlord's name are approved by Landlord in writing (such approval not to be unreasonably withheld, conditioned or delayed), and (ii) cooperate and/or participate with Tenant, to the extent reasonably required by Tenant, in the pursuit of all applications, permits, consents and approvals.

2

4. **Delivery of Premises.** Landlord shall deliver sole and exclusive possession and control of the Premises to Tenant on the Commencement Date, free of all tenants, occupants and others with a right to or claiming possession

5. **Rent.**

The annual rent during the Initial Term is $100 per year, which aggregates to $10,000 and has been paid in advance under the Mill Sale Agreement between the Parties.    The rent for each renewal period will be $10,000 payable in advance.

6. **Taxes.**

(a) **Obligation to Pay Taxes.** Except as expressly set forth herein to the contrary, Landlord shall pay shall pay or cause to be paid all taxes, assessments, general and special assessments, excises, levies, a, general or special, ordinary or extraordinary, foreseen or unforeseen, which, at any time during the Term, are imposed, levied or assessed against the Premises, or arise in respect of the operation, possession or use of the Premises, and in each case relate to the Term of this Lease (collectively, <u>Taxes</u>) that would otherwise be the responsibility of the Tenant.

(b) **Right to Contest.** Landlord shall have the right, at its sole cost and expense and from time to time, to contest the amount and/or validity of any Tax by appropriate proceedings diligently conducted in good faith, provided that, Landlord shall either continue to pay all Taxes during the pendency of the foregoing proceedings, or provide with reasonably satisfactory security to ensure Landlord's satisfying such obligations in the event of a negative outcome, and Tenant shall not be required to pay same during such contest. Upon the conclusion of such proceedings, Landlord shall pay the amount of such Tax as is finally determined in such proceedings, the payment of which shall have been deferred pursuant to this provision, together with all costs, fees, interest and penalties incurred in connection therewith. Upon the request of Landlord, Tenant shall permit Landlord to pursue the foregoing in Tenant's name and/or execute and deliver to Landlord such instruments and/or documents which may be required to be executed by the record owner of the Property in order to facilitate the foregoing and to cooperate and/or participate with Tenant Landlord, to the extent reasonably required by Landlord , in the pursuit of tax relief, provided that all reasonable out-of-pocket costs incurred by Tenant in connection therewith are paid by Landlord and Tenant approves any and all documentation to be signed by Tenant (such approval not to be unreasonably withheld, conditioned or delayed).

(e) **Tax Refunds; Tax Abatements.** If there shall be any refunds or rebates on account of the Taxes paid by Tenant hereunder, such refunds and/or rebates shall belong solely to Landlord. Any refunds and/or rebates received by Tenant shall be deemed trust funds and as such shall be received by Tenant in trust and paid to Landlord forthwith.  Tenant shall, upon the request of Landlord, sign any receipts which may be necessary to secure the payment of any such refund and/or rebate, and shall pay over to Landlord  such refund and/or rebate when and as received by Tenant. Tenant covenants and agrees to use commercially reasonable efforts, at no out-of-pocket cost to, to obtain and/or keep in force and effect any tax abatement available to the Premises and/or the use thereof.

(f) **Realty Transfer Taxes.** In the event that any federal, state or local realty transfer tax (or other tax or obligation in lieu thereof) shall be imposed as a result of the execution of this Lease, the exercise of any renewal option or the recording of a short form lease or memorandum in connection with any of the foregoing, then the parties shall each pay fifty (50%) percent of such tax or other amount at the time such tax or other amount is due and payable.

7. **Utilities.** Tenant shall have the right to make full use of the Premises as contemplated herein, and in connection therewith, Tenant shall have the right to obtain and/or make use of all water, sewer, electric,

3

gas, telecommunications and other utilities now or hereafter servicing the Premises (the "Utilities"). In furtherance thereof, Tenant shall have the right, from time to time, to grant, modify, relocate and/or terminate such easements and/or other rights as Tenant deems reasonably necessary to accommodate the design, installation, construction, connection, operation and repair of such Utilities, whether now existing or hereafter created. Landlord covenants and agrees to allow Tenant to pursue the foregoing in Landlord's name and/or execute and deliver such instruments and/or documents in recordable form (including, but not limited to, easements and/or rights-of-way of record) which may be required to be executed by the record owner of the Property in order to facilitate the foregoing and to cooperate and/or participate with Tenant, to the extent reasonably required by Tenant, in the pursuit of such utility rights, provided that all reasonable out-of-pocket costs incurred by Landlord in connection therewith are paid by Tenant and Landlord approves any and all documentation to be signed by Landlord (such approval not to be unreasonably withheld, conditioned or delayed). Landlord further covenants and agrees, with respect to real property owned or controlled by Landlord and/or any Affiliate of Landlord, to execute and deliver (or cause to be executed and delivered) such instruments and/or documents in recordable form (including, but not limited to, easements and/or rights-of-way of record) and burdening such real property which Tenant determines, acting in good faith and in a commercially reasonable manner, are necessary or expedient in order to facilitate the foregoing and to cooperate and/or participate with Tenant, to the extent reasonably required by Tenant, in the pursuit of such utility rights, provided that all reasonable out-of-pocket costs incurred by Landlord in connection therewith are paid by Tenant and Landlord approves any and all documentation to be signed by Landlord (such approval not to be unreasonably withheld, conditioned or delayed).

## 8. Indemnification.

(a) **Indemnification of Landlord.** Tenant shall defend, with counsel reasonably satisfactory to Landlord, indemnify and save Landlord harmless from and against any and all claims, damages, losses, costs and expenses including, but not limited to, reasonable attorneys' fees and court costs, suffered or incurred by Landlord that result from (i) the use, operation and/or management of the Premises or any improvements thereon, whether by Tenant or anyone claiming or holding through Tenant (including, but not limited to, any employees, contractors, subtenants, licensees, invitees or agents of Tenant), (ii) any breach or default on the part of Tenant (or anyone claiming or holding through Tenant) in the observance of, or performance of its obligations under, this Lease, (iii) any injury to or death of any person, or damage to or loss of property on or by reason of activity on the Premises, but in each case only to the extent relating to the Term of this Lease or to the extent caused by the negligence or wanton or willful misconduct of Tenant or anyone claiming or holding through Tenant (including, but not limited to, any employees, contractors, subtenants, licensees, invitees or agents of Tenant), and not having arisen by reason of or in connection with (y) the negligence or wanton or willful misconduct of Landlord or Landlord's employees, agents or contractors, and/or (z) Landlord's breach or default in the observance of, or performance of its obligations under, this Lease .Agreement.

(b) **Indemnification of Tenant.** Landlord shall defend, with counsel reasonably satisfactory to Tenant, indemnify and save Tenant harmless from and against any and all claims, damages, losses, costs and expenses including, but not limited to, reasonable attorneys' fees and court costs, suffered or incurred by Tenant that result from (i) the use, operation and/or management of the Premises or any improvements thereon, whether by Landlord or anyone claiming or holding through Landlord (other than Tenant or anyone claiming or holding through Tenant or any employees, contractors, subtenants, licensees, invitees or agents of Tenant and such third parties) prior to the Commencement Date, (ii) any breach or default on the part of Landlord (or anyone claiming or holding through Landlord, other than Tenant or anyone claiming or holding through Tenant or any employees, contractors, subtenants, licensees, invitees or agents of any of the foregoing) in the observance of, or performance of its obligations under, this Lease, (iii) any injury to or death of any person, or damage to or loss of property on or by reason of activity on the Premises, but in each case only to the extent relating to the period prior to the Commencement Date or subsequent to the expiration or earlier termination of this Lease, and not having arisen by reason of or in connection with (y) the negligence or wanton or willful misconduct of Tenant or anyone claiming or holding through Tenant or any employees, contractors, subtenants,

4

licensees, invitees or agents of any of the foregoing, and/or (z) Tenant's breach or default in the observance of, or performance of its obligations under, this Lease.

