Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:  (801) 363-4300
E-mail: mboley@ck.law
        jtrousdale@ck.law


*Attorneys for* debtor-in-possession
APPLIED MINERALS, INC.


## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**APPLIED MINERALS, INC.,**<br><br>Debtor. | Bankruptcy No. 24-25849<br><br>Chapter 11<br><br>Honorable Peggy Hunt |


## MEMORANDUM OF LAW IN SUPPORT OF
## CONFIRMATION OF JOINT PLAN OF REORGANIZATION

### – AND –

### REPLY/RESPONSE TO
### (A) THE CONFIRMATION OBJECTION OF THE BMI PARTIES, AND
### (B) THE LIMITED OBJECTION OF THE UNITED STATES TRUSTEE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND AND relevant PROCEDURAL HISTORY ................................... 3

ARGUMENT ............................................................................................................ 10

I.   THE PLAN MEETS EACH OF THE REQUIREMENTS FOR CONFIRMATION
UNDER SECTION 1129 OF THE BANKRUPTCY CODE. ......................... 10

   A. Section 1129(a)(1) – The Plan Complies with the Applicable Provisions of Title 11.
..................................................................................................................... 11

   B. Section 1129(a)(2) – The Debtor Has Complied with All Applicable Provisions of
Title 11. ..................................................................................................... 16

   C. Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith........................... 17

   D. Section 1129(a)(4) – All Payments to be Made by the Debtor in Connection With this
Case Are Subject to Approval by the Court. ............................................... 20

   E. Section 1129(a)(5) – The Identity and Affiliation of the Debtor's Post-Confirmation
Officer and Director Have Been Disclosed ................................................. 20

   F. Section 1129(a)(6) – The Plan Does Not Provide for Any Rate Change Subject to
Regulatory Approval. ................................................................................. 21

   G. Section 1129(a)(7) – The Plan is in the Best Interests of Creditors........................... 21

   H. Section 1129(a)(8) – The Plan Has Been Accepted by the Requisite Classes of
Creditors and Interest Holders. .................................................................. 22

   I. Section 1129(a)(9) – The Plan Provides For the Payment of Priority Claims............ 23

   J. Section 1129(a)(10) – The Plan Has Been Accepted By at Least One Impaired, Non-
Insider Class. ............................................................................................. 23

   K. Section 1129(a)(11) –  The Plan is Feasible. ......................................................... 23

   L. Section 1129(a)(12) – The Plan Provides for the Payment of Fees........................... 25

   M. Section 1129(a)(13) – The Plan Provides for the Debtors' Obligations to Pay Retiree
Benefits. ..................................................................................................... 26

   N. Section 1129(b) – "Cram Down" Requirements. .................................................... 26

   O. Section 1129(c) – Only One Plan is Proposed for Confirmation............................... 29

   P. Section 1129(d) – The Principal Purpose of the Plan is not Tax Avoidance or
Avoidance of Securities Laws. .................................................................... 29

II. REPLY TO OBJECTIONS...............................................................................................29

    A.  The exculpatory provisions of the Plan are narrowly tailored and focused on conduct related to the advancement of the Case and implementing the Plan..........................30

    B.  The Plan is feasible. The Feasibility of the Plan starts and ends with the Plan Funding Transaction. The Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor. ........................................................31

    C.  The Plan properly rejects executory contracts and unexpired leases and *discharges* the Debtor from obligations under any contracts that are not executory. ........................33

    D.  The Plan Proponents have acted in good faith throughout the bankruptcy case. .......34

CONCLUSION.................................................................................................................36

# TABLE OF AUTHORITIES

Page(s)

Cases

Bridgeport Jai Alai, Inc. v. Autotote Systems, Inc.,
   215 B.R. 651 (Bankr. D. Conn. 1997) ...................................................................... 24

Harrington v. Purdue Pharma L. P.,
   603 U.S. 204, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024) ....................................... 31

In re Armstrong,
   292 B.R. 678 (B.A.P. 10th Cir. 2003) ...................................................................... 22

In re Clarkson,
   767 F.2d 417 (8th Cir. 1985) .................................................................................... 24

In re Danny Thomas II Ltd. Partnership,
   241 F.3d 959 (8th Cir. 2002) .................................................................................... 24

In re Dow Corning Corp.,
   244 B.R. 718 (Bankr. E.D. Mich. 1999) ................................................................... 23

In re First Interregional Equity Corp.,
   218 B.R. 731 (Bankr. D.N.J. 1997) .......................................................................... 11

In re Genesis Health Ventures, Inc.,
   266 B.R. 591 (Bankr. D. Del. 2001) ......................................................................... 11

In re Greate Bay Hotel & Casino, Inc.,
   251 B.R. 213 (Bankr. D.N.J. 2000) ..................................................................... 25, 32

In re Hoosier Hi-Reach, Inc.,
   64 B.R. 34 (Bankr. S.D. Ind. 1986) .......................................................................... 17

In re Jersey City Med. Ctr.,
   817 F.2d 1055 (3d Cir. 1987) .................................................................................... 11

In re John Kuhni Sons, Inc.,
   10-29038 RKM, 2011 WL 1343206 (Bankr. D. Utah Mar. 30, 2011) ..................... 22

In re Jones,
   530 F.3d 1284 (10th Cir. 2008) ................................................................................ 22

In re Keck, Mahin & Cate,
   241 B.R. 583 (Bankr. N.D. Ill. 1999) ....................................................................... 12

In re Keolbl,
   751 F.2d 137 (2d Cir. 1984) ...................................................................................... 19

In re Lotspeich,
   328 B.R. 209 (B.A.P. 10th Cir. 2005) ....................................................................... 26

In re Manville Forest Prods. Corp.,
   225 B.R. 862 (Bankr. S.D.N.Y. 1998) ...................................................................... 34

In re Paige,
   685 F.3d 1160 (10th Cir. 2012) ................................................................................ 34

In re Philadelphia Newspapers, LLC,
   599 F.3d 298 (3d Cir. 2010) ...................................................................................... 27

In re Pikes Peak Water Co.,
    779 F.2d 1456 (10th Cir. 1985) ............................................................... 18, 33
In re PWS Holding Corp. Brunos, Inc.,
    228 F.3d 224 (3d Cir. 2000)........................................................................... 11
In re Ruti-Sweetwater, Inc.,
    836 F.2d 1263 (10th Cir. 1988) ........................................................... 8, 22, 26
In re S&P, Inc.,
    189 B.R. 159 (Bankr. N.D. Ind. 1995) ........................................................... 24
In re SLC Ltd. V,
    137 B.R. 847 (Bankr. D. Utah 1992) .............................................................. 26
In re Texaco Inc.,
    254 B.R. 536 (Bankr. S.D.N.Y. 2000) ............................................................ 34
In re Texaco,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988)............................................................... 20
In re Wabash Valley Power Ass'n,
    72 F.3d 1305 (7th Cir. 1995) ......................................................................... 11
In re Walker,
    No. BR 20-13557 ELF, 2021 WL 1732592 (Bankr. E.D. Pa. Apr. 30, 2021).................... 19, 35
In re WCI Cable, Inc.,
    282 B.R. 457 (Bankr. D. Or. 2002) ................................................................ 24
In re Woodbrook Assocs.,
    19 F.3d 312 (7th Cir. 1994) ........................................................................... 11
In re WR Grace & Co.,
    729 F.3d 332 (3d Cir. 2013)........................................................................... 31
Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988)........................................................................... 11
Kearney v. Unsecured Creditors Comm.,
    987 F.3d 1284 (10th Cir. 2021) ..................................................................... 34
Matters of Treasure Bay Corp.,
    212 B.R. 520 (Bankr. S.D. Miss. 1997)...................................................... 25, 32
U.S. v. TM Bldg. Prods., Ltd.,
    231 B.R. 364 (S.D. Fla. 1998) ........................................................................ 23
Unruh v. Rushville State Bank of Rushville, Mo.,
    987 F.2d 1506 (10th Cir. 1993) ..................................................................... 26
Wade v. Bradford,
    39 F.3d 1126 (10th Cir. 1994) ....................................................................... 27

Statutes

11 U.S.C. § 524(c) ........................................................................................... 34
11 U.S.C. § 1122............................................................................................ 11, 12
11 U.S.C. § 1930.............................................................................................. 25
Bankruptcy Code § 1114 ................................................................................ 26
section 109 of the Bankruptcy Code .............................................................. 17
section 365(h)(1) ............................................................................................. 30
section 506(a)(1) of the Bankruptcy Code ..................................................... 27

section 507(a)(1) ................................................................................................................ 13
section 1121(a) of the Bankruptcy Code ......................................................................... 17
section 1123 ................................................................................................................ passim
section 1125 of the Bankruptcy Code ............................................................................. 16
section 1129 of the Bankruptcy Code ........................................................................ passim

Rules

Bankruptcy Rule 3016(a) .................................................................................................. 16
chapter 7 of the Bankruptcy Code .................................................................................. 21
Fed. R. Bankr. P. 3016(a) ................................................................................................ 16
Federal Rule of Bankruptcy Procedure 3001 .................................................................... 7

Other Authorities

1978 U.S.C.C.A.N. 5787 ........................................................................................... 11, 16
1978 U.S.C.C.A.N. 5962 ................................................................................................. 11
1978 U.S.C.C.A.N. 5963 ................................................................................................. 16
5912 ................................................................................................................................ 16
5913 ................................................................................................................................ 11
6368 ........................................................................................................................... 11, 16
H.R. Rep. No. 95-595 ................................................................................................. 11, 16
S. Rep. No. 95-989 ..................................................................................................... 11, 16

APPLIED MINERALS, INC., debtor and debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 bankruptcy case (the "**Case**"), through counsel, submits this memorandum of points and authorities in support of confirmation of the *Joint Plan of Reorganization Proposed by (A) the Debtor, and (B) Halloysite Investment, LLC dated August 11, 2025* [Docket No. 178] as it may be modified with leave of Court pursuant to the *Motion for Entry of Order Approving Modification to Joint Plan of Reorganization and Approving Plan as Modified* [Docket No. 254] (as it may be further modified and/or amended, the "**Plan**").  The Debtor also responds and replies to (a) the objection to confirmation [Docket No. 255] (the "**BMI Objection**") filed by Brady McCasland, Inc., Ole Red H$_2$S Scavenger, LLC, and BMI Minerals Company (collectively, "**BMI**"), and (b) the limited objection [Docket No. 253] (the "**UST's Limited Objection**") filed by the United States Trustee (the "**US Trustee**").

