Signed as modified by the Court.

**This order is SIGNED.**

**Dated: October 20, 2025**





**PEGGY HUNT**
**U.S. Bankruptcy Judge**

*jas*

---

*Order Prepared and Submitted by:*

Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone: (801) 363-4300
E-mail:  mboley@ck.law
            jtrousdale@ck.law

*Attorneys for* debtor-in-possession
APPLIED MINERALS, INC.

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**APPLIED MINERALS, INC.,**<br><br>Debtor. | Bankruptcy No. 24-25849<br><br>Chapter 11<br><br>Honorable Peggy Hunt |

### ORDER CONFIRMING JOINT PLAN OF REORGANIZATION

This matter came before the Court on October 15, 2025 at 9:30 a.m. and continued on October 16 and 17, 2025 (collectively, the "**Confirmation Hearing**") to consider confirmation of the *Joint Plan of Reorganization of (A) the Debtor, and (B) Halloysite Investment, LLC dated August 11, 2025* [Docket No. 178] (as modified ~~pursuant to this Order~~, the "**Plan**" or the "**Confirmed Plan**"), a copy of which is attached hereto as **Exhibit 1**,[1] proposed by Applied Minerals, Inc., debtor and debtor-in-possession (the "**Debtor**" and, from and after the Effective Date[2] of the Confirmed Plan, the "**Reorganized Debtor**") in the above-referenced chapter 11

---

[1]    Dkt. No. 265-2 incorporates in redline all pre-confirmation modifications to the Plan being approved herein. Exhibit 1 is a clean version of that document.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings provided in the Confirmed Plan (as defined below), attached hereto as Exhibit 1.

4899-5494-8723, v. 5

bankruptcy case (the "**Case**"), and Halloysite Investment, LLC ("**Halloysite**") (together, the

"**Plan Proponents**"), subject to modifications proposed in the *Motion for Entry of Order*

*Approving Modification to Joint Plan of Reorganization and Approving Plan as Modified*

[Docket No. 254] (the "**Motion to Modify**"), the notices of redline(s) filed as Docket Nos. 262

and 265 and additional modifications, corrections and clarifications discussed on the record

during the Confirmation Hearing.  Matthew M. Boley and Jeffrey Trousdale appeared on behalf

of the Debtor. Ellen Ostrow appeared on behalf of Halloysite. P. Matthew Cox and David L.

Pinkston appeared on behalf of Brady McCasland, Inc. ("**BMI**"), Ole Red H2S Scavenger, LLC

("**Ole Red**"), and BMI Minerals Company ("**BMC**") (collectively, the "**BMI Entities**").  Peter

Kuhn appeared on behalf of the United States Trustee.

WHEREFORE, the Plan having been transmitted to creditors together with the

Disclosure Statement approved by the Court;

WHEREFORE, the Court having announced its findings of fact and conclusions of law

on the record during the Confirmation Hearing and having entered separately its written *Findings*

*and Conclusions Regarding Confirmation of Joint Plan of Reorganization* (collectively, the

"**Findings and Conclusions**"), which hereby are incorporated by reference; and

WHEREFORE, it having been determined, after hearing on notice, that all of the

applicable requirements for confirmation of the Plan set forth in 11 U.S.C. § 1129 have been

satisfied, and good cause appearing, it hereby is

**ORDERED** that:

1.    Plan Confirmed.  The Plan[3] shall be, and hereby is CONFIRMED. ~~as expressly~~

~~supplemented and modified by this Confirmation Order (as supplemented and modified, the~~

~~"Confirmed Plan").~~ A copy of the Confirmed Plan is attached hereto as **Exhibit "1"**

---

[3]    ~~Capitalized terms used but not otherwise defined herein are defined in the Plan.  The Plan has been~~
~~modified as discussed on the record during the Confirmation Hearing and as reflected by the redline filed at Docket~~
~~No. 265 and Exhibit 2 thereto [Docket No. 265-2].  The Confirmed Plan attached hereto as Exhibit 1 is a clean copy~~
~~thereof.~~

2.      <u>Motion to Modify Plan Granted</u>.  The Motion to Modify [Docket No. 254] shall be, and hereby is, GRANTED.

3.      <u>Resolving Inconsistency</u>.  In the event of any conflict or inconsistency between the terms of the Confirmed Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.  Except as otherwise provided herein, the terms of the Confirmed Plan are incorporated by reference into and are an integral part of this Confirmation Order.

4.      <u>Objections.</u>  Any and all objections to confirmation of the Confirmed Plan that were not withdrawn, waived or settled at or prior to the Confirmation Hearing, and all reservations of rights included in any such objections, are overruled in their entirety on the merits (except only as otherwise expressly and unambiguously provided in this Confirmation Order), and all withdrawn objections are deemed withdrawn with prejudice.

5.      <u>Effect of Confirmation</u>.  As of the Effective Date of the Confirmed Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, its Estate, or the Reorganized Debtor on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Confirmed Plan, except to the extent expressly permitted under the Confirmed Plan.  All holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, are enjoined from taking any actions to interfere with the implementation or consummation of the Confirmed Plan. Further, except as otherwise expressly provided in the Confirmed Plan or this Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against the Reorganized Debtor or (ii) enforcing,

4899-5494-8723, v. 5

attaching, collecting or recovering by any manner or means any judgment, award, decree or

order against the immediate or any mediate transferee of any property distributed pursuant to the

Confirmed Plan or of any putative securities, based upon a claim that the transferor's receipt of

such property constituted a fraudulent conveyance, preference, violation of bulk sales or other

law, or based upon any other claim that receipt and or distribution of property by transfer

pursuant to the Confirmed Plan is wrongful, whether in law or equity.  All parties further are

enjoined permanently from taking actions as provided under Article 12 of the Confirmed Plan,

and as specified in sections 524 and 1141 of the Bankruptcy Code.

6.    <u>Revesting of Debtor's Property</u>.  Except as otherwise provided in the Confirmed

Plan or in this Confirmation Order, on the Effective Date, in accordance with § 1141(b) and (c),

all property of the Debtor and the Estate, and all other property dealt with by the Confirmed

Plan, including without limitation all Avoidance Actions, shall be vested in the Reorganized

Debtor free and clear of all Liens, Claims and interests, except only Liens expressly preserved

under sections 4.3, 4.4 and 4.5 of the Confirmed Plan in favor of Classes 3, 4 and 5.

7.    <u>Assumed Contracts</u>.  As of the Effective Date, pursuant to section 8.1 of the

Confirmed Plan and §§ 365(a) and 1123(a)(5), the Debtor and/or the Reorganized Debtor's

assumption of the Assumed Contracts[4] shall be, and hereby is, approved.  The Assumed

Contracts shall be transferred to, and remain in full force and effect for the benefit of, the

Reorganized Debtor in accordance with their respective terms, notwithstanding any provision in

any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f)

of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

Except for the Cure Amount of $1,500.00 for the DOGM Contract, the "Cure Amount" to be

paid to each non-debtor party to an Assumed Contract shall be zero ($0) dollars in full and

complete satisfaction of any Cure Claim (as defined below) of such counter-party.

---

[4]    The "**Assumed Contracts**" consist of the executory contracts and unexpired leases delineated in section
8.1.2 of the Plan.

4899-5494-8723, v. 5

8.      All defaults or other obligations of the Debtor under the Assumed Contracts arising or accruing prior to the date of this Order (without giving effect to any acceleration clauses and without giving effect to any penalty rate or penalty provisions of the kind specified in section 365(b)(2)(D) of the Bankruptcy Code) and all compensation for damages with respect to the Assumed Contracts (the "**Cure Claims**") shall be cured and waived upon payment of the Cure Amounts.  Each non-debtor party to an Assumed Contract is forever barred and estopped from asserting against the Debtor, the Reorganized Debtor, or their property, any default existing as of the date of the Confirmation Hearing, or (except to the extent the counterparty holds an Allowed Claim) any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor with respect to the Assumed Contract.

9.      <u>Rejected Contracts</u>.  Except for the Assumed Contracts, all other executory contracts and unexpired leases to which the Debtor is a party shall be, and hereby are, deemed rejected, excepting only any executory contract or unexpired lease that has been assumed pursuant to a Final Order of the Bankruptcy Court entered before the Effective Date. No executory contracts or unexpired leases shall "ride through." For the avoidance of doubt, the following executory contracts and/or unexpired leases shall be Rejected Contracts: (a) any and all executory contracts or unexpired leases between the Debtor and BMI Minerals Company, BMC Minerals Company, Brady McCasland, Inc., Richard Fox, Brady McCasland and/or any of their affiliates, including (without limitation, and solely to the extent that they are determined to be executory contracts or unexpired leases) (i) the Mining Operations Agreement, (ii) the Milling Operations Agreement, (iii) any ground lease, and (iv) any and all letter agreement(s);  (b) any and all contracts between the Debtor and Durasonic Ltd.; and (c) any and all contracts with Wasatch Solutions LLC.

10.     <u>Implementation and Consummation of Plan</u>.  In accordance with section 1142 of the Bankruptcy Code, the implementation and consummation of the Confirmed Plan in accordance with its terms shall be, and hereby is, authorized and approved, and the Debtor, the

Reorganized Debtor, Halloysite, and any other person referenced in the Confirmed Plan shall be, and they hereby are, authorized, empowered and directed to issue, execute, deliver, file and record any documents, and to take any action necessary or appropriate to consummate the Confirmed Plan in accordance with its terms. Without limitation, the issuance of New Stock, as set forth in Sections 2.4, 4.2.4, 5.7, and 5.8 is authorized and approved. The New Organizational Documents set forth in Section 5.9 and attached to the Confirmed Plan as Schedule 5.9.1 are authorized and approved.

11.     Exculpation Approved.  The Court hereby adopts section 12.5 of the Confirmed Plan as the Order of this Court, as if expressly restated herein in its entirety.

12.     Payment of Statutory Fees.  Until entry of an Order closing, dismissing or converting the Bankruptcy Case, any quarterly payments due to the office of the United States Trustee after the Effective Date of the Confirmed Plan shall be paid in accordance with 28 U.S.C. § 1930(a)(6).

13.     Final Decree.  A final decree may be entered as soon as practicable, and within the time limits set forth in Local Rule 3022-1.

14.     Retention of Jurisdiction.  This Court shall retain exclusive jurisdiction, in accordance with the Confirmed Plan and sections 105(a) and 1142 of the Bankruptcy Code, with respect to all matters arising in, arising under or related to the Bankruptcy Case or Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the matters described in sections 10.1, 10.2, 10.3 and 10.4 of the Confirmed Plan.

15.     Notice of Entry of Confirmation Order.  Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), on or before the fifth Business Day following the date of entry of this Confirmation Order, the Debtor shall serve notice of entry of this Confirmation Order on all creditors, the United States Trustee and other parties-in-interest, by causing such notice of entry to be delivered to such parties by CM/ECF notice and/or via first-class mail, postage prepaid. No other or further notice shall be necessary.

16.     <u>Notice of Effective Date to be Given by the Reorganized Debtor</u>.  Within five

Business Days following the occurrence of the Effective Date, the Reorganized Debtor shall file

notice of the occurrence of the Effective Date with the Court.  No other or further notice of the

Effective Date shall be necessary.

17.     <u>Bar Dates for Administrative Claims</u>.  Consistent with section 2.2 of the

Confirmed Plan, unless otherwise provided in the Bankruptcy Code or previously filed or as

otherwise governed by a bar date order or in another order of the Court, requests for payment of

Administrative Claims arising on or after the Petition Date, through and including the Effective

Date, must be filed with the Court not later than thirty (30) days after the Effective Date (the

"<u>Administrative Claims Bar Date</u>"). Holders of Administrative Claims that are required to file a

request for payment of such Administrative Claims and that do not file such a request by the

Administrative Claims Bar Date shall be forever barred from asserting such Administrative

Claims against the Debtor, the Estate, the Reorganized Debtor and/or their respective property.

18.     <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>.  As

provided in Section 8.5 of the Confirmed Plan, all Proofs of Claim with respect to Claims arising

from the rejection of executory contracts or unexpired leases pursuant to confirmation of the

Confirmed Plan (a "**Rejection Damages Claim**"), if any, must be filed with the Court on or

before forty-five (45) days following the Confirmation Date, *i.e.*, within forty-five days from

entry of this Order (the "**Rejection Damages Bar Date**"). The fact that they Court has not

determined whether and/or which contracts and leases between the Debtor and the BMI Entities

are executory (versus non-executory) and/or unexpired (versus expired), if any, shall not extend

the Rejection Damages Bar Date as to any or all of the BMI Entities.  Any Rejection Damages

Claim that is not filed on or before the Rejection Damages Bar Date automatically shall be

disallowed, released, discharged and forever barred as against the Debtor, the Estate, the

Reorganized Debtor and/or their respective property without the need for any objection or further

notice to, or action, order, or approval of, the Court.

4899-5494-8723, v. 5

19.    <u>Section 1146(a) Exemption</u>.  Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Confirmed Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Confirmed Plan, including, without limitation, any transfers to or by the Debtor, if on or before the Effective Date, and the Reorganized Debtor, if after the Effective Date, of the property of the Debtor or the Reorganized Debtor in implementation of or as contemplated by the Confirmed Plan shall not be taxed under any law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each taxing authority, recorder of deeds or similar official for any state, county, city or Governmental Unit or parish in which any instrument hereunder or related to the Confirmed Plan or any transactions contemplated thereunder is to be recorded shall, pursuant to this Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

------------------------------------- END OF DOCUMENT -------------------------------------

4899-5494-8723, v. 5

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing **ORDER** shall be made to the parties and in the manner designated below:

**By Electronic Service**:  I certify that the parties of record in this case as identified below, are registered CM/ECF users, and will be served notice of entry of the foregoing Order through the CM/ECF System:

- **Matthew M. Boley**    mboley@ck.law, krenak@ck.law
- **Elise M. Carter**    elise.carter@foley.com
- **P. Matthew Cox**    mcox@spencerfane.com, ecall@spencerfane.com;mwatson@spencerfane.com
- **Carol Sue Crismon**    crismonlaw@gmail.com
- **Geoffrey S Goodman**    ggoodman@foley.com
- **Richard F. Holley**    rholley@spencerfane.com
- **Peter J. Kuhn**    Peter.J.Kuhn@usdoj.gov, Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov ;Brittany.Dewitt@usdoj.gov
- **Ellen E. Ostrow**    eostrow@foley.com, ellen-ostrow-4512@ecf.pacerpro.com;docketflow@foley.com;geysa.peeler@foley.com
- **David L. Pinkston**    dpinkston@spencerfane.com, ecall@spencerfane.com;mwatson@spencerfane.com
- **Jeffrey L. Trousdale**    jtrousdale@cohnekinghorn.com, mparks@ck.law;enilson@ck.law
- **United States Trustee**    USTPRegion19.SK.ECF@usdoj.gov
- **Aaron M. Waite**    aaronmwaite@agutah.gov
- **Gary T Wight**    gwight@agutah.gov
- **Melinda Willden tr**    melinda.willden@usdoj.gov, Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov ;Brittany.Dewitt@usdoj.gov

**By U.S. Mail**:  In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

☐    None

☐    If there are additional parties list the names and addresses of the additional parties.

☒    All parties on the Court's official case matrix.

/s/ Matthew M. Boley

4899-5494-8723, v. 5

# EXHIBIT "1"

# (Confirmed Plan)

**The terms of the plan of reorganization attached hereto are subject to any and all amendments, supplementations and modifications specified in the Confirmation Order.**

Matthew M. Boley (8536)
Jeffrey Trousdale (14814)
**COHNE KINGHORN, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
E-mail: mboley@ck.law
         jtrousdale@ck.law

Ellen Ostrow (14743)
**FOLEY & LARDNER, LLP**
95 S. State Street, Suite 2500
Salt Lake City, UT 84111
Telephone: (801) 401-8952
Email: eostrow@foley.com

*Attorneys for* debtor-in-possession
APPLIED MINERALS, INC.

*Attorneys for* HALLOYSITE
INVESTMENT, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br>**APPLIED MINERALS, INC.,**<br>Debtor. | Bankruptcy No. 24-25849<br>Chapter 11<br>Honorable Peggy Hunt |

## JOINT PLAN OF REORGANIZATION
## PROPOSED BY (A) THE DEBTOR, AND (B) HALLOYSITE INVESTMENT, LLC

Dated: October 16, 2025

### SUMMARY OF THE TREATMENT OF CREDITORS UNDER THE PLAN

The following is a high-level summary of certain key provisions of the Plan which affect and govern the treatment of creditor claims.  If there is any inconsistency between this summary and the provisions of the Plan, the terms of the Plan shall govern.

**Halloysite Is Contributing Up to $3.35 Million under the Plan.** Under the Plan, Halloysite will provide cash up to Three Million Three Hundred Fifty Thousand Dollars ($3,350,000) to the Debtor and/or Creditors in exchange for 300,000 shares of New Stock, a minimum of 80% of the Reorganized Debtor's total New Equity, and Causes of Action. Halloysite is releasing its rights as a senior secured super priority creditor. The Cash funded, or to be funded by Halloysite, includes:

▪ $2,100,000 of total consideration to the Class 2 Claim Fund –

  ▪ One Million Five Hundred Thousand Dollars ($1,500,000) cash delivered on the Effective Date to fund the Class 2 Claim Fund that will be distributed pro rata to the holders of Allowed Class 2 Claims; *plus*

  ▪ Allowed Class 2 Claims may elect to receive an additional pro rata distribution of up to $600,000 *or* 75,000 shares of stock in the Reorganized Debtor (the "Class 2 Supplemental Distribution Option"), plus a warrant to purchase additional shares so as to effective double the number of shares;

▪ $650,000 for Creditor Distributions and to Fund the Debtor's Operations – Six Hundred Fifty Thousand Dollars ($650,000) cash delivered on the Effective Date (a) to fund the $70,000 Convenience Claims Fund, (b) to pay Allowed Priority Claims, (c) to pay Allowed Administrative Expenses, and (d) to fund the Debtor's future operations and legal expenses (*i.e.*, the Operations & Litigation Fund); and

▪ $600,000 Funded under the DIP Credit Agreement – Six Hundred Thousand Dollars ($600,000) cash delivered after the Petition Date pursuant to the DIP Credit Agreement, plus accrued interest and loan charges.

**Summary of the Treatment of General Unsecured Claims.** Nonpriority unsecured Claims are divided into two classes.  Claims equal to or greater than $150,000 are Class 2 Claims.  Claims less than $150,000 are Convenience Claims under Class 10.

▪ Summary of Treatment of Class 2 Claims.  Allowed nonpriority Claims in Class 2 will receive:

  • *$1.5 Million Cash* – an immediate cash distribution consisting of a pro rata share of $1,500,000 distributed from the Class 2 Claim Fund within 60 days after the Effective Date of the Plan;

  • *Class 2 Supplemental Distribution: 20% of the Equity in the Reorganized Debtor or up to an additional $600,000* – Allowed Class 2 Claim holders may elect as part of the Class 2 Supplemental Distribution Option one of the below options. For the avoidance of doubt, the total amount to be set aside for the Class 2 Supplemental Distribution Option will be $600,000.

o   *20% of the Equity in the Reorganized Debtor* – Each holder of an Allowed Class 2 Claim shall be entitled to select its pro rata share of 75,000 shares of New Stock  pursuant to the Class 2 Stock Distribution, which includes ownership in the Reorganized Debtor with voting rights and a right to receive future profits distributions, which would give Class 2 Creditors in the aggregate 20% of the equity ownership of the Reorganized Debtor if all Class 2 members select to receive equity; *or*

o   *Up to $600,000 Additional Cash* – Each holder of an Allowed Class 2 Claim may opt to receive its pro rata share of up to $600,000, in lieu of the right to receive any New Stock, to be paid within 60 days of the Effective Date; *and*

   ▪   If the Allowed Class 2 Claim holder elects to receive equity, the Allowed Class 2 Claim holder will have a put option to sell the New Stock issued under the Plan to Halloysite for $8 per share, or $600,000 in the aggregate, at the three-year anniversary of the Effective Date.

- *Pro Rata Stock Purchase Right* – Allowed Class 2 Claims that elect to receive New Stock will have the right (but not the obligation) to participate in any future new equity raise to avoid dilution and maintain proportional equity ownership.

- *Warrant to Purchase Additional Shares* – Allowed Class 2 Claims that elects to receive New Stock shall receive a warrant to purchase additional shares of New Stock in an amount up to (but not greater) than the number of shares of New Stock distributed to such holder as part of the Class 2 Stock Distribution at a price of ten dollars ($10.00) per share exercisable up to the three year anniversary of the Effective Date.

▪   <u>Summary of Treatment of Convenience Claims</u>.  Allowed Convenience Claims in Class 10 will receive:

- *$70,000 Cash* – an immediate cash distribution, *to wit*, a pro rata share of $70,000 distributed from the Convenience Claims Fund within 60 days after the Effective Date of the Plan; and

**<u>Summary of the Treatment of Secured Claims</u>.** Secured Claims in Classes 3 and 5 (Leaf Capital and Tharp) will be paid in full according to the pre-bankruptcy loan or equipment lease terms between the Secured Creditor and the Debtor. The Secured Claim of Navitas (Class 4) was paid in full in March 2025.

**<u>Summary of the Treatment of Priority Claims</u>.** Allowed Priority Claims will be paid in full from the Plan Funding Transaction.