(c) **Notice of Claim.** Any party seeking indemnification hereunder shall give prompt notice to the other party of the basis therefore. The failure on the part of such party to give such notice shall not relieve the other party from its obligations hereunder, except to the extent that the failure to give such notice results in actual loss or damage to the indemnifying party.

(d) **Survival.** The obligations of the parties pursuant to this Section shall survive the expiration or termination of this Lease.

9. <u>**Condemnation.**</u>

(a) **Notices.** Each party shall immediately notify the other in the event such party receives notice of a Taking (as hereinafter defined).

(b) **Tenant Right to Intervene.** If the use, occupancy or title to the Property, or any part thereof, or any buildings or improvements thereon, is permanently taken, requisitioned, sold or impaired in, by or on account of any actual or threatened eminent domain proceeding or other action by any person having the power of eminent domain (each, a "<u>Taking</u>") during the Term, Tenant shall have the right, subject to the rights of Leasehold Mortgagees, to appear in any such proceeding or action, to negotiate, prosecute and adjust any claim for any award or compensation on account of its interests therein, and to collect any such award or compensation.

(c) **Complete Taking.** If a Taking occurs that (i) results in a taking of substantially all of the Property, or (ii) in Tenant's determination, acting in good faith and in a commercially reasonable manner, renders the remaining Premises uneconomic or unviable for Tenant's continued use (which determination may include, but shall not be limited to, that a Taking less than five (5) years before the end of the Term renders reconstruction of the Premises uneconomic and/or unviable) (each, a "<u>Substantial Condemnation</u>"), then, at Tenant's option by notice to Landlord, this Lease (except as it relates to allocation of the condemnation award) shall terminate on the date when the condemning authority has acquired title to or taken possession of any portion of the Premises (the "<u>Condemnation Effective Date</u>"). In the event of such a termination, all Rent shall be apportioned as of the Condemnation Effective Date and any Condemnation award shall be allocated in accordance with the parties' respective interests in the Premises.

(d) **Temporary Condemnation.** If a Taking of the temporary right to use or occupy all or a part of the Premises occurs (a "<u>Temporary Condemnation</u>"), and such Temporary Condemnation relates to a period longer than one hundred twenty (120) days, then Tenant may, by notice to Landlord within thirty (30) after the entry of the final order (or its equivalent) for such Temporary Condemnation, terminate this Lease effective as of the Condemnation Effective Date in which event all Rent shall be apportioned as of the Condemnation Effective Date and any Condemnation award shall be allocated in accordance with the parties' respective interests in the Premises. If the Temporary Condemnation relates to a shorter period, or if Tenant does not terminate this Lease as aforesaid, then this Lease shall continue as to that portion of the Premises not so taken (and resume as to the entire Premises immediately following the cessation of such Taking), all Rent and all other obligations under this Lease shall continue without adjustment, and Tenant shall receive all condemnation awards, if any (to the extent for periods within the Term).

(e) **Partial Taking.** If any Taking occurs except a Substantial Condemnation resulting in a termination of this Lease, or a Temporary Condemnation, then this Lease shall continue, all Rent shall be equitably adjusted and, subject to the rights of Leasehold Mortgagees, all condemnation awards shall be paid to Tenant.

(f) **Survival.** The obligations of the parties pursuant to this Section shall survive the expiration or termination of this Lease.

10. **Casualty.** Tenant shall have the right to terminate this Lease if there is a fire or other casualty. Tenant shall have the right to terminate this Lease upon written notice to Landlord within ninety (90) days of such fire or other casualty, Tenant shall have no obligation to deliver to Landlord any insurance proceeds received by Tenant The obligations of the parties pursuant to this Section shall survive the expiration or termination of this Lease.

11. **Permitted Contests.** Notwithstanding anything herein to the contrary and so long as not prohibited by Applicable Law, Tenant shall not be required, nor shall Landlord have the right, to pay, discharge or remove any tax, assessment, levy, lien or encumbrance, or to comply with any Applicable Laws applicable to the Premises or the use thereof, as long as Tenant is diligently and in good faith contesting the existence, amount or validity thereof by appropriate proceedings. Landlord covenants and agrees to allow Tenant to pursue the foregoing in Landlord's name and/or execute and deliver such instruments and/or documents which may be required to be executed by the record owner of the Property in order to facilitate the foregoing and to cooperate and/or participate with Tenant, to the extent reasonably required by Tenant, in the pursuit of same, provided that all reasonable out-of-pocket costs incurred by Landlord in connection therewith are paid by Tenant and Landlord approves any and all documentation to be signed by Landlord (such approval not to be unreasonably withheld, conditioned or delayed).

12. **Default Provisions.**

   (a) **Events of Default by Tenant.** The occurrence of the following shall constitute an "Event of Default" hereunder:

      (i) Tenant's failure to comply with or perform any term or condition set forth in this Lease to be satisfied by Tenant and such failure shall continue for 180 days after notice from Landlord to Tenant, or in the case of any default which cannot reasonably be cured within such ninety (90) day period, if Tenant fails to promptly commence to cure same or thereafter fails to prosecute the curing thereof with diligence to completion;

   (b) **Landlord's Remedies.** If an Event of Default shall have occurred and be continuing, Landlord shall have all rights and remedies available at law or in equity including, but not limited to the following:

      (i) Landlord shall have the right to require payments of all rents collected by Tenant pursuant to any sublease or occupancy agreement, provided Landlord applies such amounts as are actually received by Landlord (after deduction for costs of collection) against the obligations of Tenant hereunder and pays the remaining balance, if any, to Tenant;

      (ii) Landlord may give Tenant notice of Landlord's intention to terminate this Lease on a date specified in said notice. Upon the giving of such notice, the Term and the estate hereby granted shall expire and terminate on the date set forth in said notice as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the Term, and this Lease shall expire and terminate. No act or proceeding done or undertaken by Landlord with respect to an Event of Default shall constitute a termination of this Lease by Landlord unless and until Landlord shall give to Tenant a notice of termination;

   (c) **Events of Default by Landlord; Tenant Remedies.** If Landlord shall fail to pay or perform any of Landlord's obligations under this Lease, and such failure is not cured within forty-five (45) days following notice from Tenant to Landlord, or in the case of any default which cannot reasonably be cured within such forty-five (45) day period, if Landlord fails to promptly commence to cure same or thereafter fails to prosecute the curing thereof with diligence to completion, then such occurrence shall constitute a "Landlord Default" hereunder. If a Landlord Default shall have occurred and be continuing, Tenant shall have all rights and remedies available at law or in equity. If Landlord shall fail to pay or perform any of Landlord's obligations under this Lease, and such failure is not cured within ninety (90) days following the