## PRELIMINARY STATEMENT

*Creditors unanimously have accepted the Plan!* And not a single creditor is challenging confirmation.

Aside from the limited objection filed by the US Trustee, the only dissenter is BMI.  BMI does not hold an allowed claim against the Debtor.  BMI is interested in this case because, just over two years before this Case was filed, the Debor transferred substantial and valuable assets to (and entered into onerous, one-sided contracts with) Brady McCasland, Inc. and BMI Minerals Company, respectively, on terms which appear to be avoidable as constructively fraudulent. BMI hopes to "kill" the Debtor to avoid a reckoning, *i.e.*, because it fears that the transfers made, and obligations incurred, by the Debtor will be avoided.

The Plan provides a substantial return to creditors. It represents the culmination of good faith efforts by the Debtor and the joint proponent of the Plan, Halloysite Investment, LLC ("**Halloysite**") (collectively, the "**Joint Plan Proponents**"), to provide a meaningful return to creditors, and to reach a fair, equitable and expeditious resolution of the complex business and legal issues presented in the Case.

All creditor classes entitled to vote have accepted the Plan, either by affirmatively voting to accept or presumptively (*i.e.*, they neither returned a ballot nor objected to confirmation):

- Class 1:    1 vote accepting the Plan; no votes rejecting the Plan.

- Class 2:    8 votes accepting the Plan (aggregating over $50 million in general unsecured claims); no votes rejecting the Plan.[1]

- Class 3:    no ballots were returned.

- Class 4:    Class 4 is unimpaired, and is deemed to accept the Plan

- Class 5:    no ballots were returned.

- Class 6:    no ballots were returned

- Class 7:    Existing Equity Interests are cancelled under the Plan and, therefore, are deemed to reject the Plan.

- Class 8:    The Debtor is unaware of any creditors within Class 8. If creditors in such class exist, they are deemed to reject the Plan.

- Class 9:    The Debtor is unaware of any creditors within Class 9. If creditors in such class exist, they are deemed to reject the Plan.

- Class 10:    8 votes accepting the Plan;[2] no votes rejecting the Plan.

None of the Debtor's creditors oppose confirmation of the Plan. There are, however, two objections: the UST's Limited Objection; and the BMI Objection.

---

[1]    The Selz Family 2011 Trust mailed a ballot dated October 1, 2025, which Debtor's counsel received on October 7, 2025, that voted to reject the Plan. On October 2, 2025, the Selz Family 2011 Trust sent a ballot via email and overnight mail to counsel for Halloysite and counsel for the Debtor stating in relevant part:

Attached is a revised ballot by investor Selz Family 2011 Trust covering the Bankruptcy Claim for Applied Minerals. This ballot supersedes the one dated October 1, 2025 which was mailed in the original envelope. I am sending the new ballot to you by Federal Express.

Counsel for the Debtor and counsel for Halloysite also received the referenced "Accepting" ballot by Federal Express. Accordingly, the vote submitted by Selz Family 2011 Trust is considered an "Accepting" vote.

[2]    Sharad Mathur mailed a Class 2 Ballot dated October 3, 2025, which Debtor's counsel received on October 3, 2025, which includes a "Convenience Class Election" to be treated as a Class 10 Claim instead of a Class 2 Claim. Thus, Sharad Mathur's claim and his accepting vote is counted within the Class 10 Claims.

As evidenced by the plain terms of the Plan and the voting results, the Plan is in the best interests of the Debtor's estate and creditors.  In addition, as demonstrated in this memorandum, all requirements for confirmation set forth in section 1129 of the Bankruptcy Code are satisfied. Accordingly, the Debtor respectfully submits that the Plan can, and should, be confirmed.

### BACKGROUND AND RELEVANT PROCEDURAL HISTORY

1.      On November 11, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2.      Since the Petition Date, the Debtor has operated its business and managed its assets as a debtor-in-possession.

3.      No official committees have been appointed in the Case.

4.      No examiner or trustee has been appointed in the Case.

5.      The Court has authorized the Debtor to obtain post-petition financing from Halloysite in the aggregate principal amount of $600,000.  Halloysite holds a super-priority administrative claim and a lien against all of the Debtor's assets to secure repayment of the loan.

6.      Throughout the case, multiple plans were proposed and amended, although Wasatch (as defined below) appears to have abandoned its plan and BMI formally withdrew its competing plan of liquidation. A brief summary and timeline is as follows:

    a.      The Debtor's initial plan: The Debtor filed a proposed plan of reorganization on February 5, 2025 [Docket No. 41]. On March 24, 2025, the Debtor filed a motion to approve a proposed disclosure statement with respect to said plan [Docket No. 53]. On April 25, 2025, BMI filed an objection to the proposed disclosure statement [Docket No. 73]. On May 1, 2025, the Debtor filed an amended disclosure statement [Docket No. 81], and filed a reply to BMI's objection [Docket No. 83].

    b.      Wasatch Solutions' Plan: On July 25, 2025, Wasatch Solutions LLC ("**Wasatch**") filed a proposed plan of reorganization [Docket No. 148].  Wasatch, however,

never filed or sought approval of a disclosure statement, and appears to have abandoned its
proposed plan.

    c.  <u>BMI's Plan(s) of Liquidation</u>:  On May 20, 2025, BMI filed a competing
plan of liquidation [Docket No. 102]. Shortly thereafter, BMI filed a proposed disclosure
statement related to its competing plan [Docket No. 104]. The Debtor objected to the BMI
disclosure statement on May 30, 2025 [Docket No. 107], and Halloysite filed a joinder [Docket
No. 109]. BMI filed an amended and restated plan of liquidation on August 1, 2025 [Docket No.
159]. Approximately a week later, BMI filed its *Second Amended Chapter 11 Plan of
Liquidation* [Docket No. 167] (the "**BMI Plan**" or the "**Competing Plan of Liquidation**"). On
August 11, 2025, BMI filed a proposed disclosure statement for the BMI Plan [Docket No. 174]
and motion to approve its disclosure statement (the "**BMI's Motion to Approve Disclosure
Statement**") [Docket No. 175]. On September 4, 2025, the Debtor and Halloysite filed
objections to BMI's disclosure statement [Docket Nos. 207 & 208]. BMI filed a reply in support
of its disclosure statement on September 9, 2025 [Docket No. 211].

    d.  <u>The Joint Plan Proposed by the Debtor and Halloysite</u>: On May 27, 2025,
the Debtor and Halloysite filed a  joint plan of reorganization [Docket No. 105]. On May 30,
2025, the Debtor filed a disclosure statement regarding the proposed plan [Docket No. 108]. The
Debtor and Halloysite filed an amended and restated plan of reorganization on August 1, 2025
[Docket No. 161]. On August 11, 2025, the Debtor and Halloysite filed the "joint" Plan that is
now proposed for confirmation [Docket No. 178], a disclosure statement related to that Plan
[Docket No. 179], and a motion to approve the disclosure statement (the "**Joint Plan
Proponents' Motion to Approve Disclosure Statement**") [Docket No. 180]. On September 4,
2025, BMI objected to the proposed disclosure statement [Docket No. 209]. On September 9,
2025 The Debtor filed an amended disclosures [Docket No. 212], and a reply in support of the
disclosure statement [Docket No. 215].

7.      From approximately May 20, 2025 through September 16, 2025, the Joint Plan Proponents and BMI engaged in a "competing plan" process.

8.      To accommodate BMI's request to seek confirmation of its Competing Plan of Liquidation, the Court imposed mutual deadlines, milestones and joint hearing dates as the Joint Plan Proponents and BMI worked towards confirmation of their competing plans, and as the considered, monitored and oversaw the parties' progress toward plan confirmation. In and performing its important gatekeeping functions, the Court held combined hearings on the adequacy of the respective disclosure statements proposed by the Joint Plan Proponents and by BMI, and heard related motions relating to confirmation procedures, on September 11, 2025 and September 15, 2025.

9.      On August 11, 2025, the Plan Proponents and BMI filed a series of motions related to their then-existing plans and disclosure statements including the *Joint Motion for Order (I) Establishing Voting Record Holder Date, (II) Approving Joint Notice Solicitation Procedures, Form of Ballots, and Manner of Notice for Competing Plans, and (III) Fixing the Deadline for Filing Objections to Confirmation of Competing Plans* [Docket No. 172] (the "**Solicitation Procedures Motion**").

10.     On September 11, 2025, and September 15, 2025, the Court held hearings to consider approval of the Solicitation Procedures Motion, the Joint Plan Proponents' Motion to Approve Disclosure Statement, and BMI's Motion to Approve Disclosure Statement (collectively, the "**Plan Solicitation Hearing**").