# TABLE OF CONTENTS

**ARTICLE 1 - DEFINITIONS AND RULES OF INTERPRETATION**....................................... 1

   **SECTION A. DEFINED TERMS** .......................................................................... 1

   **SECTION B. RULES OF CONSTRUCTION** ...................................................... 10

**ARTICLE 2 - TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS AND OTHER UNCLASSIFIED PRIORITY CLAIMS**.................................................. 11

**ARTICLE 3 - CLASSIFICATION OF CLAIMS** .......................................................... 14

**ARTICLE 4 - TREATMENT OF CLAIMS AND EQUITY INTERESTS**............................... 16

**ARTICLE 5 - MEANS FOR EXECUTION OF THE PLAN** ...................................... 26

**ARTICLE 6 - IMPLEMENTATION OF THE PLAN** ................................................. 33

**ARTICLE 7 - VOTING ON THE PLAN** ................................................................. 36

**ARTICLE 8 - EXECUTORY CONTRACTS AND UNEXPIRES LEASES** ............................ 37

**ARTICLE 9 - CONDITIONS PRECEDENT TO EFFECTIVE DATE**.................................... 39

**ARTICLE 10 - RETENTION OF JURISDICTION; CASE CLOSURE** .................................. 40

**ARTICLE 11 - MODIFICATION OF THE PLAN**....................................................... 43

**ARTICLE 12 - STAYS, INJUNCTIONS AND RELEASES** ........................................ 44

**ARTICLE 13 - DEFAULT AND REMEDIES** .......................................................... 46

**ARTICLE 14 - MISCELLANEOUS**....................................................................... 47

APPLIED MINERALS, INC., debtor and debtor-in-possession (the "Debtor") in the above-referenced chapter 11 bankruptcy case (the "Case"), and senior secured and super-priority creditor HALLOYSITE INVESTMENT, LLC ("Halloysite"), hereby jointly propose the following plan of reorganization (the "Plan") under sections 1121, 1123 and 1129 of title 11 of the United States Code.

## ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

### SECTION A.  DEFINED TERMS

For purposes of this Plan, the following terms shall have the meanings specified in this Article 1.  A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.

**1.1**    "Administrative Expense Claim" shall mean an Allowed Claim under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a)(1) of the Bankruptcy Code, including, without limitation:

**1.1.1**  fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court; and

**1.1.2**  all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

**1.2**    "Allowed" shall mean, with reference to any Claim:

**1.2.1**  a Claim that has been listed by the Debtor in its Schedules and (i) is not listed as disputed, contingent or unliquidated, (ii) is not a Claim as to which a proof of claim has been filed, and (iii) is not a Claim as to which the Debtor has filed an objection;[1]

**1.2.2**  a Claim as to which a timely[2] proof of claim has been filed by the Bar Date and either (i) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

---

[1]    Except as otherwise provided in the Plan, the Debtor reserves its right to object to Claims that it has listed in its Schedules notwithstanding that the Schedules may not identify the Claim as disputed, contingent or unliquidated.  The Debtor further reserves the right to amend its Schedules to delete any reference to listed Claims, to adjust the amount of the listed Claim and/or to identify any listed Claim as disputed, contingent or unliquidated.

[2]    A proof of claim is timely filed only if (a) it is filed on or before the applicable Bar Date, or (b) if filed after the applicable Bar Date, on or before the Effective Date the Court has entered an order permitting the holder of the Claim to file a late-filed proof of claim.

1 of 52

**1.2.3** a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or

**1.2.4** any Claim expressly allowed[3] under this Plan or pursuant to the Confirmation Order; or

**1.2.5** any Claim expressly allowed pursuant to a Final Order of the Bankruptcy Court.

**1.3** "Applicable Rate" means an annual rate of interest equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week immediately preceding the Confirmation Date; provided, however, that to the extent section 511 of the Bankruptcy Code applies to a particular Claim, the "Applicable Rate" shall be the rate of interest required thereunder.

**1.4** "Assumed Contracts" shall have the meaning assigned in section 8.1.

**1.5** "Avoidance Actions" shall mean Causes of Action arising or held by the Estate under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent and voidable transfer laws.

**1.6** "Bankruptcy Case" and "Case" shall mean the Debtor's chapter 11 bankruptcy case pending in the Bankruptcy Court under case number 24-25849.

**1.7** "Bankruptcy Code" and "Code" shall mean Title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

**1.8** "Bankruptcy Court" and "Court" shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28 U.S.C. § 151.

**1.9** "Bankruptcy Rules" and "Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

**1.10** "Bar Date" shall mean: (i) March 18, 2025 with respect to a Claim against the Estate other than a Claim of a Governmental Unit; (ii) May 12, 2025 with respect to a Claim of a Governmental Unit against the Estate; (iii) if applicable, any special deadline for certain creditors to file proofs of claim as specified by the Court; or (iv) if this Plan and/or an order of the Court establishes a different bar date for a specific claim or category of claims (e.g., rejection damages claims), the date established by the Plan or order of the Court.

---

[3] The fact that a Claim may be specifically referenced and/or its treatment specified under this Plan does not mean that it is "expressly allowed." Rather, all Claims referenced or discussed in this Plan are subject to potential objection unless the Plan states expressly that the Claim is or shall be allowed, and the amount of the allowed claim is specified.

4938-3015-7418, v. 9

**1.11** "BMC" shall mean and refer to BMC Minerals Company and all agents, employees, managers, directors, officers, members, and other representatives or other persons or entities acting or purporting to act on its behalf.

**1.12** The "BMI Entities" shall mean Brady McCasland, Inc., BMC Minerals Company, Ole Red H2S Scavenger, LLC, and all agents, employees, managers, directors, officers, members, and other representatives or other persons or entities acting or purporting to act on their behalf.

**1.13** "BMI" shall mean and refer to Brady McCasland, Inc. and all agents, employees, managers, directors, officers, members, and other representatives or other persons or entities acting or purporting to act on its behalf.

**1.14** "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday recognized in the State of Utah.

**1.15** "Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

**1.16** "Causes of Action" shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

**1.17** "Claim" shall mean a claim against a Person or its property as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.18** "Class" shall mean those classes designated in Article 3 of this Plan.

**1.19** "Class 2 Cash Distribution" means and refers to the distribution of One Million Five Hundred Thousand Dollars ($1,500,000) cash from the Class 2 Claim Fund, pro rata, to each holder of an Allowed Class 2 Claim, as more particularly described in section 4.2.3 of this Plan.

**1.20** "Class 2 Claim Fund" shall mean One Million Dollars ($1,500,000) in cash funded by Halloysite as part of the Plan Funding Transaction earmarked solely for payment and distribution to the holders of Allowed Class 2 Claims, as more particularly described in sections 4.2.3 and 5.8 of the Plan.

**1.21** "Class 2 Put Option" shall mean a put option, as further described in sections 4.2.4.3 and 5.8 of the Plan, that each holder of an Allowed Class 2 Claim who elects to receive

New Stock as part of the Class 2 Supplemental Distribution Option shall have, which may be exercised during the Put Option Exercise Period (*i.e.*, from ninety days until thirty days prior to the three year anniversary of the Effective Date) and which, if exercised, will require Halloysite to purchase from such holder on the Put Option Purchase Date (*i.e.*, the three year anniversary of the Effective Date) all, but not less than all, of the New Stock that such holder of an Allowed Class 2 Claim receives as its pro rata share of the Class 2 Stock Distribution at a price of Eight Dollars ($8) per share.  By way of example, if a holder of an Allowed Class 2 Claim elects to receive New Stock and receives 30,000 shares of New Stock and timely exercises the Class 2 Put Option, then Halloysite shall pay such holder $240,000 to purchase the shares.  By way of further example, if all holders of Allowed Class 2 Claims had elected to receive New Stock under the Class 2 Supplemental Distribution Option timely exercise the Class 2 Put Option, then Halloysite shall pay such holders, in the aggregate, $600,000 to purchase the 75,000 shares of New Stock distributed to such holders pursuant to the Class 2 Stock Distribution.

**1.22**    "Class 2 Stock Distribution" means and refers to the distribution of seventy-five thousand (75,000) shares of New Stock (i.e., twenty percent (20%) of all authorized and issued shares of New Stock), pro rata, to each holder of an Allowed Class 2 Claim who elects to receive the New Stock in the Class 2 Supplemental Distribution Option, as more particularly described in section 4.2.4, 4.2.4.1, 4.2.4.2 and 5.8 of this Plan.

**1.23**    "Class 2 Stock Warrant" means and refers to a warrant issued to each holder of an Allowed Class 2 Claim who elects to receive the New Stock in the Class 2 Supplemental Distribution Option to purchase additional shares of New Stock in an amount up to (but not greater) than the number of shares of New Stock distributed to such holder as part of the Class 2 Stock Distribution at a price of ten dollars ($10.00) per share exercisable up to the three year anniversary of the Effective Date.

**1.24**    "Class 2 Supplemental Distribution Option" shall mean the additional distribution to holders of Allowed Class 2 Claims, whereby each claimholder may select its pro rata share of New Stock or cash, up to a maximum amount of $600,000.00. Claimholders will have 30 days from the Effective Date to elect to receive New Stock or cash using the "Notice of Election of Supplemental Distribution Option" in the form attached hereto under Schedule 4.2.6. Any party that fails to make an election will receive cash. All cash payments will be made within 60 days of the Effective Date.

**1.25**    "Class 2 Treatment Election" shall have the meaning specified in section 3.6 of this Plan.  The holder of an Allowed Convenience Claim may opt out of Class 10 and opt into Class 2 by making a Class 2 Treatment Election.

**1.26**    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law. Notwithstanding the identification of any property as "Collateral" in this Plan, the Debtor reserves its right to challenge any purported lien on property identified as Collateral unless otherwise stated or expressly released in the Plan or agreed to by the Debtor, in consultation with Halloysite, in a filed stipulation with a creditor or party-in-interest.

**1.27**    "Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

4938-3015-7418, v. 9

**1.28**    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

**1.29**    "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which: (a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

**1.30**    "Convenience Claim" shall mean: (i) either (a) all Allowed General Unsecured Claims that is/are less than $150,000 in dollar amount, *or* (b) an Allowed Claim as to which the holder timely has made a Convenience Class Election pursuant to section 3.5 of this Plan; and (ii) as to which the holder of the Claim has *not* made a timely Class 2 Treatment Election pursuant to section 3.6 of this Plan.

**1.31**    "Convenience Claims Fund" shall mean up to $70,000 of the Plan Funding Transaction earmarked to pay holders of Convenience Claims.

**1.32**    "Convenience Class Election" shall have the meaning specified in section 3.5 of this Plan.  The holder of an Allowed Class 2 Claim may opt out of Class 2 and opt into Class 10 by making a Convenience Class Election.

**1.33**    "Cure Amount" means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtor in accordance with the terms of an executory contract or unexpired lease of the Debtor and (b) permit the Reorganized Debtor to assume such executory contract or unexpired lease under Section 365(a) of the Bankruptcy Code.

**1.34**    "Debtor" shall mean Applied Minerals, Inc.  References to the Debtor shall mean and refer to the Reorganized Debtor at any point in time after the Effective Date.

**1.35**    "Default Notice" shall have the meaning assigned in section 13.1.

**1.36**    "DIP Administrative Fund" shall mean the funding provided for Administrative Expense Claims pursuant to the DIP Credit Agreement.

**1.37**    "DIP Credit Agreement" shall mean the *Agreement for Secured Superpriority Debtor in Possession Financing* as approved, modified and supplemented by and under the orders authorizing the Debtor to incur debt on an interim and final basis, entered November 15, 2024 and December 3, 2024 [Docket Nos. 20 and 27], and all related, agreement, amendments, term sheets, contracts, instruments and loan documents.

**1.38**    "Disallowed" shall mean and refer to any Claim that does not fall within the definition of "Allowed."

**1.39**    "Disclosure Statement" shall mean the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, in the form approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

4938-3015-7418, v. 9

**1.40** "Disputed Claim" shall mean:

**1.40.1** if no proof of claim relating to a Claim has been filed, a Claim that is listed in the Schedules as unliquidated, disputed or contingent; or

**1.40.2** a Claim as to which an objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Debtor and/or any other party in interest in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; or

**1.40.3** a Claim that otherwise is "Allowed," but which is a Contingent or Unliquidated Claim.

**1.41** "Disputed Claim Amount" shall mean the amount set forth in the proof of claim relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Disputed Claim in accordance with Section 502(c) of the Bankruptcy Code.

**1.42** "Disputed Claims Reserve" shall have the meaning assigned under section 4.14.

**1.43** "DTC" means The Depository Trust Company or any successor thereto.

**1.44** "Effective Date" shall mean the later of (a) the first Business Day on which the Confirmation Order is no longer subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e) or otherwise, and (b) unless such thirty day period is waived by the Debtor as permitted under section 9.1 of the Plan, the first Business Day that is at least thirty calendar days after the Confirmation Date; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan have not been satisfied or waived, then the Effective Date shall be the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

**1.45** "Estate" shall mean the estate created in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

**1.46** "Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtor, (b) Halloysite, and (c) their Related Parties (only to the extent of their Official Actions), including Christopher T. Carney, Geoff Scott, the Debtor's attorneys and accountants, and Halloysite's attorneys.

**1.47** "Existing Equity" means any issued, unissued, authorized and/or outstanding shares of stock (common, preferred and otherwise), or other instrument or issuance evidencing an ownership interest, whether or not transferable, together with any warrants, equity-based awards, or contractual rights to purchase or acquire such equity interests (including under any employment or benefits agreement) at any time and all rights arising with respect thereto that existed from the beginning of the world through the day or moment immediately preceding the Effective Date.

**1.48**    "<u>Final Distribution Date</u>" shall mean the earlier of (A) the Distribution Date immediately prior to, or substantially contemporaneous with, the filing of notice of substantial consummation pursuant to section 1183(c)(2) of the Bankruptcy Code, or (B) the date of the last payment/distribution pursuant to section 3.3.2 of this Plan, if later.  "<u>Final Order</u>" shall mean an order, decree, or judgment that is not subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e), a stay applicable by order of the Bankruptcy Court or by order of another Court with jurisdiction to stay an order entered in this Case, or otherwise.  If an order is not subject to a stay, the possibility that it may be modified, amended or reversed upon appeal, pursuant to a motion under Federal Rules of Civil Procedure 59 or 60, or otherwise shall not cause such order not to be a Final Order.

**1.50**    "<u>General Unsecured Claim</u>" shall mean a Claim that is not a Secured Claim and that is not entitled to priority of payment under Section 507 of the Bankruptcy Code.

**1.51**    "<u>Governmental Unit</u>" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

**1.52**    "<u>Halloysite</u>" shall refer to Halloysite Investment, LLC, a Utah limited liability company.

**1.53**    "<u>Halloysite Claim</u>" means any and all Claims on account of, arising from, arising under, or related to the Halloysite Funding, or the Halloysite Funding documents, including Claims for the aggregate outstanding principal amount, plus unpaid interest, and all fees and other expenses related thereto and arising and payable under the Halloysite Funding.

**1.54**    "<u>Halloysite Funding</u>" means the combined credit facility and/or plan funding provided by Halloysite under the DIP Credit Agreement and the Plan Funding Transaction in the aggregate amount of up to Three Million Three Hundred Fifty Thousand Dollars ($3,350,000.00).

**1.55**    "<u>Initial Distribution Date</u>" shall mean and refer to the Distribution Date first occurring after the Effective Date.

**1.56**    "<u>Interim Distribution Date</u>" shall mean each Distribution Date other than the Final Distribution Date.

**1.57**    "<u>Leaf Capital</u>" shall refer to Leaf Capital Funding, LLC.

**1.58**    "<u>Leaf Collateral</u>" shall mean and refer to all property of the Debtor existing as of the Petition Date that is described by category or other designation in the documents memorializing and governing the Leaf Loan, including, without limitation, the 2013 GMC Sierra 2500.

**1.59**    "<u>Leaf Loan</u>" shall mean and refer to, collectively, the loan in the original principal amount of $21,720.25 that Leaf made to the Debtor in or about June 29, 2024.

**1.60**    "<u>Lease</u>" or "<u>True Lease</u>" shall mean and refer to (a) a lease of real property and (b) a lease of equipment or other goods satisfying the definitions and requirements of Utah Code

Ann. § 70A-2a-103(1)(j). A transaction in the form of, or labeled as, a lease, but which creates a security interest as described under Utah Code Ann. § 70A-1a-203, is not a lease or a true lease.

**1.61**    "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; *except that* a Lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

**1.62**    "Loan" shall mean and refer to any creditor's advance of cash, goods, or services to the Debtor, hereby creating a payment obligation by the Debtor, and the terms and conditions for repayment, whether formalized in a promissory note, instrument, loan agreement, or a document denominated as a lease which is not a "true lease", but rather is a disguised loan as contemplated under Utah Code Ann. § 70A-1a-203(2).

**1.63**    "Navitas" shall refer to Navitas Credit Corporation.

**1.64**    "Navitas Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date that is described by category or other designation in the documents memorializing and governing the Navitas Loan, including, without limitation, the Bruker Tracer 5G.

**1.65**    "Navitas Loan" shall mean and refer to, collectively, the loan in the original principal amount of $43,682.50 that Navitas made to the Debtor in or about May 14, 2021.

**1.66**    "New Equity" and "New Stock" and "New Equity Interests" means and refers to the new shares of commons stock of the Reorganized Debtor issued and (if applicable) distributed on and after the Effective Date, as more particularly described under section 5.8 of this Plan.

**1.67**    "New Organizational Documents" means the new certificates, articles, bylaws and all other organizational documents of the Reorganized Debtor, including any shareholders agreement, registration rights agreement, or similar document, including all such documents referenced under section 5.9 of this Plan.

**1.68**    "Official Actions" means: (i) acts or omissions that are related to the Bankruptcy Case or implementation of the Plan taken by the Exculpated Parties in the Chapter 11 Case from the Petition Date through the Effective Date; and (ii) acts and omissions taken by the Exculpated Parties following the Effective Date that are related to the implementation of the Plan Funding Transaction, the issuance of New Stock (including the Class 2 Stock Distribution, the Class 2 Supplemental Distribution Option, the Class 2 Put Option, and the Class 2 Stock Warrant), or the adoption of the New Organizational Documents.

**1.69**    "Operations & Litigation Fund" shall mean all cash received by the Debtor as part of the Plan Funding Transaction remaining after (a) One Million Five Hundred Thousand Dollars ($1,500,000) for the Class 2 Claim Fund is set aside and/or distributed, (b) Seventy Thousand Dollars ($70,000) for the Convenience Claims Fund is set aside and/or distributed, and (c) Allowed Administrative Expenses, Cure Amounts, and Priority Claims are paid in full and/or cash necessary to pay them has been reserved. After plan distributions are completed, any

remaining Cash held by the Debtor or available to be advanced under the DIP Credit Agreement and/or the Plan Funding Transaction shall be added to the Operations & Litigation Fund.

**1.70** "O-Red" shall mean and refer to Ole Red H2S Scavenger, LLC and all agents, employees, managers, directors, officers, members, and other representatives or other persons or entities acting or purporting to act on its behalf.

**1.71** "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, articles of incorporation, or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement, or an operating, limited liability company, shareholders, or members agreement).

**1.72** "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, Governmental Unit or political subdivision thereof.

**1.73** "Petition Date" shall mean November 11, 2024.

**1.74** "Plan" shall mean this Plan of Reorganization, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

**1.75** "Plan Funding Transaction" means cash to by funded by Halloysite to the Reorganized Debtor on the Effective Date to fund the Plan, post-confirmation litigation by the Debtor, and the Debtor's future operations, including (a) any funds remaining and not yet advanced under the DIP Credit Agreement (which contemplated principal advances totaling Six Hundred Thousand Dollars ($600,000)),[4] plus (b) up to an additional Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000) – in the aggregate amount of up to Three Million Three Hundred Fifty Thousand Dollars ($3,350,000), allocated as follows:

**1.75.1** One Million Five Hundred Thousand Dollars ($1,500,000) earmarked to be distributed, pro rata, to the holders of Allowed Class 2 Claims (*i.e.*, the Class 2 Claim Fund);

**1.75.2** up to $600,000 to fund elections under the Class 2 Supplemental Distribution Option;

**1.75.3** up to Seventy Thousand Dollars ($70,000) earmarked to be distributed, pro rata, to the holders of Allowed General Unsecured Claims in the Convenience Class (*i.e.*, the Convenience Claims Fund); and

---

[4] If the full $600,000 available under the DIP Credit Agreement has not been advanced to the Debtor on or before Effective Date, the undisbursed (or not yet advanced) amounts shall be funded to the Debtor on the Effective Date as part of the Plan Funding Transaction.

4938-3015-7418, v. 9

**1.75.4**   all remaining or additional amounts to pay (a) Allowed Administrative Expenses including Professional Fees and quarterly fees due pursuant to 28 U.S.C. § 1930 (whether incurred or due before or after the Effective Date), (b) Allowed Priority Claims (including both Unclassified Priority Claims and Class 1 Claims), and (c) to pay for continued Debtor operations.

**1.76**   "Plan Period" shall mean the period of time commencing on the Effective Date and ending on the Final Distribution Date.  If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the Petition Date with respect to that particular Claim or creditor.

**1.77**   "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under Section 507(a) of the Bankruptcy Code other than Administrative Expense Claims.  If a Claim otherwise entitled to priority is a Secured Claim, it shall not be deemed to be, or treated as, a Priority Claim.

**1.78**   "Priority Tax Claims" shall mean any Claim of a Governmental Unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code, and that is not a Secured Claim.

**1.79**   "Pro Rata Share" shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims in such Class.

**1.80**   "Professionals" shall mean (i) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.81**   The "Put Option Exercise Period" shall be the period of time beginning on the date that is ninety (90) days prior to the Put Option Purchase Date and ending on the date that is thirty (30) days prior to the Put Option Purchase Date, or if such date is not a Business Day, then the preceding Business Day.