6

aforesaid notice from Tenant to Landlord, or in the case of any default which cannot reasonably be cured within such ninety (90) day period, if Landlord fails to promptly commence to cure same or thereafter fails to prosecute the curing thereof with diligence to completion, then in addition to the rights and remedies available to Tenant in the event of a Landlord Default, Tenant shall have the right to give Landlord notice of Tenant's intention to terminate this Lease on a date specified in said notice. Upon the giving of such notice, the Term and the estate hereby granted shall expire and terminate on the date set forth in said notice as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the Term, and this Lease shall expire and terminate. Tenant, at its option but without being obligated to do so, and in addition to any other rights and remedies Tenant may have on account of such Landlord Default, shall immediately have the right to cure such Landlord Default, whereupon all costs and expenses reasonably incurred by Tenant in curing such Landlord Default, shall be paid by Landlord within thirty (30) days of a demand therefore and in the event of Landlord's failure to do so, Tenant shall have the right to offset such amounts against amounts otherwise owing hereunder from Tenant to Landlord.

13. **Assignment and Subletting.** Tenant shall have the right, from time to time, to sublease such portions of the Premises and/or grant licenses and/or concessions as Tenant elects in its sole discretion, provided that such subleases, licenses and concessions are for uses permitted hereunder and are otherwise subject to all of the terms and conditions of this Lease. Tenant shall have the right to assign this Lease without the consent of Landlord. No such assignment shall modify or limit any right or power of Landlord hereunder or affect or reduce any obligation of Tenant. Any sublease or assignment shall require the subtenant or assignee, as applicable, to assume in writing all of Tenant's obligations with respect to the Premises (or applicable part thereof) pursuant to this Lease from and after the date thereof (and in the case of a sublease, for the term thereof). Every sublease shall include a provision substantially as follows:

> "If for any reason the right of possession and/or leasehold estate of the Sublessor as tenant under any underlying lease is terminated, then, at the option of landlord under such underlying lease, Sublessee shall attorn to landlord and shall recognize landlord as Sublessee's landlord under this Sublease. Sublessee agrees to execute and deliver, from time to time, upon the request of Sublessor or of landlord under such underlying lease, instruments appropriate to evidence such attornment, and Sublessee hereby irrevocably appoints landlord under such underlying lease the Sublessee's attorney-in-fact, coupled with an interest, to execute and deliver such instrument for and on behalf of Sublessee following Sublessee's failure to do so. Sublessee waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Sublessee any right of election to terminate this Sublease or to surrender possession of the Subleased Premises in the event such underlying lease is terminated or any proceeding is brought by landlord to enforce its rights under such underlying lease, and agrees that, at the election of such landlord, this Sublease shall not be affected in any way whatsoever by any such termination or proceeding."

14. **Additional Landlord Covenants.**

   (a) **Cooperation.** Landlord covenants and agrees to reasonably cooperate with Tenant from and after the execution and delivery of this Lease so as to permit Tenant the fullest opportunity possible to obtain and maintain any necessary governmental and quasi-governmental permits, licenses and approvals (including, but not limited to, land use waivers, variances and approvals, building permits and certificates of occupancy) as Tenant, acting in good faith and in a commercially reasonable manner, deems necessary or desirable in connection with the development, construction, operation, maintenance and repair of the Premises for the uses contemplated herein. Such cooperation shall include, but not be limited to, joining in one or more applications \and/or permitting Tenant to proceed with such applications in the name of Landlord, attendance at such hearings, proceedings, meetings and/or consultations held by governmental, quasi-governmental, neighborhood, civic group or other persons as tenant may reasonably require. All reasonable out-of-pocket expenses incurred by Landlord in connection with the foregoing shall be promptly reimbursed by Tenant.

   (b) **Licensing.** Landlord shall, at its sole cost and expense, comply, and cause all persons associated with Landlord to comply, with all Applicable Laws to the extent necessary to allow Tenant to

lease the Property from Landlord. Landlord further covenants and agrees not to take any action (or fail to take any action) which might result in Tenant's governmental and/or quasi-governmental permits, licenses and approvals to be revoked or suspended. Landlord's obligations hereunder shall include, but not be limited to, its obtaining and maintaining throughout the Term, all required business and other permits, licenses and approvals relating to the operations and business conducted by Landlord (as opposed to the operations and business of Tenant or anyone claiming by or through Tenant) including the ownership of the Property.  Tenant shall have the right to obtain injunctive relief in the event of such a Landlord Default or a threatened Landlord Default.

## 15. Environmental.

(a) **Tenant's Environmental Covenants.** Tenant covenants and agrees with Landlord that Tenant shall:

> (i) not locate, store, generate, manufacture, process, distribute, use, treat, transport, handle, dispose of, emit, discharge or release any Hazardous Substance or Hazardous Waste (as such terms are hereinafter defined) on or from the Premises, and shall not knowingly permit others to do so, except in the ordinary course of business and in compliance with all Environmental Laws (as hereinafter defined);

> (ii) comply with all orders, actions and demands of all governmental agencies and legal or administrative agencies having jurisdiction over the Premises to clean and remove any Hazardous Substance or Hazardous Waste from the Premises attributable to Tenant's (or anyone claiming by or through Tenant) use and enjoyment of the Premises, and shall pay for such clean up, removal and associated costs, fines and penalties pertaining thereto; and

> (iii) otherwise comply with all Environmental Laws as they apply to the Premises.

(b) **Landlord's Environmental Covenants.** Landlord covenants and agrees with Tenant that  Landlord shall not locate, store, generate, manufacture, process, distribute, use, treat, transport, handle, dispose of, emit, discharge or release any Hazardous Substance or Hazardous Waste on or from the Premises, or any other property in the vicinity of the Premises which Landlord or any Affiliate of Landlord may own, lease or otherwise hold an interest in or exercise any control over and shall not knowingly permit others to do so, except in compliance with all Environmental Laws.

(c) **Tenant's Additional Environmental Indemnification of Landlord.** Tenant hereby agrees to indemnify, defend (with counsel reasonably acceptable to Landlord) and hold Landlord harmless from and against any and all costs, expenses (including, but not limited to reasonable attorneys' fees and court costs), claims, liabilities, actions, demands, losses and damages which may be asserted against or incurred by Landlord (each, a "Claim") with respect to the existence, introduction, discharge, release or spill of any Hazardous Substances or Hazardous Waste upon the Premises in violation of any Environmental Laws which shall occur from and after the date of this Lease, except to the extent such introduction, discharge, spill or release is attributable to (i) conditions existing prior to the date of this Lease (except if caused by Tenant or anyone holding through Tenant or any employees, contractors, subtenants, licensees, invitees or agents of any of the foregoing), and/or (ii) the acts or omissions of Landlord or Landlord's Affiliates or the employees, contractors or agents of any of the foregoing.

(d) **Landlord's Additional Environmental Indemnification of Tenant.** Landlord hereby agrees to indemnify, defend (with counsel reasonably acceptable to Tenant) and hold Tenant harmless from and against any and all costs, expenses (including, but not limited to, reasonable attorneys' fees and court costs), claims, liabilities, actions, demands, losses and damages which may be asserted against or incurred by Tenant (each, a "Claim") with respect to any failure by Landlord to comply with its obligations pursuant to paragraph (b) above.