11.     At the Plan Solicitation Hearing, the Court approved the Joint Plan Proponents' proposed disclosure statement subject to certain revisions directed by the Court (as it was later modified, the "**Disclosure Statement**") and the Court subsequently entered an order approving the same [Docket No. 233] (the "**Order Approving Disclosure Statement**").

12.     At the Plan Solicitation Hearing, the Court also approved the Solicitation Procedures Motion, subject to certain modifications made on the record at the Plan Solicitation

Hearing. And on September 16, 2025, the Court entered the *Order (I) Establishing Voting Record Holder Date, (II) Approving Joint Solicitation Procedures, Joint Solicitation Letter, Form of Ballots and Manner of Notice for Competing Plans, and (III) Fixing the Deadline for Filing Objections to Confirmation of Competing Plans* [Docket No. 231] ("**Solicitation Procedures Order**").

13.    On September 16, 2025, BMI filed a notice withdrawing its Competing Plan of Liquidation and its disclosure statement [Docket No. 236] ("**Notice of Withdrawal**"). That same day, in light of the Notice of Withdrawal, the Debtor and Halloysite filed an *ex parte* motion for an order modifying the Solicitation Procedures Order [Docket No. 237].

14.    Accordingly, on September 16, 2025, the Plan Proponents filed an *Ex Parte Motion to Modify Proposed Solicitation Procedures Order and Authorizing Joint Plan Proponents to Modify Form of Notice, Ballots, Disclosure Statement and Solicitation Procedures to Remove References to Withdrawn Competing Plan and Disclosure Statement* [Docket No. 237] (the "**Solicitation Procedures Modification Motion**"), whereby they sought Court approval to remove references to BMI's Plan and BMI's disclosure statement and to make necessary modifications to the procedures for solicitation and confirmation.

15.    In consideration of the Notice of Withdrawal and the record, the Court entered its order modifying the Solicitation Procedures Order on September 17, 2025 [Docket No. 242] ("**Modified Solicitation Procedures Order**"), which provides in relevant part:

a.    Paragraph 10 of the Modified Solicitation Procedures Order provides: "The deadline for persons and entities to return their Ballots accepting or rejecting the Joint Plan shall be <u>October 8, 2025</u>." (the "**Voting Deadline**").

b.    Paragraph 17 of the Modified Solicitation Procedures Order provides, in pertinent part:  "Any objection to confirmation of the Joint Plan must be filed with the Clerk of the Bankruptcy Court, together with proof of service, no later than October 8, 2025, and must be served so as to be received by them on the same day on: (i) [counsel for the Debtor],

(ii) [Counsel for Halloysite], and (iii) the Office of the United States Trustee....  Any objection to confirmation of the Joint Plan must be in writing and (a) must state the name and address of the objecting party and the amount(s) of its Claim(s) or the nature of its interest, and (b) must state, with particularity, the nature of its objection."

        c.      Paragraph 4 of the Modified Solicitation Procedures Order provides: "For voting purposes and mailing of notices pursuant to this Order, <u>September 16, 2025</u> shall be the "**Record Holder Date**" for the holders of Claims and Equity Interests."

        d.      Paragraph 5 of the Modified Solicitation Procedures Order provides, in pertinent part:  "Except as otherwise ordered by the Court, holders of Claims shall not be permitted to vote on the Joint Plan (a) if the Claim (whether evidenced by a Proof of Claim or the Debtor's schedules) is subject to a pending objection on the Record Holder Date…, (b) if the Claim otherwise is not "Allowed" pursuant to a prior order of this Court, or (c) with respect to transferred and assigned Claims, if there is an objection to the transfer, filed in accordance with Federal Rule of Bankruptcy Procedure 3001, pending on the close of business on the Record Holder Date."

        16.      On or before September 18, 2025, the Debtor served the *Notice of Confirmation Hearing for Joint Plan of Reorganization,, Deadline to Return Ballots and Deadline to File and Serve Objections to Confirmation Joint Plan of Reorganization and Notice of Order (I) Approving Disclosure Statement With Respect to Joint Plan of Reorganization, (II) Establishing Voting Record Holder Date, (III) Approving Solicitation Procedures, Form of Ballots and Manner of Notice, and IV) Fixing the Deadline for Filing Objections to Confirmation of the Joint Plan of Reorganization* [Docket No. 244] (the "**Notice of Confirmation Deadlines**") upon all creditors and parties-in-interest.  As reflected on the *Certificate of Service* of record [Docket No. 246] (the "**Certificate**"), the Notice of Confirmation Deadlines was served upon all creditors and parties-in-interest with standing to be heard regarding confirmation of the Plan.

17.     As further reflected on the Certificate, on September 18, 2025, the Debtor mailed to all creditors entitled to vote on the Plan (a) a copy of the court-approved Disclosure Statement (with the Plan attached as Exhibit A), (b) one or more appropriate ballots, and (c) a copy of the Notice of Confirmation Deadlines.

18.     On October 8, 2025, The Debtor and Halloysite filed the *Motion for Entry of Order Approving Modifications to Joint Plan of Reorganization and Approving Plan as Modified* [Docket No. 254].

19.     As reflected in the *Ballot Tabulation Register*, filed on October 10, 2025 [Docket No. 256] (the "**Ballot Register**"), creditors in Classes 1, 2, and 10 returned ballots by the Voting Deadline.[3]  No creditors in Classes 3, 5, or 6 returned ballots.  Class 4 is unimpaired and, therefore, is deemed to accept the Plan. Class 7 is existing equity interests, which are cancelled under the plan and, therefore, deemed to reject the plan. The Debtor is unaware of any claimants in Classes 8 and 9.

20.     As summarized in the Ballot Register, creditors in Classes 1, 2 and 10 unanimously voted to accept the Plan.  Creditors in classes 3, 5 and 6 did not return effective ballots, and have not filed objections to confirmation.  As such, under controlling Tenth Circuit precedent, the Court should determine that classes 3, 5 and 6 have accepted the Plan.[4]

---

[3]      After the Voting Deadline had passed and after the Ballot Register had been filed, counsel for the Debtor received an additional Class 2 Ballot voting to "accept" the Plan on October 10, 2025, from Joseph D. Mark in the amount of $1,113,978.00.

[4]      Under the law of the Tenth Circuit, where a class of creditors does not vote either to accept or reject the plan, the Court may presume acceptance:

> Since the [secured creditor class] did not object to the Plan at any time prior to its confirmation and because the [class] unilaterally opted not to vote on the confirmation of the Plan, the bankruptcy court did not err in presuming their acceptance of the Plan for purposes of § 1129(b).

> Once acceptance was properly presumed, the court was not obligated to inquire as to whether the Plan discriminated unfairly or was not fair and equitable to the [non-voting class] under § 1129(b)(1). When the [creditors] failed to object to the Plan, they waived their right to challenge the Plan or to assert, after the fact, that the Plan discriminated unfairly and was not fair and equitable.

In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1267-68 (10th Cir. 1988).

21.     The Debtor proposes to reorganize its business and financial affairs.

22.     The primary means for implementation of the Plan and funding distributions to creditors is the Plan Funding Transaction.

     a.      The Plan Funding Transaction does not depend upon the Debtor's future business or profitable operations in the future.

     b.      All funds necessary for the Plan Funding Transaction, and that will be used to fund cash distributions to creditors under the Plan, are coming from Halloysite.

23.     Distributions on account of Class 1 priority claims will be made on the Effective Date.

24.     Distributions on account of Class 2 (all non-priority unsecured claims, excepting Convenience Claims), begin 60 days after the Effective Date. In addition to the pro rata cash distribution, the Class 2 claimholders may elect to receive either a pro rata share of up to Seventy-Five Thousand (75,000) shares of new stock in the Reorganized Debtor or a pro rata share of an additional cash distribution of up to $600,000. Class 2 claimants also have the option to make a Convenience Class election (and one has).

25.     Distributions to Class 3 begin on the first day of the month following the Effective Date. The Reorganized Debtor has the option to sell the collateral free and clear provided the claimant consents, the proceeds are sufficient to pay the unpaid balance, or a Court order approves the sale. Under the Plan, the Class 3 secured creditor retains its lien.

26.     The Plan does not impair Class 4. The Debtor paid the remaining balance owed to the Class 4 claimant.

27.     Distributions to Class 5 begin the first day of the month following the Effective Date. The Reorganized Debtor has the option to sell the collateral free and clear provided the claimant consents, the proceeds are sufficient to pay the unpaid balance, or a Court order approves the sale. Under the Plan, the Class 5 secured creditor retains its lien.

28.     Distributions to Class 6 begin the first day of the month after the Effective Date.

29.     The Plan does not provide any distributions to Classes 7, 8 or 9.

30.     The Plan provides that Class 10 will receive a distribution in satisfaction of Class 10 claims on or before sixty (60) days after the Effective Date.

31.     As will be described in detail in the Declaration of Christopher Carney in support of confirmation, to be filed on October 13, 2025 concurrent with the Debtor's lists of witnesses and exhibits, all requirements to confirm the Plan under section 1129 of the Bankruptcy Code are satisfied, including:

a.      that the Plan complies, and the Joint Plan Proponents have complied, with all applicable provisions of the Bankruptcy Code;

b.      that the Plan is proposed in good faith and not by means forbidden by law; and

c.      that funding distributions under the Plan is not dependent upon the Debtor's future success or profits, thus, it is "not likely" that confirmation of the Plan will be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

32.     As will be described in detail in the declaration of Geoffrey Scott in support of confirmation, also to be filed on October 13, 2025 concurrent with the Debtor's lists of witnesses and exhibits, the funds required for Halloysite to satisfy the Plan Funding Transaction are available and will be funded on or before the Effective Date.