**1.82**   The "Put Option Purchase Date" shall be the date that is the three-year anniversary of the Effective Date, or if such date is not a Business Day, then the next Business Day.

**1.83**   "Record Holder Date" shall mean and refer to the date (a) delineated and fixed by the Bankruptcy Court as the "Record Holder Date" by entry of an order entered in the Case, (b) if no specific date is fixed by order of the Court, the date on which the Bankruptcy Court approves the Disclosure Statement by entry of an order pursuant to Section 1125 of the Bankruptcy Code, as contemplated by Bankruptcy Rule 3017(d)(4), and (c) if the Court has not entered an order approving the Disclosure Statement or fixing a Record Holder Date prior to the Confirmation Date, the last business day that is at least thirty calendars days before the Confirmation Date.

**1.84**    "Rejected Contracts" shall have the meaning assigned to it in section 8.4.

**1.85**    "Related Parties" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former members, directors, managers, officers, proxyholders, control persons, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors, each solely in their capacity as such, and any such person's or Entity's respective heirs, executors, estates, and nominees.

**1.86**    "Reorganized Debtor" shall mean the Debtor as reorganized after the Effective Date pursuant to the terms of this Plan.

**1.87**    "Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements have been or may be supplemented or amended from time to time.

**1.88**    "Schedule of Assumed Contracts" shall mean a schedule of executory contracts and unexpired leases to be assumed by the Reorganized Debtor pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**1.89**    "Schedule of Cure Amounts" shall mean the schedule of Cure Amounts which are to be paid with respect to the executory contracts and unexpired leases which are to be assumed pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**1.90**    "Schedule of Rejected Contracts" shall mean the schedule of executory contracts and unexpired leases to be rejected by the Reorganized Debtor pursuant to this Plan (which will include the effective dates that such executory contracts and unexpired leases shall be deemed to be rejected), as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**1.91**    "SEC" means the United States Securities and Exchange Commission.

4938-3015-7418, v. 9

**1.92**    "Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

**1.93**    "Securities Act" means the Securities Act of 1933, as now in effect or hereafter amended, or any regulations promulgated thereunder.

**1.94**    "Subordinated § 510(b) Claim" shall mean any unsecured Claim that is subordinated under § 510(b) of the Bankruptcy Code.

**1.95**    "Subordinated Claim" shall mean any unsecured Claim that is subordinated in right of payment to General Unsecured Claims by reason of either (a) voluntary agreement or consent by the holder of the Claim, or (b) a Final Order of the Court.

**1.96**    "Tharp" shall refer to Tharp & Associates.

**1.97**    "Tharp Collateral" shall mean and refer to all property of the Debtor existing as of the Petition Date that is described by category or other designation in the documents memorializing and governing the Tharp Loan, including, without limitation, the Volvo EC290 LC Excavator.

**1.98**    "Tharp Loan" shall mean and refer to, collectively, the loan in the original principal amount of $59,000.00 that Tharp made to the Debtor in or about July 1, 2024.

**1.99**    "Unclassified Priority Claims" are Priority Claims (other than Administrative Expense Claims) defined in section 2.3 of this Plan, including claims within the scope of sections 507(a)(2), 507(a)(3) and/or 507(a)(8) of the Bankruptcy Code.

## SECTION B.  RULES OF CONSTRUCTION

**1.100**    **Capitalized Terms.**  Unless otherwise provided, any capitalized terms used in the Plan shall have the meaning set forth in Article 1.

**1.101**    **Other Terms.**  All terms not defined in this Article 1 or otherwise defined in the Plan, but that are defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed by the Bankruptcy Code or the Bankruptcy Rules.  For convenience, terms defined in the Bankruptcy Code may be capitalized in the Plan, and the Plan sometimes may include a cross-reference to the Bankruptcy Code.  Neither the failure to capitalize any such term, nor the failure to include a Bankruptcy Code cross-reference, however, shall modify the meaning or use of such term as defined in the Bankruptcy Code.

**1.102**    **References Generally.**  Unless otherwise stated, all references to an "article" or "articles," whether or not designated by a capital letter, are to articles in the Plan, including all sections, subsections, and numbered paragraphs under the referenced article.  All references to a "section," "paragraph," "sections" or "paragraphs" designated by numbers are to the individual numbered sections or numbered paragraphs in the Plan.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, sub-section or clause contained in the Plan.

**1.103   References to Documents, Headings or Exhibits.**  Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented.  Unless otherwise specified in a particular reference, all references in the Plan to articles, sections, subsections and exhibits are references to articles, sections, subsections and exhibits of or to the Plan.

**1.104   General Rules of Construction.**  The headings at the beginning of each paragraph or section of this Plan are solely for convenience and may not be used or construed in any manner to interpret, define, change, modify, amend, alter or restrict the substance of the Plan.  Unless the context requires otherwise, singular nouns and pronouns used in this Plan shall be deemed to include the plural, and pronouns of one gender or the neuter shall be deemed to include the equivalent pronouns of the other gender or the neuter.  The rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the terms of this Plan.

**1.105   Computation of Time.**  In computing any period of time prescribed or allowed in the Plan, Bankruptcy Rule 9006(a) shall apply.

**ARTICLE 2**
**TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS**
**AND OTHER UNCLASSIFIED PRIORITY CLAIMS**

**2.1   Non-Classification.**  As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Unclassified Priority Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan.  Notwithstanding anything to the contrary contained herein, all such Claims instead are treated separately in accordance with the terms in this Article 2.

**2.2   Administrative Expense Claims.**

**2.2.1   Bar Date.**  All applications for allowance of Administrative Expense Claims other than (a) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, (b) fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930, and (c) Claims arising pursuant to section 12.4 of the Plan, shall be filed not later than thirty (30) days after the Effective Date.  All Administrative Expense Claims not filed within thirty days after the Effective Date shall be barred.  The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations.  The Reorganized Debtor shall provide notice to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date.  The Bankruptcy Court shall determine all Administrative Expense Claims.

**2.2.2   General.**  Except as otherwise agreed to by the Debtor and the holder of an Allowed Administrative Expense Claim, and subject to section 2.2.4., below, each such holder shall be paid in full in Cash on the later of (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms, or (ii) the Effective Date.  If the Debtor disputes any portion of an Administrative Expense Claim,

13 of 52

the Debtor shall pay such Claim within 30 days after the entry of a Final Order with respect to the allowance of such disputed Administrative Expense Claim.

**2.2.3** <u>U.S. Trustee's Fees</u>.  The United States Trustee's quarterly fees shall be paid in full without prior approval pursuant to 28 U.S.C. § 1930 on or before the Effective Date.

**2.2.4** <u>Professional Compensation and Expense Reimbursement Claims</u>.

2.2.4.1    Each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date.  Any award granted by the Bankruptcy Court shall be paid (i) within fifteen days of the entry of the order of the Bankruptcy Court approving such award, unless a stay is obtained, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtor.

2.2.4.2    All fees and expenses of Professionals of the Reorganized Debtor for services rendered after the Effective Date in connection with the Bankruptcy Case and the Plan shall be paid by the Reorganized Debtor upon receipt of reasonably detailed invoices therefor in such amounts and on such terms as such Professional and the Reorganized Debtor may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**2.3**    **<u>Unclassified Priority Claims</u>.**

**2.3.1** <u>Payment and Treatment</u>.  Allowed Priority Tax Claims shall be paid in Cash after the Effective Date over the Plan Period, in compliance with § 1129(a)(9)(C) of the Bankruptcy Code.  The holders of Allowed Priority Tax Claims shall receive a total value, as of the Effective Date, equal to the Allowed amount of such Claims, plus interest from and after the Effective Date at the Applicable Rate.  Unless they have agreed to different treatment, the Priority Tax Claims shall be paid in full on or before the end of the fifth anniversary of the Petition Date.

**2.3.2** <u>Annual Installment Payments</u>.  If not paid earlier pursuant to the provisions of section 2.3.3 of this Plan, the Priority Tax Claims shall be paid in five annual installments equal to one-fifth of the total amount of the Allowed Claim.  Specifically, unless such installment amounts have been pre-paid as contemplated under section 2.3.3 of this Plan, the holders of Priority Tax Claims shall be paid regular annual installment payments as follows: the first payment on the later of (a) forty-five days after the Effective Date or (b) the one year anniversary of the Petition Date; the second payment on the second anniversary of the Petition Date; the third payment on the third anniversary of the Petition Date; the fourth payment on the fourth anniversary of the Petition Date; and the fifth and final payment on the fifth anniversary of the Petition Date.

**2.3.3** <u>If Elected by the Reorganized Debtor, Payment on the Effective Date May Be Made from the Plan Funding Transaction.</u> Subject to the priorities specified under section 5.5.5.1 of the Plan, to the extent funds are available on the Effective Date for

14 of 52

distribution to the holders of Allowed Priority Claims under section 507(a)(8) of the Bankruptcy Code, then in the sole discretion of the Reorganized Debtor, the Reorganized Debtor may pay the holders of Allowed Priority Tax Claims in full from the funds loaned and/or otherwise funded as part of the Plan Funding Transaction.

**2.4**   **Halloysite Claim.**

**2.4.1**   Halloysite holds an Allowed super-priority Secured Claim against the Debtor, as more particularly defined and described in the DIP Credit Agreement, to wit, as provided under the orders authorizing the Debtor to incur debt on an interim and final basis, entered November 15, 2024 and December 3, 2024 [Docket Nos. 20 and 27], and the *Agreement for Secured Superpriority Debtor in Possession Financing* as approved, modified and supplemented by said orders.

**2.4.2**   On the Effective Date, all funding advanced under the DIP Credit Agreement shall be due and payable in the full amount owing under the DIP Credit Agreement, including, for the avoidance of doubt, (a) the principal amounts outstanding under the DIP Facility on such date; (b) all interest accrued and unpaid thereon through and including the date of payment; and (c) all accrued fees, expenses, and indemnification obligations payable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Credit Agreement shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation. Further, any funds not advanced under the DIP Credit Agreement shall be advanced on or before the Effective Date as part of the Plan Funding Transaction.

2.4.2.1 On the Effective Date, in full and final satisfaction of the DIP Credit Agreement and in consideration for the Plan Funding Transaction, Halloysite shall receive three hundred thousand (300,000) shares of New Stock in the Reorganized Debtor issued pursuant to sections 5.8 and 5.8.1 of this Plan, *i.e.*, one (1) share for each eleven dollars and seventeen cents ($11.17), in principal amount, that Halloysite has advanced to the Debtor pursuant to the DIP Credit Agreement prior to the Effective Date and all cash funded by Halloysite to the Debtor on the Effective Date as part of the Plan Funding Transaction.

2.4.2.2 Halloysite's Allowed super-priority Secured Claim against the Debtor shall be satisfied and released, and all Liens in favor of Halloysite shall be extinguished and released, upon the occurrence of (a) the Effective Date, *and* (b) Halloysite's receipt of 300,000 shares of New Stock in Reorganized Debtor as contemplated under sections 2.4.2.1 and 5.8.1 of this Plan.

2.4.2.3 Notwithstanding anything to the contrary herein, upon the occurrence of the Effective Date, Halloysite shall be relieved of all further duties and responsibilities under the DIP Credit Agreement; provided, that any provisions of the DIP Credit Agreement that by their terms survive the termination of the DIP Credit

Agreement shall survive in accordance with the terms of the same; and, provided further, that any principal amounts available under the DIP Credit Agreement that have not previously been advanced or funded to the Debtor, shall be funded to the Debtor on the Effective Date as part of the Plan Funding Transaction.

   2.4.2.4 Subject to the conditions precedent specified in section 2.4.2 (and all subparagraphs thereof) of this Plan, to the fullest extent provided under Section 1141(c) and other applicable provisions of the Bankruptcy Code, this Plan, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the 300,000 shares of New Stock distributed to Halloysite, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtor or the Estate related to the Halloysite Funding shall be fully released, canceled, terminated, extinguished, and discharged, without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.

# ARTICLE 3
## CLASSIFICATION OF CLAIMS

  **3.1** **Claims Provided for in the Plan.**  This Plan treats all Claims against the Debtor, the Debtor's Property, and against the Estate. Only Allowed Claims receive any distribution under this Plan.  **All other Claims are disallowed by the Plan and will not receive any distributions under the Plan.**

  **3.2** **Limitation on Inclusion in a Class.**  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that class.  A Claim is in a particular Class only to the extent that the portion of the Claim is an Allowed Claim in that class.

  **3.3** **Unclassified Claims.**  In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims are not classified under this Article 3 but are treated in the Plan in accordance with the requirements of 11 U.S.C. § 1129.  Likewise, in accordance with § 1123(a)(1) of the Bankruptcy Code, gap claims within the scope of § 507(a)(3) of the Bankruptcy Code and tax claims within the scope of § 507(a)(8) of the Bankruptcy Code are not classified except to the extent such claim otherwise should be classified, *e.g.*, in the event such claims are not unsecured Priority Claims, but are Secured Claims.

  **3.4** **Classified Claims and Interests.**  Claims, other than Administrative Expense Claims, the Halloysite Claim, and Unclassified Priority Claims, shall be classified for all purposes, including voting on, confirmation of, and distribution pursuant to the Plan, as follows:

   **3.4.1** Class 1 – Priority Claims.  Class 1 shall consist of all Allowed Priority Claims against the Debtor other than (a) Unclassified Priority Claims (including Priority Tax Claims), and (b) Priority Claims that are Secured Claims.

   **3.4.2** Class 2 – General Unsecured Claims (excluding Convenience Claims).  Class 2 shall consist of all Allowed General Unsecured Claims against the Debtor, excepting and excluding Convenience Claims.

**3.4.3** <u>Class 3 – Leaf Capital Funding, LLC Secured Claim</u>.  Class 3 shall consist of the Allowed Secured Claim of Leaf Capital.

**3.4.4** <u>Class 4 – Navitas Credit Corp Secured Claim</u>.  Class 4 shall consist of the Allowed Secured Claim of Navitas.

**3.4.5** <u>Class 5 – Tharp & Associates Secured Claim</u>.  Class 5 shall consist of the Allowed Secured Claim of Tharp.

**3.4.6** <u>Class 6 – Miscellaneous Secured Claims</u>.  Class 6 shall consist of all Allowed Claims that are secured by property of the Debtor that are not otherwise classified under this Plan, or that are otherwise subject to treatment as Class 4 Claims.

**3.4.7** <u>Class 7 – Existing Equity Interests</u>.  Class 7 shall consist of all Existing Equity Interests in the Debtor.

**3.4.8** <u>Class 8 – Subordinated Claims</u>.  Class 8 shall consist of all (i) Claims of insiders of the Reorganized Debtor that are voluntarily subordinated; or (ii) Claims that are otherwise subordinated by an Order of the Court.

**3.4.9** <u>Class 9 – Subordinated § 510(b) Claims</u>.  Class 9 shall consist of all Subordinated § 510(b) Claims, including but not limited to the Claims of insiders or former insiders of the Debtor to the extent that those Claims are based on the rescission of a purchase or sale of a security of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under § 502 of the Bankruptcy Code for such Claim.

**3.4.10** <u>Class 10 – Convenience Claims</u>.  Class 10 shall consist of all Allowed Convenience Claims against the Reorganized Debtor.

**3.5**   **<u>Convenience Class Election</u>.**  The holder of any Allowed Claim may, on or before the Voting Deadline for returning ballots either accepting or rejecting this Plan, provide an authenticated written notice to the Debtor voluntarily electing (a "<u>Convenience Class Election</u>"): (a) if the Claim is, or may be, greater than $150,000, voluntarily to reduce the amount of the Claim to $150,000; (b) if the Claim is secured, to waive any and all Liens and other interests in Collateral; and (c) if the Claim is a Priority Claim, to waive any and all priority in payment or treatment vis-à-vis General Unsecured Claims.  Such an election constitutes an irrevocable waiver and release of all amounts in excess of $150,000, any rights in Collateral and any priority.  Any holder that makes a Convenience Class Election shall be deemed to release the Debtor from any and all liability for amounts in excess of $150,000.  In the event a holder timely makes such a Convenience Class Election, its Claim shall be treated as a Convenience Claim in the lesser amount of (a) $150,000, or (b) the Allowed Amount of the Claim.  Holders of Allowed Convenience Claims shall receive distributions after the Effective Date in accordance with Sections 4.10.2 and 5.5.5.1 of the Plan.

**3.6**   **<u>Class 2 Treatment Election</u>.**  The holder of any Allowed Convenience Claim (excepting any holder of a Convenience Claim that became a Convenience Claim by making a

Convenience Class Election) may, on or before the Voting Deadline for returning ballots either accepting or rejecting this Plan, provide an authenticated written notice to the Debtor voluntarily electing (a "Class 2 Treatment Election"): (a) to convert its Allowed Convenience Claim into an Allowed Class 2 Claim; (b) to receive treatment of the Claim under section 4.2 of this Plan; (c) to receive, in full satisfaction of the Claim, a Pro Rata Share of the Class 2 Cash Distribution, together with either a Pro Rata Share of New Stock rounded down to the lowest whole number share together with the option to purchase additional shares of New Stock pursuant to the Supplemental Stock Purchase Option or a pro rata share of the additional cash distribution set forth in Section 4.2.4.3 of this Plan; and (d) foregoing the right to receive any share of the Convenience Claims Fund. Such an election constitutes an irrevocable waiver and release of any rights to receive a cash distribution and/or to receive a Pro Rata share of the Convenience Claims Fund. Holders of Allowed Class 2 Claims shall receive distributions after the Effective Date in accordance with Sections 4.2.2 and (if New Stock is elected) 5.8.2 of the Plan.

### ARTICLE 4
### TREATMENT OF CLAIMS AND EQUITY INTERESTS

### Summary of Classification and Treatment of Claims and Interests.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Unsecured | *Impaired* | Entitled to Vote |
| 2 | General Unsecured | *Impaired* | Entitled to Vote |
| 3 | Leaf Capital | *Impaired* | Entitled to Vote |
| 4 | Navitas | *Unimpaired* | Deemed to Accept |
| 5 | Tharp | *Impaired* | Entitled to Vote |
| 6 | Miscellaneous Secured Claims | *Impaired* | Entitled to Vote |
| 7 | Existing Equity Interests | *Impaired* | Deemed to Reject |
| 8 | Subordinated Claims | *Impaired* | Deemed to Reject |
| 9 | Subordinated § 510(b) Claims | *Impaired* | Deemed to Reject |
| 10 | Convenience Claims | *Impaired* | Entitled to Vote |

**4.1**   **Class 1 – Priority Claims.**

**4.1.1**   Impairment and Voting. Class 1 is impaired under the Plan. Each holder of an Allowed Class 1 Claim shall be entitled to vote to accept or reject the Plan.

**4.1.2**   Treatment of Claim. To the extent that they are Allowed, the Class 1 Priority Claims shall be treated and paid as follows. Subject to the priorities specified under section 5.5.5.1 of the Plan, to the extent funds are available on the Effective Date for distribution to the holder(s) of an Allowed Class 1 Claim, the holders of Allowed Class 1 Claims shall be paid in full from the funds loaned and/or otherwise funded as part of the Plan Funding Transaction. The holders of Allowed Priority Claims shall be paid from the funds loaned and/or otherwise funded as part of the Plan Funding Transaction up to the lesser of (a) the full amount of the Allowed Claim, or (b) the statutory limit applicable to the particular Priority Claim on the Petition Date.

**4.2**    **Class 2 – General Unsecured Claims (Excepting Convenience Claims).**

    **4.2.1**    Impairment and Voting.  Class 2 is impaired under the Plan.  Each holder of an Allowed Class 2 Claim shall be entitled to vote to accept or reject the Plan.

    **4.2.2**    Distribution of Cash and the Class 2 Supplemental Distribution Option. Each holder of an Allowed Class 2 Claim shall receive in full satisfaction of its Claim: (a) a pro rata distribution of cash from the Class 2 Claim Fund, as described in section 4.2.3; (b) distribution of shares of New Stock in the Reorganized Debtor (*i.e.*, a Pro Rata Share of the Class 2 Stock Distribution if the claimholder elects that option) or an additional cash payment pursuant to the Class 2 Supplemental Distribution Option, as described in section 4.2.4; and (c), if the claimholder elects to receive equity under the Class 2 Supplemental Distribution Option, an option to purchase additional New Equity pursuant to the Supplemental Stock Purchase Option

    **4.2.3**    Cash Distribution of Pro Rata Share of $1,500,000 from the Class 2 Claim Fund. On or before the date that is sixty (60) days after the Effective Date, each holder of an Allowed Class 2 Claim shall be paid a Pro Rata Share of the Class 2 Claim Fund, *i.e.*, a pro rata share of One Million Five Hundred Thousand Dollars ($1,500,000) cash (the "Class 2 Cash Distribution").

    **4.2.4**    Class 2 Supplemental Distribution Option.  In addition to the Class 2 Cash Distribution, each holder of an Allowed Class 2 Claim shall be permitted to elect its preferred treatment in the Supplemental Distribution Option. If a claimholder elects to receive New Stock, it will also receive the right to purchase a pro rata share of any New Stock that is authorized and issued by the Debtor after the Effective Date (i.e., the Pro Rata Stock Purchase Right), as described in section 4.2.4.4.

        4.2.4.1 Shares of New Stock Issued and Available for Distribution.  As more fully described in section 5.8 of this Plan, a total of Three Hundred Seventy Five Thousand (375,000) shares of new common stock (*i.e.*, New Stock) in the Reorganized Debtor will be authorized and issued (or authorized and reserved) on the Effective Date.  As described above, Three Hundred Thousand (300,000) shares of New Stock shall be issued and distributed to Halloysite.  The remaining shares of New Stock shall be distributed or reserved as described in sections 4.2.4.2, 5.8.2 and 5.8.3 of this Plan.