(e) **Environmental Indemnification Procedures.** An indemnified party hereunder shall promptly provide the indemnifying party with notice of a claim for indemnification hereunder, but the failure to notify

8

the indemnifying party shall not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is materially prejudiced by the indemnified party's failure to give such notice. If any Claim referred to in this Section is brought against an indemnified party and it gives notice thereof to the indemnifying party, the indemnifying party shall be entitled to participate in the defense of same and, if (i) the indemnifying party acknowledges in writing to the indemnified party, without qualification or limitation, its obligation to indemnify the indemnified party pursuant to this Lease, and (ii) provides the indemnified party with satisfactory assurances that it has the financial ability to fully meet its obligations under this Section 16, the indemnifying party shall assume the defense of such Claim with counsel reasonably satisfactory to the indemnified party. If notice is given to an indemnifying party of a Claim and the indemnifying party does not, within ten (10) days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Claim, the indemnifying party will be bound by any determination made with respect to such Claim or any compromise or settlement effected by the indemnified party. Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Claim may adversely affect it other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, or if an indemnified party reasonably believes that it may not receive the indemnification to which it may be entitled from the indemnifying party, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Claim, but the indemnifying party will not be bound by any determination of a Claim so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld). The parties shall cooperate reasonably in the defense of all third party claims which may give rise to claims for indemnification hereunder. In connection with the defense of any claim, each party shall make available to the party controlling the defense of such claim, all books, records and other materials within the control of such party and not protected by attorney-client privilege that are necessary or appropriate to such defense.

(f) **Definitions.** As used herein (i) the terms "Hazardous Substance" or "Hazardous Waste" mean any substance which (a) constitutes a hazardous waste, radioactive waste, or substance under any applicable federal, state or local law, rule, order or regulation now or hereafter adopted, (b) constitutes a "hazardous substance" under CERCLA or the regulations promulgated thereunder, (c) constitutes a "hazardous waste" under RCRA or the regulations promulgated thereunder, (d) constitutes a pollutant, contaminant, chemical or industrial, toxic or hazardous substance or waste, (e) exhibits any of the characteristics enumerated in 40 C.F.R. Sections 261.20-261.24, inclusive, (f) constitutes any of those extremely hazardous substances listed under §302 of SARA which are present in threshold planning or reportable quantities as defined under SARA, (g) constitutes toxic or hazardous chemical substances which are present in quantities which exceed exposure standards as those terms are defined under §§6 and 8 of OSHA and 29 C.F.R. Part 1910 subpart 2, (h) consists, in whole or in part, of asbestos, urea formaldehyde or polychlorinated biphenyls, or (i) constitutes low-level radioactive waste under the Atomic Energy Act of 1954; and (ii) the term "Environmental Laws" means the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., as amended by the Water Quality Act of 1987, Pub. L. No. 100-4 (Feb. 4, 1987), the Toxic Substances Control Act, 15 U.S.C. §§2601 et seq., the Clean Air Act, 42 U.S.C. §§7401 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§136 et seq., the Safe Drinking Water Act, 42 U.S.C. §§300f et seq., the Surface Mining Control and Reclamation Act, §§1201 et seq., 30 U.S.C. §§1201 et seq., the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 et seq., the Superfund Amendment and Reauthorization Act of 1986 ("SARA"), Public Law 99-499, 100 Stat. 1613, the Emergency Planning and Community Right to Know Act, 42 U.S.C. §11001 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6901 et seq., the Occupational Safety and Health Act as amended ("OSHA"), 29 U.S.C. §655 and §657, the Hazardous Materials Transportation Act, as amended (49 U.S.C. 1801 &c), the Atomic Energy Act of 1954, 42 U.S.C. Sect. 2011 - Sect. 2259, and any other applicable provisions of law of the state in which the Property is located, together with all other federal, state, local or foreign statutory or common laws, regulations or orders now existing or hereafter adopted with respect to Hazardous Substances or Hazardous Waste or relating to pollution or protection of the environment including, but not limited to, all common laws of nuisance or trespass, and all laws and regulations relating to emissions, discharges, releases or threatened release of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes into the environment (including, but not

limited to, ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, radiological, industrial, toxic or hazardous substances or wastes. Any reference in this Agreement to any legislative act or regulation shall be deemed to include all amendments, modifications and supplements thereto and all substitutions therefor, and all regulations thereunder. The term "Environmental Laws" also includes all regulations, codes, plans, orders, decrees, judgments, injunctions, notices and demand letters issued, entered, promulgated or approved under or pursuant to any of the aforesaid Environmental Laws by any court, agency, bureau or other governmental body or authority with relevant jurisdiction.

(g) **Survival.** This Section shall survive the expiration or termination of this Lease.

16. **Tenant's Nondisturbance and Attornment; Subordination of Fee Mortgages.** In the event that Landlord mortgages or otherwise encumbers the Property at any time (including, but not limited to, prior to the Commencement Date), Landlord shall (i) deliver to Tenant a non-disturbance agreement (a "Non-Disturbance Agreement") in form and substance reasonably satisfactory to Tenant, duly executed by the holder of any such mortgage or encumbrance (each, a "Fee Mortgagee"), and (ii) include within any instrument granting such mortgage or other encumbrance a provision, reasonably satisfactory to Tenant, requiring the applicable Fee Mortgagee to attorn to this Lease and any substitute Lease pursuant to the provisions hereof or the provisions of any Recognition Agreement (as hereinafter defined) and the rights of Tenant hereunder or thereunder, and agrees to be bound by the terms of this Lease and the Recognition Agreement, in the event that such Fee Mortgagee shall succeed to the interests of Landlord.

17. **Leasehold Mortgages.** Landlord covenants and agrees to cooperate with Tenant and each lender providing financing to Tenant (each, a "Leasehold Mortgagee"), from time to time, at no out-of-pocket cost to Landlord, to the extent such financing is, or is intended to be, secured by a mortgage encumbering the leasehold estate of Tenant hereunder or any part thereof. Landlord covenants and agrees to provide each Leasehold Mortgagee of which Landlord has notice with a reasonable means to protect and preserve its lien and security interest in the Premises upon the occurrence of an Event of Default by Tenant hereunder. Landlord, Tenant and each Leasehold Mortgagee shall execute, acknowledge and deliver to one another one or more agreements, in form and substance reasonably acceptable to such Leasehold Mortgagee(s) to facilitate the closing of such leasehold mortgage financing transaction(s) (each, a "Recognition Agreement"); provided, however, that Landlord will not have any obligation to enter into any agreement that will affect the Term or the Rent due hereunder, or substantially increase the obligations or materially adversely affect any rights of Landlord thereunder, except as expressly set forth herein nor  shall Landlord be obligated to subordinate its fee estate to any Leasehold Mortgagee, execute any document creating personal liability on the part of Landlord or otherwise subject Landlord or its interests in the Property to liability on account of such leasehold financing beyond that expressly granted to Tenant pursuant to this Lease. Each such agreement shall provide, *inter alia*, that each Leasehold Mortgagee shall have the following rights: (i) copies of all notices to Tenant under this Lease shall be provided contemporaneously to the Leasehold Mortgagee, provided that Landlord has been provided with written notice of the address to which such notices should be sent, (ii) Landlord's failure to so provide each Leasehold Mortgagee with copies of notices to Tenant shall render the subject of such notice non-binding on such Leasehold Mortgagee, (iii) in the event of a default by Tenant hereunder, such Leasehold Mortgagee shall have the same concurrent notice and grace periods as are required to be given to Tenant to cure the same hereunder or after Landlord has provided such Leasehold Mortgagee with such notice, whichever is later, plus, in each instance, an additional ninety (90) days after the expiration of same; or where Leasehold Mortgagee's ability to cure such Event of Default is contingent upon such Leasehold Mortgagee (or its designee) taking possession of the Premises and such Leasehold Mortgagee has commenced to take such action(s) as may be required to so take possession within such additional ninety (90) day period, such additional period of time as is reasonably required to complete such action(s), take possession of the Premises and cure such Event of Default (except in the case of a monetary default hereunder, in which event such Leasehold Mortgagee shall not have any additional cure period beyond the ninety (90) day period described above), (iv) Leasehold Mortgagee, without prejudicing any of its rights or remedies, shall have the right to cure any default or Event of Default of Tenant within the notice and cure periods set forth herein and/or the Recognition Agreement and Landlord shall be