33.     The unanimous acceptance of the Plan by creditors demonstrates the creditor body's desire to receive the certain distribution under the Plan.

## ARGUMENT

## I.     THE PLAN MEETS EACH OF THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

To obtain confirmation of a chapter 11 plan, the proponent must demonstrate that the plan satisfies each of the requirements in section 1129 of the Bankruptcy Code.  As discussed below, the Plan satisfies these requirements and should be confirmed.

**A.      Section 1129(a)(1) – The Plan Complies with the Applicable Provisions of Title 11.**

Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if the plan "complies with the applicable provisions of this title." The legislative history of section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that the *form* of the plan complies with the provisions of section 1122 (classification of claims and interests) and section 1123 (contents of a plan) of the Bankruptcy Code. See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913; H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5962, 6368; see also In re PWS Holding Corp. Brunos, Inc., 228 F.3d 224, 243 (3d Cir. 2000) ("[t]his requires that the plan conform to the applicable provisions of Title 11"); Kane v. Johns-Manville Corp., 843 F.2d 636, 648-49 (2d Cir. 1988) (legislative history indicates that section 1129(a)(1) was intended to require compliance with sections 1122 and 1123); In re Genesis Health Ventures, Inc., 266 B.R. 591, 599 (Bankr. D. Del. 2001) (citing legislative history and cases).

        1.      Classification of Claims and Interests under 11 U.S.C. § 1122.

The basic rule governing the classification of claims and interests is that the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class. See 11 U.S.C. § 1122(a). Notably, the Bankruptcy Code does not require the converse—that all similar claims be placed in one class. See In re Woodbrook Assocs., 19 F.3d 312, 318 (7th Cir. 1994) ("Section 1122 does not expressly forbid the separate classification of similar claims."); In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes."); In re First Interregional Equity Corp., 218 B.R. 731, 738-39 (Bankr. D.N.J. 1997) (referencing the trustee's power to classify similar claims in different classes). In fact, courts have recognized that a proponent of a plan "has considerable discretion to classify claims and interests in a chapter 11 reorganization plan" and may classify claims differently if there are "'good business reasons' for doing so or if the claimants have sufficiently different interests in the plan." In re

Wabash Valley Power Ass'n, 72 F.3d 1305, 1321 (7th Cir. 1995); see also In re Keck, Mahin & Cate, 241 B.R. 583, 589 (Bankr. N.D. Ill. 1999) (the plan proponent "has broad discretion in classifying claims" and may classify similar claims in separate classes if the proponent "can articulate differences among the claims") (citations omitted).

The Plan properly classifies Claims and Interests.  Article 3 of the Plan provides for the separate classification of Claims and Interests into ten distinct Classes[5] based on differences in their legal nature or priority:  Priority Claims (Class 1); General Unsecured Claims (excluding Convenience Claims) (Class 2); Leaf Capital Funding, LLC Secured Claim (Class 3); Navitas Credit Corp Secured Claim (Class 4 ); Tharp & Associates Secured Claim (Class 5); Miscellaneous Secured Claims (Class 6); Existing Equity Interests (Class 7); Subordinated Claims (Class 8); Subordinated § 510(b) Claims (Class 9); and Convenience Claims (Class 10).

This classification structure is proper because each Class under the Plan differs in legal character or nature.  Furthermore, all Claims within each Class are substantially similar to the other Claims in that Class.  Claims and Interests within a Class are treated equally.  Accordingly, the classification structure set forth in the Plan is proper, thereby satisfying the requirements of section 1122.

It is also worth noting that neither the BMI Objection nor the UST's Limited Objection have challenged the classes or classification of claims or interests under the Plan.  Stated another way, the Plan's compliance with section 1122 is not challenged, or even questioned.

    2.    <u>The Plan Meets the Requirements of Section 1123(a) of the Bankruptcy Code</u>.

Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of a plan of reorganization for a non-individual debtor.  As shown in sequence below, the Plan fully complies with each of these requirements. And, again, the Plan's compliance with section 1123(a) has not been challenged.

---

[5]    In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

> a.    *Section 1123(a)(1) — The Plan Designates Classes of Claims.*

The Bankruptcy Code requires that a plan designate classes of claims, other than claims of a kind specified in section 507(a)(1) (administrative expense claims), section 507(a)(2) (claims arising under the "gap" period in an involuntary case), and section 507(a)(8) (tax claims). Article 3 of the Plan designates thirteen Classes of Claims. Administrative Expense Claims and Priority Tax Claims are not classified, but are treated under Article 2 of the Plan. The Plan therefore complies with section 1123(a)(1) of the Bankruptcy Code.

> b.    *Section 1123(a)(2) — The Plan Specifies Unimpaired Classes.*

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." The Plan meets this requirement because, in Article 4, it specifies that Class 4 is not impaired.

> c.    *Section 1123(a)(3) — The Plan Specifies the Treatment of Impaired Classes.*

Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the Plan." The Plan specifies the treatment of the impaired classes (Classes 1, 2, 3, 5, 6, 7, 8, 9, and 10) in Article 4, thus satisfying this requirement.

> d.    *Section 1123(a)(4) — The Plan Provides for the Same Treatment of Claims within the Same Class.*

Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Article 4 of the Plan complies with this provision because all holders of Claims within a particular Class receive identical treatment under the Plan (unless the holder of a particular Claim or Interest has agreed to an alternative or less favorable treatment with respect to such Claim or Interest).

> e.    *Section 1123(a)(5) — The Plan Provides Adequate Means for its Implementation.*

Section 1123(a)(5) of the Bankruptcy Code requires that a plan of reorganization "provide adequate means for its implementation" and lists certain examples, such as retention by

the debtor of all or any part of the property of the estate; transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan; merger or consolidation of the debtor with one or more persons; amendment of the debtor's charter; or cancellation or modification of any indenture or similar instrument.  See 11 U.S.C. § 1123(a)(5).  Articles 5 and 6 of the Plan provide adequate means for its execution and implementation.  Primarily, the means for implementing the Plan are (a) the Plan Funding Transaction to be funded by Halloysite in the aggregate amount of $3,350,000 (including the $600,000 post-petition loan, which will be credit bid and/or forgiven as part of the Plan Funding Transaction), (b) cash distributions to creditor funded via the Plan Funding Transaction, (c) the cancellation of all existing stock and equity in the Debtor, (d) the issuance and distribution of New Stock as provided under the Plan, and (e) except for the unpaid secured claims, which are nominal, the Debtor will emerge from bankruptcy debt free.

Although not critical to implementing the Plan, the Plan also provides for: (i) the vesting of the property of the Debtor and its chapter 11 bankruptcy estate in the Reorganized Debtor; (ii) the funding of additional working capital to the Reorganized Debtor by Halloysite as part of the Plan Funding Transaction, and (iii) the Reorganized Debtor's continuation of business operations, and its ability to fill customer orders and satisfy obligations to customers.

        *f.*      *Section 1123(a)(6) — The Plan Provides for Required Charter Provisions.*

Section 1123(a)(6) of the Bankruptcy Code specifies that a Plan provide for the inclusion of provisions in a corporate debtor's charter prohibiting the issuance of certain nonvoting securities and the establishment of an appropriate distribution of voting power.  Article 5 of the Plan specifies that the debtor's new organizational documents shall comply with Section 1123(a)(6).

        *g.*      *Section 1123(a)(7) — The Plan Provides for the Selection of Officers and Directors.*

Section 1123(a)(7) of the Bankruptcy Code requires that a plan contain only provisions that are consistent with the interests of creditors and with public policy with respect to the

manner of selection of any officer, director, or trustee.  The Plan and the Disclosure Statement satisfy this requirement, because the Debtor has properly and adequately disclosed the identity and affiliations of the post-Effective Date officers and director of the Reorganized Debtor, *to wit*, Christopher T. Carney and Geoffrey G. Scott. Christopher T. Carney will continue as the Reorganized Debtor's President and Chief Executive Officer, and the continuation of Christopher Carney as an officer is consistent with the interests of creditors and public policy. Geoffrey G. Scott will be appointed, and will serve, as the Reorganized Debtor's sole initial director.  Geoffrey G. Scott's service as the initial director is consistent with the interests of creditors and public policy.

   3.  Permitted Contents of a Plan.

  Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization, provided they are "not inconsistent with" applicable provisions of the Bankruptcy Code.

  As permitted under section 1123(b), the Plan provides for: (a) certain Classes of Claims to be unimpaired, (see Plan § 4.4); (b) the assumption of certain executory contracts and unexpired leases, (see Plan §§ 8.1 and 8.2); (c) the retention and future enforcement by the Debtor of claims under chapter 5 and applicable non-bankruptcy law, (see Plan § 5.2); and (d) modification of the rights of holders of secured claims, (see Plan §§ 4.3, 4.5, and 4.6).

  In addition, the Plan includes provisions (i) governing distributions on account of Allowed Claims, particularly as to the timing and calculation of amounts to be distributed, (see Plan §§ 4.2, 4.3.2, 4.4.2, 4.5.2, 4.6.2, 4.10.2, and 6.1 through 6.8), (ii) establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved, (see Plan §§ 4.13, 6.2, 6.3 and 6.9), and (iii) regarding the retention of jurisdiction by this Court over certain matters after the Effective Date, (see Plan §§ 10.1 through 10.3).