        4.2.4.2 Pro Rata Distribution of New Stock for Class 2 Claim Holders who elect this option. A total of up to Seventy-Five Thousand (75,000) shares of New Stock shall be distributed, pro rata, to the holders of Allowed Class 2 Claims that elect to receive stock pursuant to the Class 2 Supplemental Distribution Option (the "Class 2 Stock Distribution"). Each holder of an Allowed Class 2 Claim that elects to receive the Class 2 Stock Distribution shall receive, on the Effective Date, a Pro Rata Share of the Class 2 Stock Distribution rounded down to the lowest whole number share. To the extent rounding down to the lowest whole number share results in less than 75,000 shares of New Stock being delivered (or reserved as part of the Disputed Claims Reserve) under this subsection 4.2.4.2 of the Plan, then any such shares not

distributed shall be cancelled and shall no longer be authorized. The "pro rata" share distributed to each Class 2 Claim Holder who elects to receive a distribution of New Stock (rather than an additional cash distribution) shall be determined as if all Class 2 Claim Holders elect to receive New Stock. Stated another way, the number of shares of New Stock to each Class 2 Claim Holder will not be affected by the elections of other Class 2 Claim Holders, and the shares of New Stock available for distribution to Class 2 Claim Holders that elect to receive cash shall not be distributed.

4.2.4.3 <u>Pro Rata Distribution of Cash at the Election of the Claimholder:</u> The holder of an Allowed Class 2 Claim may elect to receive its pro rata share of the additional cash distribution up to $600,000 as part of the Class 2 Supplemental Distribution Option in lieu of receiving any New Stock. The "pro rata" share distributed to each Class 2 Claim Holder who elects to receive an additional cash distribution (rather than a distribution of New Stock) shall be determined as if all Class 2 Claim Holders elect to receive additional cash. Stated another way, the dollar amount distributed each Class 2 Claim Holder will not be affected by the elections of other Class 2 Claim Holders, and the cash available for distribution to Class 2 Claim Holders that elect to receive New Stock shall not be distributed.

4.2.4.4 <u>Class 2 Put Option</u>. Each holder of an Allowed Class 2 Claim that elects to receive a distribution of New Stock under the Class 2 Supplemental Distribution Option shall have the right (the "<u>Class 2 Put Option</u>"), exercisable by written notice delivered to Halloysite during the Put Option Exercise Period, to require Halloysite to purchase all, but not less than all, of the New Stock that such holder of an Allowed Class 2 Claim receives as its pro rata share of the Class 2 Stock Distribution at a price of Eight Dollars ($8) per share (the "<u>Put Option Purchase Price</u>") of New Stock. If the Class 2 Put Option is timely exercised by the holder of an Allowed Class 2 Claim, then on the Put Option Purchase Date (i.e., the three year anniversary of the Effective Date, or the next business day) Halloysite shall pay to such holder the Put Option Purchase Price for the shares of New Stock distributed to and held by such holder.

4.2.4.4.1 <u>Exercising the Put Option</u>. To exercise the Class 2 Put Option, the holder of the Allowed Class 2 Claim shall, during the Put Option Exercise Period: (A) complete the "Notice of Exercise of Option" in the form attached hereto under <u>Schedule 4.2.4</u>; <u>and</u> (B) shall deliver the signed, fully completed "Notice of Exercise of Class 2 Option" to each and all of (w) Applied Minerals, Inc. c/o Christopher T. Carney, President, at ccarney@appliedminerals.com, (x) counsel for the Reorganized Debtor at mboley@ck.law and jtrousdale@ck.law, (y) Halloysite, c/o Geoffrey G. Scott, at geoffscott100@gmail.com, and (z) counsel for Halloysite at eostrow@foley.com and ggoodman@foley.com.

4.2.4.4.2 <u>Put Option Not Assignable</u>. The Class 2 Put Option is not assignable. If the holder of an Allowed Class 2 Claim sells or otherwise transfers the shares of New Stock that it receives as its pro rata share of the Class 2 Stock

Distribution, then neither the holder nor its successor nor assign shall have the right to exercise the Class 2 Put Option.

4.2.4.4.3  Put Option Waived upon Exercise of the Pro Rata Stock Purchase Right and/or Exercised of the Class 2 Stock Warrant.  If the holder of an Allowed Class 2 Claim exercises the Pro Rata Stock Purchase Right or exercises the Class 2 Stock Warrant, such exercise shall constitute an irrevocable waiver and Release of the Class 2 Put Option.

4.2.4.5  Pro Rata Stock Purchase Right.  Each holder of an Allowed Class 2 Claim that receives and retains New Stock as part of the Class 2 Stock Distribution under the Class 2 Supplemental Distribution Option shall have the right, if the Debtor authorizes and issues additional New Stock after the Effective Date as part of a new equity raise, to purchase New Shares in the same proportion as its existing shareholding (the "Pro Rata Stock Purchase Right").  Stated another way, the Pro Rata Stock Purchase Right ensures that if the Debtor raises additional capital by issuing additional shares of New Stock, existing shareholders can purchase enough new shares to keep their percentage ownership the same. Class 2 Creditors who elect to receive cash under the Class 2 Supplemental Distribution Option will not receive this Pro Rata Stock Purchase Right.  The Pro Rata Stock Purchase Right is not assignable or transferable.

4.2.4.6 Class 2 Stock Warrant.  Each holder of an Allowed Class 2 Claim that receives and retains New Stock as part of the Class 2 Stock Distribution under the Class 2 Supplemental Distribution Option shall have a warrant, at any time on or before the three year anniversary date of the Effective Date, to purchase additional shares of New Stock in an amount up to (but not greater) than the number of shares of New Stock distributed to such holder as part of the Class 2 Stock Distribution at a price of ten dollars ($10.00) per share.  (The warrant effectively permits the holder to double its shares of New Stock.) The warrant may be exercised by (a) providing to the Debtor and Halloysite a written notice of exercise specifying the number of shares of New Stock to be purchased, and (b) delivering payment to the Debtor in immediately available funds, or other payment method acceptable to the Debtor in its sole discretion, of the aggregate exercise price (i.e., the number of shares multiplied by eight dollars).  The warrant shall expire and become void at 5:00 p.m. MDT on the three year anniversary of the Effective Date.  The warrant shall not give rise to any voting rights or other rights as a shareholder of the Reorganized Debtor until the warrant is exercised and the additional shares of New Stock have been issued.  The warrant is not assignable or transferable.

4.2.5  Convenience Class Election.  Each holder of an Allowed Class 2 Claim may make a Convenience Class Election.  If the holder of an Allowed Class 2 Claim timely makes a Convenience Class Election, then the Claim (a) shall be a Class 10 Convenience Claim, (b) shall be treated as specified in section 4.10 of this Plan, and (c) shall not receive treatment as a Class 2 Claim, including as specified in section 4.2.2 of this Plan.

**4.2.6**   Class 2 Supplemental Distribution Election. To elect its preferred choice of Class 2 Supplemental Distribution Option, the holder of the Allowed Class 2 Claim shall, on or before the date that is 30 days after the Effective Date: (A) complete the "Notice of Election of Supplemental Distribution Option" in the form attached hereto under Schedule 4.2.6, which shall be delivered by the Debtor to each holder of an Allowed Class 2 Claim on or before the Effective Date; and (B) shall deliver the signed, fully completed "Notice of Election of Supplemental Distribution Option" to each and all of (w) Applied Minerals, Inc. c/o Christopher T. Carney, President, at ccarney@appliedminerals.com, (x) counsel for the Reorganized Debtor at mboley@ck.law and jtrousdale@ck.law, (y) Halloysite, c/o Geoffrey G. Scott, at geoffscott100@gmail.com, and (z) counsel for Halloysite at eostrow@foley.com and ggoodman@foley.com. If the holder of an Allowed Class 2 Claim does not complete and return the Notice of Election of Supplemental Distribution Option, such holder shall be deemed to elect to receive a pro rata share of the additional cash being paid pursuant to Section 4.2.4.3 of this Plan.

**4.3      Class 3 – Secured Claim of Leaf Capital Funding, LLC.**

**4.3.1**   Impairment and Voting.  Class 3 is impaired under the Plan.  The holder(s) of an Allowed Class 3 Claim(s) shall be entitled to vote to accept or reject the Plan.

**4.3.2**   Treatment of Claim.  To the extent it is Allowed and Secured, the Secured Claim of Leaf Capital shall be treated and paid as follows –

4.3.2.1 Interest on Secured Claim. Interest on the Class 3 Claim shall continue to accrue on the unpaid principal balance of the Allowed Claim in accordance with the non-default interest rate provided for in the loan documents governing the Class 3 Claim.

4.3.2.2 Option to Sell Collateral.  At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing the Allowed Class 3 Claim may be sold free and clear of such holder's Lien(s), provided that (i) the holder of the Class 3 Claim consents in writing to the sale of the Collateral, (ii) the proceeds to be realized from the sale of the Collateral are sufficient to pay in full the unpaid balance of the Allowed Class 3 Claim of Leaf Capital, or (iii) the sale is approved by Order of the Court in the Case. Upon the sale of the Collateral, (a) the holder of the Allowed Secured Class 3 Claim will be paid the proceeds from the Sale of Collateral, up to the amount of the Allowed Secured Class 3 Claim, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the amount of the Allowed Secured Class 3 Claim.

4.3.2.3 Distributions.  Subject to section 4.3.2.4, commencing on the first day of the month that follows the Effective Date, the Debtor shall make payments to the holder of the Allowed Class 3 Claim in the manner and amount provided for under the non-default provisions of the loan documents related to the Class 3 Claim. Stated another way, the Debtor shall commence making regular monthly payments in the amount required under the non-default provisions of the loan documents

beginning on the first day of the month commencing after the Effective Date.  If Collateral which secures the Class 3 Claim is sold, the Reorganized Debtor will pay in full the unpaid balance of the Allowed Class 3 Claim attributable to such Collateral.  At the discretion of the Reorganized Debtor, the Class 3 Claim may be paid either (a) immediately upon the closing of the sale of the Collateral, or (b) on the next Distribution Date.

4.3.2.4 <u>Pre- and Post-Petition Arrearage</u>. Any arrearage or past-due payments as the Effective Date (the "Arrearage") shall be and due and payable upon the earlier of (a) the final maturity date of the original note memorializing the Class 3 Claim, or (b) upon the sale of the Collateral securing the Class 3 Claim.  The portion of the Arrearage consisting of unpaid interest shall not bear interest.

4.3.2.5 <u>Retain Liens</u>.  The holder of the Allowed Class 3 Claim shall retain its Lien(s) in the Collateral securing the Class 3 Claim until its Class 3 Claim is paid in full or the Collateral securing the Class 3 Claim is sold and the proceeds are distributed to the holder of the Allowed Class 3 Claim as provided in Sections 4.3.2.2 and 4.3.2.3.

4.3.2.6 <u>Debtor's Right to Abandon</u>. If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral securing the Class 3 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of the Allowed Class 3 Claim in complete and full settlement and satisfaction of such Claim.  To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 3 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.4    Class 4 – Secured Claim of Navitas Credit Corp.**

**4.4.1**  <u>Impairment and Voting</u>.  Class 4 is not impaired under the Plan. The holder(s) of an Allowed Class 4 Claim(s) shall be deemed to accept the Plan.

**4.4.2**  <u>Treatment of Claim</u>.  To the extent it is Allowed and Secured, the Secured Claim of Navitas shall be treated and paid as follows: in or about March, 2025, the Debtor paid the remaining balance owed on the Secured Claim of Navitas and, therefore, the Secured Claim is now paid in full. To the extent that Navitas asserts that any balance remains on the Navitas Secured Claim, and to the extent that the Debtor does not object to such Claim, the Debtor will pay such balance in full on or before the date that is thirty (30) days after the Effective Date.

4938-3015-7418, v. 9

**4.5**     **Class 5 – Secured Claim of Tharp & Associates.**

**4.5.1**  Impairment and Voting.  Class 5 is impaired under the Plan. The holder(s) of an Allowed Class 5 Claim(s) shall be entitled to vote to accept or reject the Plan.

**4.5.2**  Treatment of Claim.  To the extent it is Allowed and Secured, the Class 5 Secured Claim shall be treated and paid as follows –

4.5.2.1 Interest on Secured Claim. Interest on the Class 5 Claim shall continue to accrue on the unpaid principal balance of the Allowed Claim in accordance with the non-default interest rate provided for in the loan documents governing the Class 5 Claim.

4.5.2.2 Option to Sell Collateral.  At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing the Allowed Class 5 Claim may be sold free and clear of such holder's Lien(s), provided that (i) the holder of the Class 5 Claim consents in writing to the sale of the Collateral, (ii) the proceeds to be realized from the sale of the Collateral are sufficient to pay in full the unpaid balance of the Allowed Class 5 Claim of Tharp, or (iii) the sale is approved by Order of the Court in the Case. Upon the sale of the Collateral, (a) the holder of the Allowed Secured Class 5 Claim will be paid the proceeds from the Sale of Collateral, up to the amount of the Allowed Secured Class 5 Claim, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the amount of the Allowed Secured Class 5 Claim.

4.5.2.3 Distributions.  Subject to section 4.5.2.4, commencing on the first day of the month that follows the Effective Date, the Debtor shall make payments to the holder of the Allowed Class 5 Claim in the manner and amount provided for under the non-default provisions of the loan documents related to the Class 5 Claim. Stated another way, the Debtor shall commence making regular monthly payments in the amount required under the non-default provisions of the loan documents beginning on the first day of the month commencing after the Effective Date.  If Collateral which secures the Class 5 Claim is sold, the Reorganized Debtor will pay in full the unpaid balance of the Allowed Class 5 Claim attributable to such Collateral.  At the discretion of the Reorganized Debtor, the Class 5 Claim may be paid either (a) immediately upon the closing of the sale of the Collateral, or (b) on the next Distribution Date.

4.5.2.4 Pre- and Post-Petition Arrearage. Any arrearage or past-due payments as the Effective Date (the "Arrearage") shall be and due and payable upon the earlier of (a) the final maturity date of the original note memorializing the Class 5 Claim, or (b) upon the sale of the Collateral securing the Class 5 Claim.  The portion of the Arrearage consisting of unpaid interest shall not bear interest.

4.5.2.5 Retain Liens.  The holder of the Allowed Class 5 Claim shall retain its Lien(s) in the Collateral securing the Class 5 Claim until its Class 5 Claim is paid

in full or the Collateral securing the Class 5 Claim is sold and the proceeds are distributed to the holder of the Allowed Class 5 Claim as provided in Sections 4.5.2.2 and 4.5.2.3.

4.5.2.6 Debtor's Right to Abandon. If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral securing the Class 5 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of the Allowed Class 5 Claim in complete and full settlement and satisfaction of such Claim. To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 4 Claim by mail to its last known address and/or the last known address of its counsel of record.

## 4.6    Class 6 – Miscellaneous Secured Claims.

**4.6.1**   Impairment and Voting. Class 6 is impaired under the Plan. The holders of Class 6 Claims shall be entitled to vote to accept or reject the Plan.

**4.6.2**   Treatment of Claim. To the extent that they are Allowed and Secured, the Class 6 Secured Claims shall be treated and paid as follows –

4.6.2.1    *Potential Bifurcation of Claim.* To the extent the amount of the Class 6 Claim as of the Petition Date exceeds the forced liquidation value of the applicable Collateral, the Claim shall be treated as a Secured Claim only to the extent of such value.

4.6.2.2    *Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties in interest regarding the claim and amount) shall have the right to object to the Class 6 Claim or ostensible Lien on any grounds, including amount, validity, perfection, and priority.

4.6.2.3    *Interest on the Secured Claim.* Interest on a Class 6 Secured Claim shall continue to accrue on the unpaid principal balance of such holder's applicable loan at the lesser of (i) five and one-half percent per annum (5.5%) or (ii) the non-default rate specified under the loan documents governing the holder's Class 6 Claim.

4.6.2.4    *Monthly Installment Payments.* The Class 6 Secured Claims shall be paid in monthly installments calculated on a ten-year amortization. Beginning on the first day of the month after the Effective Date, the Debtor shall pay equal monthly installments to the holder of a Class 6 Secured Claim, amortized over ten years at the rate of interest described in this section.

4.6.2.5    *Option to Sell Collateral.* At the discretion of the Reorganized Debtor and subject to the other terms and conditions of this Plan, the Collateral securing an Allowed Class 6 Claim may be sold—collectively or individually—free

and clear of such holder's Lien(s), provided that (i) the Court enters an order approving such sale, (ii) the holder of the Class 6 Claim consents in writing to the sale of the Collateral, or (ii) the proceeds to be realized from the sale of any item(s) of Collateral are sufficient to pay in full the Collateral Release Amount(s) for the particular item(s) of Collateral sold. Upon the sale of the Collateral, (a) the holder of the Allowed Class 6 Claim will be paid the Collateral Release Amount for the Collateral sold, or (b) the holder's Lien(s) will attach to the proceeds of sale up to the Collateral Release Amount, and the Claim holder will be paid 100% of the proceeds up to the Collateral Release Amount for the Collateral sold. For any item(s) of Collateral sold, the Reorganized Debtor shall be entitled to retain, free and clear of the Class 6 Claim holder's Liens, any proceeds that exceed the Collateral Release Amount(s) for the particular item(s) of Collateral sold.

4.6.2.6    *Payment Upon Sale of Collateral.*  If any item(s) of a Class 6 Claim holder's Collateral is sold, the Reorganized Debtor will pay in full the Collateral Release Amount(s) either (a) immediately upon the closing of the sale of the Collateral, or (b) on the first Interim Effective Date following the closing of the sale. To the extent the Reorganized Debtor elects to pay the Collateral Release Amount(s) after closing, the Collateral shall be sold free and clear of the lien, claim or interest of the holder of the Class 6 Claim with all liens to attach instead to the proceeds of the sale, up to the Collateral Release Amount.

4.6.2.7    *Debtor's Right to Abandon Property in Satisfaction of Claim.*  If, at any time, the Reorganized Debtor determines that the Reorganized Debtor's rights and interests in the Collateral for a Class 6 Claim are burdensome or of inconsequential value, the Reorganized Debtor may elect to abandon all of the Reorganized Debtor's right, title and interest in the Collateral to the holder of an Allowed Class 6 Claim in complete and full settlement and satisfaction of such Claim.  To effectuate such abandonment, the Reorganized Debtor need only execute a notice of abandonment (if the Case has not been closed, file it in the Case) and deliver the same to the holder of the Allowed Class 6 Claim by mail to its last known address and/or the last known address of its counsel of record.

**4.6.3**   Retain Lien.  To the extent that it has a properly perfected Lien (and then, only to the extent such Lien is not avoided pursuant to section 544(a) of the Bankruptcy Code, or otherwise), the holder of an Allowed Secured Class 6 Claim shall retain its Lien upon its Collateral until its Allowed Claim is paid in full.

**4.7**    **Class 7 – Existing Equity Interests in the Debtor.**

**4.7.1**   Impairment and Voting.  Class 7 is Impaired and Holders of Existing Equity Interests are deemed to have rejected this Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject this Plan.

    **4.7.2** <u>Treatment of Equity Interests</u>.  Holders of Existing Equity Interests are not entitled to receive a recovery or distribution on account of such Existing Equity Interests. On the Effective Date, Existing Equity Interests shall be canceled, terminated, released, discharged, and extinguished, and shall be of no further force or effect.

**4.8**    <u>**Class 8 – Subordinated Claims.**</u>

    **4.8.1** <u>Impairment and Voting</u>.  Class 8 is impaired under the Plan.  Each holder of an Allowed Class 8 Subordinated Claim shall be deemed to reject the Plan.

    **4.8.2** <u>No Payment or Distribution</u>.  The holders of Allowed Class 8 Subordinated Claims shall not receive any payment or distribution under the Plan.

**4.9**    <u>**Class 9 – Subordinated § 510(b) Claims.**</u>

    **4.9.1** <u>Impairment and Voting</u>.  Class 9 is impaired under the Plan.  Each holder of an Allowed Class 9 Subordinated Claim shall be deemed to reject the Plan.

    **4.9.2** <u>No Payment or Distribution</u>.  The holders of Allowed Class 9 Claims shall not receive any payment or distribution under the Plan.

**4.10**    <u>**Class 10 – Convenience Claims.**</u>

    **4.10.1** <u>Impairment and Voting</u>.  Class 10 is impaired under the Plan.  Each holder of an Allowed Class 10 Convenience Claim shall be entitled to vote to accept or reject the Plan.

    **4.10.2** <u>Payment</u>.  On or before sixty days after the Effective Date and in full satisfaction of each such Claim, the holders of Allowed Class 10 Claims shall receive a pro rata share of the Convenience Claims Fund, divided among the holders of all Allowed Class 10 Claims.

    **4.10.3** <u>Class 2 Treatment Election</u>.  Each holder of an Allowed Class 10 Convenience Claim may make a Class 2 Treatment Election, unless and excepting any holder of a Class 10 Claim that became a Convenience Claim by making a Convenience Class Election.  If the holder of an Allowed Class 10 Claim timely makes a Class 2 Treatment Election, then the Claim (a) shall be a Class 2 Claim, (b) shall be treated as specified in section 4.2 of this Plan, and (c) shall not receive treatment as a Class 10 Claim, including as specified in sections 4.10.2 of this Plan.