10

required to accept such performance and/or payment (and such Leasehold Mortgagee is and shall be authorized to enter upon the Premises for such purposes), (v) if the Lease shall be terminated due to a failure to cure an Event of Default, such Leasehold Mortgagee shall have the right to require that Landlord enter into a new and separate lease with such Leasehold Mortgagee or its designee on the same terms and conditions as this Lease, provided that such Leasehold Mortgagee (or its designee) thereafter cures all Events of Defaults within ninety (90) of written notice from Landlord, (vi) in the event of a default by Tenant under a leasehold mortgage, the applicable Leasehold Mortgagee shall be entitled to enforce all of its rights and remedies as provided for therein (provided that no Leasehold Mortgagee shall have rights in addition to those of Tenant hereunder other than as expressly set forth in this Section), (vii) this Lease may be assigned, without the consent of Landlord, but otherwise subject to the terms and conditions of this Lease, and (viii) no surrender, other than upon the Expiration Date, shall be effective as against such Leasehold Mortgagee unless expressly consented to in writing by such Leasehold Mortgagee.

18.MFF&E **Liens.** Tenant and any subtenant of Tenant shall have the right, from time to time, to enter into and grant one or more liens (each, an "MFF&E Lien") with respect to its acquisition of MFF&E (the "Financed MFF&E"). Provided no Event of Default then exists and such MFF&E Lien otherwise complies with the provisions of this Section, then upon a request therefor Landlord shall enter into an agreement regarding the Financed MFF&E in form and substance reasonably acceptable to the holder of such MFF&E Lien, Tenant and Landlord, providing for, *inter alia* (i) Landlord's subordination of any right, title or interest in the Financed MFF&E including, but not limited to, the right to take possession of such Financed MFF&E upon an Event of Default, and (ii) the agreement of Landlord to enable the holder of such MFF&E Lien to repossess such Financed MFF&E if such holder exercises remedies under its MFF&E Lien; provided, however, that the foregoing agreement shall not in any way interfere with Landlord's rights in and under this Lease to obtain possession of the Premises. If Tenant or any subtenant enters into and/or grants an MFF&E Lien with any party other than a Leasehold Mortgagee providing leasehold mortgage financing pursuant to Section 18 above, then Tenant or such subtenant, as applicable, shall (i) not file (or cause or permit to be filed) such MFF&E Lien as a lien against the Premises or any part thereof (other than against the Financed MFF&E itself), and (ii) cause to be inserted in the documents for such MFF&E Lien the following provision:

"Notwithstanding anything herein to the contrary, this [chattel mortgage, conditional sales agreement, title retention agreement, security or other agreement] shall not create, be deemed to create, or be filed as, a lien against the fee interest of the owner of the Property."

19. **Representations and Warranties.**

(a) Landlord represents and warrants to Tenant that the following facts and conditions exist and are true as of the Commencement Date:

(i) Landlord is a corporation duly organized and validly existing under the laws of the state of Delaware and is legally authorized to transact business in the state of Utah;

(ii) Landlord's execution and delivery of this Lease and Landlord's performance and satisfaction in full of its obligations hereunder have been duly authorized by all requisite action on the part of Landlord, including the consent of all necessary third parties, including its officers, directors, and/or shareholders. This Lease constitutes a legal, valid and binding obligation of Landlord, enforceable against it in accordance with its terms;

(iii) No litigation or proceeding in any court or before any other governmental or quasi-governmental authority or other person or entity is currently pending or threatened (i) with respect to the Premises or any part thereof, or (ii) which seeks to enjoin Landlord from entering into this Lease or any of the other transactions contemplated herein including, but not limited to, any condemnation proceedings or other exercise of eminent domain;

(iv) Neither the execution and delivery by Landlord of this Lease, the consummation of the transactions contemplated herein, nor compliance with the provisions hereof, violates,

11

breaches, contravenes or conflicts with, or will violate, breach, contravene or conflict with, any provision of the certificate of incorporation or bylaws of Landlord or any provisions of any existing note, bond, mortgage, debenture, indenture, trust, license, lease, instrument, decree, order, judgment or other agreement to which Landlord is a party or by which it or its assets (including, but not limited to, the Property) may be bound or affected; and

(v) Landlord has good and marketable fee simple title to the Property.

(b) Tenant represents and warrants to Landlord that the following facts and conditions exist and are true as of the Commencement Date:

(i) Tenant is a corporation duly organized and validly existing under the laws of the State of Missouri;

(ii) Tenant's execution and delivery of this Lease and Tenant's performance and satisfaction in full of its obligations hereunder have been duly authorized by all requisite action on the part of Tenant, including the consent of all necessary third parties, including its officers, directors and shareholders. This Lease constitutes a legal, valid and binding obligation of Tenant, enforceable against it in accordance with its terms;

(iii) Neither the execution and delivery by Tenant of this Lease, the consummation of the transactions contemplated herein, nor compliance with the provisions hereof, violates, breaches, contravenes or conflicts with, or will violate, breach, contravene or conflict with any provision of the certificate of incorporation or bylaws of Tenant or any provisions of any existing note, bond, mortgage, debenture, indenture, trust, license, lease, instrument, decree, order, judgment or other agreement to which Tenant is a party or by which it or its assets may be bound or affected; and

(iv) No litigation or proceeding in any court or before any other governmental or quasi-governmental authority or other person or entity is currently pending or, to the best knowledge of Tenant, threatened, with respect to Tenant or any of Tenant's property, or which seeks to enjoin Tenant from entering into this Lease or any of the other transactions contemplated herein.

20. **Notices.** All notices required or permitted to be given pursuant to this Lease (each, a "notice") shall be in writing and shall be sent by hand delivery, mailed by prepaid registered or certified mail, return receipt requested, or sent by nationally recognized courier service guaranteeing overnight delivery, postage prepaid, in each case addressed as follows:

If to AMI, to:
APPLIED MINERALS, INC.
1200 Silver City Road
PO Box 432
Eureka, UT 84628
Attn: Christopher Carney

or to such other address as AMI may designate to BMC, in writing.