4.      The Plan Meets the Requirements of Bankruptcy Rule 3016(a).

The Bankruptcy Rules require that "[e]very proposed plan and any modification must be dated." In a Chapter 11 case, the plan or modification must also name the entity or entities proposing or filing it." Fed. R. Bankr. P. 3016(a). The Plan satisfies this rule as it is dated and identifies the Debtor as the entity submitting it. And to the extent the Court grants the *Motion for Entry of Order Approving Modification to Joint Plan of Reorganization and Approving Plan as Modified* [Docket No. 254], the modified Plan will be dated as of the Confirmation Date.

The Plan therefore complies with applicable provisions of the Bankruptcy Code and satisfies the requirements of section 1129(a)(1).

**B.      Section 1129(a)(2) – The Debtor Has Complied with All Applicable Provisions of Title 11.**

The legislative history of section 1129(a)(2) of the Bankruptcy Code indicates that its principal purpose is to ensure that the proponent of a plan complies with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code. See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368.

Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved ... by the court as containing adequate information." 11 U.S.C. § 1125(b).

This Court approved the Disclosure Statement on September 16, 2025 [Docket No. 233]. In addition, this Court approved, among other things, (a) all materials to be transmitted to creditors entitled to vote on the Plan (collectively, the "**Solicitation Package**"), including the form of notice, the form of the Joint Disclosure Statement and the form of ballots, (see Modified

Solicitation Procedures Order ¶ 8); (b) the timing and method of delivery of the Solicitation

Package, (see Modified Solicitation Procedures Order ¶¶ 6, 7, 8, and 14); and (c) the rules for

tabulating votes accepting or rejecting the Plan, (see Solicitation Procedures Order ¶¶ 4, 5, and 9-

14).  The Debtor delivered the Solicitation Packages to all creditors entitled to vote on the Plan in

compliance with the Modified Solicitation Procedures Order.

Moreover, as set forth in the Ballot Register, following the distribution of the Solicitation

Materials, the ballots returned by holders of Claims that were entitled to vote, and in fact voted,

were duly tabulated in accordance with the rules and procedures set forth in the Modified

Solicitation Procedures Order.

The Debtor otherwise has complied with the applicable provisions of the Bankruptcy

Code, except as otherwise provided or permitted by orders of this Court.  The Debtor is a proper

debtor under section 109 of the Bankruptcy Code and the Debtor and Halloysite are proper

proponents of the Plan under section 1121(a) of the Bankruptcy Code.

The Debtor has complied with applicable provisions of the Bankruptcy Code and has

satisfied the requirements of section 1129(a)(2).

### C.       Section 1129(a)(3) — The Plan Has Been Proposed in Good Faith.

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be

"proposed in good faith and not by any means forbidden by law."  Although not defined in the

Bankruptcy Code, courts have held that the good faith requirement of this section is satisfied

when a plan "establishes a reasonable likelihood that it will achieve a result consistent with the

purposes and objectives of the Bankruptcy Code."  In re Hoosier Hi-Reach, Inc., 64 B.R. 34, 38

(Bankr. S.D. Ind. 1986).

The Court of Appeals for the Tenth Circuit provided the following explanation of the

"good faith" standard, which has not been reversed or modified, and is, therefore, controlling

authority in the Tenth Circuit:

> In finding a lack of good faith, courts have looked to whether the
> debtor intended to abuse the judicial process and the purposes of

> the reorganization provisions. Not confirming the plan for lack of
> good faith is appropriate … when there is no realistic possibility of
> an effective reorganization and it is evident that the debtor seeks
> merely to delay or frustrate the legitimate efforts of secured
> creditors to enforce their rights.

In re Pikes Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985).  As such, the court should

find that "[t]he test of good faith is met if there is a reasonable likelihood that the plan will

achieve its intended results which are consistent with the purposes of the Bankruptcy Code, that

is, is the plan feasible, practical, and would it enable the company to continue its business and

pay its debts in accordance with the plan provisions."  Id. at 1459 (quoting the ruling of the court

below).

This is not a case that was filed without any realistic possibility of an effective

reorganization.  The fact that all creditors have accepted the Plan, standing alone, should be

enough evidence to satisfy the "good faith" requirement.  Further, based upon the evidence that

Halloysite is ready, willing and able to fund the Plan Funding Transaction, (a) there is (at a

minimum) a reasonable likelihood that the plan will achieve its intended results which are

consistent with the purposes of the Bankruptcy Code, and (b) the plan is feasible, practical, and

will enable the company both (i) to continue its business and (ii) to pay its debts in accordance

with the Plan's provisions (all of which will be paid from the Plan Funding Transaction).

BMI has argued, and may continue to argue, that the Plan is not feasible because the

Debtor's financial history is full of losses; not profits.  That argument is a "red herring" – a

distraction, a misleading ruse and a logical fallacy.  If the cash distributions to creditors under the

Plan were dependent on future profits (which they are not), and if unsecured creditors had not

unanimously accepted the Plan (which they have), then the Debtor's future projections would be

a key consideration for confirmation of the Plan.  Here, however, Plan is feasible irrespective of

the Debtor's future business prospects, because distributions to creditors flow from the Plan

Funding Transaction; not future profits.

Further, based upon the Debtor's future projections, certain creditors may "bet on" the Debtor's future success, as Halloysite is doing.  Class 2 Creditor may (but are not required to) opt to receive New Stock in the Reorganized Debtor.  But even then, they have a "parachute." They can "pull the rip cord" and an exercise a put option to exchange their New Stock for cash as late as three years after the Effective Date.

Good faith for purposes of section 1129(a)(3) also may be found where the plan is supported by key creditor constituencies or is overwhelmingly supported by creditors.  In re Walker, No. BR 20-13557 ELF, 2021 WL 1732592, at *18 (Bankr. E.D. Pa. Apr. 30, 2021) ("When the affected creditors support confirmation of a plan, the court generally should be circumspect about overriding the expressed will of the voting creditors based on the good faith requirement of 11 U.S.C. § 1129(a)(3).… In evaluating the good faith of the proposed Plan, it is extremely significant that the unsecured class of creditors voted overwhelmingly in support the Plan. The parties most directly affected prefer that this Plan be confirmed.")

As the Court is well aware, the plan confirmation process in this case has been highly contentious.  For a time, BMI (the party now objecting) proposed its own competing plan of liquidation.  Realizing that its Competing Plan of Liquidation was inferior, BMI elected to withdraw its plan rather than improving its plan to "outbid" Halloysite.

The Debtor and Halloysite proposed the Plan with the legitimate and honest purpose of, among other things, providing a meaningful return to creditors and reorganizing the Debtor's business and financial affairs. Halloysite is putting its money where its mouth is.  BMI is not. The Court should find and conclude that Plan (which has received unanimous acceptance by creditors) has been proposed in good faith.

The second prong of section 1129(a)(3) requires that the plan not contravene any applicable non-bankruptcy law.  See In re Keolbl, 751 F.2d 137, 139 (2d Cir. 1984).  The Plan is entirely consistent with applicable non-bankruptcy law.

**D.      Section 1129(a)(4) – All Payments to be Made by the Debtor in Connection
With this Case Are Subject to Approval by the Court.**

Section 1129(a)(4) of the Bankruptcy Code requires that all payments made by the debtor
or by a person issuing securities or acquiring property under a plan, for services or for costs and
expenses incurred in connection with the case or the plan, be approved by the Court as
reasonable.

As set forth in section 2.2.4 of the Plan, all fees and expenses of Professionals incurred
through the Effective Date will be subject to the Court's approval.  Moreover, section 10.1.2 of
the Plan provides that this Court will retain jurisdiction after the Effective Date to hear and
determine all applications by Professionals and others for compensation and reimbursement of
expenses.  Accordingly, the Plan complies with the requirements of section 1129(a)(4).

**E.      Section 1129(a)(5) – The Identity and Affiliation of the Debtor's Post-
Confirmation Officer and Director Have Been Disclosed.**

Section 1129(a)(5)(A)(i) of the Bankruptcy Code provides that a plan of reorganization
may be confirmed only if the proponent discloses the "identity and affiliations of any individual
proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the
debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the
debtor under the plan[.]"  In addition, under section 1129(a)(5)(A)(ii), the appointment or
continuation in office of such individual must be consistent with the interests of creditors, equity
security holders and public policy.

Under the Plan, the Debtor's current President and CEO, Christopher T. Carney, will
continue to serve as the Reorganized Debtor's chief executive officer.  Geoff Scott will serve as
the Reorganized Debtor's sole director.  Messrs. Carney and Scott will provide overall strategic
management of the Reorganized Debtor after consummation of the Plan.  Their identities have
been disclosed to creditors, and their affiliations have been disclosed to the Court and creditors
through the Plan and Disclosure Statement.  (See Disclosure Statement § 4.1.2)  The case law is
clear that a plan may provide for the retention of the debtor's existing management.  See, e.g., In

re Texaco, 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (holding that section 1129(a)(5) was

satisfied where notice was provided that the debtor's existing directors and officers would

continue to serve in office after plan confirmation).

Section 1129(a)(5)(B) requires plan proponents disclose the identity of insiders retained

by the reorganized debtor and the nature of compensation for that insider. In compliance with

1129(a)(5)(B), the Joint Disclosure Statement states the nature of the compensation of Mr.

Carney. (See Disclosure Statement § 4.1.2.) Accordingly, the Plan satisfies the requirements of

section 1129(a)(5).

### F.      Section 1129(a)(6) – The Plan Does Not Provide for Any Rate Change Subject to Regulatory Approval.

Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory

commission with jurisdiction, after the confirmation of the plan, over the rates of the debtor has

approved any rate change provided for in the plan, or such rate change is expressly conditioned

on such approval." The Plan complies with this statute because the Plan does not provide for any

change in rates over which a governmental regulatory commission has jurisdiction.