    **4.11**    <u>**Satisfaction of Claims and Release.**</u>  As of the Effective Date, all Claims against the Debtor shall be released except as provided in the Plan.

    **4.12**    <u>**No Assumed Liability.**</u>  Except as otherwise expressly set forth in the Plan, the Reorganized Debtor shall not assume or be liable for any Claims.

**4.13    Disputed Claims.**  Notwithstanding any other provision of this Plan, no Cash or property (including New Stock) shall be distributed under the Plan on account of any Disputed Claim until the Claim is Allowed or disallowed.  The Reorganized Debtor shall establish a reserve ("Disputed Claims Reserve") with respect to Disputed Claims.  Cash and property to be distributed on account of Disputed Claims (including New Stock) shall be held by the Debtor until such Claims are Allowed or disallowed by Final Order.  At the option of the Reorganized Debtor, Cash which is held in Disputed Claim Reserve may be held in the Debtor's current operating account, may be deposited into one or more segregated, interest-bearing bank accounts that satisfy the requirements of 11 U.S.C. § 345, or may be used to purchase a short-term certificate of deposit or another short-term investment.  Upon the later of the Effective Date or thirty (30) days after a Disputed Claim becomes Allowed, the holder shall receive a distribution from the Disputed Claims Reserve, based upon the Allowed amount of the Claim, and, thereafter, shall participate in any further distributions under the Plan as the holder of an Allowed Claim.  Any Cash or property remaining in the Disputed Claims Reserve after the resolution of all disputes by Final Order shall be distributed in accordance with the Plan.  Without limitation, any New Stock that is part of the Class 2 Stock Distribution that is held in the Disputed Claims Reserve on account of a Disputed Claim, if the Disputed Claim is disallowed or withdrawn, shall be distributed pro rata to the holders of Allowed Class 2 Claims (and/or reserved for remaining Disputed Claims).

**4.14    No Penalties.**  Except as expressly stated in the Plan or allowed by the Bankruptcy Court, no late charge, or penalty, including but not limited to prepayment penalties, shall be allowed on any Claim subsequent to the Petition Date.

**4.15    All Defaults Cured and Waived; All Notes and Obligations Decelerated and Treated by this Plan.**  Pursuant to Sections 1123(a)(5)(G) and 1124(2) of the Bankruptcy Code, among others, and except as otherwise provided by this Plan, all defaults that existed or that may have existed under any promissory note, loan document, unexpired lease, executory contractor or other written agreement of or by the Debtor shall be deemed cured and waived as of the Effective Date.  All notes, instruments or obligations that were accelerated pre-petition and/or pre-confirmation shall be decelerated as of the Effective Date and treated as set forth in this Plan.  All judicial and non-judicial foreclosure actions and proceedings that were instituted pre-petition and/or pre-confirmation shall be canceled, terminated and/or deemed withdrawn and rescinded as of the Effective Date.

**4.16    Prepayment Allowed.**  Notwithstanding anything to the contrary herein, the Debtor may prepay any obligations under the Plan without penalty, including the Plan Payments and payments owed to any Allowed Secured Claim, provided that such prepayment(s) must comply with priorities of payments set forth in Section 5.5 of this Plan.

## ARTICLE 5
## MEANS FOR EXECUTION OF THE PLAN

**5.1    Vesting of Property**.  Except as otherwise provided in this Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the assets of the Estate.

4938-3015-7418, v. 9

5.2      **Avoidance Actions and Other Claims.**  The Reorganized Debtor shall be vested with all claims and causes of action of the Debtor including, without limitation, Avoidance Actions, including without limitation the Avoidance Actions and claims against the BMI Entities, and other claims arising under Sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code and applicable state law.

5.3      **Bankruptcy Case Administration**.  Except as otherwise provided in this Plan, from and after the Effective Date and continuing through the date on which a final decree closing the Bankruptcy Case is entered pursuant to Section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Reorganized Debtor shall possess the rights of a party in interest pursuant to Section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Bankruptcy Case.  In addition to the foregoing, for all matters arising under or related to the Bankruptcy Case, the Reorganized Debtor shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of all applications, motions and other papers and pleadings before the Bankruptcy Court.

5.4      **Continuation of Business Operations**.  From and after the Effective Date of the Plan, the Reorganized Debtor is authorized to continue its normal business operations and enter into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan. In its sole discretion, the Reorganized Debtor may use the Operations & Litigation Fund to continue its normal business operations upon and after the Effective Date.

     5.4.1   Management of the Reorganized Debtor.

        5.4.1.1 Officers. Christopher T. Carney shall continue to serve as the President and Chief Executive Officer of the Reorganized Debtor from and after the Effective Date.  Any other person that is, or purports to be, an appointed or acting officer of the Debtor as the Effective Date shall be removed from such position(s) as of the Effective Date.

        5.4.1.2 Board of Directors. All previously appointed and acting directors of the Debtor as of the Effective Date shall be removed. One director shall be appointed to serve on the board of directors of the Reorganized Debtor from and after the Effective Date.  The initial director serving from and after the Effective Date shall be Geoffrey G. Scott.

5.5      **Source(s) of Funds.**  The Debtor's future operations and all payments and cash distributions to Creditors shall be funded and paid from the following sources:

     5.5.1   Cash on Hand as of the Effective Date.  The Debtor may use any and all cash on hand held by the Debtor on the Effective Date, from any source, to fund payment of operating expenses, payment of cash distributions required under the Plan, and for any other purpose determined by the Debtor in the exercise of its business judgment.

4938-3015-7418, v. 9

**5.5.2** <u>Cash Derived from Future Operations and/or Sales of Assets</u>. The Debtor may use any and all cash derived from operating the Debtor's business and/or from selling assets of the Debtor, from any source, to fund payment of operating expenses, payment of cash distributions required under the Plan, and for any other purpose determined by the Debtor in the exercise of its business judgment.

**5.5.3** <u>Deposits from Proceeds of Avoidance Actions</u>. If the Reorganized Debtor realizes proceeds from Avoidance Actions or Claims against third-parties, creditors, insiders or employees of the Debtor, the Reorganized Debtor may use such proceeds to fund payment of operating expenses, payment of cash distributions required under the Plan, and for any other purpose determined by the Debtor in the exercise of its business judgment. For example, if the Debtor's board of directors determines that the cash proceeds of Avoidance Actions or Claims are in excess of the amounts that the Debtor needs for working capital and/or capital expenditures contemplated as part of the Debtor's strategic objectives, then some or all of the proceeds may be distributed to the holders of New Stock as a cash dividend.

**5.5.4** <u>Use of Unexhausted Proceeds of DIP Credit Agreement</u>. Any unexhausted funds from the DIP Credit Agreement as of the Effective Date shall be advanced and/or funded to the Debtor as part of the Plan Funding Transaction.

**5.5.5** <u>Plan Funding Transaction</u>. On or before the Effective Date, Halloysite shall advance and/or fund to the debtor the aggregate principal amount of up to Three Million Three-Hundred Fifty Thousand Dollars ($3,350,000), including (a) all principal amounts advanced by Halloysite to the Debtor pursuant to the DIP Credit Agreement prior to the Effective Date, (b) any funds remaining and not yet advanced under the DIP Credit Agreement (which contemplated principal advances totaling $600,000),[5] plus (c) an additional Two Million Seven-Hundred Fifty Thousand Dollars ($2,750,000) in principal amount. The amounts funded to the Debtor by Halloysite pursuant to the Plan Funding Transaction shall be allocated as follows:

5.5.5.1 One Million Five Hundred Thousand Dollars ($1,500,000) shall be earmarked and set aside to be distributed (or reserved as part of the Disputed Claims Reserve), pro rata, to the holders of Allowed Class 2 Claims (*i.e.*, the Class 2 Claim Fund);

5.5.5.2 up to an additional pro rata share of $600,000 to the extent the Allowed Class 2 Claims do not elect to receive shares pro rata share of up to 75,000 shares in the Reorganized Debtor pursuant to the Class 2 Supplemental Distribution Option;

---

[5] If the full $600,000 available under the DIP Credit Agreement has not been advanced to the Debtor on or before the Effective Date, the undisbursed (or not yet advanced) amounts shall be funded to the Debtor on the Effective Date as part of the Plan Funding Transaction.

4938-3015-7418, v. 9

5.5.5.3 up to Seventy Thousand Dollars ($70,000) shall be earmarked and set aside to be distributed, pro rata, to the holders of Allowed General Unsecured Claims in the Convenience Class (*i.e.*, the Convenience Claims Fund);

5.5.5.4 at least Five Hundred and Eighty Thousand for administrative claims and remaining a portion of the remaining funds loaned and/or otherwise funded as part of the Plan Funding Transaction shall be used or reserved to pay Administrative Expenses and Priority Claims, in the following order of priority –

*first*, pursuant to section 507(a)(2) of the Bankruptcy Code, in payment of Allowed Administrative Expenses, including compensation to the attorneys and other Professionals of the Debtor as contemplated under section 2.2.4 of the Plan,

*second*, pursuant to section 507(a)(2) of the Bankruptcy Code, payment of (or a reserve for payment of) Administrative Expenses arising or coming due after the Effective Date including (A) all post-Effective Date quarterly fee payments to the United States Trustee, and (B) all compensation for actual services provided and reimbursement of expenses incurred by Professionals providing post-Effective Date services for the Reorganized Debtor, in providing general bankruptcy-related and plan-related professional services after the Effective Date, in connection with (x) investigating or objecting to Claims and (y) in investigating or pursuing recovery of Avoidance Actions,

*third*, after the foregoing amounts are paid or reserved, payments due to the holders of holders of Class 1 Claims holding claims Allowed under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for certain unpaid wages or employment benefits,

*fourth*, subject to sections 2.3.2 and 2.3.3 of this Plan (including, if applicable, subject to the discretion and election of the Debtor and Halloysite under section 2.3.3 of this Plan), after the foregoing amounts are paid or reserved, payments due to the holders of Allowed Priority Tax Claims, entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, as described in section 2.3.2 and 2.3.3. of this Plan, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full, and

*fifth*, after the foregoing amounts are paid or reserved, payments due to the holders of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(9) through (a)(10) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full; and

5.5.5.5 all remaining or additional amounts shall be used and/or treated as part of the Operations & Litigation Fund.  The Debtor may use such cash for any business purpose, including payment of Cure Amounts, and/or any purpose contemplated or permitted by this Plan, including (a) funding the investigation and/or litigation of claims and causes of action vested in the Debtor pursuant to section 5.2 of the Plan, including Avoidance Actions against the BMI Entities (or any one of them), (b) paying the Debtor's operating expenses, and (c) capital expenditures approved by the Debtor's board of directors.

**5.6**     **Cancellation of All Existing Equity.**  On the Effective Date, all Existing Equity shall be canceled, terminated, released, discharged, and extinguished, and shall be of no further force or effect.

**5.7**     **The Debtor Shall Be a Private Company; No Public Registrations of Listings.** The Reorganized Debtor shall exist and operate as a private company after the Effective Date.

**5.7.1**     Deregistration; De-Listing.  If the Debtor has not previously been deregistered as a public company with the SEC and delisted from all public and private stock exchanges, the Reorganized Debtor shall be deregistered and delisted.  On the Effective Date, or as promptly as reasonably practicable thereafter, the Reorganized Debtor shall take all necessary steps to terminate the registration of all securities under the Exchange Act and Securities Act, including to de-register its Existing Equity Interests, and to terminate its reporting obligations under Sections 12, 13, and 15(d) of the Exchange Act, including, if necessary, (i) filing, or causing any applicable national securities exchange to file, a Form 25 with the SEC under the Exchange Act, and/or (ii) filing a Form 15 with the SEC under the Exchange Act.

**5.7.2**     No Future Registration or Listings. The Reorganized Debtor shall not be obligated to effect or maintain any listing of the Existing Equity (all of which are cancelled under this Plan) or the New Equity Interests for trading on any national securities exchange (within the meaning of the Exchange Act) and it has no current intention of maintaining or obtaining such listing.

5.7.2.1  No registration statement shall be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer and distribution of the New Equity Interests under this Plan. The offering, sale, issuance, and distribution of the New Equity Interests in exchange for Claims pursuant to this Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for the offer or sale of a security pursuant to Section 1145 of the Bankruptcy Code.

5.7.2.2  Any and all such New Equity Interests may be resold without registration under the Securities Act by the recipients thereof pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, subject to: (1) the provisions of Section 1145(b)(1) of the Bankruptcy Code, which limits resale by Persons who are "underwriters" as that term is defined in such Section; (2) restrictions under the

Securities Act applicable to recipients who are an "affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act; (3) compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities; (4) the restrictions, if any, on the transferability of such securities in the organizational documents of the issuer of, or in agreements or instruments applicable to holders of, such securities; and (5) any other applicable regulatory approval.

5.7.2.3   The Reorganized Debtor need not provide any further evidence other than this Plan and the Confirmation Order with respect to the treatment of the New Equity Interests under applicable securities laws. Notwithstanding anything to the contrary in this Plan, no Person or Entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Equity Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. All such Persons and Entities including DTC shall be required to accept and conclusively rely upon this Plan or the Order in lieu of a legal opinion regarding whether the New Equity Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC and any participants and intermediaries shall fully cooperate and take all actions to facilitate any and all transactions necessary or appropriate for implementation of this Plan or other contemplated thereby, including without limitation any and all distributions pursuant to this Plan.

**5.7.3**   <u>Distributions of New Stock Pursuant to DTC</u>.  Distributions of New Equity Interests are expected to be delivered via DTC; provided, however, in the event the New Equity Interests are not DTC eligible on the Effective Date, distributions shall be made by delivery or book-entry transfer thereof by the Reorganized Debtor in accordance with this Plan and the New Organizational Documents, rather than through the facilities of DTC.

**5.8**   <u>**Issuance of New Equity Interests; Distribution of New Stock to Creditors**</u>.  As of the Effective Date, the Reorganized Debtor shall issue or reserve for issuance Three Hundred Seventy-Five Thousand (375,000) shares of new common stock ("<u>New Equity</u>" or "<u>New Stock</u>" or "<u>New Equity Interests</u>").  All of the New Equity Interests issued, or authorized but reserved for issuance, under this Plan and the Confirmation Order shall, when so issued, be duly authorized, validly issued, fully paid, and non-assessable.  On and after the Effective Date, transfers of New Equity Interests shall be made in accordance with applicable United States securities laws (as applicable).

**5.8.1**   <u>300,000 Shares of New Stock Shall be Distributed to Halloysite</u>.  Three Hundred Thousand (300,000) shares of New Stock shall be issued and distributed, on the Effective Date, to Halloysite in full satisfaction of the Halloysite Claim and in compensation for all funds delivered (and to be delivered) by Halloysite to the Debtor as part of the Halloysite Funding – including Three Million Three Hundred Fifty Thousand

Dollars ($3,350,000) in principal amount to be advanced and/or funded under the DIP Credit Agreement and/or as part of the Plan Funding Transaction (of which, $1,500,000 shall be earmarked, distributed or reserved as part of the Class 2 Claim Fund) – including all principal, interest, loan charges, fees, costs and expenses.

     **5.8.2** <u>75,000 Shares of New Stock Shall be Distributed to the Holders of Allowed Class 2 Claims that Elect to receive New Stock pursuant to the Class 2 Supplemental Option</u>.  Seventy-Five Thousand (75,000) shares of New Stock shall be issued and distributed, on the Effective Date, Pro Rata to the holders of Allowed Class 2 Claims who elects to receive New Stock under the Class 2 Supplemental Distribution Option.  To the extent rounding down to the lowest whole number share results in less than 75,000 shares of New Stock being delivered (or reserved as part of the Disputed Claims Reserve) under subsection 4.2.4.2 of the Plan, then any such shares not distributed shall be cancelled and shall no longer be authorized.  As described in sections 4.2.4.3 and 4.2.4.4 of the Plan, each holder of Allowed Class 2 Claim who elects to receive New Stock under the Class 2 Supplemental Distribution Option also shall receive, on account and in conjunction with the New Stock distributed to it the Class 2 Put Option and a Pro Rata Stock Purchase Right.

     **5.9** **<u>New Organizational Documents</u>.** As of the Effective Date, all certificates, articles, bylaws, shareholders agreements and all other organizational documents of the Debtor which were created or existed prior to the Effective Date shall be canceled, terminated, released, discharged, and extinguished, and shall be of no further force or effect. On the Effective Date, the Reorganized Debtor and its corporate affairs shall be governed by the New Organizational Documents and all of the New Equity Interests shall be authorized and issued pursuant to the New Organization Documents.

     **5.9.1** <u>New Certificate of Incorporation & Bylaws</u>. The Reorganized Debtor shall be governed by the amended and restated certificate of incorporation and the amended and restated bylaws attached hereto under <u>Schedule 5.9.1</u>. From and after the Effective Date, the organizational documents of the Reorganized Debtor shall comply with Section 1123(a)(6) of the Bankruptcy Code, as applicable, and with the laws of the applicable state(s) of incorporation of the Reorganized Debtor. To the extent filing is required by applicable nonbankruptcy law, on or immediately before the Effective Date, the Reorganized Debtor shall file copies of its New Organizational Documents, if any, with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Organizational Documents to become effective.

     **5.10**   **<u>Safe Harbor under IRC § 382</u>.** The Debtor's historical operating losses, its past net operating losses (NOLs) and NOL carryforwards are a valuable asset of the Debtor and its Estate. Accordingly, in formulating, proposing and obtaining confirmation of this Plan, the Debtor intends to qualify for the bankruptcy exception to the change in ownership attribute limitations under subsection (l)(5) of section 382 of the Internal Revenue Code ("<u>IRC</u>"), *i.e.*, under 26 U.S.C. § 382(l)(5) (the "Bankruptcy Exception"). This Plan shall be interpreted and

4938-3015-7418, v. 9

applied so that all conditions for the application of the Bankruptcy Exception are met. Without limitation, (i) the Debtor (i.e., "the old loss corporation") is immediately before the ownership change contemplated by this Plan under the jurisdiction of the United States Bankruptcy Court of for the District of Utah in a chapter 11 bankruptcy case pending under title 11 of the United States Code, (ii) the [shareholders and] creditors of the Debtor, i.e., the "old loss corporation," (determined immediately before the ownership change on the Effective Date shall own (after the ownership change under the Confirmed Plan as of the Effective Date and as a result of being shareholders or creditors immediately before such change) stock of the Reorganized Debtor, i.e., the "new loss corporation") which meets the requirements of IRC § 1504(a)(2) (determined by substituting "50 percent" for "80 percent" each place it appears); (iii) a second ownership change must not occur within two years following the ownership change under the Plan; (iv) the corporation must not elect not to have such bankruptcy exception apply to the change; and (v) the corporation must reduce its pre-change losses which it carries to post-change years to the extent that they reflect certain pre-change interest payments or accruals (see IRC §382(l)(5)(G)). Each creditor that will received a distribution of New Stock under the Plan, including Halloysite, qualifies under IRC §382(l)(5)(E) because the indebtedness satisfied by the transfer of the New Stock either (a) was held by the creditor at least 18 months prior to the Petition Date or (b) arose in the ordinary course of the trade or business of the Debtor business and is held by the person who at all times held the beneficial interest in such indebtedness. The di minimis rule allowing a special presumption of meeting such holding periods will be used by the Reorganized Debtor in determining qualified creditors where the claim holder is less than a 5% shareholder after the change. The Bankruptcy Court shall have continuing jurisdiction to interpret and enforce compliance with the foregoing conditions. Further, the Reorganized Debtor may restrict the transfer of its stock from and after the Effective Date in order to meet the requirement of no further change in ownership for two years as set forth in IRC § 382(l)(5)(D), and this Plan shall act as such restriction until the Reorganized Debtor's certificate is amended to provide such restrictions. Stated another way, any transfer of New Stock in the Reorganized Debtor which would trigger loss of NOLs pursuant to IRC § 382(l)(5)(D) automatically shall be void.

**5.11    Employment of Professionals**. The Reorganized Debtor may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtor after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.

**5.12    Ability to Incur Debt.**  The Reorganized Debtor may incur debt after the Effective Date on a secured or unsecured basis without further notice, opportunity for hearing or order, except only to the extent the terms and provisions of this Plan (including any stipulation incorporated as part of this Plan) and/or the New Organizational Documents may expressly forbid.

**5.13    Approval of Agreements; Authority to Perform and Implement**.  Unless otherwise expressly provided in the Confirmation Order, entry of the Confirmation Order shall constitute approval of and authorization permitting the Reorganized Debtor to enter into, perform under and implement each of the transactions expressly contemplated under this Plan.

**5.14**   **Continuation of Anti-Discrimination Provisions of Bankruptcy Code**.  A governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, the Reorganized Debtor, or another Person with whom the Debtor or the Reorganized Debtor have been or are associated or affiliated, solely because of the commencement, continuation, or termination of the Bankruptcy Case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a governmental unit.

**ARTICLE 6**
**IMPLEMENTATION OF THE PLAN**

**6.1**   **Method of Distributions under the Plan.**

**6.1.1**   In General.  Subject to Bankruptcy Rule 9010, all cash distributions under the Plan to be made by the Debtor to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Effective Date, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Debtor shall have no obligation to locate holders whose distributions or notices are properly mailed but nevertheless returned.  Distributions may be made under this Plan through payments directly from the Debtor.