If to BMC, to:
BMI MINERALS COMPANY.
16640 Chesterfield Grove Road, Suite 170
Chesterfield, MO 63005
Attn: Richard Fox

12

or to such other address as BMC may designate to AMI, in writing.

Notices shall be effective (i) upon receipt (or refusal thereof) in the case of personal delivery, (ii) three (3) business days after being deposited, postage prepaid, in the United States mail in the case of mail, and (iii) the next business day if sent via courier service of nationally recognized standing (e.g., Federal Express). Either party may from time to time specify, by giving written notice to the other party in accordance with the terms hereof (a) any other address as its address for purposes of this Lease, and/or (b) any other person or entity that is to receive copies of notices hereunder.

21. **Estoppel Certificates.** Each of the parties shall, from time to time, upon ten (10) days' written request from the other, execute, acknowledge and deliver to the requesting party a certificate duly signed by an authorized officer stating that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and setting forth such modifications) and the dates to which Rent has been paid, and either stating that to the knowledge of the signer of such certificate no default exists hereunder or specifying each such default of which the signer has knowledge. Any such certificate may be relied upon by any actual or prospective mortgagee, assignee, sublessee or purchaser of the Premises.

22. **No Merger.** There shall be no merger of this Lease or of the estate hereby created with any other estate in the Premises by reason of the fact that the same person acquires or holds, directly or indirectly, this Lease or the estate hereby created or any interest herein or in such estate as well as any other estate in the Premises or any interest in such other estate.

223. **Surrender; Holdover.** Upon the Expiration Date or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord.

24. **Severability; Binding Effect; Amendments to be in Writing.** If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and enforceable to the extent permitted by law. All provisions contained in this Lease shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and assigns of Landlord and, to the extent permitted hereunder, Tenant, in each case to the same extent as if each such successor and assign were named as a party hereto. This Lease may not be changed, modified or discharged except by a writing signed by Landlord and Tenant.

25. **Governing Law.** This Lease shall be governed by and interpreted in accordance with the laws of the state of Utah without regard to its conflict of laws principles.

26. **Headings.** The headings set forth herein have been inserted for convenient reference only and shall not to any extent have the effect of modifying or amending the express terms and provisions of this Lease.

27. **Limitation of Liability.** Notwithstanding anything herein to the contrary, the liability of Tenant under this Lease for damages or otherwise, shall be enforceable against, and shall not extend beyond, Tenant or any assets of Tenant including, but not limited to, its interest in the Premises (including the proceeds thereof and all rents and profits therefrom).

29. **Force Majeure.** Except as it relates to any monetary or payment obligations under this Lease, in the event that either party shall be delayed, hindered or prevented from the performance of any act required hereunder by reason of strike, lock-out, labor trouble, inability to procure material, failure of power, restrictive governmental laws or regulations, riot, insurrection, the act, failure to act or default of the other party, war or other reason beyond such party's control (other than financial condition of such party which, in all events shall be deemed within such party's control), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

13

29. **Default Rate.** Any amount due but unpaid hereunder shall bear interest until paid at an annual rate of 5%.

30. **Memorandum of Lease.** The parties shall execute and deliver a short form or memorandum of lease in the form attached hereto as **Exhibit B** and made a part hereof contemporaneously with the execution of this Lease, which instrument shall be placed of record by Tenant in the Recorder of Deeds for Juab County. Upon the Expiration Date or earlier termination of this Lease, the parties shall immediately execute a termination of said instrument which shall be placed of record by Landlord.

31. **Relationship of the Parties.** The parties do not intend to create any partnership, joint venture or other relationship as amongst themselves and neither this Lease nor the performance by the parties of their respective obligations shall establish or be deemed to establish any relationship between the parties other than as landlord and tenant. Except as expressly set forth herein to the contrary, nothing contained herein shall be construed as appointing or authorizing either party or any of their agents, employees or representatives to represent or bind the other party in any manner.

32. **Quiet Enjoyment.** At all times during the Term, the rights and privileges of Tenant hereunder to the possession and quiet enjoyment of the Premises shall not be disturbed by Landlord or any person acting by, though or on behalf of Landlord.

33. **No Third Party Beneficiaries.** Except as expressly set forth in this Lease to the contrary, no other person shall be deemed a third party beneficiary under this Lease.

34. **Counterparts.** This Lease may be executed in any number of counterparts, each of which as executed shall be deemed to be an original, but all such counterparts shall constitute one and the same agreement.

35. **Construction.** Each of the parties was involved in the negotiation, review and execution of this Agreement. In the event of any dispute or controversy regarding this Agreement, the parties shall be considered joint authors of this Agreement and no provision of this Agreement shall be interpreted against a party due to authorship.

    **IN WITNESS WHEREOF,** the parties hereto have caused this Lease to be executed as of the date and year first above written.

APPLIED MINERALS INC.                          BRADY McCASLAND, INC.

By: _Christopher T Carney_                     By: _____

Name: _CHRISTOPHER T. CARNEY_                  Name: _Richard Fox_

Title: _PRESIDENT & CEO_                        Title: _President_

**List of Exhibits**

**A - Legal Description of Property**
**B - Form of Memorandum of Lease**

14



**Exhibit A**

**Legal Description of Property**

The Property includes the following mining claims:

Certain patented mining claims situated in Juab County, State of County, as more particularly described as follows:

Township 10 South, Range 2 West, SLBM

|  | Survey No. | Section | Property No | Unit No | Acreage |
|---|---|---|---|---|---|
| King James | 87 | 31 | 24657 | 59887 | 5.157 |
| Nom de Plume | 117 | 30 | 51929 | 59887 | 5.327 |
| Roadside | 150 | 31 | 51931 | 59887 | 6.800 |
| Rattler | 151 | 31 | 51917 | 59887 | 9.950 |

15

**Exhibit B**

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

William Gleeson
4710 Bethesda Ave.
Suite 1405
Bethesda, MD 20814

===============================================================================

(Space Above For Recorder's Use)

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made and entered into as of the __ day of July 2022 (the
"Effective Date"), by and between APPLIED MINERALS INC., a Delaware corporation, with a mailing
address of ("AMI"), and with a mailing address of 1200 Silver City Road, PO Box 432, Eureka, Utah
84628 *("AMI"),* and BRADY MCCASLAND, INC., (*"BMI"*), a Missouri corporation having its
principal place of business at 16640 Chesterfield Grove Road, Suite 170, Chesterfield, MO 63005.
AMI and BMI may be collectively referred to herein as the "Parties" or individually as a "Party,"

### RECITALS

A. WHEREAS, AMI is the 100% interest owner in certain patented and unpatented mining claims
located in the Juab County, State of Utah, as more particularly described on attached Exhibit A (the
"Mining Claims"); and

B. WHEREAS, AMI and BMI entered into that certain Ground Lease Agreement, of even date
herewith (the "Lease Agreement").

c. WHEREAS, by this Memorandum, AMI and BMI desire to provide public notice of the Lease
Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals, and for other good and valuable
consideration. the receipt and sufficiency of which are hereby acknowledged, the Parties agree as
follows:

1.      Public Notice. All members of the general public are hereby placed on notice of inquiry
as to the specific provisions of the Lease Agreement, all of which are incorporated herein by reference
with the same force and effect as if herein set forth in full. This Memorandum shall be recorded in the
real estate records of Juab County, Utah, in lieu of recording the entire Lease Agreement.