### G.      Section 1129(a)(7) – The Plan is in the Best Interests of Creditors.

Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired

class of claims or interests, each holder of a claim or interest of such class (a) has accepted the

plan or (b) will receive or retain property of a value not less than what such holder would receive

or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This provision is

often referred to as a test of whether the plan is in the "best interests" of impaired creditors.

As summarized in the Ballot Register, all creditors entitled to vote have accepted the

Plan. Creditors in classes 3, 5, and 6 did not return ballots, and have not filed objections to

confirmation. As such, under controlling Tenth Circuit precedent, the Court may presume that

the non-voting classes have accepted the Plan.[6]

---

[6]      Under the law of the Tenth Circuit, where a class of creditors does not vote either to accept or reject the
plan, the Court may presume acceptance:

As to the non-voting classes, if necessary, the Debtor will present evidence that the holders of claims in the non-voting classes will receive or retain property of a value not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

**H.      Section 1129(a)(8) – The Plan Has Been Accepted by the Requisite Classes of Creditors and Interest Holders.**

Pursuant to Section 1129(a)(8) of the Bankruptcy Code, unless a plan is to be confirmed pursuant to the "cram down" provisions of Bankruptcy Code § 1129(b), the plan must be accepted by all impaired classes of claims or interests.

Not all impaired Classes were entitled to vote on the Plan.  As evidenced by the Ballot Register, each Class entitled to vote has accepted the Plan either (a) by affirmatively voting to accept the Plan, or (b) by opting neither to vote nor to object to confirmation.  See In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1267-68 (10th Cir. 1988) (presuming acceptance of class of creditors that did not return a ballot and did not timely object to confirmation); In re John Kuhni Sons, Inc., 10-29038 RKM, 2011 WL 1343206 at *4 (Bankr. D. Utah Mar. 30, 2011) ("As to the classes wherein no creditors voted …, the creditors silence is deemed acceptance of the Plan"); In re Jones, 530 F.3d 1284, 1291 (10th Cir. 2008) ("the failure to object constitutes acceptance of the plan"); In re Armstrong, 292 B.R. 678, 684 (B.A.P. 10th Cir. 2003) ("a nonvoting, nonobjecting judgment lien creditor is deemed to have accepted the plan").

---

Since the [secured creditor class] did not object to the Plan at any time prior to its confirmation and because the [class] unilaterally opted not to vote on the confirmation of the Plan, the bankruptcy court did not err in presuming their acceptance of the Plan for purposes of § 1129(b).

Once acceptance was properly presumed, the court was not obligated to inquire as to whether the Plan discriminated unfairly or was not fair and equitable to the [non-voting class] under § 1129(b)(1). When the [creditors] failed to object to the Plan, they waived their right to challenge the Plan or to assert, after the fact, that the Plan discriminated unfairly and was not fair and equitable.

In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1267-68 (10th Cir. 1988).

**I.        Section 1129(a)(9) – The Plan Provides For the Payment of Priority Claims.**

Section 1129(a)(9) of the Bankruptcy Code requires (a) that certain priority claims be

paid in full on the effective date of a plan or upon such other terms as are agreed, and (b) unless

otherwise agreed, that the holders of certain other priority claims receive deferred cash payments

and will be paid in full within five years.  The Plan satisfies these requirements.

The Plan provides that Allowed Administrative Expense Claims will be paid in full in

Cash on the later of (1) the date it is due, or (2) the Effective Date.  (See Plan, Article 2.)  The

Plan provides that professional compensation "shall be paid (i) within fifteen days of the entry of

the order of the Bankruptcy Court approving such award …, or (ii) upon such other terms as may

be mutually agreed …."  (Plan § 2.2.4.1.)

The Plan provides that the holders of Priority Tax Claims, unless they have agreed to

different treatment, (x) may be paid from funds of the Plan Funding Transaction, (y) will be paid

in five regular annual installment payments, and (z) that the claim(s) will be paid in full within

five years after the Petition Date.[7]

Accordingly, the Plan satisfies the requirements of section 1129(a)(9).

**J.        Section 1129(a)(10) – The Plan Has Been Accepted By at Least One
           Impaired, Non-Insider Class.**

Section 1129(a)(10) of the Bankruptcy Code requires that the Plan be accepted by at least

one class of claims that is impaired under the Plan, determined without including the acceptance

of the plan by any insider.  As set forth in the Ballot Report, this requirement is satisfied.

All impaired classes entitled to vote, voted to accept the Plan.

**K.        Section 1129(a)(11) –  The Plan is Feasible.**

Under section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be

confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or

---

[7]      See In re Dow Corning Corp., 244 B.R. 718, 719 (Bankr. E.D. Mich. 1999) ("Reorganization plans are
routinely confirmed with provisions for [priority tax] payments on an annual basis and there is nothing in
1129(a)(9)(C) or anywhere else in the Bankruptcy Code suggesting that this is improper."); see also U.S. v. TM
Bldg. Prods., Ltd., 231 B.R. 364, 372 (S.D. Fla. 1998) (the term "deferred cash payments" means "periodic
payments, the interval of which is determined by balancing the circumstances of the debtor with the reasonable right
of the creditor to receive prompt payment of its claim").

the need for further financial reorganization, of the debtor or any successor to the debtor under

the plan." 11 U.S.C. § 1129(a)(11).  One commentator has stated that this section "requires

courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of

success and is workable." 7 Collier on Bankruptcy ¶ 1129.02[11] (16th ed. 2011).

Section 1129(a)(11), however, does not require a guarantee of the plan's success.  Rather,

the proper standard is whether the plan offers a "reasonable prospect" of success.  See In re

Danny Thomas II Ltd. Partnership, 241 F.3d 959, 962 (8th Cir. 2002) ("While a reorganization

plan's 'success need not be guaranteed,' the bankruptcy court cannot approve a plan unless it has

at least a reasonable prospect for success.") (citations omitted); Bridgeport Jai Alai, Inc. v.

Autotote Systems, Inc., 215 B.R. 651, 653 (Bankr. D. Conn. 1997) (stating that success does not

need to be "absolutely assured.").

Courts have identified a number of factors relevant to evaluating the feasibility of a

proposed plan of reorganization, including (a) the prospective earnings or earning power of the

debtor's business, (b) the soundness and adequacy of the capital structure and working capital for

the debtor's post-confirmation business, (c) the debtor's ability to meet its capital expenditure

requirements, (d) economic conditions, (e) the ability of management and the likelihood that

current management will continue, and (f) any other material factors that would affect the

successful implementation of the plan.  See, e.g., In re Clarkson, 767 F.2d 417, 420 (8th Cir.

1985); In re WCI Cable, Inc., 282 B.R. 457, 486 (Bankr. D. Or. 2002); In re S&P, Inc., 189 B.R.

159, 168-169 (Bankr. N.D. Ind. 1995).

In this Case, the Plan offers a "reasonable prospect" of success because the cash

distributions under the Plan will be provided by Halloysite via the Plan Funding Transaction.

Halloysite is contributing over $3 million to the Debtor for the benefit of creditors. In short, the

distributions to creditors contemplated under the Plan do not depend upon the Debtor's future

economic success.  In short, while BMI would like to turn the Plan confirmation hearing into a

test of the Debtor's financial projections, they are irrelevant and the argument is a "red herring."

Indeed, when distributions to creditors under a plan derive from an infusion of new capital, rather than on future profits, the infusion of cash under the plan (standing alone) satisfies section 1129(a)(11). See In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000) (the plan's capitalization of the debtor was considered, and found to be sufficient in that case, for the feasibility of the debtor's plan); Matters of Treasure Bay Corp., 212 B.R. 520 (Bankr. S.D. Miss. 1997) (the investment of $9 million to the debtor, and the contribution of real property, was sufficient to satisfy plan feasibility). Here, the cash infusion via the Plan Funding Transaction satisfies the feasibility requirement. (See Joint Disclosure Statement § 5.2.)

That said, if the Court believes that the Debtor's future business prospects must be evaluated, the Debtor is prepared to present evidence (a) of the Reorganized Debtor's prospective earnings and earning power, (b) the soundness and adequacy of the new (debt free) capital structure and working capital for the Reorganized Debtor's post-confirmation business, (c) the Reorganized Debtor's ability to meet its capital expenditure requirements, (d) current economic and market conditions, (e) the ability of management and the likelihood that current management will continue, and (f) any other material factors that would affect Reorganized Debtor's future business.

In short, the evidence shows that the plan offers a reasonable prospect of success, and is workable. Confirmation of the Plan is not likely to be followed by a liquidation or further reorganization, therefore, the requirements of section 1129(a)(11) are satisfied.

**L.    Section 1129(a)(12) – The Plan Provides for the Payment of Fees.**

Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition precedent to confirmation of a plan of reorganization, "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." The Plan complies with this section by providing that such fees "shall be paid in full without prior approval pursuant to 11 U.S.C. § 1930 on or before the Effective Date." (Plan § 2.2.3)

**M.      Section 1129(a)(13) – The Plan Provides for the Debtors' Obligations to Pay Retiree Benefits.**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or by court order pursuant to Bankruptcy Code § 1114 at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits.  The Debtor does not have any unsatisfied pre-confirmation obligation to pay retiree benefits.  As such, this provision does not apply.

**N.      Section 1129(b) – "Cram Down" Requirements.**

Section 1129(b)(1) of the Bankruptcy Code provides that a plan may be confirmed "notwithstanding" rejections of the plan by one or more classes of creditors or equity holder "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests *that is impaired under and has not accepted, the plan*."  11 U.S.C. § 1129(b)(1) (emphasis added).