**6.1.2**   Form of Distributions.  Any payment of Cash made by the Debtor pursuant to the Plan shall be made by regular check; *provided, however,* that after the occurrence of the Effective Date, the Debtor is not obligated to make any Cash payment under the Plan unless the payment exceeds twenty-five dollars ($25); *provided, further,* that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to twenty-five dollars ($25) shall be maintained in a reserve for the benefit of such holder until an aggregate of at least twenty-five dollars ($25) is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

**6.1.3**   Distributions to be on Business Days.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**6.1.4**   Withholding Taxes on Distributions.  The Reorganized Debtor shall withhold from any Cash or property distributed under the Plan such amounts as the Debtor is obligated under non-bankruptcy law to withhold and transmit to taxing authorities.

**6.1.5**   Minimum Distributions.  The Reorganized Debtor shall not be obligated to make any cash distribution, including a final distribution, unless the payment exceeds

twenty-five dollars ($25).  To the extent the entire amount distributable to the holder of a claim is not at least twenty-five dollars ($25), the Reorganized Debtor may retain the funds otherwise distributable to such holder and may use such funds for the benefit of the Reorganized Debtor's business and/or its other creditors.

      **6.1.6**  <u>Only Whole Shares of New Stock to be Distributed</u>.  When any distribution of New Stock pursuant to this Plan on account of an Allowed Claim would result in the issuance of a number of shares of New Equity Interests that is not a whole number (i.e., that is a fractional number or a number that includes decimal places such as tenths, hundredths, thousandths and so on), the Debtor shall issue shares rounded down to the lowest whole number. No fractional shares of New Stock shall be authorized or issued.

      **6.2**    **Objections to Claims.**  Except as otherwise provided in this Plan (including stipulations that are incorporated into and made a part of this Plan, which stipulations may include a waiver of, and prohibition against, objecting to a particular creditor's Claim or Lien) any objections to Claims against the Estate may be prosecuted by the Debtor or the Reorganized Debtor or any other party in interest.  Except as otherwise provided by order of the Bankruptcy Court the Debtor or any other party in interest may file an objection to any Claim until one hundred eighty (180) days after the Effective Date.  Upon motion filed within such one hundred eighty (180) days, the Bankruptcy Court may extend the period within which to object to a Claim for a reasonable period of time, not to exceed an additional one hundred eighty (180) days.  Any Claim to which no timely objection has been filed shall be deemed an Allowed Claim.

      **6.3**    **Estimation of Claims.**  The Debtor or the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.  The Debtor and the Reorganized Debtor shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim.  If the Bankruptcy Court determines the maximum limitation of such Claim, such determination shall not preclude the Debtor or Reorganized Debtor from pursuing any additional proceedings to object to any ultimate payment of such Claim.  If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under this Plan.  All such proceedings are cumulative and not exclusive remedies.

      **6.4**    **Determination of Tax Liability.**  To the fullest extent permitted under Section 505 of the Bankruptcy Code, the Debtor or the Reorganized Debtor may, at any time, (a) request that the Bankruptcy Court determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, (b) exercise or pursue any other rights or remedies of the Debtor with respect to tax liabilities and/or tax claims under the Bankruptcy Code, under the Bankruptcy Rules and/or under applicable nonbankruptcy law.

      **6.5**    **No Distributions to the Holders of Disallowed Claims.**  Any and all Claims which are not Allowed, as specified herein, shall be Disallowed.  Claims which are Disallowed (or not Allowed) shall be forever barred as against the Debtor, and shall receive no payments or

distribution under this Plan; provided, however, that any Claim which is a Disputed Claim solely by reason of an objection or other legal challenge that is pending and unresolved shall be treated as a Disputed Claim, and may receive payments or distributions to the extent it later becomes Allowed, in whole in part, upon resolution of such objection or challenge.

**6.6     Late-Filed Claims Forever Barred.**  All Claims arising from proofs of claim filed after the Bar Date automatically shall be disallowed without the need for the Debtor to file an objection, and without any further order of the Court.  No Claim that is late-filed (*i.e.*, filed after the applicable Bar Date) shall be treated or paid as an Allowed Claim under this Plan unless the tardiness is excused and the late-filing of such Claim specifically is permitted pursuant to a Final Order entered prior to the Effective Date.  Rather, any such "late" Claim automatically and without further notice or opportunity for hearing shall be disallowed under this Plan. Notwithstanding the foregoing, a claim filed after the applicable Bar Date may be treated as an Allowed Claim only if, prior to the Effective Date and after notice and an opportunity for hearing, the Court has entered an order expressly allowing the Claim and/or permitting the holder of the Claim to file a late-filed proof of claim.

**6.7     Reversion of Unclaimed Checks.**  The amount of any checks issued for distributions under the Plan that remain uncashed for a period of ninety (90) days after the date of such distribution, and for which the payee does not request a replacement check within the additional time period contemplated under section 6.8, shall revert and be vested in the Reorganized Debtor free and clear of any claim or interest of any holder of a Claim under the Plan.

**6.8     Cash Payments and Time Bar.**  Cash distributions made by the Reorganized Debtor shall be by checks drawn on a domestic bank, and promptly mailed, postage prepaid. Any check issued to pay an Allowed Claim will be null and void if such check is not negotiated within ninety (90) days of its issuance; *provided, however,* that the payee of a check may request reissuance of a "stale" check on or before sixty (60) days after the expiration of the ninety (90) day period following the date of issuance of such check.  Requests for reissuance of any check shall be in writing to the Reorganized Debtor by the holder of the Allowed Claim (or check payee) to whom such check originally was issued.  If both the initial ninety (90) day period and subsequent sixty (60) day period shall expire, thereafter, the portion of the Claim that would have been paid by the voided check shall be barred and disallowed, and all rights to such distribution by such creditor shall be forfeited.  The Reorganized Debtor will retain the funds resulting from such void checks.

**6.9     Retention and Preservation of Claim Objections and Causes of Action.** Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtor or the Reorganized Debtor's rights to object to all Claims and Interests asserted against the Estate and all of the Debtor's or Estate's Causes of Action, including without limitation: (1) the Debtor's Causes of Action asserted in any adversary proceeding, U.S. District Court litigation, state court proceeding, or any other proceeding  which is pending as of the Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; (3) all Claims and Causes of Action described in the Disclosure Statement; (4) any Claims and Causes of Action contained in any contested matter or objection

38 of 52

to Claim pending on the Confirmation Date; and (5) any and all other Claims and Causes of Action that the Debtor holds pre-confirmation, including, but not limited to, Claims for unpaid accounts receivable, shall vest in the Estate.  Notwithstanding anything else in the Plan to the contrary, no provision in this Plan is intended or shall be construed to preclude or otherwise bar the Debtor from pursuing any claims arising under chapter 5 of the Bankruptcy Code or under other applicable law.  Among other things no Person sued pursuant to Sections 547, 548, 549, 550, 553 of the Bankruptcy Code or otherwise may argue that confirmation of this Plan precludes such claim on grounds of res judicata, issue preclusion or otherwise. The Debtor and the Reorganized Debtor expressly reserve their rights, Claims, and Causes of Action for surcharge under § 506(c) of the Bankruptcy Code and subordination under § 510 of the Bankruptcy Code.

**6.10**   **No Release or Waiver.**  Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtor expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court. For the avoidance of doubt, the use of a defined term such as "Collateral," "Secured," "lease," "true lease," "Lien," and so forth, is not, and shall not be construed as, an admission that the referenced thing, item, document, or description does, in fact, constitute such thing, item, document, or description.

## ARTICLE 7
## VOTING ON THE PLAN

**7.1**   **Voting of Claims**.  Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

**7.2**   **Nonconsensual Confirmation**.  If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan in accordance with Article 11 hereof to the extent necessary to obtain entry of a Confirmation Order.

## ARTICLE 8
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1**    <u>Assumption of Executory Contracts and Leases</u>.  The following executory contracts and Leases are "<u>Assumed Contracts</u>" under this Plan.

**8.1.1**    <u>By Order of the Court Prior to the Effective Date</u>.  Any executory contract and Leases which the Debtor was authorized to, and did, assume by order entered in the Case prior to the Effective Date.

**8.1.2**    <u>Upon the Effective Date</u>.  The following executory contracts and Leases are assumed as of the Effective Date pursuant to 365(a) and 1123 of the Bankruptcy Code in accordance with their terms, unless (a) alternative terms are agreed to by the non-Debtor party or parties to such executory contracts or Lease or (b) alternative terms are specified in the Plan:

8.1.2.1    all of the Reorganized Debtor's contracts with its customers;[6]

8.1.2.2    all insurance policies in favor of the Debtor;

8.1.2.3    the Debtor's contract with Leaf Capital Funding LLC for the purchase and/or lease of that certain 2013 GMC Sierra 2500;

8.1.2.4    the Debtor's contract(s) with Navitas Credit Corp. for the purchase and/or lease of that certain Bruker Tracer 5G;

8.1.2.5    the Debtor's purchase and/or lease agreement with Tharp for the lease and purchase of a 2001 Volvo EC290 LC Excavator;

8.1.2.6    the Debtor's sale agreement with Boral Resources, LLC for waste piles;

8.1.2.7    solely to the extent that it is an executory contract, the Debtor's exploration agreement and option to purchase with Tintic Copper & Gold, Inc. for metallic mineral rights;

8.1.2.8    the Debtor's *Large Mine Reclamation Contract for Mining on Federal Public Lands in Utah*, dated May 19, 2019, with the Utah Division of Oil Gas and Mining (the "**DOGM Contract**"); and

8.1.2.9    All executory contracts and unexpired Leases listed on the Schedule of Assumed Contracts, as the same may be amended, modified, or supplemented from time to time in accordance with this Plan, which shall be filed with the Bankruptcy Court and served on all counterparties to the executory

---

[6]  For purposes of this section 8.1.2.1, none of the following persons (or their affiliates) shall be considered to be a "customer" of the Debtor:  Durasonic, Ltd.; BMI Minerals Company; BMC Minerals Company; Brady McCasland, Inc.; and any other person whose contract with the Debtor is identified as a Rejected Contract.

4938-3015-7418, v. 9

contracts and unexpired leases that are identified therein not later than five (5) Business Days before the deadline set by the Bankruptcy Court to vote on the Plan.

**8.1.3** <u>Reclamation Bond Obligations Under DOGM Contract</u>. As listed in the Debtor's schedules, the Debtor has posted a reclamation bond in the amount of $303,000, as required by the DOGM Contract (the "**Reclamation Bond**"). The Reclamation Bond is a cash bond held on deposit at Zions Bank. The Reclamation Bond is not actually an asset of the Estate, except only that it permits the Debtor to operate the Dragon Mine. Stated another way, the Reclamation Bond has "enterprise value" or "going concern value" because it satisfies one of the important conditions necessary for the Debtor to continue in business. Without the Reclamation Bond, the Debtor could not operate the Dragon Mine. But the Reclamation Bond has no "liquidation value." The Debtor shall not use the Reclamation Bond to pay operating expenses or to make distributions to creditors.

**8.1.4** <u>Motion to Assume</u>.  Either before or after the Effective Date, the Debtor may file a motion (a "<u>Motion to Assume</u>") and, subject to notice and opportunity for a hearing, obtain entry of an order pursuant to Section 365 of the Bankruptcy Code and/or this section 8.1 of the Plan authorizing the Debtor to "assume" any executory contract or Lease that is not, and does not become, a Rejected Contract.

**8.2**    **<u>Cure Amounts for Assumed Contracts</u>**.  Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default, as well as any nonmonetary defaults, shall be satisfied, to the extent required under Section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor, as applicable, upon assumption thereof, subject to the conditions provided in this Plan.  The Schedule of Assumed Contracts, a Motion to Assume and/or the Schedule of Cure Amounts may set forth the proposed Cure Amount for any particular executory contract or unexpired Lease.  Unless a different amount is listed, the proposed, reasonable and appropriate Cure Amount for each executory contract and unexpired Lease shall be zero dollars ($0), provided, however, that the Cure Amount for the DOGM Contract shall be $1,500 and shall be paid from the Operations & Litigation Fund on or before the Effective Date.

**8.3**    **<u>Determination of Cure Disputes and Deemed Consent</u>**.  If any counterparty to an executory contract or unexpired lease disputes (a) any Cure Amount, (b) the ability of the Reorganized Debtor to provide adequate assurance of future performance (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, (c) whether a nonmonetary default is required to be cured, or (d) any other matter pertaining to assumption, such counterparty must file an objection with the Bankruptcy Court on or before the date and time scheduled for the hearing on confirmation of the Plan.  Such disputes shall be adjudicated by the Bankruptcy Court prior to the assumption of such executory contracts and unexpired leases becoming effective; provided, however, that the Reorganized Debtor may reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount shall be deemed to have assented to such assumption and to the Cure Amount proposed by the Debtor (and that no

nonmonetary defaults exist or that they need not be cured) and shall be forever barred, estopped, and enjoined from challenging the Cure Amount or the validity of such assumption.

**8.4** **Rejection of Executory Contracts.** Except for Assumed Contracts, any and all executory contracts and unexpired Leases that have not been either assumed or rejected prior to the Effective Date are rejected by the Debtor (the "Rejected Contracts") as of the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code. For the avoidance of doubt, the following executory contracts shall be Rejected Contracts: (a) any and all executory contracts or unexpired leases between the Debtor and BMI Minerals Company, BMC Minerals Company, Brady McCasland, Inc., Richard Fox, Brady McCasland and/or any of their affiliates, including (without limitation, and solely to the extent that they are executory contracts or unexpired leases) (i) the Mining Operations Agreement, (ii) the Milling Operations Agreement, (iii) any ground lease, and (iv) any and all letter agreement(s);  (b) any and all contracts between the Debtor and Durasonic Ltd.; and (c) any and all contracts with Wasatch Solutions LLC.

**8.5** **Rejection Damage Claims**.  If the rejection of an executory contract or unexpired lease by the Debtor or the Reorganized Debtor results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before forty-five (45) days following the later of (a) the Confirmation Date or (b) the effective date of the rejection of such executory contract or unexpired lease.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim timely are filed will be treated as Class 2 General Unsecured Claims subject to the provisions of the Plan.  The Debtor shall have the right to object to any such rejection damage claims filed in accordance with this section.

**8.6** **Reservation of Rights**.

**8.6.1** *No Admission*.  Neither the exclusion nor the inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan, in the Schedule of Assumed Contracts, in the Schedule of Rejected Contracts or in the Schedule of Cure Amounts, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is (or is not) an executory contract, unexpired lease, or true lease, or that the Debtor or the Reorganized Debtor has any liability thereunder.

**8.6.2** *No Waiver.*  Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor or the Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease.

**8.6.3** *No Addition to Duties.*  Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the

Reorganized Debtor under any executory or non-executory contract or unexpired or expired lease.

    **8.6.4** *Right to Alter Treatment.* If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtor or Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**8.7**    **Post-Petition Agreements Unaffected by Plan**. Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that were otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date. The Reorganized Debtor shall be deemed to be substituted for any Debtor in such contract or agreement, as applicable, and the Reorganized Debtor shall have all right, title and interest of the Debtor under such contract or agreement as if the Reorganized Debtor had been the original contracting party thereunder.

## ARTICLE 9
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

**9.1**    **Conditions Precedent to Effectiveness**. The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived:

    **9.1.1** the Confirmation Order, in form and substance acceptable to Halloysite and the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

    **9.1.2** all actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

    **9.1.3** the Court shall have entered orders (or there shall be agreements satisfactory to the Debtor) concerning Claims, any Liens asserted by holders of Claims, and any interests in the Debtor (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtor are required for the feasibility and implementation of the Plan; and

    **9.1.4** the Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

**9.2**    **Failure of Conditions Precedent**. Notwithstanding anything in this Plan to the contrary, the conditions set forth in section 9.1 above must be satisfied or waived on or before December 31, 2025. In the event that the conditions set forth in section 9.1 above are not satisfied or waived on or before said date, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and section 11.1 of the Plan shall apply.

**9.3**      **Waiver of Conditions**.  The Debtor, with the approval of Halloysite, may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in section 9.1 above, except that the Debtor may not waive the condition that the Estate will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date.

## ARTICLE 10
## RETENTION OF JURISDICTION; CASE CLOSURE

**10.1**      **Retention of Jurisdiction**.  After the Effective Date, the Bankruptcy Court shall have original jurisdiction of all matters arising in, arising under or related to the Bankruptcy Case or Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the following specific matters:

**10.1.1** Executory Contracts.  The Court shall retain jurisdiction (a) to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and (b) to hear and determine any and all Claims resulting from the rejection of any executory contract or unexpired lease, and any objections to such Claims.

**10.1.2** Compensation.  The Court shall retain jurisdiction to hear and determine all applications by Professionals and others for compensation and reimbursement of expenses for the period ending on the Effective Date.

**10.1.3** Distributions.  The Court shall retain jurisdiction to ensure that the distributions to holders of Claims are accomplished as provided herein, provided, however, that the Bankruptcy Case may be closed prior to the completion of distributions to holders of Claims.

**10.1.4** Litigation.  The Court shall retain jurisdiction to hear and determine any and all adversary proceedings, applications, contested matters and other litigated matters pending on the Confirmation Date or filed thereafter, including any and all claims that might be filed by the Reorganized Debtor under chapter 5 of the Code or that are otherwise reserved under sections 6.9 and 6.10 of this Plan.

**10.1.5** Determine Claims Arising Post-Confirmation.  The Court shall retain jurisdiction to determine any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein.

**10.1.6** Determination of Claims Relating to Effective Date Transactions.  The Court shall retain jurisdiction to hear and decide any Claims or Litigation that arise under, arise from or relate to the transactions contemplated and approved under this Plan. To the extent that any litigation contemplated by this section is filed in any state or federal court other than the Bankruptcy Court, the Debtor and any other party-in-interest (a) may remove the action as permitted by 28 U.S.C. 1452, and (b) may seek to transfer venue of such action to the Bankruptcy Court in the District of Utah.

**10.1.7** <u>Tax Claims</u>.  The Court shall retain jurisdiction to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

**10.1.8** <u>Objections to Claims</u>.  The Court shall retain jurisdiction (a) to hear and determine any objections to Claims filed both before and after the Confirmation Date, (b) to allow or disallow any Claim in whole or in part, (c) to decide any controversies as to the classification of any Claims and/or (d) to estimate any Disputed Claim.

**10.1.9** <u>Stay or Reversal of Confirmation</u>.  The Court shall retain jurisdiction to enter and implement such orders as may be appropriate in the event Confirmation of the Plan is for any reason stayed, reversed, revoked, modified or vacated.

**10.1.10**  <u>Plan Modification</u>.  The Court shall retain jurisdiction to hear applications, if any, to modify the Plan in accordance with § 1127 of the Bankruptcy Code.  After Confirmation of the Plan, the Reorganized Debtor may also, so long as it does not adversely affect the interests of creditors, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Order of Confirmation, in such manner as may be necessary to carry out the purpose and effect of the Plan.

**10.1.11** <u>Plan Disputes</u>.  The Court shall retain jurisdiction to hear and determine disputes arising in connection with the Plan or its implementation, including without limitation disputes relating to the execution of agreements, documents or instruments required to be executed pursuant to the terms of the Plan, or arising under or relating to the interpretation of agreements, documents or instruments executed in connection with the Plan.

**10.1.12** <u>Plan Implementation</u>.  The Court shall retain jurisdiction to construe and to take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan.

**10.1.13** <u>Enforce Plan Injunction</u>.  The Court shall retain jurisdiction to enforce the releases, exculpatory provisions and/or injunctions described or provided under this Plan including, without limitation, those described or summarized under Article 12. Among other things, the Court shall retain jurisdiction to enter temporary restraining orders, preliminary injunctions, permanent injunctions, contempt sanctions and other appropriate orders and remedies, including to stay and prevent litigation filed or pending before another court or tribunal.

**10.1.14** <u>Plan Corrections</u>.  The Court shall retain jurisdiction to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan.

**10.1.15** <u>Creditors' Disputes</u>.  The Court shall retain jurisdiction to take any action to resolve any disputes arising out of or relating to any Claim, to hear and determine

other issues presented by or arising under the Plan, and to take any action to resolve any disputes of Creditors with respect to their Claims.

**10.1.16** <u>Other Matters</u>.  The Court shall retain jurisdiction to determine such other matters and for such other purposes as may be provided in the Order of Confirmation or that are not inconsistent with chapter 11 of the Bankruptcy Code.

**10.2** **<u>Exclusive Jurisdiction.</u>**  The retention of jurisdiction provided for in this Plan shall be exclusive with respect to all matters set forth in section 10.1 hereof so as to preserve for the Reorganized Debtor the benefits of the Plan, subject to the Court's power under Section 305 of the Bankruptcy Code or 28 U.S.C. § 1334(c) to abstain as to all or part of any proceeding.

**10.3** **<u>Effectuating Orders.</u>**  The Bankruptcy Court shall enter all judgments, partial judgments, and Orders necessary to effectuate or enforce the Plan, any term therein or as reasonably requested by any party intended as a direct beneficiary of a material provision of the Plan.  Such Orders and decrees may include a permanent injunction effectuating all actions, releases, assignments, transfers and waivers required by the Plan.

**10.4** **<u>Closure of the Case.</u>**

**10.4.1** <u>Closing the Bankruptcy Case</u>.  As soon as the Debtor determines that there is no further need for administration of the Case by the Bankruptcy Court, the Bankruptcy Case shall be closed pursuant to 11 U.S.C. § 350(a), Bankruptcy Rule 3022 and Local Rule 3022-1. Subject to the Bankruptcy Court's discretion, the Bankruptcy Case may be closed notwithstanding that adversary proceedings related to the Case may be, and remain, pending.

**10.4.2** <u>Post-Confirmation Payments to United States Trustee</u>.  Until entry of an Order closing, dismissing or converting the Bankruptcy Case, any quarterly payments due to the office of the United States Trustee after the Effective Date of the Plan shall be paid in accordance with 28 U.S.C. § 1930(a)(6) by the Reorganized Debtor. No quarterly payments shall come due or be required after the Bankruptcy Case is closed.