2.      Lease Agreement. As set forth more fully in the Lease Agreement, AMI has granted to
BMI, and its successors and assigns, the right to lease the surface rights to the property in Exhibit A upon
and subject to the terms, conditions, covenants and provisions hereof, rights of property together with any
and all appurtenances, rights, privileges and easements benefiting same (all the foregoing, collectively,
the "Premises").  BMI shall hold legal title to, and possession of all improvements constructed on the

16

Property by or for the benefit of Tenant currently or subsequently installed, including the Mill. The improvements are severed from the land and will be deemed to be personal property. The term of the Lease Agreement is 100 years, commencing on the Effective Date with ten (10) consecutive ten (10) year extensions at BMI's election. The 100-year period begins on July ___, 2022 and ending the day before the one-hundredth (100th) anniversary of such date.

3. Conflicts. In the event of any conflict between the terms of this Memorandum and the terms of the Lease Agreement, the terms of the Lease Agreement shall control.

4. Captions and Capitalized Terms. Caption headings are inserted herein only as a matter of convenience of reference, and in no way serve to define, limit, or describe the scope of intent of, or in any way affect, this Memorandum. Capitalized terms not defined in this Memorandum shall have the meanings ascribed to them in the Memorandum.

IN WITNESS WHEREOF, the Parties hereto have executed this Memorandum of Lease as of the date set forth above.

APPLIED MINERALS INC., a
Delaware corporation

Signature: *Christopher T. Carney*

Name:   Christopher T. Carney

Title:   President

Dated this 19 day of July 2022.

State of New York          )

County of New York        )

On the 19th day of July in the year 2022 before me, personally came Christopher T. Carney to me known, who, being by me duly sworn, did depose and say that he resides in 425 East 51st Street, New York, N.Y. 10022; that he is the president of the Applied Minerals, Inc., the corporation described in and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by authority of the board of directors of said corporation, and that he signed his name thereto by like authority.

*Mohan D Buxani*

**MOHAN D. BUXANI**
**Notary Public, State of New York**
**Registration No. 01BU6266896**
**Qualified in New York County**
**Commission Expires Aug. 06, 202***

18

**BRADY MCCASLAND, INC.**

A Missouri corporation

Signature: _____

Name:   Richard Fox

Title:  President

Dated this **22** day of July 2022

State of Missouri

County and or City of CHESTERFIELD

On this 22 day of July in the year 2022 before me, Scott Grieshaber, a
Notary Public in and for said state, personally appeared Richard Fox, President of
Brady McCasland Inc., known to me to be the person who executed the within ground
lease in behalf of said corporation and acknowledged to me that he or she executed the
same for the purposes therein stated.

[Seal]

> SCOTT A GRIESHABER
> Notary Public, Notary Seal
> State of Missouri
> St. Charles County
> Commission # 20953769
> My Commission Expires 05-13-2024

19

SCOTT A GRIESHABER
Notary Public, Notary Seal
State of Missouri
St. Charles County
Commission # 20889700
My Commission Expires 06-13-2024

# EXHIBIT H

## PROPOSED TRANSACTIONS

### July 1, 2022

The undersigned (a) the holders of a majority of the principal amount of the Series A Notes and Series 2023 Notes (collectively the "Noteholders") (b) Applied Minerals, Inc. ("AMI"), and (c) the exiting members of the Board of AMI in their personal capacities (namely Mario Concha, Robert Betz, and John Levy), and the non-exiting members of the Board of AMI in their personal capacities (namely Geoffrey Scott and Christopher Carney), propose the following to Brady McCasland, Inc. ("BMI") and BMC Minerals Company ("BMCO"). Acceptance by BMI and BMCO will form a binding agreement.

In consideration for BMI and BMCO agreeing to amend the Four Agreements (defined as the Iron Sale Agreement, Mill Sale Agreement, Mining Operations Agreement, and the Milling Operations Agreement entered into among BMI, BMCO and AMI on May 31, 2022 and described in a Form 8-K filed on June 2, 2022) to remove the condition precedent that AMI enter into agreements with the Noteholders that eliminate the outstanding balances of the Series A Notes and Series 2023 Notes, the Noteholders and AMI agree to the following:

1.      The Noteholders and AMI will take reasonable actions necessary to protect the interests of BMI and BMCO as described in the Four Agreements, including (i) providing reasonable assurances in writing to BMI and BMCO that in the event of a future bankruptcy or other legal proceeding against AMI, neither the Noteholders nor AMI will take any position or action that adversely affects or could adversely affect the interests of BMI and/or BMCO as described in the Four Agreements, and (ii) not opposing, or taking any action contrary to, any position taken by others that serves to protect the interests of BMI and BMCO as described in the Four Agreements.

2.      The Noteholders will execute and deliver to BMI and BMCO a document prepared by the legal counsel of BMI and BMCO that is consistent with Section 1 above. Up to a total of $20,000 of legal costs incurred by BMI and BMCO to have such document prepared shall be deducted from the remaining purchase price to be paid by BMI and BMCO under the Four Agreements. Samlyn Offshore Master Fund, Ltd. and Samlyn Onshore Fund, LP, as holders of a majority of the principal of the Series A Notes, will agree to waive any event of default that is caused or, that could be caused, by the execution and/or the consummation of the Four Agreements or the action contemplated thereby ("Series A Waivers"). M. Kingdon Offshore Master Fund, Ltd. and Berylson Master Fund, LP, as holders of a majority of the principal amount of the Series 2023 Notes, agree to waive any event of default that is caused or, that could be caused, by the execution and/or the consummation of the Four Agreements or the action contemplated thereby ("2023 Waivers").

3.      Messrs. Concha, Levy, Betz, Scott have entered into a corporate resolution agreeing, upon the closing of the Four Agreements, to relinquish payment of all accrued but unpaid Board Fees and Operations Committee Fees as those terms are used in AMI's 2021 Proxy Statement. Furthermore, Mr. Concha has agreed to relinquish a total of $180,446 of unpaid salary he accrued as CEO. In conjunction with the relinquishment

of their Board Fees, Operations Committee Fees and other compensation, Messrs. Levy, Betz, and Concha hereby resign from the Board of Directors of AMI.

4.      AMI will not use the proceeds received from BMI and BMCO upon the closing of the Four Agreement to pay the accrued but unpaid salaries of any former employees or directors of AMI.

5.      Upon the closing of the Four Agreements, AMI hereby limits the maximum number of directors elected to its Board of Directors to five.

6.      Upon the closing of the Four Agreements, BMI will have the right to nominate, and the Board of Directors will use its best efforts to appoint or cause the election of a number of directors that is equal to one-third the number of directors of the Board of Directors of AMI. If the number of directors is not divisible by three (3), the number of directors nominated by BMI will be rounded up to the next whole number. Unanimous approval of the Board will be required to approve (i) the assumption by AMI of any interest bearing debt and (ii) fees paid to the directors for Board and Committee service.

7.      Upon the closing of the Four Agreements, holders of a majority of the principal of the Series 2023 Notes hereby waive their rights under the 2023 Director Nomination Agreement to designate one person to be nominated for election to the Board of Directors of AMI. For purposes of clarity, the Samlyn Funds, as an owner of the common stock of AMI, has a right under the Samlyn Director Nomination Agreement to designate one person to be nominated for election to the Board of Directors of AMI.