A plan proponent, however, need not satisfy the "cram down"[8] requirements of section 1129(b) as to any accepting class.  See Ruti-Sweetwater, Inc., 836 F.2d at 1268 ("Once acceptance was properly presumed, the court was not obligated to inquire as to whether the Plan discriminated unfairly or was not fair and equitable to the [nonvoting secured creditors] under § 1129(b)(1)."); Unruh v. Rushville State Bank of Rushville, Mo., 987 F.2d 1506, 1508 (10th Cir. 1993) (explaining that the absolute priority rule is applicable only to "a *dissenting class* of unsecured creditors.") (emphasis added); see also In re SLC Ltd. V, 137 B.R. 847, 850 (Bankr. D. Utah 1992) (same).

> 1.      All Creditor Classes Have Accepted the Plan.  Accordingly, the "Cram Down" Requirements Are Not Applicable.

As demonstrated by the Ballot Register, all classes of creditors and equity holders have accepted the Plan. Creditors and equity holders in Classes 1, 2 and 10 voted to accept the Plan.

---

[8]      "This provision is often referred to as the cram down provision of the Bankruptcy Code.  It is so termed because if its provisions are met, a plan can be confirmed or 'crammed down' over the objections of impaired classes."  In re Lotspeich, 328 B.R. 209, 219 (B.A.P. 10th Cir. 2005).

Creditors in classes 3, 5 and 6 did not return ballots, and have not filed objections to

confirmation.  As such, pursuant to the authorities discussed in section I.H above, the Court

should presume that the non-voting classes have accepted the Plan.  Class 4 is not impaired, was

not entitled to vote and is deemed to have accepted the Plan. Class 7 is comprised of equity

interests that will be cancelled under the Plan.

> 2.    <u>To the Extent Applicable, the Plan Satisfies the Cram Down Requirements
> Applicable to Secured Claims.  The Plan Does Not "Discriminate
> Unfairly" and is "Fair and Equitable" in Its Treatment of Secured Claims.</u>

Section 1129(b)(1)(A) defines what is required for a plan to be "fair and equitable" to a

class of secured claims.  The statute affords a plan proponent any one of three, mutually

exclusive alternatives:  (a) the plan shall (i) permit the secured creditor to retain its lien, and

(ii) provide for "deferred cash payments totaling at least the allowed amount" of the claim;

(b) the plan shall provide for the sale of the secured creditor's collateral, with the creditor's liens

to attach to the proceeds; or (c) the plan shall provide the secured creditor "the indubitable

equivalent" of its claim.  <u>See</u> <u>Wade v. Bradford</u>, 39 F.3d 1126, 1130 (10th Cir. 1994)

(concluding that § 1129(b)(2)(A)'s "requirements are written in the disjunctive, requiring the

plan to satisfy only one before it could be confirmed over creditor's objection").  As such, a

debtor has flexibility as to which subsection to use under Section 1129(b)(2)(A) to confirm a

plan over a dissenting creditor's objection.  <u>See, e.g.</u>, <u>In re Philadelphia Newspapers, LLC</u>, 599

F.3d 298, 309 (3d Cir. 2010), as amended (May 7, 2010) ("a plan could be confirmed so long as

it met any one of the three subsections' requirements, regardless of whether the plan's structure

more closely resembled another subsection").

Pursuant to section 506(a)(1) of the Bankruptcy Code, however, an allowed claim "is a

secured claim [only] to the extent of the value of such creditor's interest in the estate's interest in

such property … and is an unsecured claim to the extent that the value of such creditor's interest

… is less than the amount of such allowed claim."

The Plan satisfies one of these three alternatives as to each class of secured creditors.

*Class 3* – The Plan provides (a) that Leaf Capital Funding, LLC, the holder of the Class 3 secured claim, shall retain its liens, (Plan § 4.3.2.5), (b) that the collateral may be sold free and clear of the lien holder's interest provided that the lien holder consents, the sale proceeds are sufficient to satisfy the unpaid balance, or the sale is approved by order of the Court, (Plan § 4.3.2.2), (c) the Debtor shall make monthly payments under the non-default provisions of the loan documents beginning on the Effective Date, (Plan § 4.3.2.3), and (d) any arrearage shall be paid upon the maturity date of the original note or upon sale of the collateral. (Plan § 4.3.2.4)

*Class 5* – The Plan provides (a) that the Tharp & Associates, the holder of the Class 5 secured claim, shall retain its liens, (Plan § 4.5.2.5), (b) that the collateral may be sold free and clear of the lien holder's interest provided that the lien holder consents, the sale proceeds are sufficient to satisfy the unpaid balance, or the sale is approved by order of the Court, (Plan § 4.5.2.2), (c) the Debtor shall make monthly payments under the non-default provisions of the loan documents beginning on the Effective Date, (Plan § 4.3.2.3), and (d) any arrearage shall be paid upon the maturity date of the original note or upon sale of the collateral. (Plan § 4.5.2.4)

*Class 6* – The Plan provides (a) that the holders of Class 6 miscellaneous secured claims shall retain liens to the extent the lien is an unavoidable properly perfected lien, (Plan § 4.6.3), (b) that the Debtor will make monthly installments calculated on a ten-year amortization beginning on the Effective Date, (Plan § 4.6.2.4),  and (c) that the collateral may be sold free and clear provided the Court enters an order approving the sale, the claim holder consents, or the proceeds are sufficient to pay in full the collateral release amount and that the claim holder will be paid in full or the lien will attach to the sale proceeds. (Plan § 4.6.2.6)

In short, even if the "cram down" requirements of section 1129(b)(2)(A) were applicable as to one or more of the classes of secured creditors, the Plan would and does satisfy such requirements.

3.     <u>To the Extent Applicable, the Plan Satisfies the Cram Down Requirements Applicable to Unsecured Claims.</u>

Class 1, 2 and 10 voted unanimously to accept the Plan. All classes of unsecured creditors unanimously voted to accept the Plan. As such, the requirements of sections 1129(b)(1) and 1129(b)(2)(B) of the Bankruptcy Code do not apply. In any event, the cram down requirement of section 1129(b)(2)(B) are satisfied. Class 7 Equity Interests are cancelled under the Plan. As such, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

**O.    Section 1129(c) – Only One Plan is Proposed for Confirmation.**

Section 1129(c) of the Bankruptcy Code provides that a court may confirm only one plan. In the instant case, the Court has not confirmed another plan, and no competing plan is set for confirmation.

**P.    Section 1129(d) – The Principal Purpose of the Plan is not Tax Avoidance or Avoidance of Securities Laws.**

Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of application of section 5 of the Securities Act of 1933. As noted above, the Plan has been proposed with the honest intent to continue the business of the Reorganized Debtor and to maximize recoveries to creditors. Moreover, no party-in-interest that is a governmental unit has objected to confirmation of the Plan on the basis that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. Accordingly, Bankruptcy Code § 1129(d) is satisfied.

**II.    REPLY TO OBJECTIONS**

On October 8, 2025, BMI filed its *Objection to Confirmation of Joint Plan of Reorganization Proposed by (A) the Debtor, and (B) Halloysite Investment, LLC* [Docket No.

255] (the "**BMI Objection**"). Also on October 8, 2025, the US Trustee filed the *Acting United States Trustee's Objection to Confirmation of Joint Plan of Reorganization Proposed by (A) the Debtor, and (B) Halloysite Investment, LLC Under Chapter 11 of the Bankruptcy Code and Memorandum of Points and Authorities* [Docket No. 253] (the "**UST's Limited Objection**").

At the outset, it is important to keep in mind that *no creditor* has objected to the Plan. Rather, all creditors holding allowed claims and entitled to vote unanimously voted to accept the Plan. Accordingly, the Court should consider the objections in the appropriate light. Confirmation of the Plan is not contested by creditors.  Putting aside the UST's Limited Objection, which the Joint Plan Proponents believe has been addressed and resolved via proposed revisions to the Plan's exculpation verbiage, the only party objecting is BMI.  BMI is not acting, or thinking, as a creditor. It is acting out of self-interest and its challenge to confirmation is an attempt to "kill" the Debtor to avoid a reckoning.

BMI alleges that the Plan fails to comply with section 1129(a)(1) because the Plan rejects contracts that are not executory, and BMI retains rights under section 365(h)(1) which makes rejection of the onerous and one-sided ground lease an unreasonable exercise of bad business judgment. BMI also has adopted the US Trustee's objections based upon the scope of the Plan's exculpatory clause. Although BMI elected to withdraw its Competing Plan of Liquidation, and notwithstanding that all creditors have accepted the Plan, BMI persists in arguing that the Plan is not proposed in good faith. Finally, BMI argues that the Plan is not feasible.

For the reasons that follow, the Court should overrule the objections:

**A.  The exculpatory provisions of the Plan are narrowly tailored and focused on conduct related to the advancement of the Case and implementation of the Plan.**

The objecting parties misread the exculpatory provision of the Plan. It is not a third-party release and is not governed by Purdue Pharma. Rather, it is narrowly tailored to acts and omissions from the Petition Date through entry of a Final Decree which are in furtherance of the Case or in implementing the Plan.

For the avoidance of doubt, however, the Plan Proponents have proposed to modify the Plan to address the concerns raised by the US Trustee and BMI. In short, malpractice claims are excluded, and it is beyond clear that the exculpatory clause neither releases third parties nor extends beyond the scope of acts done in furtherance of the bankruptcy case.