**10.4.3** <u>Reopening Case</u>.  At any time, the Reorganized Debtor may obtain entry of an order reopening the Bankruptcy Case to obtain any relief or order from the Bankruptcy Court consistent with 11 U.S.C. § 350(b) and/or this Plan, including section 10.1 hereof.  The Reorganized Debtor may seek such relief on an *ex parte* basis.

**ARTICLE 11**
**MODIFICATION OF THE PLAN**

**11.1** **<u>Revocation or Withdrawal of the Plan</u>**.  The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or

against the Estate or any other Person or to prejudice in any manner the rights of the Debtor, or any Person in any further proceedings involving the Estate.

**11.2 Amendments to Plan Before Confirmation.** With the approval of Halloysite, the Debtor may alter, amend or modify the Plan at any time before the Plan is confirmed and becomes effective.

**11.3 Savings Clause; Reformation; Severability.** Subject to section 11.5 of this Plan and Section 1127 of the Bankruptcy Code, if any provision of this Plan is found to be invalid or unenforceable for any reason, such provision shall be construed and/or reformulated by the Court in such a way as to make it valid and enforceable to the maximum extent permitted by the Bankruptcy Code and other applicable law, and the Plan shall be confirmed as so modified and reformed. Any provision of this Plan which the Court determines is prohibited or unenforceable under the Bankruptcy Code, Bankruptcy Rules or other applicable law shall not affect or render invalid or unenforceable any other provisions of Plan. Specifically, to the extent a particular provision, term or condition of this Plan would prevent confirmation, the Court (with the consent of the Debtor) may strike such provision and may confirm the Plan as modified, with such term, condition or provision omitted, excluded or otherwise modified.

**11.4 Amendments After Confirmation.** Subject only to the applicable requirements of the Bankruptcy Code, the Debtor, with the approval of Halloysite, may alter, amend or modify the Plan at any time after the Confirmation Date.

**11.5 Effect on Acceptance Requirements.** A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (a) such Person fails timely to object to the proposed alteration, amendment or modification, or (b) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtor may correct any defect or omission in this Plan and any exhibit hereto without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

**11.6 Effect of Modification.** Every modification of the Plan will supersede all previous versions of the Plan when such modification becomes effective. Previous superseded versions of the Plan will be deemed to be in the nature of a withdrawn or rejected settlement proposal, and will be of no evidentiary or substantive effect for any purpose whatsoever.

# ARTICLE 12
# STAYS, INJUNCTIONS AND RELEASES

**12.1 Continuation of Injunctions or Stays until Effective Date**. All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Further, unless the Plan provides otherwise, any injunctions or stays ordered by the Bankruptcy Court shall continue in effect through and after the Effective Date.

**12.2**   **Injunction Relating to the Plan**.  As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor, its Estate, or the Reorganized Debtor on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan.  Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Further, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against the Reorganized Debtor or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

**12.3**   **Broad Injunction.**  The intent of sections 12.2 and 12.3 is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtor to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction.  The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against Reorganized Debtor with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation: (i) that the Debtor breached any contract, with, or any duty or obligation to the creditor; (ii) that the Debtor was the alter ego or instrumentality of another Person; (iii) that the Debtor made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtor is liable for any act or omission.

**12.4**   **Subrogation Rights of Guarantors**.  To the extent that any holder of any Allowed Claim receives a payment, voluntary or involuntary, from any guarantor, co-obligor, or co-debtor of an obligation of the Debtor (collectively, a "guarantor"), in any amount, such guarantor shall be subrogated in all respects as to such creditor's Allowed Claim against the Debtor (whether secured or unsecured), subject to the provisions of Section 509 of the Bankruptcy Code. For purposes of Section 509(b)(2), a guarantor of any Claim against the Debtor shall be deemed—as between the Debtor and the guarantor—to have not received the consideration for the Claim held by the holder of any Claim.

**12.5**   **Exculpation.**  The Exculpated Parties will neither have nor incur any liability to any person or entity for any Official Actions, provided, however, that the foregoing shall not exonerate any of the Exculpated Parties from any liability that results from an act or omission to

the extent such act or omission is determined by Final Order to have constituted professional malpractice, gross negligence or willful misconduct, and provided further that the foregoing limitation shall not apply to retained counsel to the extent that Rule 1.8(h)(1) of the Utah Rules of Professional Conduct applies. In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any Official Actions of such Exculpated Party, except for: (a) the liability of any Exculpated Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Exculpated Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted professional malpractice, gross negligence or willful misconduct, and (c) actions taken by Exculpated Parties who are holders of a Claim and are taking actions in pursuit of their allowance or payment of such Claim. The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

   **12.5.1**  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the bankruptcy court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person or entity.

   **12.5.2**  If any provision of Section 12.5 of this Plan is determined by the Bankruptcy Court to be invalid, illegal, or unenforceable under applicable law, such provision shall be modified or reformed to the minimum extent necessary to make it enforceable, and the remaining provisions of the exculpation clause (and the clause as so modified or reformed) shall remain in full force and effect to the maximum extent permitted by law.

   **12.6**   **Release of Claims.**  Except as contemplated by the Plan, the rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtor or the Reorganized Debtor and acceptance of such distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor.  Persons deemed to have released claims pursuant to this paragraph shall be forever precluded from asserting against the Debtor, the Reorganized Debtor or their respective assets any Claim, including any Claim of the type released or deemed released herein.

   **12.7**   **Setoffs**.  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

## ARTICLE 13
## DEFAULT AND REMEDIES

**13.1    Default of Plan; Notice Required.**  In the event of any material default of the provisions of this Plan, a creditor or party in interest aggrieved by such default may provide written notice to the Reorganized Debtor (a "Default Notice").  The Default Notice must describe with specificity the nature of the default alleged and the steps required of the Debtor to cure such default.

**13.2    Opportunity to Cure.**  Except only to the extent a different notice and cure period is specified as to a particular Class under this Plan (including under a stipulation incorporated as part of this Plan), the Reorganized Debtor shall have thirty (30) days after receipt of a written Default Notice to cure such default.  Except only to the extent otherwise specifically provided under this Plan (including under a stipulation incorporated as part of this Plan), the aggrieved Person shall take no further action until at least thirty (30) days have passed and the Debtor has not cured or substantially complied with the Default Notice.  Even after the thirty (30) day period has expired, the Reorganized Debtor may cure a default at any time, even after an application or motion has been filed by an aggrieved party.

**13.3    Remedies in the Event of Default.**

**13.3.1**  Application to Compel Compliance.  If a material default has occurred and the Reorganized Debtor does not cure such default within thirty (30) days after receipt of a Default Notice, a creditor or party in interest aggrieved by such a material default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan.  Such application must be accompanied by an affidavit or sworn declaration specifying the default, the applicant's compliance with the notice requirements, and the Reorganized Debtor's failure to cure the same as required herein.

**13.3.2**  Service of Application.  The application must be served upon (a) the Debtor, (b) Debtor's counsel, and (c) the United States Trustee.

**13.3.3**  Determination and Relief by Bankruptcy Court.  The Bankruptcy Court, after notice and a hearing, shall determine whether a default occurred, whether it was and is material, and if a material default occurred, whether such default has been cured.  If the Court determines that a material default has occurred and has not been cured, the Court shall determine an appropriate remedy in light of the applicable default, including an order compelling compliance with the pertinent provisions of the Plan.  In determining an appropriate remedy, the Court should consider and impose the least severe remedy that will appropriately compensate the aggrieved party or address the default.  Neither the section nor any other provision of this Plan, however, shall be construed to provide a creditor or other Person with the right to recover attorneys' fees from the Debtor, in the event of a material default or otherwise.

## ARTICLE 14
## MISCELLANEOUS

**14.1** <u>Severability</u>. If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtor, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

**14.2** <u>Binding Effect</u>. The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person. Pursuant to 11 U.S.C. § 1141(a), the provisions of this Plan bind the Reorganized Debtor, any Person issuing securities under the Plan, any Person acquiring property or receiving distributions under the Plan, the counter-parties to any executory contracts or unexpired leases with the Debtor, any and all creditors or Equity Interest holders of the Debtor, and any and all other Persons referred to or contemplated in this Plan, whether or not the Lien, Claim, Equity Interest or other right of such Person is impaired under the Plan and whether or not such Person has accepted the Plan. To the extent the Bankruptcy Case is converted to chapter 7 or the Reorganized Debtor files a future bankruptcy case, the Claims, Liens, Equity Interests and rights of creditors and other Persons, as determined and modified by this Plan, shall be final and shall determine the allowed amounts of such claims and interests in the subsequent chapter 7 case or future bankruptcy case.

**14.3** <u>Further Assurances</u>. Each Person receiving any payment or other benefit under the Plan, including any holder of any Allowed Claim or Equity Interest, shall execute such documents and shall take such other actions (or omit to take actions) as may be necessary or reasonable in order to effectuate the Plan.

**14.4** <u>Notices</u>. Except as otherwise provided herein, all notices, requests and demands to or upon the Debtor shall only be effective if in writing and delivered, via registered mail or hand-delivery, to the Debtor and its counsel addressed as follows:

<u>If to the Debtor</u>:

> APPLIED MINERALS, INC
> Attn: Christopher T. Carney
> 1200 Silver City Road
> P.O. Box 432
> Eureka, UT 84628
> E-Mail: ccarney@appliedminerals.com

<u>with a copy to</u>:

        Matthew M. Boley
        Jeffrey Trousdale
        COHNE KINGHORN, P.C.
        111 East Broadway, Suite 1100
        Salt Lake City, UT  84111
        E-Mail: mboley@ck.law and jtrousdale@ck.law

<u>If to the Halloysite</u>:

        HALLOYSITE INVESTMENT, LLC
        Attn: Geoffrey G. Scott
        26320 Daniel
        Chapel Hill, NC, 27517
        E-Mail: geoffscott100@gmail.com

<u>with a copy to</u>:

        Ellen E. Ostrow
        Geoffrey S. Goodman
        FOLEY & LARDNER LLP
        95 S State Street, Suite 2500
        Salt Lake City, UT 84111
        E-Mail: eostrow@foley.com and ggoodman@foley.com

Notice shall be deemed to have been duly given or made when actually delivered to or received by the Debtor.

    **14.5**   **Governing Law**.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, construed and enforced in accordance with, the laws of the State of Utah, without giving effect to the principles of conflicts of law of such jurisdiction.

    **14.6**   **Post-Confirmation Fees, Final Decree**.  The Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. § 1930 and the filing of required post-confirmation reports, until a final decree and/or Order closing the Bankruptcy Case is entered.

4938-3015-7418, v. 9

**14.7**    **Inconsistency**.  In the event of any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern.

DATED this 16th day of October, 2025.

APPLIED MINERALS, INC.

By /s/ Christopher T. Carney
    Christopher T. Carney
    President and Chief Executive Officer

HALLOYSITE INVESTMENT, LLC

By /s/ Geoffrey G. Scott
    Geoffrey G. Scott
    Manager and/or Member-Manager

COHNE KINGHORN, P.C.

/s/ Matthew M. Boley
Matthew M. Boley
Jeffrey Trousdale
*Attorneys for* debtor-in-possession
APPLIED MINERALS, INC.

FOLEY & LARDNER LLP

/s/ Ellen E. Ostrow
Ellen E. Ostrow
Geoffrey S. Goodman
*Attorneys for* secured and super-priority creditor
HALLOYSITE INVESTMENT, LLC

**SCHEDULE 4.2.4**

**(Notice of Exercise of Option)**

# APPLIED MINERALS, INC.
# NOTICE OF EXERCISE OF CLASS 2 OPTION

[Name]

[Address]

[Date]

Attn: Halloysite Investment, LLC

RE: Notice of Exercise of Class 2 Option


Applied Minerals, Inc.:

In accordance with the terms and definitions of that certain Joint Plan of Reorganization dated May 27, 2025 (the "Plan"), this letter shall constitute written notice of election to exercise the Class 2 Put Option granted pursuant to Section 4.2.4.3 of the Plan.

Signatory, as signed below, wishes to sell [Number of Shares], creating a total net purchase price of [$Total] (the "Put Option Purchase Price"). Halloysite Investment, LLC shall pay the Put Option Purchase Price to Signatory in immediately available funds within one (1) month's receipt of this notice, in accordance with the following wire transfer instructions:

Bank Name:

Bank Address:

ABA Number:

Account Name:

Account Number:

I understand that this notice must be delivered to Halloysite Investment, LLC in accordance with Section 4.2.4.3.1 of the Plan to constitute valid notice.

Sincerely,

SIGNATORY:

Entity (if applicable: _____

Name:_____

Signature:_____

**SCHEDULE 4.2.6**

**(Notice of Election of Supplemental Distribution Option )**

# APPLIED MINERALS, INC.
# NOTICE OF ELECTION OF CLASS 2 SUPPLMENTAL DISTRIBUTION OPTION

[Name]

[Address]

[Date]

Attn: Halloysite Investment, LLC and Applied Minerals, Inc.

RE: Notice of Election of Class 2 Supplemental Distribution Option


Applied Minerals, Inc.:

In accordance with the terms and definitions of that certain Joint Plan of Reorganization dated October 6, 2025 (the "Plan"), this letter shall constitute written notice of election of the Class 2 Supplemental Distribution Options granted pursuant to Section 4.2.4 of the Plan. **You are advised to review Section 4.2 (including all subsections) carefully before making this election.**

Signatory, as signed below, makes the following election on behalf of the Holder of the Class 2 Claim (only select one of the following):

☐   Holder elects to receive its pro rata share of New Stock as part of the Class 2 Stock Distribution under the Class 2 Supplemental Distribution Option.

☐   Holder elects to receive its pro rata share of the additional cash distribution up to $600,000.00 as part of the Class 2 Supplemental Distribution Option in lieu of receiving any New Stock.

Holder understands that each holder of an Allowed Class 2 Claim that elects to receive a distribution of New Stock under the Class 2 Supplemental Distribution Option shall have the right (the "Class 2 Put Option"), exercisable by written notice delivered to Halloysite during the Put Option Exercise Period, to require Halloysite to purchase all, but not less than all, of the New Stock that such holder of an Allowed Class 2 Claim receives as its pro rata share of the Class 2 Stock Distribution at a price of Eight Dollars ($8) per share (the "Put Option Purchase Price") of New Stock. If the Class 2 Put Option is timely exercised by the holder of an Allowed Class 2 Claim, then on the Put Option Purchase Date (i.e., the three year anniversary of the Effective Date, or the next business day) Halloysite shall pay to such holder the Put Option Purchase Price for the shares of New Stock distributed to and held by such holder

If Holder elects to receive its pro rata share of the additional cash distribution up to $600,000.00 as part of the Class 2 Supplemental Distribution Option, payment to Holder shall be made by regular check, provided, however, that if Holder prefers to be paid by wire transfer, Holder instructs Halloysite Investment, LLC to pay in accordance with the following wire transfer instructions:

Bank Name:

Bank Address:

ABA Number:

Account Name:

Account Number:

I understand that this notice must be delivered to each and all of (w) Applied Minerals, Inc. c/o Christopher T. Carney, President, at ccarney@appliedminerals.com, (x) counsel for the Reorganized Debtor at mboley@ck.law and jtrousdale@ck.law, (y) Halloysite Investment, LLC, c/o Geoffrey G. Scott, at geoffscott100@gmail.com, and (z) counsel for Halloysite at eostrow@foley.com and ggoodman@foley.com in accordance with Section 4.2.6 of the Plan to constitute valid notice.

Sincerely,

SIGNATORY:

Entity (if applicable: _____

Name:_____

Signature:_____

Title:_____

2

**SCHEDULE 5.9.1**

**(Amended and Restated Certificate of Incorporation and Bylaws)**

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF APPLIED MINERALS, INC.**

Applied Minerals, Inc., a Delaware corporation, hereby certifies as follows.

The name of the corporation is Applied Minerals, Inc. The corporation was formed by merger on September 9, 2009 as Atlas Mining Sub, Inc. and it and its name was changed to Applied Minerals, Inc. on October 30, 2009.

The Restated Certificate of Incorporation of the corporation amends and restates in its entirety the prior article(s) of incorporation and/or certificate(s) of incorporation, as heretofore amended and/or restated, has been duly adopted by the corporation's Board of Directors and by the stockholders in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware.

**FIRST:** The name of the Corporation is and shall be Applied Minerals, Inc. (hereinafter in this Certificate of Incorporation called the "Corporation").

**SECOND:** The name and post office address of the registered agent of the Corporation in the State of Delaware is National Registered Agents, Inc., 160 Greentree Drive, Suite 101, in the City of Dover, County of Kent, Delaware, 19904

**THIRD:** The nature of the business, or objects or purposes to be transacted, promoted or carried on are as follows:

To engage in, conduct, perform or participate in every kind of commercial, agricultural, mercantile, manufacturing, mining, transportation, industrial or other enterprise, business, work, contract, undertaking, venture or operation.

To buy, sell, manufacture, refine, import, export and deal in all products, goods, wares, merchandise, substances, apparatus, and property of every kind, nature and description, and to construct, maintain, and alter any buildings, works or mines.

To enter into, make and perform contracts of every kind with any person, firm or corporation.

To do all and everything necessary, suitable, convenient or proper for the accomplishment of any of the purposes or the attainment of one or more of the objects herein enumerated, or of the powers herein named, or which shall at any time appear conducive to or expedient for the protection, or benefit of the Corporation, either as holder of, or interested in, any property or otherwise, to the same extent as natural persons might or could do, in any part of the world.

To conduct any of its business in the State of Delaware and elsewhere, including in the term "elsewhere" any of the states, districts, territories, colonies or dependencies of the United States, and in any and all foreign countries and to have one or more offices, and to hold, purchase, mortgage and convey real and personal property, without limit as to amount, within or (except as and when forbidden by local laws) without the State of Delaware.

4916-5863-9175, v. 2

To carry on any other business to any extent and in any manner not prohibited by the laws of Delaware or, where the Corporation may seek to do such business elsewhere, by local laws.

The foregoing clauses shall be construed both as objects and powers, but no recitation or declaration of specific or special objects or powers herein enumerated shall be deemed to be exclusive; but in each and every instance it is hereby expressly declared that all other powers, not inconsistent therewith, now or hereafter permitted or granted under the laws of Delaware, or by the laws of any other state or country into which the Corporation may go or seek to do business, are hereby expressly included as if such other or general powers were herein set forth.

## FOURTH:

### A. Authorized Shares and Classes of Stock.

The total number of shares and classes of stock that the Company shall have authority to issue is Three Hundred Thousand (300,000) shares of Common Stock, which shall be in a single class, par value of Ten Dollars ($10.00) per share.

### B. Limitations, Relative Rights and Powers in Respect of Shares of Common Stock.

(1) The holders of Common Stock shall be entitled to receive such dividends as may be declared from time to time by the Board of Directors.

(2) In the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding-up of the Corporation, the holders of the Common Stock shall be entitled to receive all the remaining assets of the Corporation of whatever kind available for the distribution to stockholders ratably in proportion to the number of shares of Common Stock held by them respectively.

(3) Except as may be otherwise required by law or by this Certificate of Incorporation, each holder of Common Stock shall have one vote in respect of each share of stock held by him on all matters voted upon by the stockholders.

### D. Other Provisions.

(4) No holder of stock of any class of the Corporation shall be entitled as of right to purchase or subscribe for any part of any unissued stock of any class, or of any additional stock of any class of Capital Stock of the Corporation, or to any bonds, certificates of indebtedness, debentures, or other securities convertible into stock of the Corporation, now or hereafter authorized, but any such stock or other securities convertible into stock may be issued and disposed of pursuant to resolution by the Board of Directors to such persons, firms, corporations or associations and upon such terms and for such consideration as the Board of Directors in the exercise of its discretion may determine and as may be permitted by law. Any and all shares of stock so issued for which the consideration so fixed has been paid or delivered to the Corporation shall be fully paid and not liable to any further call.

(5) In no case shall fractions of shares of any class of stock be issued by the Corporation, but in lieu thereof the Corporation shall, at its option, make a cash adjustment or issue fractional Scrip

4916-5863-9175, v. 2

Certificates, in such form and in such denominations as shall from time to time be determined by the Board of Directors. Such Scrip Certificates shall be exchangeable on or before such date or dates as the Board of Directors may determine, when surrendered with other similar Scrip Certificates in sufficient aggregate amounts, for certificates for fully paid and non-assessable full shares of the respective stocks for which such Scrip Certificates are exchangeable, and new Scrip Certificates of a like tenor for the remaining fraction of a share, if any. Such Scrip Certificates shall not entitle any holder thereof to voting rights, dividend rights or any other rights of a stockholder or any rights other than the rights therein set forth, and no dividend or interest shall be payable or shall accrue with respect to Scrip Certificates or the interests represented thereby. All such Scrip Certificates which are not surrendered in exchange for shares of stock on or before their respective expiration dates shall thereafter be void and of no effect whatever.

**FIFTH:** The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and it is expressly provided that the same are intended to be in furtherance and not in limitation or exclusion of the powers conferred by statute:

(1) The number of directors shall be as described in the Corporation's Bylaws.  If not specified in the Bylaws, the number of directors shall be fixed from time to time solely by resolution of the Board of Directors, acting by not less than a majority of the directors then in office.

(2) Election of directors need not be by ballot unless the Bylaws so provide.