8.      Upon the closing of the Four Agreements, AMI will pay the following amounts in exchange for the Series A Waivers and Series 2023 Waivers: (i) $244,500 hereby directed to Samlyn Offshore Master Fund, Ltd.; (ii) $130,500 hereby directed to Samlyn Onshore Partners, LP; (iii) $250,000 hereby directed to M. Kingdon Offshore Master Fund, LP; and (iv) $125,000 hereby directed to Berylson Master Fund.

**Samlyn Offshore Master Fund, Ltd.**

By: Samlyn Capital, LLC

Its: _____

By: _____

Its: Authorized Signatory

Date: Jul 5, 2022

**Samlyn Onshore Fund, LP**

By: Samlyn Capital, LLC

Its: _____

By: _____

Its: Authorized Signatory

Date: July 5, 2022

**M. Kingdon Offshore Master Fund, LP.**

By: Kingdon Capital Management, LLC,
as agent and investment adviser

Its: _____

By: Richard Weinstein

Its: COO & GC

Date: July 1, 2022

**Berylson Master Fund, LP**

By: Berylson Capital Partners, LLC

Its: _____ Investment Advisor

By: _____

Its: _____ Nicolas Nesta, COO

Date: 7/6/2022

**Applied Minerals, Inc.**

_____
Christopher T. Carney, President and CEO
and on behalf of the Applied Minerals, Inc.'s Board of Directors
Date:6-28-22

_____
Mario Concha
In his personal capacity
Date: 6/28/22

_____
John Levy
In his personal capacity
Date:6-28-22

Robert Betz
In his personal capacity
Date: 6/28/22

Geoffrey Scott
In his personal capacity
Date: 6-28-22

Christopher T. Carney
In his personal capacity
Date: 6-28-22

**ACCEPTED:**

**Brady McCasland, Inc.**

By:

Its: _President_

Date: 7/6/22

**BMI Minerals Company**

By:

Its: _President_

Date: 7/6/22

# EXHIBIT I

## AGREEMENT

THIS AGREEMENT ("**Agreement**"), dated and effective as of August 5, 2022 (the "**Effective Date**"), by and among Brady McCasland, Inc. ("**BMI**"), BMC Mineral Company ("**BMCO**"), Applied Minerals, Inc. ("**AMI**") and certain majority holders of the Series A Notes, Samlyn Offshore Master Fund, Ltd. and Samlyn Onshore Fund, LP, and Series 2023 Notes, M. Kingdon Offshore Mater Fund, Ltd. and Berylson Master Fund, LP, (collectively, the "**Noteholders**") of AMI, is made with reference to the following:

Pursuant to a certain Proposed Transactions letter agreement ("**Letter Agreement**") (Exhibit 1), by and among AMI, BMI, BMCO, and the Noteholders dated as of July 1, 2022, whereby the Noteholders offered certain assurances to BMI and BMCO in lieu of agreeing to eliminate the outstanding balance of the Series A Notes and Series 2023 Notes, which was a condition precedent to BMI and BMCO entering into certain agreements with AMI (the "**Four Agreements**").

## TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the foregoing premises and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     **Agreement of Noteholders**. Pursuant to the paragraph numbered "1" of the Letter Agreement, the Noteholders and AMI will take reasonable actions necessary to protect the interests of BMI and BMCO as described in the Four Agreements, including (i) in the event of a future bankruptcy or other legal proceeding against AMI, neither the Noteholders nor AMI will take any position or action that adversely affects or could adversely affect the interests of BMI and/or BMCO as described in the Four Agreements, and (ii) not opposing, or taking any action contrary to, any position taken by others that serves to protect the interests of BMI and BMCO as described in the Four Agreements. For the avoidance of doubt, nothing in this Agreement shall prevent the Noteholders from exercising their rights under the Series A Notes or the Series 2023 Notes, respectively, provided such exercise does not violate subsections (i) and (ii) above.

2.     **Entire Agreement; Amendments**. This Agreement and the Exhibit attached hereto contain the entire agreement between BMI, BMCO, AMI and the Noteholders, with respect to the subject matter hereof. No amendment, modification, supplement, extension, termination or waiver of any provision of this Agreement or any other agreement executed in connection with any of the foregoing shall be effective unless in writing and signed by all the Parties, and then only in the specific instance and for the specific purpose given.

3.     **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to conflict of laws principles.

4.     **Severability of Provisions**. No provision of this Agreement that is held to be inoperative, unenforceable and invalid shall affect the remaining provisions, and this and all provisions of this Agreement are hereby declared to be severable.

5.     **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the Effective Date.

**Samlyn Offshore Master Fund, Ltd.**

By: _____

Its: Authorized Signatory

Date: 8/6/22

**Samlyn Onshore Fund, LP**

By: _____

Its: Authorized Signatory

Date: 8/6/22

**M. Kingdon Offshore Master Fund, LP.**

By: Kingdon Capital Management, LLC,

    as agent and investment advisor

By: _____

Its: COO & GC

Date: August 5, 2022

**Berylson Master Fund, LP**

By: Berylson Capital Partners, LP

By: _Nicolas Nesta_

Its: Nicolas Nesta, COO, Berylson Capital Partners GP LLC its General Partner

Date: 8/6/2022

Applied Minerals, Inc.

_Christopher T. Carney_

Christopher T. Carney, President and CEO of AMI
and on behalf of the Applied Minerals, Inc.'s Board of Directors

Date: 8-5-22

ACCEPTED:

Brady McCasland, Inc.

By: _____

Richard B. Fox

Its: President

Date:    August 6, 2022

BMI Minerals Company

By: _____

Richard B. Fox

Its: President

Date:    August 6, 2022

# EXHIBIT J

**CONFIDENTIAL NOTICE**

# NOTICE OF TRADE SECRET UNDER COMPANY'S CONFIDENTIALITY, RESTRICTIVE COVENANTS, AND INVENTIONS AGREEMENT ("Notice")

To:  Christopher T. Carney, President and CEO of Applied Minerals, Inc.

The purpose of this Notice is to inform you of a specific trade secret that is considered confidential by Brady McCasland, Inc. ("Company") and therefore worthy of your special protection.

A trade secret is something that is "*not commonly known by, or generally available to, the public and that: (i) derives or creates economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy*."

The following is considered a special trade secret ("Trade Secret") of the Company:

_**Unique milling specifications to be disclosed and documented after signature.**_

To protect the foregoing Trade Secret, please take the following reasonable measures:

1.   Do not discuss the Process with anyone inside the Company who has not signed a document similar to this Notice. Feel free to ask Company if someone has signed it.

2.   Do not discuss the Trade Secret with anyone outside of the Company, other than third party contractors who have signed a document similar to this Notice.  Again, feel free to ask Company for confirmation who has signed it.

3.   If and when you are no longer a vendor of the Company, you agree to delete and destroy all information about the Trade Secret and to not disclose it to anyone for so long as it remains a confidential trade secret.

RECEIVED AND ACCEPTED:


*Christopher T. Carney*


DATE: July 7, 2022

**[Please do not keep a copy for your files. We can provide a copy for review when needed.]**