This case is simply not Purdue Pharma, and the Plan Proponents are not seeking exoneration from actions outside of the Case. See generally Harrington v. Purdue Pharma L. P., 603 U.S. 204, 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024). There is no third-party release from prepetition liability. Nor is there a release of post-petition liability for acts or misconduct unrelated to the Case.  Any concerns with such releases are misguided and addressed by the proposed modification. The proposed modification is presented in good faith to appease the objecting parties.

Finally, to the extent the Court believes that the exculpation clause requires further "pruning," the Court should not deny confirmation of the Plan, but rather should "reform" the clause and confirm the Plan with the exculpation clause as reformed.

**B.  The Plan is feasible. The Feasibility of the Plan starts and ends with the Plan Funding Transaction. The Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.**

BMI invites the Court to misconstrue both the letter and spirit of the Bankruptcy Code, and to read section 1129(a)(11) out of context. Further, the plan proponent's burden under section 1129(a)(11) is low. In re WR Grace & Co., 729 F.3d 332, 349 (3d Cir. 2013) ("[Debtors] need[] only to demonstrate a reasonable likelihood of success, not an absolute certainty.")

Section I.J of this memorandum already includes a lengthy discussion of section 1129(a)(11) and discusses how it is satisfied here.  Rather than repeat the above-stated points and authorities in their entirety, the Debtor invites the Court to look back (or above) – at pages 23-25.

BMI argues that the Debtor is destined to repeat the business losses it has suffered in the past, but it studiously ignores that the feasibility of this Plan does not depend upon future profits or the Debtor's future success.  Under the Plan, distributions to creditors will come entirely from

Halloysite and the Plan Funding Transaction. In short, even if the Debtor's business fails and the Debtor never earns a profit, creditors will receive what they are promised under the Plan in full. There will be no plan default. And the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

Indeed, when distributions to creditors under a plan derive from an infusion of new capital rather than on future profits, as they do here, the infusion of cash under the plan (standing alone) satisfies section 1129(a)(11). See In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000) (the plan's capitalization of the debtor was considered, and found to be sufficient in that case, for the feasibility of the debtor's plan); Matters of Treasure Bay Corp., 212 B.R. 520 (Bankr. S.D. Miss. 1997) (the investment of $9 million to the debtor, and the contribution of real property, was sufficient to satisfy plan feasibility).

In any event, the purpose and spirit of chapter 11 is to permit failed and flailing businesses to reorganize – to give them a chance at new life. If BMI's interpretation of section 1129(a)(11) is correct, there would never be any successful reorganizations and Chapter 11 would be futile. As such, if the Court believes that the Debtor's future business prospects must be evaluated, the Debtor is prepared to present evidence (a) of the Reorganized Debtor's prospective earnings and earning power, (b) the soundness and adequacy of the new (debt free) capital structure and working capital for the Reorganized Debtor's post-confirmation business, (c) the Reorganized Debtor's ability to meet its capital expenditure requirements, (d) current economic and market conditions, (e) the ability of management and the likelihood that current management will continue, and (f) any other material factors that would affect Reorganized Debtor's future business.

The Plan as presented is feasible. The creditors will be paid based on the Plan Funding Transaction, *not* the ongoing operations of the Debtor. But even considering the ongoing operations, the Plan resolves the Debtor's obligations in such a manner that the Reorganized Debtor does have reasonable prospects moving forward.

Caselaw supports the Debtor's position. The Tenth Circuit explained that the purpose of the feasibility requirement is to "prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." In re Pikes Peak Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985) (citation omitted). Here, the Joint Plan promises cash shortly after the Effective Date. There is no question about whether the Halloysite can provide funding for the Plan Funding Transaction. Concerns regarding the Reorganized Debtor's future operations simply are not relevant.

### C.  The Plan properly rejects executory contracts and unexpired leases and *discharges* the Debtor from obligations under any contracts that are not executory.

Section 8.4 of the Plan calls for the rejection of all unassumed executory contracts and unexpired leases. The Plan explicitly states: "for the avoidance of doubt, the following executory contracts shall be Rejected Contracts: (a) any and all contracts between the Debtor and BMI Minerals Company, BMC Minerals Company, Brady McCasland, Inc., Richard Fox, Brady McCasland and/or any of their affiliates, including (without limitation) (i) the Mining Operations Agreement, (ii) the Milling Operations Agreement, (iii) any ground lease, and (iv) any and all letter agreement(s)…." (Plan § 8.4)

In its objection, BMI clarifies it takes no issue with "the Debtor's rejection of the Milling Operations Agreement and Mining Operations Agreement." BMI Obj., 8. BMI then goes on to claim that, as lessee to a rejected unexpired lease of real property, it will elect to retain its rights under the lease under section 365(h)(1)(A)(ii).

BMI objects to the Plan on the ground that it may reject contracts between the Debtor and BMI that are not executory.  The Debtor hereby clarifies that is not seeking to "reject" any contracts that are not executory, because a contract that is not executory cannot "ride through" and survive discharge.

Accordingly, the Court need not sift and sort through the Debtor's contracts with BMI to determine whether any – aside from the Mining Operations Agreement, the Milling Operations

Agreement, and the ground lease – are executory.  If they are executory, the Plan unambiguously rejects them.  They cannot, and will not, ride through. Further, any and all obligations of the Debtor under contracts that are not "executory" are "discharged." <u>See generally</u> <u>In re Manville Forest Prods. Corp.</u>, 225 B.R. 862, 865 (Bankr. S.D.N.Y. 1998), <u>subsequently aff'd</u>, 209 F.3d 125 (2d Cir. 2000) ("A claim arising from a pre-petition, non-executory contract is similar to any other pre-petition claim and would be discharged by confirmation."); <u>In re Texaco Inc.</u>, 254 B.R. 536 (Bankr. S.D.N.Y. 2000) (same); <u>see also</u> 11 U.S.C. § 524(c) ("An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent" it is reaffirmed.)

In short, the Bankruptcy Code requires a chapter 11 debtor either to assume or reject executory contracts.  The Plan rejects all executory contracts between the Debtor and BMI.  The Bankruptcy Code discharges the Debtor from all obligations under contracts that are not executory.   "Rejection" of them is irrelevant.

**D.  The Plan Proponents have acted in good faith throughout the bankruptcy case.**

Denial of confirmation for lack of good faith is reserved for cases where "the debtor intended to abuse the judicial process and the purposes of the reorganization provisions." <u>In re Paige</u>, 685 F.3d 1160, 1179 (10th Cir. 2012). Section 1129(a)(3) "require[es] only that there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." <u>Kearney v. Unsecured Creditors Comm.</u>, 987 F.3d 1284, 1293 (10th Cir. 2021)

The Debtor and Halloysite have proposed a Plan which provides a meaningful return to creditors, which permits the Debtor an opportunity to continue in business, and which all creditors have accepted.  Distributions under the Plan do not depend on future profits, they are coming from Halloysite.  Halloysite has put its money where its mouth is. BMI, however, was unwilling to outbid Halloysite.  It has withdrawn its Competing Plan of Liquidation and now is playing the role of "spoiler."

Section I.C of this memorandum already includes a lengthy discussion of section 1129(a)(3) and discusses how it is satisfied here.  Rather than repeat the above-stated points and authorities in their entirety, the Debtor invites the Court to look back (or above) – at pages 17-19.

The fact that all creditors have accepted the Plan, standing alone, should be enough evidence to satisfy the "good faith" requirement.  Further, based upon the evidence that Halloysite is ready, willing and able to fund the Plan Funding Transaction, (a) there is (at a minimum) a reasonable likelihood that the plan will achieve its intended results which are consistent with the purposes of the Bankruptcy Code, and (b) the plan is feasible, practical, and will enable the company both (i) to continue its business and (ii) to pay its debts in accordance with the Plan's provisions (all of which will be paid from the Plan Funding Transaction).

If anyone's motives should be questioned, it is BMI. BMI has employed a scorched earth approach to this Case, and has attempted to "kill" the Debtor at every turn.  Notably, BMI is not even a creditor in the case.

Creditors overwhelming, indeed unanimous, support for the Plan – standing alone – satisfies the good faith requirement. See, e.g., In re Walker, No. BR 20-13557 ELF, 2021 WL 1732592, at *18 (Bankr. E.D. Pa. Apr. 30, 2021) ("When the affected creditors support confirmation of a plan, the court generally should be circumspect about overriding the expressed will of the voting creditors based on the good faith requirement of 11 U.S.C. § 1129(a)(3).... In evaluating the good faith of the proposed Plan, it is extremely significant that the unsecured class of creditors voted overwhelmingly in support the Plan. The parties most directly affected prefer that this Plan be confirmed.")

In any event, all relevant evidence demonstrates that the Debtor and Halloysite proposed the Plan with the legitimate and honest purpose of, among other things, providing a meaningful return to creditors and reorganizing the Debtor's business and financial affairs. The Court should find and conclude that the Plan (which has received unanimous acceptance by creditors) has been proposed in good faith.

## CONCLUSION

WHEREFORE, For the reasons, and based on the authorities and evidence, presented above, and as will be further demonstrated at the Confirmation Hearing, the Debtor submits that the Plan satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be confirmed.  Accordingly, the Debtor respectfully requests that the Court enter an order (a) overruling all objections, (b) confirming the Plan, and (c) granting such other and further relief as is just and appropriate.

DATED this 10th day of October, 2025.

COHNE KINGHORN, P.C.

/s/ Matthew M. Boley
Matthew M. Boley
Jeffrey Trousdale
*Attorneys for* debtor-in-possession
APPLIED MINERALS, INC.