(3) The Board of Directors shall have power to determine from time to time whether and if allowed under what conditions an regulations the accounts, and except as otherwise provided by statute or by this Certificate of Incorporation, the books of the Corporation shall be open to the inspection of the shareholders, and the shareholders' rights in this respect are and shal be restricted or limited accordingly, and no shareholder shall have any right to inspect any account or book or document o the Corporation except as conferred by statute or by this Certificate of Incorporation, or authorized by the Board of Directors or by a resolution of the shareholders.

(4) The Board of Directors shall have the power to adopt, amend or repeal the Bylaws of the Corporation.

(5) Except as may be otherwise provided by statute or in this Certificate of Incorporation, the business and affairs of this Corporation shall be managed under the direction of the Board of Directors.

(6) No director shall be personally liable to the Corporation or its stockholders for any monetary damages for breaches of fiduciary duty as a director; provided that this provision shall not eliminate or limit the liability of a director, to the extent that such liability is imposed by applicable law, (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation o law; (iii) under Section 174 or successor provisions of the Delaware General Corporation Law; or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this provision shall apply to or have any effect on the liability or alleged liability of any director for or with respect to any acts or

Page **3** of 7

omissions of such director occurring prior to such amendment or repeal. If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.

**SIXTH:**

(1) Any action required or permitted to be taken at any annual or special meeting of stockholders may be taken without a meeting by the written consent of the stockholders of the Corporation, but only if such action is taken in accordance with the provisions of this Article Sixth and the Corporation's By-Laws.

(2) The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting shall be as fixed by the Board of Directors or as otherwise established under this Article.

(3) Any person other than the Corporation seeking to have the stockholders authorize or take corporate action by written consent without a meeting shall, by written notice addressed to the secretary of the Corporation and delivered to the Corporation and signed by the holders of record of no less than thirty percent (30%) of the Capital Stock of the Corporation entitled to express consent on the relevant action, request that a record date be fixed for such purpose ("Record Date Request"). The written notice must contain the information required by the By-Laws with respect to the business and/or nominations that are the subject of the proposed action. Following receipt of the notice, the Board of Directors shall promptly, but in all events within ten (10) business days after the date the notice is received, determine the validity of the request and whether the request relates to an action that may be taken by written consent pursuant to this Article and, if appropriate, adopt a resolution fixing the record date for such purpose. The record date for such purpose shall be no more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors and shall not precede the date such resolution is adopted. If no record date has been fixed by the Board of Directors within ten (10) business days following the Corporation's receipt of the notice to fix a record date for such purpose, the record date shall be the day on which the first signed written consent is delivered to the Corporation in the manner described in paragraph 7 of this Article; except that, if prior action by the Board of Directors is required under the provisions of Delaware law and the Board determines to take such prior action, the record date shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action, and except that no record date shall be set for any action that is not a proper subject for action by written consent pursuant to paragraph 4 of this Article or for which consents are not to be solicited as provided in paragraph 5 of this Article.

(4) The Board of Directors shall not be obligated to set a record date for an action by written consent if

(i) the Record Date Request does not comply with this Article Sixth and the Corporation's By-Laws,

4916-5863-9175, v. 2

(ii) such action is not a proper subject for stockholder action under applicable law,

(iii) the request for a record date for such action is received by the Corporation during the period commencing ninety (90) days prior to the first anniversary of the date of the immediately preceding annual meeting and ending on the date of the current year annual meeting or the period from the time notice of any special meeting is first given to shareholders and ending on the date of such meeting,

(iv) an annual or special meeting of stockholders was held not more than thirty (30) days before such request for a record date was received by the secretary of the Corporation,

(v) an item of business substantially the same as or substantially similar to such action ("Similar Item") is to be included in the Corporation's notice as an item of business to be brought before a meeting of the stockholders that is to be called within fifteen (15) days after the request for a record date is received and held as soon as practicable thereafter, or

(vi) such record date request or any solicitation of consents to such action was made in a manner that involved a violation of applicable law. For purposes of this, the nomination, election or removal of directors shall be deemed to be a Similar Item with respect to all actions involving the nomination, election or removal of directors, changing the size of the Board of Directors or filling of vacancies and/or newly created directorships resulting from any increase in the authorized number of directors. The Board of Directors shall determine in good faith whether a record date is required to be set under the provisions of this Article Sixth.

(5) Every written consent purporting to take or authorize the taking of corporate action (each such written consent is referred to in this paragraph and in paragraph 7 as a "Consent") must bear the date of signature of each stockholder who signs the Consent, and no Consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated Consent delivered in the manner required by paragraph 7 of this Article and not later than one hundred twenty (120) days after the record date, Consents signed by a sufficient number of stockholders to take such action are so delivered to the Corporation.

(6) No Consents may be effective until twenty (20) days after the record date. Consents must be delivered to the Corporation by delivery to its registered office in the State of Delaware or its principal place of business or to an agent designated by the Corporation. Delivery must be made by hand or by certified or registered mail, return receipt requested.

**SEVENTH:** In or about the year 2025, the Corporation reorganized under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the bankruptcy case styled In re Applied Minerals, Inc., Case No. 24-25849 (the "Bankruptcy Case") filed in the United States Bankruptcy Court for the District of Utah.  As part of its chapter 11 reorganization, the Debtor confirmed a plan a reorganization (the "Confirmed Plan"), which was approved, confirmed and adopted pursuant to an order of the Bankruptcy Court confirming the Plan (the "Confirmation Order"). The terms and conditions of the Confirmed Plan and the Confirmation Order are incorporated herein by reference.  To the extent of any inconsistency between this certificate of incorporation, on the

4916-5863-9175, v. 2

one hand, and the Confirmed Plan and/or the Confirmation Order, on the other hand, the terms of the Confirmed Plan and the Confirmation Order shall control.

**EIGHTH:** The Corporation expressly elects to be governed by Section 203 of the Delaware General Corporation Law.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this corporation has caused this Amended and Restated Certificate of Incorporation to be signed by its duly authorized officer and the foregoing facts stated herein are true and correct.

**The Company:**


Applied Minerals, a Delaware corporation


By: _____
   Christopher T. Carney, President

Date:_____

**AMENDED AND RESTATED**

**BYLAWS**

of

**APPLIED MINERALS, INC.**

dated as of

_____, 2025

# AMENDED AND RESTATED BYLAWS

## of

## APPLIED MINERALS, INC.

## ARTICLE I
## OFFICES

**Section 1.01   Offices.** The address of the registered office of Applied Minerals, Inc. (hereinafter called the **"Corporation"**) in the State of Delaware shall be at 1209 Orange Street, Wilmington, Delaware 19801. The Corporation may have other offices, both within and without the State of Delaware, as the board of directors of the Corporation (the **"Board of Directors"**) from time to time shall determine or the business of the Corporation may require.

**Section 1.02   Books and Records.** Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be maintained on any information storage device or method; *provided that* the records so kept can be converted into clearly legible paper form within a reasonable time.  The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law.

## ARTICLE II
## MEETINGS OF THE STOCKHOLDERS

**Section 2.01   Place of Meetings.** All meetings of the stockholders shall be held at such place, if any, either within or without the State of Delaware, as shall be designated from time to time by resolution of the Board of Directors and stated in the notice of meeting.

**Section 2.02   Annual Meeting.** The annual meeting of the stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held at such date, time and place, if any, as shall be determined by the Board of Directors and stated in the notice of the meeting.

**Section 2.03   Special Meetings.** Special meetings of stockholders for any purpose or purposes shall be called pursuant to a resolution approved by the Board of Directors and may not be called by any other person or persons. The only business which may be conducted at a special meeting shall be the matter or matters set forth in the notice of such meeting.

**Section 2.04   Adjournments.** Any meeting of the stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time, place, if any, thereof and the means of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date is fixed for stockholders entitled to vote at

1

the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

Section 2.05   **Notice of Meetings.** Notice of the place, if any, date, hour, the record date for determining the stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and means of remote communication, if any, of every meeting of stockholders shall be given by the Corporation not less than ten days nor more than 60 days before the meeting (unless a different time is specified by law) to every stockholder entitled to vote at the meeting as of the record date for determining the stockholders entitled to notice of the meeting. Notices of special meetings shall also specify the purpose or purposes for which the meeting has been called. Except as otherwise provided herein or permitted by applicable law, notice to stockholders shall be in writing and delivered personally or mailed to the stockholders at their address appearing on the books of the Corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, notice of meetings may be given to stockholders by means of electronic transmission in accordance with applicable law. Notice of any meeting need not be given to any stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

Section 2.06   **List of Stockholders.** The officer of the Corporation who has charge of the stock ledger shall prepare a complete list of the stockholders entitled to vote at any meeting of stockholders (provided, however, if the record date for determining the stockholders entitled to vote is less than ten days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares of each class of capital stock of the Corporation registered in the name of each stockholder at least ten days before any meeting of the stockholders. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network if the information required to gain access to such list was provided with the notice of the meeting or during ordinary business hours, at the principal place of business of the Corporation for a period of at least ten days before the meeting. If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting the whole time thereof and may be inspected by any stockholder who is present. If the meeting is held solely by means of remote communication, the list shall also be open for inspection by any stockholder during the whole time of the meeting as provided by applicable law. Except as provided by applicable law, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

Section 2.07   **Quorum.** Unless otherwise required by law, the Corporation's Certificate of Incorporation (the "**Certificate of Incorporation**") or these by-laws, at each meeting of the stockholders, a majority in voting power of the shares of the Corporation entitled to vote at the

2

meeting, present in person or represented by proxy, shall constitute a quorum. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power, by the affirmative vote of a majority in voting power thereof, to adjourn the meeting from time to time, in the manner provided in Section 2.04, until a quorum shall be present or represented. A quorum, once established, shall not be broken by the subsequent withdrawal of enough votes to leave less than a quorum. At any such adjourned meeting at which there is a quorum, any business may be transacted that might have been transacted at the meeting originally called.

Section 2.08   **Conduct of Meetings.** The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of the stockholders as it shall deem appropriate. At every meeting of the stockholders, the President, or in his or her absence or inability to act, the Chief Executive Officer, or, in his or her absence or inability to act, the person whom the President shall appoint, shall act as chairman of, and preside at, the meeting. The secretary or, in his or her absence or inability to act, the person whom the chairman of the meeting shall appoint secretary of the meeting, shall act as secretary of the meeting and keep the minutes thereof. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (c) rules and procedures for maintaining order at the meeting and the safety of those present; (d) limitations on attendance at or participation in the meeting to stockholders of record of the corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (e) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (f) limitations on the time allotted to questions or comments by participants.

Section 2.09   **Voting; Proxies.** Unless otherwise required by law, and except as may be set forth in the the Certificate of Incorporation or these by-laws, any matter, other than the election of directors, brought before any meeting of stockholders shall be decided by the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the matter. Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot.

Section 2.10   **Inspectors at Meetings of Stockholders.** The Board of Directors, in advance of any meeting of stockholders, may, and shall if required by law, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting or any adjournment

3

thereof and make a written report thereof. The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting, the existence of a quorum and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties. Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a stockholder shall determine otherwise. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for office at an election may serve as an inspector at such election.

**Section 2.11   Fixing the Record Date.**

(a)     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 60 nor less than ten days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,* that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote therewith at the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a

4

record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting: (i) when no prior action by the Board of Directors is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery (by hand, or by certified or registered mail, return receipt requested) to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded and (ii) if prior action by the Board of Directors is required by law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

## ARTICLE III
## BOARD OF DIRECTORS

**Section 3.01   General Powers.** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The Board of Directors may adopt such rules and procedures, not inconsistent with the Certificate of Incorporation, these by-laws, or applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

**Section 3.02   Number; Term of Office.** The number of directors shall be no fewer than one (1) and no more than five (5). For so long as Halloysite Investment, LLC, as the initial "**Founder Stockholder**," owns at least 5% of the issued and outstanding shares of the Corporation, the Founder Stockholder shall have the exclusive right to designate a "**Founder Director**," who shall have the exclusive right to appoint or remove any other directors. If the Founder Stockholder ceases to own at least 5% of the issued and outstanding shares of the Corporation, the Founder Director position shall automatically terminate, and the stockholders shall thereafter elect directors by a majority in voting power of the shares of the Corporation. Each director shall hold office until a successor is duly elected and qualified or until the director's earlier death, resignation, disqualification or removal.

4924-9520-6215, v. 1

**Section 3.03    Newly Created Directorships and Vacancies.** Any newly created directorships or vacancies on the Board shall be filled by the Founder Director. If the Founder Stockholder ceases to own at least 5% of the issued and outstanding shares of the Corporation, the Founder Director position shall automatically terminate, and any vacancies occurring thereafter shall be filled by the affirmative vote of a majority in voting power of the shares of the Corporation. A director so elected shall hold office until the earlier of the expiration fo the term of office of the director whom he or she has replaced, a successor is duly elected and qualified, or such director's death, resignation, disqualification, or removal.

**Section 3.04    Resignation.** Any director may resign at any time by notice given in writing or by electronic transmission to the Corporation. Such resignation shall take effect at the date of receipt of such notice by the Corporation or at such later time as is therein specified.

**Section 3.05    Removal.** During such time as the Founder Stockholder holds at least 5% of the issued and outstanding shares of the Corporation, the Founder Director shall have the exclusive right to remove any director, with or without cause. If the Founder Stockholder ceases to own at least 5% of the issued and outstanding shares of the Corporation, the stockholders entitled to vote in an election of directors may remove any director from office at any time, with or without cause, by the affirmative vote of a majority in voting power of the shares of the Corporation.

**Section 3.06    Fees and Expenses.** Directors shall receive such fees and expenses as the Board of Directors shall from time to time prescribe.

**Section 3.07    Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such times and at such places as may be determined from time to time by the Board of Directors or its chairman.

**Section 3.08    Special Meetings.** Special meetings of the Board of Directors may be held at such times and at such places as may be determined by the chairman or the Chief Executive Officer on at least 24 hours' notice to each director given by one of the means specified in Section 3.11 hereof other than by mail or on at least three days' notice if given by mail. Special meetings shall be called by the chairman or the Chief Executive Officer in like manner and on like notice on the written request of any two or more directors.

**Section 3.09    Telephone Meetings.** Board of Directors or Board of Directors committee meetings may be held by means of telephone conference or other communications equipment by means of which all persons participating in the meeting can hear each other and be heard. Participation by a director in a meeting pursuant to this Section 3.09 shall constitute presence in person at such meeting.

**Section 3.10    Adjourned Meetings.** A majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place. At least 24 hours' notice of any adjourned meeting of the Board of Directors shall be given to each director whether or not present at the time of the adjournment, if such notice shall be given by one of the means specified in Section 3.11 hereof other than by mail, or at least three days' notice if by mail. Any

6

business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

**Section 3.11   Notices.** Subject to Section 3.08, Section 3.10 and Section 3.12 hereof, whenever notice is required to be given to any director by applicable law, the Certificate of Incorporation or these by-laws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such director at such director's address as it appears on the records of the Corporation, facsimile, e-mail or by other means of electronic transmission.

**Section 3.12   Waiver of Notice.** Whenever notice to directors is required by applicable law, the Certificate of Incorporation or these by-laws, a waiver thereof, in writing signed by, or by electronic transmission by, the director entitled to the notice, whether before or after such notice is required, shall be deemed equivalent to notice. Attendance by a director at a meeting shall constitute a waiver of notice of such meeting except when the director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special Board of Directors or committee meeting need be specified in any waiver of notice.

**Section 3.13   Organization.** At each meeting of the Board of Directors, the chairman or, in his or her absence, another director selected by the Board of Directors shall preside. The secretary shall act as secretary at each meeting of the Board of Directors. If the secretary is absent from any meeting of the Board of Directors, an assistant secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the secretary and all assistant secretaries, the person presiding at the meeting may appoint any person to act as secretary of the meeting.

**Section 3.14   Quorum of Directors.** The presence of a majority of the Board of Directors shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board of Directors.

**Section 3.15   Action by Majority Vote.** Except as otherwise expressly required by these by-laws, the Certificate of Incorporation or by applicable law, the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

**Section 3.16   Action Without Meeting.** Unless otherwise restricted by the Certificate of Incorporation or these by-laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all directors or members of such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee in accordance with applicable law.

**Section 3.17   Committees of the Board of Directors.** The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting

7

of the committee. If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board of Directors. Unless the Board of Directors provides otherwise, at all meetings of such committee, a majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Each committee shall keep regular minutes of its meetings. Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III.

## ARTICLE IV
## OFFICERS

**Section 4.01   Positions and Election.** The officers of the Corporation shall be elected by the Board of Directors and shall include a president, a treasurer and a secretary. The Board of Directors, in its discretion, may also elect a chairman (who must be a director), one or more vice chairmen (who must be directors) and one or more vice presidents, assistant treasurers, assistant secretaries and other officers. Any two or more offices may be held by the same person.

**Section 4.02   Term.** Each officer of the Corporation shall hold office until such officer's successor is elected and qualified or until such officer's earlier death, resignation or removal. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors at any time with or without cause by the majority vote of the members of the Board of Directors then in office. The removal of an officer shall be without prejudice to his or her contract rights, if any. The election or appointment of an officer shall not of itself create contract rights. Any officer of the Corporation may resign at any time by giving written notice of his or her resignation to the president or the secretary. Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Should any vacancy occur among the officers, the position shall be filled for the unexpired portion of the term by appointment made by the Board of Directors.

**Section 4.03   The President.** The president shall have general supervision over the business of the Corporation and other duties incident to the office of president, and any other duties as may be from time to time assigned to the president by the Board of Directors and subject to the control of the Board of Directors in each case.

8

**Section 4.04    Vice Presidents.** Each vice president shall have such powers and perform such duties as may be assigned to him or her from time to time by the chairman of the Board of Directors or the president.

**Section 4.05    The Secretary.** The secretary shall attend all sessions of the Board of Directors and all meetings of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform like duties for committees when required. He or she shall give, or cause to be given, notice of all meetings of the stockholders and meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the president. The secretary shall keep in safe custody the seal of the Corporation and have authority to affix the seal to all documents requiring it and attest to the same.

**Section 4.06    The Treasurer.** The treasurer shall have the custody of the corporate funds and securities, except as otherwise provided by the Board of Directors, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the directors, at the regular meetings of the Board of Directors, or whenever they may require it, an account of all his or her transactions as treasurer and of the financial condition of the Corporation.

**Section 4.07    Duties of Officers May Be Delegated.** In case any officer is absent, or for any other reason that the Board of Directors may deem sufficient, the president or the Board of Directors may delegate for the time being the powers or duties of such officer to any other officer or to any director.

## ARTICLE V
## UNCERTIFICATED STOCK & TRANSFERS

**Section 5.01    Uncertificated Stock.** Pursuant to the authority granted by the Delaware Code Title 8 Section 151(f), all shares of stock issued by the Corporation shall be uncertificated, unless otherwise required by law or determined by the Board of Directors. The Corporation shall maintain a record of ownership for all uncertificated shares in accordance with the Delaware General Corporation Law. Upon compliance with appropriate procedures for transferring shares in uncertificated form, the person in whose name shares of stock stand on the books of the Corporation shall be deemed the owner thereof for all purposes as regards the Corporation. The uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock, including the name and address of each stockholder and the number of shares held by each.

**Section 5.02    Transfers of Stock.** Stock of the Corporation shall be transferable in the manner prescribed by law and in these by-laws. Transfers of stock shall be made on the books of the Corporation only by the holder of record thereof, by such person's attorney lawfully constituted in writing. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry

9

showing from and to whom transferred. To the extent designated by the president or any vice president or the treasurer of the Corporation, the Corporation may recognize the transfer of fractional uncertificated shares, but shall not otherwise be required to recognize the transfer of fractional shares.

**Section 5.03   Transfer Agents and Registrars.** The Board of Directors may appoint, or authorize any officer or officers to appoint, one or more transfer agents and one or more registrars.

**ARTICLE VI**
**GENERAL PROVISIONS**

**Section 6.01   Seal.** The seal of the Corporation shall be in such form as shall be approved by the Board of Directors. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise, as may be prescribed by law or custom or by the Board of Directors.

**Section 6.02   Fiscal Year.** The fiscal year of the Corporation shall be determined by the Board of Directors.

**Section 6.03   Checks, Notes, Drafts, Etc.** All checks, notes, drafts or other orders for the payment of money of the Corporation shall be signed, endorsed or accepted in the name of the Corporation by such officer, officers, person or persons as from time to time may be designated by the Board of Directors or by an officer or officers authorized by the Board of Directors to make such designation.

**Section 6.04   Dividends.** Subject to applicable law and the Certificate of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting of the Board of Directors. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Certificate of Incorporation.

**Section 6.05   Conflict with Applicable Law or Certificate of Incorporation.** These by-laws are adopted subject to any applicable law and the Certificate of Incorporation. Whenever these by-laws may conflict with any applicable law or the Certificate of Incorporation, such conflict shall be resolved in favor of such law or the Certificate of Incorporation.

**ARTICLE VII**
**PRIOR BYLAWS SUPERSEDED AND REPLACED; FUTURE AMENDMENTS**

These Amended and Restated Bylaws amend, supersede, restate and replace in their entirety any and all prior bylaws of the Corporation. These by-laws may be amended, altered, changed, adopted and repealed or new by-laws adopted by the Board of Directors. The stockholders may make additional by-laws and may alter and repeal any by-laws whether such by-laws were originally adopted by them or otherwise.

[SIGNATURE PAGE FOLLOWS]

10

4924-9520-6215, v. 1

**IN WITNESS WHEREOF**, the parties hereto have executed these Amended and Restated Bylaws as of the dated signed.

**The Company:**


Applied Minerals, a Delaware corporation


By: _____
     Christopher T. Carney, President

Date:_____

4924-9520-6215, v. 1